FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN - 4 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

October 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>HENRY T. NICHOLAS, III, and<br>WILLIAM J. RUEHLE,<br><br>              Defendants. | SA CR. SA CR 08 - 00139<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy;<br>18 U.S.C. § 1348: Securities<br>Fraud; 18 U.S.C. § 1350(c)(1):<br>False Certification of Financial<br>Reports; 15 U.S.C. §§ 78m(a)(2),<br>78ff, and 17 C.F.R. §§ 240.12b-<br>20, 240.13a-13: False Statements<br>in Reports Filed with the SEC;<br>15 U.S.C. §§ 78m(b)(2)(B), 78ff<br>and 17 C.F.R. § 240.13b2-2:<br>Lying to Accountants; 15 U.S.C.<br>§§ 78m(b)(2)(A), 78m(b)(5),<br>78ff, and 17 C.F.R. § 240.13b2-<br>1: Falsification of Corporate<br>Books and Records; 18 U.S.C.<br>§§ 1341, 1343, 1346: Honest<br>Services Mail and Wire Fraud;<br>and 18 U.S.C. § 2: Aiding and<br>Abetting and Causing an Act To<br>Be Done]<br><br>**UNDER SEAL** |

The Grand Jury charges:

## COUNT ONE

[18 U.S.C. § 371]

[Conspiracy]

I.   INTRODUCTION AND OVERVIEW

    A.   <u>Defendants and Co-conspirators</u>

    1.   At all times relevant to this Indictment, Broadcom Corporation ("Broadcom") was a corporation organized under the laws of the State of California and headquartered in Irvine, California, within the Central District of California.  Broadcom's common stock was listed on the NASDAQ National Market under the symbol "BRCM."

    2.   Defendant DR. HENRY T. NICHOLAS, III, ("NICHOLAS") was Broadcom's co-founder.  Beginning in or before 1998 and continuing until he left the company in January 2003, NICHOLAS was Broadcom's Chief Executive Officer ("CEO").  Beginning in or before 1998 and continuing until in or around May 2003, NICHOLAS was co-chairman of the board of directors at Broadcom.  While he was Broadcom's CEO, NICHOLAS was a corporate officer governed by Section 16 of the Securities Exchange Act of 1934 (a "Section 16 officer").

    3.   At all times relevant to this Indictment, defendant WILLIAM J. RUEHLE ("RUEHLE") was Broadcom's Chief Financial Officer ("CFO"), Assistant Corporate Secretary, and a Section 16 officer.

    4.   At all times relevant to this Indictment, unindicted co-conspirator H.S. was Broadcom's co-founder, Chief Technical Officer, and a Section 16 officer.  H.S. was co-chairman of Broadcom's board of directors beginning in or before 1998 and continuing to in or around May 2003, when he became the sole chairman of the board.

5.    At all times relevant to this Indictment, co-conspirator Nancy Tullos ("Tullos") was Broadcom's Vice-President of Human Resources.

6.    As Section 16 officers and, in the case of NICHOLAS, a member of the board of directors, defendants NICHOLAS and RUEHLE occupied positions of trust and confidence at Broadcom and owed a duty to provide honest services to Broadcom and all of its shareholders.  This duty included, among other things, obligations to be honest with Broadcom's shareholders and board of directors and to avoid self-dealing.

**B.    Broadcom's Use of Stock Options to Increase Compensation**

7.    Stock options give employees the right to buy a share of stock on a future date at a set price, known as the "exercise" or "strike" price.  Typically, when a company grants stock options to an employee, the employee cannot exercise the options until they "vest."  The "vesting period" is the period of time over which all options granted would vest and become exercisable.  When the holder of an option exercises it, he or she purchases the stock from the company at the predetermined exercise price.  Options that have an exercise price equal to the price at which the stock currently is trading in the market (the stock's fair market value) are commonly referred to as being "at-the-money."  Options that have an exercise price below the current trading price are commonly referred to as being "in-the-money."  Options that have an exercise price higher than the current trading price are commonly referred to as being "underwater."

8.    Broadcom designed computer chips that it would usually outsource for manufacture and then sell to its customers.  To design

3

1  these computer chips, Broadcom hired and retained highly skilled

2  engineers, many with advanced and specialized degrees.  Hiring and

3  retaining these skilled engineers was critical to Broadcom's

4  business model.  Broadcom paid less cash compensation than its

5  competitors did for these engineers.  Instead, to attract and retain

6  these employees, Broadcom offered them more stock options than did

7  its competitors.  As such, stock option grants were central to

8  Broadcom's compensation philosophy and its hiring and retention of

9  employees.

10      C.  **Broadcom's Shareholder-Approved Options Granting Policies**

11      9.  In or around early 1998, Broadcom's board of directors and

12  shareholders approved Broadcom's stock option plan.  The stock

13  option plan became effective in 1998, and was later amended by the

14  shareholders to increase the number of options available to be

15  granted.  The stock option plan authorized two separate committees

16  of Broadcom's board of directors to grant stock options.  One

17  committee, known as the Compensation Committee, had "sole and

18  exclusive authority" to grant options to Section 16 officers.  This

19  committee was to be composed of independent non-employee directors.

20  The other committee, known as the Option Committee, was responsible

21  for granting options to all Broadcom employees who were not Section

22  16 officers.

23      10.  The board of directors placed two independent directors on

24  the Compensation Committee and placed defendant NICHOLAS and H.S. on

25  the Option Committee.  NICHOLAS and H.S., as officers and employees

26  of Broadcom, were not eligible to serve on the Compensation

27  Committee and had no authority to grant options to Section 16

28  officers.

**D.   Reporting Requirements And Accounting Principles**

11.   As a company whose stock was publicly traded and registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12 of the Securities Exchange Act of 1934, Broadcom was required to comply with federal laws, regulations, and rules governing the purchase and sale of publicly traded stock and the public reporting of information about the company.  These laws, regulations, and rules are designed to protect members of the investing public by, among other things, ensuring that a company's financial information is accurately recorded and disclosed to the public.

12.   Broadcom was required to file with the SEC quarterly reports on Form 10-Q, annual reports on Form 10-K, and proxy statements.  These reports were required to include financial statements that accurately presented the company's financial condition and results of its business operations.

13.   Under the federal securities laws, Broadcom was required to have an outside auditor conduct an annual audit of Broadcom's financial statements.  At all times relevant to this Indictment, Broadcom's outside auditor was Ernst & Young ("EY").  As Broadcom's outside auditor, EY conducted annual audits and quarterly reviews of Broadcom's financial statements, and assisted Broadcom in preparing its quarterly and annual filings with the SEC.  As part of EY's quarterly reviews and annual audits, EY's auditors regularly reviewed Broadcom's books and records.

14.   In accounting for stock option grants to its employees, Broadcom was not required to, and did not, recognize any compensation expenses for option grants made "at-the-money," that

1  is, with an exercise price equal to the fair market value of the

2  stock on the grant date.  On the other hand, Broadcom was required

3  to recognize compensation expenses for option grants made "in-the-

4  money," that is, with an exercise price below the fair market value

5  on the date of the grant.  Similarly, when Broadcom lowered the

6  strike price of options already granted, it was required to

7  recognize compensation expenses.  Broadcom was required to report

8  option-related compensation expenses as a charge against earnings.

9  Such charges reduce Broadcom's publicly reported net income on its

10  financial statements.

11     E.   **Overview of Fraudulent Scheme**

12     15.  Beginning in or around 1999 and continuing until at least

13  in or around 2005, defendants NICHOLAS and RUEHLE (collectively

14  "defendants"), together with others known and unknown to the Grand

15  Jury, engaged in a fraudulent scheme and conspiracy to disguise,

16  conceal, understate, and mischaracterize compensation expenses

17  Broadcom was required to recognize in connection with its stock

18  options.  In particular:

19          a.   Defendants and their co-conspirators backdated stock

20  option grants by selecting option grant dates in the past when the

21  stock had a price lower than the current market price.  Defendants

22  and their co-conspirators falsely claimed to Broadcom's auditors and

23  shareholders that the option grants were made "as of" the earlier

24  date so that the strike price appeared to be set at fair market

25  value on the date of the grant.  (Hereinafter referred to as

26  "backdated options").

27          b.   When Broadcom's stock price declined over time,

28  defendants and their co-conspirators caused previously-granted

options to be repriced.  Defendants and their co-conspirators
pretended the earlier grants and subsequent repricing had not
occurred, falsely claiming to Broadcom's auditors and shareholders
that the option grants were made, for the first time, "as of" the
repricing date.  (Hereinafter referred to as "repriced options").

c.   As a result of these fraudulent and deceptive
practices and others, defendants and their co-conspirators caused
Broadcom to grant tens of millions of backdated in-the-money and
repriced options to Broadcom employees and Section 16 officers
without publicly reporting the required compensation expense.  To
facilitate this scheme, defendants and their co-conspirators falsely
claimed to Broadcom's investors and auditors that these options were
not backdated or repriced, and were granted in real-time and at-the-
money.

d.   By fraudulently backdating and repricing option
grants, defendants and their co-conspirators deceived Broadcom's
shareholders, potential shareholders, and auditors as to the nature
and amount Broadcom truly was compensating its employees and
officers.

16.   During the time period of the fraudulent scheme, defendant
NICHOLAS sold more than $1 billion of his Broadcom stock.  As part
of the scheme, defendant RUEHLE was granted Broadcom options that
were millions of dollars in-the-money at the time of their grant.

17.   As a consequence of defendants' fraudulent scheme, in or
around January 2007, Broadcom restated its financial reports for
1998 to 2005, to recognize, for the first time, over $2.2 billion in
additional stock-based compensation expense.

## II.   OBJECTS OF THE CONSPIRACY

18.   Beginning on a date unknown to the Grand Jury but as early as in or around January 1999, and continuing to at least in or around 2005, within the Central District of California and elsewhere, defendants NICHOLAS and RUEHLE, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offenses:

a.   securities fraud, by knowingly and willfully, directly and indirectly, in connection with the purchase and sale of Broadcom securities, (1) employing a device, scheme, and artifice to defraud; (2) making and causing others to make untrue statements of material fact, and omitting and causing others to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business that operated and would operate as a fraud and deceit upon the purchasers or Broadcom securities, and using the means and instrumentalities of interstate commerce in furtherance of such acts and omissions, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

b.   filing false reports with the SEC, by knowingly and willfully making untrue, false, and misleading statements of material fact in annual reports on SEC Form 10-K, quarterly reports on SEC Form 10-Q, and proxy statements, which were required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a)(2), 78n, and 78ff, and Title 17, Code of

1 Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-13, and

2 240.14a-9;

3       c.   accounting fraud, by knowingly and willfully

4 falsifying Broadcom's books and records, in violation of Title 15,

5 United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff, and

6 Title 17, Code of Federal Regulations, Section 240.13b2-1;

7       d.   lying to Broadcom's outside auditor, EY, by knowingly

8 and willfully making and causing to be made materially false and

9 misleading statements to EY in connection with its audits of

10 Broadcom's financial statements and the preparation of the annual

11 reports required to be filed with the SEC on Forms 10-K and

12 quarterly reports required to be filed with the SEC on Forms 10-Q,

13 in violation of Title 15, United States Code, Sections 78m(b)(2)(B)

14 and 78ff, and Title 17, Code of Federal Regulations, Section

15 240.13b2-2; and

16       e.   honest services mail and wire fraud, by using the

17 United States Postal Service or commercial interstate carrier and

18 interstate wires to knowingly and intentionally deprive Broadcom and

19 its shareholders of the honest services of defendants by

20 transferring shareholder value and granting backdated and repriced

21 in-the-money options to defendant RUEHLE and others, which was not

22 disclosed as required to Broadcom's shareholders, in violation of

23 Title 18, United States Code, Sections 1341, 1343, 1346, and 2.

24 ///

25 ///

26 ///

27 ///

28 ///

## III. MANNER AND MEANS OF THE CONSPIRACY

19.   The objects of the conspiracy were carried out, and were to be carried out, in part, as follows:

A.   **General Fraudulent Options Practices From 1999 to 2002**

20.   Defendants NICHOLAS and RUEHLE, and others, set strike prices for option grants by looking at the past closing prices of Broadcom's stock and selecting a price lower than the current stock price.   Defendants and others then granted in-the-money options with these lower strike prices.   To make it appear that these in-the-money grants were made at-the-money, defendants and others falsely claimed that the Option Committee met on these past dates and granted at-the-money options.   In particular:

a.   Defendant RUEHLE had a subordinate send him a list of the past closing prices for Broadcom's stock, typically closing prices on Fridays, the day the Option Committee ordinarily was supposed to meet;

b.   Defendant RUEHLE selected a favorable past date and stock price from the list that was provided to him;

c.   Defendant RUEHLE directed a subordinate to create fraudulent corporate records for the signature of the Option Committee members memorializing the grant; and

d.   the fraudulent corporate records were signed by defendant NICHOLAS and H.S. as the Option Committee.

21.   Defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, also repriced options to more favorable strike prices without taking required compensation expenses.

22.   Defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, circumvented Broadcom's Compensation

Committee to backdate and reprice options without obtaining the Compensation Committee's contemporaneous permission.  Because Broadcom's Compensation Committee was unwilling to backdate and reprice options, NICHOLAS, RUEHLE, and others determined the numbers of options to grant to Section 16 officers, selected the grant dates after the fact based on favorable strike prices, and caused the Compensation Committee members to be provided with corporate documents fraudulently reflecting that the Compensation Committee had authorized the grants "as of" the retroactively selected grant dates.

23.  Defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, circumvented Broadcom's option plan and fraudulently concealed and mischaracterized expenses relating to option grants made to newly hired Broadcom employees by falsely making it appear that the employees were hired to work at a company that Broadcom was acquiring.

24.  Using the procedures described above, defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, knowingly created and caused to be created fraudulent corporate records that made it appear as though Broadcom's Option Committee had met and granted non-repriced, at-the-money, options on March 5, 1999, April 23, 1999, May 7, 1999, May 14, 1999, May 25, 1999, May 28, 1999, June 1, 1999, June 4, 1999, September 30, 1999, October 22, 1999, December 3, 1999, December 10, 1999, December 17, 1999, December 23, 1999, January 28, 2000, March 1, 2000, April 14, 2000, June 16, 2000, June 23, 2000, July 28, 2000, December, 21, 2000, October 1, 2001, October 19, 2001, December 24, 2001, July 3, 2002,

August 5, 2002, October 18, 2002, November 8, 2002, and December 27, 2002.

25.   Using the procedures described above, defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, knowingly created and caused to be created fraudulent corporate records that made it appear as though Broadcom's Compensation Committee had met and granted at-the-money options on October 19, 2001, December 24, 2001, and August 5, 2002.

**B.   Specific Fraudulent Option Practices in 1999**

    **1.   The M.N. New Hire Grant**

26.   On or about May 26, 1999, H.S. emailed co-conspirator Tullos and another Broadcom senior executive asking whether Broadcom should make an offer of employment to engineer M.N.  On or about May 27, 1999, Tullos responded, informing H.S. she was going to set up an interview between M.N. and defendant NICHOLAS.

27.   In or around June 1999, after interviewing M.N., defendant NICHOLAS hired M.N. and agreed with M.N. that he would receive a grant of options with a strike price of $88.375, equal to Broadcom's closing stock price on May 25, 1999.

28.   In or around July 1999, after he began working for Broadcom, M.N. discovered that his new hire options were shown by Broadcom's online option system as having a grant date of Friday, May 28, 1999, with a strike price of $95.75, the closing stock price on that day.

29.   On or about July 15, 1999, M.N. sent an email to complain about his option's strike price.  M.N. demanded that the strike price for his new hire options be altered to reflect the more

favorable May 25, 1999 grant date and strike price, in accordance with his agreement with defendant NICHOLAS.

30. On or about July 15, 1999, a Broadcom employee responsible for documenting options emailed a number of Broadcom executives, including defendant RUEHLE and Tullos, that RUEHLE had instructed that M.N.'s "5/28 grant date is not to be changed" because options were granted "only as of the Friday close for employees who began work that week. We do not single out individuals to be granted options on their hire dates."

31. On or after July 19, 1999, after further discussion between defendant RUEHLE, Tullos, and others, RUEHLE and others repriced M.N.'s new hire options to reflect the earlier and more favorable grant date of May 25, 1999 with a strike price of $88.375, the closing stock price on that day.

32. On or after July 19, 1999, defendant NICHOLAS and H.S. signed Broadcom corporate records fraudulently reflecting that the new hire grant of 120,000 options to M.N. had been made on May 25, 1999, with a strike price of $88.375. In fact, these options were granted by NICHOLAS, RUEHLE, and others after May 25, 1999, and were in-the-money at the time of their actual grant as well as when they were repriced. With respect to this backdated, in-the-money, and repriced grant, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

> 2. **The Maverick, Epigram, and Armedia "Top Up" Grants**

33. Broadcom grew by acquiring other companies that had developed, or were developing, technology of interest to Broadcom. It was important for Broadcom to retain the senior executives of the

companies it acquired.  To accomplish this, Broadcom granted its options to senior executives and other employees of the acquired companies who became Broadcom employees.  These grants of options were referred to as "top up" grants because they were intended to make the equity positions of employees who came to Broadcom through acquisitions comparable to those of existing Broadcom employees of the same level.  Defendant NICHOLAS personally determined the number of top up options Broadcom granted to senior executives of most companies Broadcom acquired.

34.  In or around the end of May 1999, Broadcom acquired companies named "Maverick," "Epigram," and "Armedia."  After Broadcom acquired Maverick, Epigram, and Armedia, it made top up grants of Broadcom options to employees of those companies who became Broadcom employees.

35.  As of June 18, 1999, defendant NICHOLAS still had not approved the top up options that Broadcom was going to grant to former Maverick, Epigram, and Armedia employees.

36.  On or after June 18, 1999, defendant NICHOLAS and H.S. signed corporate records reflecting a June 1, 1999, grant of 3,279,428 options, all with a strike price of $93.0625, Broadcom's closing stock price on that day.  This grant included the top up grants for former Armedia, Epigram, and Maverick employees.  These top up grants purportedly made at-the-money on June 1, 1999, were, in fact, backdated by NICHOLAS, RUEHLE, and others, and were in-the-money at the time they were granted.  With respect to these backdated in-the-money grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS,

1   RUEHLE, and others caused Broadcom not to recognize or report

2   compensation expenses.

3              3.   **The Altocom and Hot Haus "Top Up" Grants**

4       37.  On or about August 31, 1999, Broadcom completed its

5   acquisition of companies called "Altocom" and "Hot Haus."  On or

6   about September 8, 1999, defendant RUEHLE told a subordinate

7   responsible for documenting options that the Option Committee had

8   met on September 2, 1999, and granted top up options to former Hot

9   Haus and Altocom employees

10      38.  After September 8, 1999, Broadcom's share price fell.  On

11   or about October 6, 1999, defendant RUEHLE informed a subordinate

12   responsible for documenting options that the Option Committee had

13   "met and approved" option grants, which included the top up grants

14   to former Hot Haus and Altocom employees, "effective" September 30,

15   1999, with a strike price corresponding to Broadcom's closing price

16   on September 30, 1999, which was the lowest closing price of the

17   third quarter of 1999.

18      39.  Although defendant RUEHLE backdated the grant to October

19   6, 1999, NICHOLAS had still not determined the number of top up

20   options that Broadcom was going to grant to former Altocom and

21   HotHaus employees.

22      40.  On or after October 7, 1999, defendant NICHOLAS and H.S.

23   signed corporate records reflecting a September 30, 1999, grant of

24   1,605,127 options, all with a strike price of $109, Broadcom's

25   closing price on that day.  This grant included the top up grants

26   for former Altocom and Hot Haus employees.  These top up grants

27   purportedly made on September 30, 1999, were, in fact, backdated

28   NICHOLAS, RUEHLE, and others, had been repriced, and were in-the-

1  money at the time they were granted.  With respect to these
2  backdated, repriced in-the-money grants, despite rules requiring the
3  recognition and reporting of compensation expenses, NICHOLAS,
4  RUEHLE, and others caused Broadcom not to recognize or report
5  compensation expenses.

6  　　　　　　**4.　The October 22, 1999 Special Grant**

7  　　　41.  On October 22, 1999, Broadcom's share price closed at
8  $113.25.  On November 4, 1999, Broadcom's share price closed at
9  $150.63.  On December 31, 1999, the end of the quarter and the end
10  of Broadcom's fiscal year, Broadcom's closing share price was
11  $272.38 - more than double the October 22, 1999 closing price.

12  　　　42.  On or about November 4, 1999, defendant RUEHLE determined
13  that October 22, 1999, would be the claimed grant date for an option
14  grant, due to the low closing price on that date.  Because October
15  22, 1999, was such a favorable strike price, NICHOLAS, RUEHLE, and
16  H.S. continued to increase the number of options purportedly granted
17  on October 22, 1999, into the next year.

18  　　　43.  On or about January 10, 2000, defendant RUEHLE provided
19  defendant NICHOLAS with a spreadsheet of the option positions of
20  Broadcom's "directors & above" so that NICHOLAS could grant them
21  additional options at the favorable October 22, 1999 strike price.
22  RUEHLE cautioned NICHOLAS that he had to "act quickly" if he wished
23  to make additional grants at this favorable strike price.

24  　　　44.  On or after January 10, 2000, defendant NICHOLAS and H.S.
25  signed corporate records reflecting an October 22, 1999, grant of
26  1,362,600 options, all with a strike price $113.25, Broadcom's
27  closing stock price on that day.  Some or all of the options
28  purportedly granted on this date were, in fact, granted by NICHOLAS,

RUEHLE and others after that date, and were in-the-money at the time
of their actual grant.  With respect to these in-the-money grants,
despite rules requiring the recognition and reporting of
compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom
not to recognize or report compensation expenses.

     5. **The Preparation and Filing of a Materially False 10-K**

   45. On or about January 18, 2000, defendants NICHOLAS and
RUEHLE, and others known and unknown to the Grand Jury, made
representations to EY in connection with Broadcom's 1999 audit and
10-K.  NICHOLAS, RUEHLE, and others represented and caused to be
represented to EY that Broadcom had "no material transactions that
have not been properly recorded in the accounting records underlying
the financial statements" and that Broadcom's financial statements
were in compliance with generally accepted accounting principles.
NICHOLAS, RUEHLE, and others also represented and caused to be
represented to EY that Broadcom had "no material weaknesses in
internal control" and that there was "no fraud involving management
or employees who have significant roles in internal control."  In
fact, as NICHOLAS, RUEHLE, and others knew, these representations
were false and materially misleading in that NICHOLAS, RUEHLE, and
others had caused options to be granted in-the-money by
retroactively selecting grant dates, had repriced options after the
fact to reduce their previously-designated strike prices, and had
caused Broadcom to fail to recognize or report compensation expenses
that should have been recognized and reported as the result of these
option practices.

   46. On or about March 30, 2000, Broadcom filed its 1999 10-K
with the SEC.  The SEC filing, approved by defendants NICHOLAS and

RUEHLE, and others known and unknown to the Grand Jury, materially understated the amount of compensation expenses that Broadcom was required to take for grants of backdated in-the-money and repriced options during 1999.

### C. Specific Fraudulent Option Practices in 2000

#### 1. The March 1, 2000 Grant

47. On or about March 16, 2000, defendant RUEHLE told a Broadcom employee responsible for documenting options that he was going to wait to see what Broadcom's closing stock price would be on March 17, 2000, and that if Broadcom's closing stock price on March 17, 2000, was higher than the closing price on March 1, 2000, then Broadcom would select an options grant date of March 1, 2000.

48. Broadcom's closing stock price on March 17, 2000, was higher than the closing price on March 1, 2000.

49. On or after March 17, 2000, defendant NICHOLAS and H.S. signed corporate records reflecting a March 1, 2000 grant of 3,134,564 options, all with a strike price of $206, Broadcom's closing stock price on that day. Some or all of the options purportedly granted on this date were, in fact, granted by NICHOLAS, RUEHLE, and others, after that date, and were in-the-money at the time of their actual grant. With respect to these backdated in-the-money grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

#### 2. The May 26, 2000 Focal Grant

50. In 2000, Broadcom changed its procedure for granting options to existing employees. Instead of granting options to existing employees on the anniversary dates of their hire, Broadcom

adopted what was known as a "focal" grant process under which Broadcom granted options to all existing employees at the same time based on their performance.

51.   Broadcom's first company-wide focal grant of options was purportedly made on May 26, 2000.  This grant ultimately included 7,098,811 options granted to employees by the Option Committee and 550,000 options granted to section 16 officers by the Compensation Committee.  All of these options were granted with a strike price of $118.375, which was Broadcom's closing stock price on May 26, 2000.

52.   During the summer of 2000, EY expressed concerns to Broadcom that the May 26, 2000 grant was not properly handled.

53.   Defendants NICHOLAS and RUEHLE were alerted to EY's concerns and informed that Broadcom might have to take a $700 million compensation charge for the May 26, 2000 grant.  RUEHLE informed NICHOLAS that he was not "about to let that happen" and instructed his finance staff that Broadcom had to "win this one" with EY.

54.   In order to "win this one" with EY, defendant RUEHLE and others at Broadcom falsely told EY that on May 26, 2000, Broadcom's Option Committee had (a) authorized a fixed number of options to be granted and (b) approved a "program" or "plan" establishing a set "Guideline Matrix" by which individual employees were subsequently granted specific numbers of these available options based on a formula.

55.   To support these false claims to EY, RUEHLE directed his finance staff to create a set of false documents that purported to provide contemporaneous evidence of the May 26, 2000 grant, as well as the purported "program" or "plan."  These false documents

19

1 included false minutes of an Option Committee meeting that

2 purportedly took place on May 26, 2000, and approved a grant of 7

3 million options and a "Guideline Matrix" for distributing these

4 options to individual employees, as well as other false documents.

### 3.   The Pivotal "Top Up" Grant

56.   On or about July 10, 2000, defendant RUEHLE informed a subordinate that the grant date for a portion of the top up grants connected with Broadcom's acquisition of a company called "Pivotal" would be June 1, 2000, with a strike price of $144.63, the closing stock price for Broadcom on that date.  Defendant NICHOLAS, however, instructed Tullos that four key Pivotal executives were to be issued options with a grant date of May 26, 2000, and a strike price of $118.37, the closing stock price for Broadcom on that date.

57.   A Broadcom employee responsible for documenting options raised concerns with defendant RUEHLE and others that a May 26, 2000 grant date for the four Pivotal executives would be problematic because it pre-dated the acquisition of Pivotal.

58.   On or about July 13, 2000, defendant RUEHLE caused Broadcom to abandon the June 1, 2000 grant date, and instead issue these four Pivotal executives options with a June 16, 2000 grant date, and a strike price of $144.00, Broadcom's closing stock price on that date.

59.   Because the June 16, 2000 strike price was inferior to the May 26, 2000 strike price the Pivotal executives expected, defendant NICHOLAS agreed to make up the difference by granting additional in-the-money options to these four executives backdated to the June 16, 2000, strike price.

60.   On or after July 16, 2000, defendant NICHOLAS and H.S. signed corporate records reflecting a June 16, 2000, grant of 2,173,650 options, all with a strike price of $144, Broadcom's closing stock price on that day.  This grant included the top up grants for former Pivotal employees.  These top up grants purportedly made on June 16, 2000, were, in fact, backdated by NICHOLAS, RUEHLE, and others, and were in-the-money at the time they were granted.  With respect to these backdated in-the-money options, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

### 4.   The U.E. Grant

61.   On or after September 18, 2000, defendant NICHOLAS and H.S. signed corporate records reflecting a July 28, 2000, grant of 725,400 options, all with a strike price of $213.063, Broadcom's closing price on that day.  These grants were backdated by NICHOLAS, RUEHLE, and others and were already in-the-money at the time they were made.  With respect to these backdated in-the-money grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

62.   The options purportedly granted on July 28, 2000, originally included 35,000 new hire options issued to U.E.  On July 28, 2000, U.E. was not yet employed by Broadcom.  Broadcom was required to recognize compensation expense for options granted to non-employees like U.E., whether or not they were made at-the-money.

63.   By December 2000, Broadcom's share price had declined over thirty percent since July, leaving options with a July 28, 2000

21

1  strike price "underwater." At the request of other Broadcom
2  executives, after the end of 2000, defendant RUEHLE and others
3  removed U.E. from the July 28, 2000 grant of options and added him
4  to the December 21, 2000 grant of options so that his options would
5  be in-the-money. Despite rules requiring the recognition and
6  reporting of compensation expenses, at RUEHLE's direction, Broadcom
7  took no compensation expense for granting U.E. in-the-money and
8  repriced options.

9       **5.   The M.N. Payoff**

10      64.   In late October 2000, Broadcom terminated M.N.'s
11  employment. According to the terms of M.N.'s option agreement, the
12  termination of his employment caused his Broadcom options to cease
13  to vest.

14      65.   In or around November 2000, M.N.'s attorney provided
15  defendants NICHOLAS and RUEHLE, and others, with a draft complaint
16  that alleged, among other things, that Broadcom backdated M.N.'s
17  employment documents to enable it to issue him in-the-money options,
18  concealed from EY its practice of backdating and issuing in-the-
19  money options, artificially inflated its earnings by backdating and
20  issuing in-the-money options without taking compensation expenses,
21  and failed to disclose this information in its periodic filings with
22  the SEC.

23      66.   On or about January 17, 2001, after receiving this draft
24  complaint, defendant NICHOLAS met personally with M.N. at a hotel in
25  Orange County. NICHOLAS pleaded with M.N. not to come forward with
26  his allegations, and offered to have Broadcom vest approximately 85%
27  of M.N.'s outstanding options. At the time of the meeting with

28

1  NICHOLAS, this settlement offer was worth over $7 million dollars to

2  M.N.

3      67.  M.N. accepted defendant NICHOLAS's offer and agreed to

4  keep his allegations of backdating and issuing in-the-money options,

5  as well as the other allegations in his draft complaint,

6  confidential.

7      68.  Defendants NICHOLAS and RUEHLE, and others, did not

8  disclose M.N.'s allegations regarding backdating and issuance of in-

9  the-money options to EY or to Broadcom's outside directors.

10          6.   **The K.V. Hiring Grant**

11      69.  On or about August 6, 2000, Broadcom entered into an

12  agreement to acquire a company called Newport Communications,

13  located in Newport Beach, California.

14      70.  In or around this same time period, Broadcom was seeking

15  to hire a Chief Information Officer ("CIO"), a senior position at

16  Broadcom.  Defendants NICHOLAS and RUEHLE interviewed K.V. for the

17  position and decided to hire him.  To induce K.V. into accepting

18  Broadcom's employment offer, RUEHLE offered K.V. options that were

19  approximately $10 million in-the-money.  K.V. accepted the offer and

20  came to work at Broadcom in September 2000.

21      71.  Defendant RUEHLE and others created and caused to be

22  created false documents stating that K.V. had been hired as an

23  employee of Newport Communications, when in truth and in fact, as

24  RUEHLE and others knew, K.V. was hired solely to be the CIO at

25  Broadcom and never worked at Newport Communications.  In connection

26  with K.V.'s purported hiring by Newport Communications, RUEHLE and

27  others caused Newport Communications to grant K.V. 600,000 Newport

28  Communications stock options, which ultimately converted to in-the-

1 money Broadcom options once the companies merged.  At the time

2 Broadcom completed its acquisition of Newport Communications, K.V.'s

3 options converted to Broadcom options that were approximately $10

4 million in-the-money.

5     72.   When Broadcom converted the outstanding Newport

6 Communications options, such as the options issued to K.V., to

7 Broadcom options, Broadcom took a one-time acquisition-related

8 compensation expense for the amount the Newport options were in-the-

9 money at the time the acquisition closed.  Acquisition-related

10 expenses, in contrast to expenses relating to hiring and retaining

11 employees, were non-recurring, and discounted by some investors and

12 analysts.

13     73.   Defendant RUEHLE and others knew that falsely claiming

14 that K.V. was hired by Newport Communications, and then causing

15 Newport Communications, instead of Broadcom, to grant him options,

16 would circumvent Broadcom's shareholder-approved option plan and

17 would fraudulently recharacterize compensation expense from those

18 options as a non-recurring acquisition expense.

19     7.   **The Preparation and Filing of a Materially False 10-K**

20     74.   On or about March 30, 2001, defendants NICHOLAS and

21 RUEHLE, and others, made representations to EY in connection with

22 Broadcom's 2000 audit and 10-K.  NICHOLAS, RUEHLE, and others

23 falsely told EY that Broadcom had "no material transactions that

24 have not been properly recorded in the accounting records underlying

25 the financial statements" and that Broadcom's financials were in

26 compliance with generally accepted accounting principles.  NICHOLAS,

27 RUEHLE, and others also falsely represented to EY that Broadcom had

28 "no material weaknesses in internal control" and that there was "no

1  fraud involving management or employees who have significant roles
2  in internal control."  In fact, as NICHOLAS, RUEHLE, and others
3  knew, these representations were false and materially misleading in
4  that NICHOLAS, RUEHLE, and others had caused options to be granted
5  in-the-money by retroactively selecting grant dates, had repriced
6  options to reduce their strike prices, had fraudulently issued an
7  employee hired by Broadcom options in a company acquired by Broadcom
8  despite the fact that this employee had never been hired by or
9  worked for that acquired company, and had caused Broadcom to fail to
10 recognize or report compensation expenses that should have been
11 recognized and reported as the result of these option practices.

12      75.  On or about April 2, 2001, Broadcom filed its 10-K with
13 the SEC for 2000.  The SEC filing, approved by defendants NICHOLAS
14 and RUEHLE, and others, materially understated the amount of
15 compensation expenses that Broadcom was required to take for grants
16 of in-the-money, repriced, and otherwise fraudulent options during
17 2000.

18      D.   **Specific Fraudulent Option Practices in 2001**

19           1.   **The Abandoned January 2, 2001, "Top Up" Grant and**
20                **"Double-Up and Cancel" Proposal**

21      76.  By late 2000 and into 2001, Broadcom's stock price was in
22 decline.  This decline left many Broadcom employees with options
23 that were underwater.  As a result, certain employees whose options
24 no longer provided an incentive to remain at Broadcom considered
25 leaving their positions at Broadcom.

26      77.  On or about January 29, 2001, defendants NICHOLAS and
27 RUEHLE, and others, agreed to provide a top up grant to many of
28 those Broadcom employees whose options were underwater.  The top up

1  grant was to be backdated to January 2, 2001, which had a more

2  favorable strike price ($76.12) than January 29, 2001 ($110.25).

3      78.  In addition to doing a top up grant, defendant NICHOLAS

4  wished to provide special compensation to certain senior managers

5  whose options were underwater.  NICHOLAS directed Tullos to identify

6  candidates for a "double-up and cancel" of options, wherein

7  executives would be granted additional Broadcom options in exchange

8  for an undocumented, oral side agreement that they would not

9  exercise certain options that had already been granted.  The

10  agreement was to be undocumented so that EY did not learn of it and

11  force Broadcom to recognize a compensation expense for

12  constructively repricing the options the executives agreed not to

13  exercise.

14      79.  On or about January 30, 2001, defendant RUEHLE instructed

15  Tullos to inform defendant NICHOLAS that the "double-up and cancel"

16  proposal was not a good idea.  RUEHLE stated: "If we get too cute

17  E&Y will blow the whistle on our whole program."  RUEHLE expressed

18  his concern over the possibility that an executive might disclose or

19  threaten to disclose the undocumented side agreement necessary to

20  accomplish the "double-up and cancel" program, stating: "in the

21  unlikely event we have someone in our midst with [M.N.]-like

22  tendencies, we're screwed."  RUEHLE instructed Tullos to convey to

23  NICHOLAS his "serious reservations about killing the golden goose."

24      80.  Broadcom then abandoned the "double-up and cancel"

25  proposal.

26      81.  Throughout February 2001, Broadcom's stock price continued

27  to decline, in mid-February reaching a price below the January 2,

28  2001, price.  As a result, in mid-February 2001, defendant RUEHLE

1  abandoned the plan for doing a top up grant backdated to January 2,
2  2001.

### 2.   The June 24, 2001 Grant and Tender Offer

4        82.   Faced with a stock price that continued to decline,
5  defendants NICHOLAS and RUEHLE, and others, continued to search for
6  a way to address the issue of underwater options.  Ultimately, after
7  consulting with both EY and accounting firm Arthur Andersen to
8  determine that Broadcom would not be required to recognize
9  compensation expenses as a result, NICHOLAS and RUEHLE decided that
10 Broadcom would conduct a tender offer.  The tender offer allowed
11 employees to elect to tender their existing options to Broadcom in
12 exchange for the promise that Broadcom would grant them the same
13 number of options between six months and a day and seven months
14 later with a strike price set at Broadcom's closing share price on
15 the date they received their new options.  Because the tendering
16 employees would bear the market risk that during the six to seven
17 month period between their tender and the subsequent grant
18 Broadcom's shares could either continue to decline in price
19 (resulting in their new options having a more favorable strike
20 price) or might increase in price (resulting in their new options
21 having a less favorable strike price), the tender and subsequent
22 grant was not considered a repricing and would not require Broadcom
23 to recognize compensation expenses.

24       83.   In conjunction with the June 24, 2001 tender offer,
25 defendants NICHOLAS and RUEHLE determined that Broadcom would
26 conduct a focal grant of options that employees could then either
27 tender or retain.  Employees who elected not to tender would receive
28 a supplemental grant of options.  This grant was made "as of"

Sunday, June 24, 2001 with a strike price of $33.83, the closing price on the previous Friday, June 22, 2001.

84.   As of the end of August 2001, defendant NICHOLAS had not yet determined the option grants for employees who reported to him who were supposed to receive the June 22, 2001 strike price.   On August 24, 2001, Tullos told NICHOLAS, "We are totally out of time for shareholder services to hold the $33.83 stock price for the focal grants to your staff . . . ."   NICHOLAS wanted more time to make his determination, and asked Tullos if Broadcom could set aside options and later determine the specific employees to receive those options.   Tullos responded: "Bill R. left me voice mail that we cannot hold aside an aggregate number of options with the optionees to be defined later.   So I really need the CABU [a business unit reporting directly to NICHOLAS] and Executive staff numbers if they are going to be included in the June 22nd grant at $33.68.   We have not had a Friday since June 22nd where the stock has closed lower."

85.   By mid-September 2001, defendant NICHOLAS still had not determined which employees who reported to him would be granted options with the June 22, 2001 strike price.   Broadcom's stock price had continued to decline and had reached a price below the June 22, 2001 strike price.   As a result, NICHOLAS abandoned the plan for granting these employees options with the June 22, 2001 strike price.

### 3.   The October 1, 2001 Grant

86.   By October 1, 2001, after continuing to decline, Broadcom's stock price hit $18.77, which was Broadcom's lowest stock price during all of 2001.

87.   On November 1, 2001, a senior Broadcom executive who reported to defendant NICHOLAS wrote him to complain that he had "never seen anything from you on focal grants."  NICHOLAS responded, falsely claiming that the Option Committee had met and granted options on October 1, 2001: "I had shares set aside to be granted, however, since I saw the stock going down, and, since I knew you were not going to exercise the regrant option, I decided to keep our 'powder dry.'  The stock option committee met on October 1st, the first day of this quarter.  Our stock closed at $18.77 on that day. I need to check my notes to see what was granted to You, Ed, and Jack."

88.   In fact, no grants were granted by the Option Committee on October 1, 2001, as defendant NICHOLAS falsely claimed.  On November 12, 2001, H.S. advised NICHOLAS and Tullos that "we are about to do some additional stock grants for key people" and requested that Tullos provide him with "the spreadsheet you are working on for Nick as soon as it is ready."  (At Broadcom, NICHOLAS was often referred to as "Nick.")  The spreadsheet to which H.S. referred was a spreadsheet showing proposed grants to the employees for which NICHOLAS was responsible, which included "Ed" and "Jack," two of the individuals referenced in NICHOLAS's November 1, 2001 email. Thereafter, on November 28, 2001, Tullos advised RUEHLE that she and H.S. "spent 4.5 hours on his jet last night working on the option grants while flying to Delaware.  We spent another hour on the tarmac, but we finished!".

89.   On November 14, 2001, Tullos had advised defendant NICHOLAS that she had "unofficially 'reserved' 2M options, including focal grants for your direct reports" to be granted with an October

1, 2001 strike price.  On November 30, 2001, however, RUEHLE advised NICHOLAS that he add one million additional shares to the October 1, 2001 grant, stating "It's ok to go to 3M shares for the option grants."

90.  Throughout November and December 2001, defendant RUEHLE, H.S., Tullos, and others continued to work on determining which employees would be granted options with the October 1, 2001 strike price, and how many options each of these employees would receive. They also continued to seek NICHOLAS's approval for their various proposals, which were set forth in spreadsheets.  In an email sent on December 27, 2001, and copied to H.S. and RUEHLE, Tullos advised NICHOLAS that "Bill said today that tomorrow (Friday, the 28th) is the absolute deadline to get these options granted at the $18.77 strike price."

91.  Defendant NICHOLAS did not approve the proposals for October 1, 2001 grants provided to him by H.S. and Tullos until January 2002.  On January 1, 2002, Tullos advised RUEHLE that NICHOLAS "called me on Saturday night [and] promised me that he would send me the final 10/1 list by today.  I guess we still have a few hours!!"  NICHOLAS provided Tullos with the promised list on January 2, 2002, in an email, copied to H.S., with the subject line "I found my old share grant spreadsheet from before October" which falsely stated, "Attached is the spreadsheet that I developed at the option meeting months ago."  In fact, the attached spreadsheet could not have been created "before October" as NICHOLAS claimed.  The attached spreadsheet also increased the total number of options to be granted to slightly in excess of 3 million and added new grantees.

92.   After receiving defendant NICHOLAS's revisions to the October 1, 2001 grant, H.S. met with NICHOLAS and they made additional changes to the list.   H.S. then forwarded the purportedly "Final option grant list" for the October 1, 2001 grants to Tullos as an attachment to an email dated January 2, 2002, that was copied to RUEHLE and NICHOLAS.

93.   After receiving the revised list from H.S., Tullos had additional questions that were resolved in a telephone call with defendant NICHOLAS and H.S. on January 7, 2002.   Thereafter, on January 23, 2002, Tullos circulated to NICHOLAS and H.S. the final list of options to be granted with an October 1, 2001, strike price. In this email, Tullos falsely stated, "Nick, I wanted to confirm that I did find the attached option spreadsheets that you sent to me a few months ago.  Bill Ruehle is also aware that I found these." In fact, as NICHOLAS, RUEHLE, H.S., and Tullos knew, the attached spreadsheets were modifications to the spreadsheets that Tullos had been discussing and modifying with NICHOLAS and H.S. throughout December 2001 and January 2002.  In fact, between the beginning of 2002 and January 23, 2002, NICHOLAS, RUEHLE, and others added hundreds of thousands options, backdating them to an October 1, 2001 grant date and corresponding strike price.

94.   Defendant NICHOLAS and H.S. signed corporate records fraudulently reflecting a grant of 5,624,080 options as of October 1, 2001, with a strike price of $18.77, Broadcom's closing price on that day and its lowest closing price during 2001.  Significant numbers of these options purportedly granted on October 1, 2001, were, in fact, backdated by NICHOLAS, RUEHLE, and others, and were in-the-money at the time they were granted.  With respect to these

backdated in-the-money grants, despite rules requiring the
recognition and reporting of compensation expenses, NICHOLAS,
RUEHLE, and others caused Broadcom not to recognize or report
compensation expenses.

### 4. The October 19, 2001 Grant

95. As described above, in early 2002, defendants NICHOLAS and
RUEHLE, and others, were debating what dates, with their
corresponding strike prices, should be used for option grants in the
prior year.  This debate included the dates and strike prices to be
used for grants to Section 16 officers.  These grants, unlike other
grants that Broadcom made, would have their grant date, strike
price, and other information publically disclosed.

96. The debate over options to be granted to Section 16
officers focused in part on where these officers should receive
grants at the June 24, 2001 focal grant strike price afforded most
employees ($33.68), the much more favorable October 1, 2001 strike
price given to a shorter list of favored employees ($18.77), or
somewhere in between.  On or about January 3, 2002, Tullos sent an
email to defendant RUEHLE, H.S., and others regarding the
appropriate price for the Compensation Committee grant to non-
tendering Section 16 officers.  Section 16 officers who tendered
were not eligible for an option grant until at least December 24,
2001.  Tullos wrote: "Just spoke with Nick.  He does NOT want to
grant above market options on October 1st.  He would like to find
another opportunistic date, say $25.55 on 10/5 or $29.25 on 10/19.
He does not see a need to get as close to the $33.68 number as I do.
He is clearly not as sensitive to the employee reaction as I am and
I can't really speak to outside shareholder reaction."

97.  On or about January 3, 2002, H.S. responded, in an email to defendant RUEHLE, Tullos, and others: "OK, then go with the 10/19 price."

98.  Between January 4, 2002, and January 23, 2002, Tullos circulated to defendant NICHOLAS and H.S. for approval a series of spreadsheets reflecting the options to be granted to Section 16 officers with the October 19, 2001 strike price.  Tullos's January 23, 2002 email falsely represented that she had found spreadsheets, including one addressing the October 19, 2001 grant to Section 16 officers, that NICHOLAS sent to her "a few months ago."  In fact, as NICHOLAS, RUEHLE, H.S., Tullos, and others knew, the attached spreadsheet addressing the October 19, 2001 grant to Section 16 officers was a modification of the spreadsheets that Tullos had been discussing and modifying with NICHOLAS and H.S. throughout January 2002.

99.  Pursuant to Broadcom's authorized options plan, grants to Section 16 officers were to be approved by the Compensation Committee, which consisted of two independent directors.  In July 2001, one of the two members of the Compensation Committee died.  As of November 4, 2001, no one had yet been appointed to replace the deceased Compensation Committee member.  On November 4, 2001, defendants NICHOLAS and RUEHLE, H.S., and Tullos were sent an email reminding them that "The Comp Ctte has exclusive jurisdiction for option grants to Section 16 officers.  Accordingly, we cannot make those grants until it is in a position to act."  The replacement member for the Compensation Committee necessary to enable it to act was not formally appointed until some time after January 3, 2002.

100. Defendants NICHOLAS and RUEHLE, and others, caused false corporate documents to be provided to Broadcom's Compensation Committee reflecting a grant of 450,000 options to three Section 16 officers "as of" October 19, 2001 with a strike price of $29.25, Broadcom's closing price on that day.  These options purportedly granted on October 19, 2001 by the Compensation Committee, were, in fact, granted by NICHOLAS, RUEHLE, and others, and ultimately approved by the Compensation Committee, after October 19, 2001, and were in-the-money at the time they were granted and approved.  With respect to these in-the-money grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

5.   **The December 24, 2001 Grant and Tender Offer Re-Grant**

101. Under the terms of the tender offer, December 24, 2001, was the first day that Broadcom was permitted to grant options to employees, including Section 16 officers, who had tendered their options back to Broadcom.  The last day for granting options to tendering employees was January 31, 2002.

102. Defendant RUEHLE and others were told that if grants to tendering employees were made in December 2001, EY would have to be advised of the grants by January 5, 2002.  If grants to tendering employees were made in January 2002, Broadcom anticipated that EY would require notice that the grants had been made within five to seven business days of the grants.

103. On December 24, 2001, Broadcom's closing stock price was $39.75.  After December 24, 2001, Broadcom's stock price increased, with the result that December 24, 2001, had the lowest closing stock

1  price within the window for granting options to tendering employees

2  but before year's end.

3      104. As of January 1, 2002, no grants to tendering employees

4  had been made.  On that date, Tullos sent an email to defendant

5  NICHOLAS, with a copy to defendant RUEHLE, which stated: "Nick, I

6  just got an email from Bill.  He said that the deadline for grabbing

7  the 12/24 stock price for the cancel and re-grant program is Jan

8  5th.  The 12/24 closing price was $39.75."  That same date, H.S.

9  sent an email to NICHOLAS and Tullos that "we will be repricing the

10  cancelled grants very shortly."

11      105. By January 4, 2002, the options cancelled as part of the

12  tender offer had not yet been regranted.  Defendant RUEHLE sent an

13  email to defendant NICHOLAS, H.S., Tullos, and others, in which he

14  stated: "I VERY strongly recommend that these options be priced as

15  of Dec 24 ($39 & change).  The absolute drop dead date for this

16  decision is Friday Jan 4.  If there are no objections I would like

17  to go ahead and price as of that date.  Under the terms of the

18  [tender offer] we have until Jan 31 to price. Given the recent

19  market performance, I think we should grab the Dec 24 price.  If we

20  wait beyond Friday we will have missed the deadline and will be

21  subject to market risk."

22      106. On January 4, 2002, H.S. responded to defendants RUEHLE

23  and NICHOLAS, Tullos, and others: "I agree.  We may not see the

24  $39.75 price again before Jan 31.  It would be far too risky to wait

25  and see."

26      107. On January 13, 2002, H.S. advised Tullos that he had not

27  yet "reviewed the New Grant list for those that cancelled yet with

28  Nick.  Hold off on putting it officially in place."  On January 21,

2002, Tullos was still waiting for defendant NICHOLAS to provide defendant RUEHLE with a list of which employees should receive which numbers of options.

108. Defendants NICHOLAS and RUEHLE, and others, caused false corporate documents to be provided to Broadcom's Compensation Committee reflecting a grant of 800,000 options to three Section 16 officers not eligible for an October grant, including RUEHLE, "as of" December 24, 2001 with a strike price of $39.75, Broadcom's closing stock price on that day.  These options purportedly granted on December 24, 2001, were, in fact, granted by NICHOLAS, RUEHLE, and others, and ultimately approved by the Compensation Committee, after December 24, 2001, and were in-the-money at the time they were granted and approved.  In particular, the options granted to RUEHLE were more than $2 million in-the-money at the time they were granted.  With respect to these in-the-money grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

109. Defendant NICHOLAS and H.S. signed corporate records fraudulently reflecting a grant of 25,573,971 options on December 24, 2001, with a strike price of $39.75, Broadcom's closing stock price on that day.  Significant numbers of these options purportedly granted on December 24, 2001, were, in fact, backdated by NICHOLAS, RUEHLE, and others, and were in-the-money at the time they were granted.  Despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses for these grants.

6.   **The Preparation and Filing of a Materially False 10-K**

110. On or about March 15, 2002, defendants NICHOLAS and RUEHLE, and others, made representations to EY in connection with Broadcom's 2001 audit and 10-K.  NICHOLAS, RUEHLE, and others, falsely told EY that Broadcom had "no material transactions that have not been properly recorded in the accounting records underlying the financial statements" and that Broadcom's financials were in compliance with generally accepted accounting principles.  NICHOLAS, RUEHLE, and others, also falsely represented to EY that Broadcom had "no material weaknesses in internal control" and that there was "no fraud involving management or employees who have significant roles in internal control."  In fact, as NICHOLAS, RUEHLE, and others knew, these representations were false and materially misleading in that NICHOLAS, RUEHLE, and others had caused options to be granted in-the-money by retroactively selecting grant dates, and had caused Broadcom to fail to recognize or report compensation expenses that should have been recognized and reported as the result of these in-the-money grants.

111. On or about March 19, 2002, Broadcom filed its 10-K with the SEC for 2001.  The SEC filing, approved by defendants NICHOLAS and RUEHLE, and others, materially understated the amount of compensation expenses that Broadcom was required to take for the in-the-money grants of options in 2001.

E.   **Fraudulent Option Practices in 2002**

1.   **The July 3, 2002 Double-Focal Grant**

112. By the summer of 2002, a large number of Broadcom employee options were underwater because Broadcom's stock price had lost most of its value.  These underwater options, coupled with the low-cash

1  compensation, created concerns among Broadcom's senior managers

2  about employee morale and retention.

3      113. To assist in remedying these problems, defendants NICHOLAS

4  and RUEHLE, and others, decided to double the size of the 2002 focal

5  grant in lieu of Broadcom granting focal options in 2003

6  (hereinafter referred to as the "double focal"). Defendants and

7  others wanted to make this larger grant to take advantage of what

8  they believed to be Broadcom's low stock price at the time.  In

9  addition to granting more shares, NICHOLAS, RUEHLE and others wanted

10 employees to be able to redeem a portion of the double focal options

11 for cash.  To achieve this goal, NICHOLAS, RUEHLE, and others agreed

12 that a portion of the options granted in the double focal would vest

13 immediately so that recipients of the option grant would be able to

14 immediately redeem their options for cash.  To assure the options

15 could be redeemed for cash, defendants and others backdated the

16 double focal to be in-the-money at the time of the grant.

17     114. On or about July 16, 2002, defendant RUEHLE, H.S., and

18 Tullos met to discuss whether Broadcom would conduct a double focal

19 grant.  At this meeting, RUEHLE instructed Tullos not to communicate

20 anything in writing about the backdated double focal grant, in order

21 to avoid a trail of unfavorable dates.

22     115. Defendant NICHOLAS and H.S. signed corporate records

23 fraudulently reflecting a July 3, 2002 grant of 31,562,475 options

24 with a strike price of $15.74, Broadcom's closing stock price on

25 that date.  A portion of this grant immediately vested to its

26 recipients.  Significant numbers of these options purportedly

27 granted on July 3, 2002, were, in fact, backdated by NICHOLAS,

28 RUEHLE, and others, and were in-the-money at the time they were

granted.  Despite rules requiring the recognition and reporting of
compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom
not to recognize or report compensation expenses for these grants.

### 2.    The August 5, 2002 Double-Focal Grant

116. Defendant NICHOLAS continued to make modifications to the
options to be granted to employees who reported to him, including
officers and Section 16 officers, until well after July 3, 2002.  As
a result of the delay, defendant RUEHLE determined that they could
no longer take advantage of the July 3, 2002 grant date and strike
price for these grants.

117. On or about July 27 and 28, 2002, defendant NICHOLAS
completed his revisions to the options to be granted to Section 16
officers.  Tullos then sought Compensation Committee approval for
the grants.  On July 29, 2002, when Broadcom's stock price closed at
$19.11, Tullos sent an email to NICHOLAS and the two members of the
Compensation Committee requesting that they "confirm that the
Compensation Committee of the Board of Directors has met and
approved the attached Section 16 Officer Grants."

118. On July 30, 2002, one of the two members of the
Compensation Committee sent an email to defendant NICHOLAS and
Tullos indicating his approval of the Section 16 officer grants.
The other Compensation Committee member was on an Alaskan cruise,
was not in contact with Broadcom, and did not approve the Section 16
officer grants at this time.

119. On July 31, 2002, Tullos advised defendant RUEHLE and
others that she had received approval from only one member of the
Compensation Committee.  Tullos asked whether she could "submit
these as having been approved last Friday."  On Friday, July 26,

2002, Broadcom's closing stock price was $17.38, a more favorable strike price than the $19.11 closing stock price on Monday, July 29, 2002; the $19.65 closing stock price on Tuesday, July 30, 2002; or the $18.76 closing stock price on Wednesday, July 31, 2002.

120. On July 31, 2002, defendant RUEHLE emailed Tullos that his "understanding is that the comp committee approved them as of last Friday." Moving the grant date back to Friday, July 26, 2002, from Monday, July 29, 2002, would have put the value of the options RUEHLE was to be granted $519,000 in-the-money.

121. On or after July 31, 2002, defendant NICHOLAS continued to make changes to the number of options to be granted to employees who reported to him. In the meantime, Broadcom's stock price continued to decline, and on August 5, 2002, hit a closing price of $15.74, the same as the July 3, 2002 closing price. Defendant RUEHLE therefore again moved the grant date, this time to August 5, 2002. By doing so, RUEHLE put his options $1,011,000 in-the-money compared to the July 29, 2002, price.

122. Defendant NICHOLAS and others continued to make changes and additions to the August 5, 2002 grant, but the time to do so was limited by EY's demand that Broadcom provide it with "all resolutions of the Option and Compensation Committees adopted through the date of their rep letter to us (it will either be dated today or Mon.) In connection with the filing of our forthcoming 10-Q." EY's demand required that all changes be completed by August 9, 2002, or August 12, 2002. On August 8, 2002, NICHOLAS increased the size August 5, 2002 Option Committee grant, falsely characterizing this increase as errors made by Tullos.

123. Defendants NICHOLAS and RUEHLE, and others, caused false corporate documents to be provided to Broadcom's Compensation Committee reflecting a grant of 850,000 options to Section 16 officers "as of" August 5, 2002, with a strike price of $15.74, Broadcom's closing stock price on that day.  This grant included stock options for RUEHLE.  These options purportedly granted on August 5, 2002, were, in fact, twice repriced and approved by the Compensation Committee after August 5, 2002.  With respect to these repriced grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

124. Defendant NICHOLAS and H.S. signed corporate records fraudulently reflecting a grant of 2,112,262 options as of August 5, 2002, with a strike price of $15.74, Broadcom's closing price on that day.  Significant numbers of these options purportedly granted on August 5, 2002, were, in fact, backdated by NICHOLAS, RUEHLE, and others, and were in-the-money at the time they were granted.  With respect to these in-the-money grants, despite rules requiring the recognition and reporting of compensation expenses, NICHOLAS, RUEHLE, and others caused Broadcom not to recognize or report compensation expenses.

125. On or about August 14, 2002, Broadcom filed its 10-Q for the quarter ending June 30, 2002.  In this filing's "subsequent events" section Broadcom falsely claimed that the July 3 and August 5 focal grants were made at "the fair market value on the date of grant."  This 10-Q was signed by defendant RUEHLE and was certified by defendants NICHOLAS and RUEHLE as being true and correct under the Sarbanes-Oxley Act enacted on July 30, 2002.

41

1    126. On or about November 14, 2002, Broadcom filed its 10-Q for

2    the quarter ending September 30, 2002.  In this filing, Broadcom

3    again falsely claimed that the July 3 and August 5 focal grants were

4    made at "the fair market value on the date of grant."  This 10-Q was

5    certified under the Sarbanes-Oxley Act as true and correct by both

6    defendants NICHOLAS and RUEHLE.

7          3.    **The Preparation and Filing of a Materially False 10-K**

8    127. On or about January 23, 2003, defendant RUEHLE and others

9    made representations to EY in connection with Broadcom's 2002 audit

10   and 10-K.  RUEHLE and others falsely told EY that Broadcom had "no

11   material transactions that have not been properly recorded in the

12   accounting records underlying the financial statements" and that

13   Broadcom's financials were in compliance with generally accepted

14   accounting principles.  RUEHLE and others also falsely represented

15   to EY that Broadcom had "no material weaknesses in internal control"

16   and that there was "no fraud involving management of employees who

17   have significant roles in internal control."  In fact, as RUEHLE and

18   others knew, these representations were false and materially

19   misleading in that defendants NICHOLAS and RUEHLE, and others, had

20   caused options to be granted in-the-money by retroactively selecting

21   grant dates, had repriced options, and had caused Broadcom to fail

22   to recognize or report compensation expenses that should have been

23   recognized and reported as the result of these options practices.

24   128. On or about March 31, 2003, Broadcom filed its 10-K with

25   the SEC for 2002.  The SEC filing, approved by defendant RUEHLE and

26   others, materially understated the amount of expense that Broadcom

27   was required to take for the in-the-money grants.  This 10-K was

28

1  certified as true and correct by RUEHLE pursuant to the Sarbanes-

2  Oxley Act.

3      **F.    Fraudulent 2003 and 2004 10-Ks**

4      129.  Because option-related compensation expenses are spread

5  over the vesting period of the options, the fraudulent backdating of

6  in-the-money options by defendants NICHOLAS and RUEHLE, and others,

7  resulted in Broadcom materially understating compensation expense in

8  the years after Broadcom ceased backdating stock-options.

9      130.  On or about March 15, 2004, Broadcom filed its 10-K for

10 2003.  The SEC filing, approved by defendant RUEHLE and others,

11 materially understated the amount of expense that Broadcom was

12 required to take for the in-the-money and repriced grants.

13     131.  On or about March 1, 2005, Broadcom filed its 10-K for

14 2004.  The SEC filing, approved by defendant RUEHLE and others,

15 materially understated the amount of expense that Broadcom was

16 required to take for the in-the-money and repriced grants.

17 **IV.  OVERT ACTS**

18     132. In furtherance of the conspiracy, and to accomplish its

19 objects, defendants NICHOLAS and RUEHLE, together with co-

20 conspirators known and unknown to the Grand Jury, committed and

21 caused others to commit the following overt acts, among others, in

22 the Central District of California, and elsewhere:

23     **OVERT ACT NO. 1**: On or about May 4, 1999, defendant RUEHLE

24 instructed a subordinate to hold off setting Broadcom option grants

25 for April 1999 until Broadcom was due for another filing with the

26 SEC.

27

28

1    **OVERT ACT NO. 2**: In or after May 1999, defendant NICHOLAS and

2  H.S. signed a corporate record called a "unanimous written consent"

3  ("UWC") dated "as of" April 23, 1999.

4    **OVERT ACT NO. 3**: On or about June 23, 1999, Tullos instructed a

5  subordinate to delete an email relating to the date and price of

6  options to be granted to M.N.

7    **OVERT ACT NO. 4**: In or after July 1999, defendant NICHOLAS and

8  H.S. signed a UWC dated "as of" May 25, 1999.

9    **OVERT ACT NO. 5**: In or after July 1999, defendant NICHOLAS and

10  H.S. signed a UWC dated "as of" June 1, 1999..

11    **OVERT ACT NO. 6**: In or after July 1999, defendant NICHOLAS and

12  H.S. signed a UWC dated "as of" June 4, 1999.

13    **OVERT ACT NO. 7**: In or after October 1999, defendant NICHOLAS

14  and H.S. signed a UWC dated "as of" September 30, 1999.

15    **OVERT ACT NO. 8**: On or after November 4, 1999, defendant RUEHLE

16  directed that Broadcom employee E.S. be added to the list to receive

17  a grant of options with the October 22, 1999 strike price.

18    **OVERT ACT NO. 9**: On or about November 18, 1999, defendant

19  RUEHLE directed that Tullos and Broadcom employee G.J. be granted

20  additional options with the October 22, 1999 strike price.

21    **OVERT ACT NO. 10**: On or after January 10, 2000, defendant

22  NICHOLAS handwrote his approvals of grants to several Broadcom

23  employees of additional options with the October 22, 1999 strike

24  price.

25    **OVERT ACT NO. 11**: On or after January 10, 2000, defendant

26  NICHOLAS and H.S. signed a UWC dated "as of" October 22, 1999.

27    **OVERT ACT NO. 12**: On or about March 1, 2000, in connection with

28  Broadcom's acquisition of a company known as "Blue Steel,"

defendants NICHOLAS and RUEHLE falsely represented to EY that the options Broadcom had granted "from January 1, 2000 to March 1, 2000" were "granted at the fair market value of the Company's common stock at the date of grant."

**OVERT ACT NO. 13**: On or about March 16, 2000, defendant RUEHLE told a subordinate that he would like to wait until the end of the day on Friday, March 17, 2000, to make a decision on whether to grant options on March 1, 2001.  RUEHLE explained that if the Broadcom's stock price was higher at the close of the day on March 17, 2000 than it was at the close of the day on March 1, 2000, then the March 1, 2000 grant date would be selected.

**OVERT ACT NO. 14**: On or after March 17, 2000, defendant NICHOLAS and H.S. signed a UWC dated "as of" March 1, 2000.

**OVERT ACT NO. 15**: On or about March 30, 2000, defendants NICHOLAS and RUEHLE, and others, caused to be filed with the SEC Broadcom's 10-K for the year 1999, which understated compensation expenses related to stock options.

**OVERT ACT NO. 16**: On or about April 18, 2000, in response to an inquiry whether the Option Committee "met to approve any grants" on either April 7 or April 14, defendant RUEHLE sent an email to Tullos and others stating, "I think the option committee probably met last Friday.  When do I have to let you know for sure?"

**OVERT ACT NO. 17**: In or after May 2000, defendant NICHOLAS and H.S. signed a UWC dated "as of" April 14, 2000.

**OVERT ACT NO. 18**: On or about May 31, 2000, in a representation letter provided in connection with Broadcom's acquisition of a company known as "Pivotal," defendants NICHOLAS and RUEHLE falsely represented to EY that the options Broadcom had granted "from

45

1  January 1, 2000 to May 31, 2000" were "granted at the fair market

2  value of the Company's common stock at the date of grant."

3  **OVERT ACT NO. 19:** On or after July 16, 2000, defendant NICHOLAS

4  and H.S. signed a UWC dated "as of" June 16, 2000.

5  **OVERT ACT NO. 20:** On or about July 20, 2000, defendant RUEHLE

6  sent an email to defendant NICHOLAS in which he asked NICHOLAS to

7  make a final decision regarding grants of options with a May 26,

8  2000 strike price to Section 16 officers and executives.  To

9  encourage NICHOLAS to quickly make a decision, RUEHLE wrote: "We

10 need to give to E&Y a list of approved option grants for the 5/26

11 focal reviews.  They are making noises that we will have to take a

12 compensation hit for the difference between the 5/26 price ($118)

13 and the current price because we have not yet 'completed' the

14 grants.  This would result in a charge of over $700M!  Obviously we

15 are not about to let this happen."

16 **OVERT ACT NO. 21:** On or about July 24, 2000, defendant RUEHLE

17 falsely claimed to EY that on May 26, 2000, Broadcom had authorized

18 the grant of a fixed number of options constituting its initial

19 focal grant.

20 **OVERT ACT NO. 22:** On or about July 25, 2000, defendant RUEHLE

21 caused a subordinate to create false corporate minutes of a May 26,

22 2000 Option Committee meeting that included approval of a fixed

23 number of options to be granted with a May 26, 2000 strike price and

24 a "Guideline Matrix" for allocating these options to individual

25 employees.

26 **OVERT ACT NO. 23:** On or about August 15, 2000, regarding a

27 final decision on grants of options with a May 26, 2000 strike price

28 to Section 16 officers, defendant RUEHLE sent defendant NICHOLAS an

email stating: "You keep threatening to give this to me. You said there was some additional information you needed.  What is it?  We are going to lose our opportunity to price at $118 if we don't get this in!"

OVERT ACT NO. 24: On or about August 21, 2000, H.S. sent to defendant NICHOLAS and Tullos an email commenting on NICHOLAS's proposals for grants of options with a May 26, 2000 strike price to Section 16 officers and executives.

OVERT ACT NO. 25: On or about August 22, 2000, defendant NICHOLAS sent to defendant RUEHLE, H.S., and Tullos, an email setting out the final determination of grants of options with a May 26, 2000 strike price to Section 16 officers and executives under NICHOLAS's direct supervision, falsely stating, "These are the grants that were made many months ago.  Sorry for the poor record keeping."

OVERT ACT NO. 26: On or about September 11, 2000, defendant RUEHLE received from a subordinate an email setting forth a list of closing prices for Broadcom's stock on Fridays from July 7 through September 8, 2000, with the request that RUEHLE, "Please advise if the Option Committee met and approved option grants on any of these dates."

OVERT ACT NO. 27: On or after September 13, 2000, defendant NICHOLAS and H.S. signed a UWC dated "as of" July 28, 2000.

OVERT ACT NO. 28: On or after December 20, 2000, defendant RUEHLE directed his subordinates to remove U.E. from the July 28, 2000 grant of options so that U.E. could be granted options with a more favorable strike price.

1     **OVERT ACT NO. 29**: On or about January 17, 2001, defendant

2 NICHOLAS met with M.N. to discuss M.N.'s allegations regarding

3 Broadcom's employment and options granting practices, including

4 M.N.'s allegation that "[Broadcom] has engaged in a pattern and

5 practice of falsifying the dates on employment contracts with the

6 intent of taking advantage of fluctuations in stock and option

7 prices to provide compensation to employees in the form of

8 artificially priced options rather than pay salaries in the form of

9 cash to artificially inflate [Broadcom] earnings and then failed to

10 report such transactions in its 10Q, 10K or any other public

11 disclosure filings with the United States Securities and Exchange

12 Commission and concealed such transactions from its auditors."

13     **OVERT ACT NO. 30**: On or about January 29, 2001, defendant

14 NICHOLAS directed Tullos to identify candidates for a "double-up and

15 cancel" of options.

16     **OVERT ACT NO. 31**: On or about January 30, 2001, defendant

17 RUEHLE sent an email to Tullos explaining, "The more I think about

18 the 'double-up and cancel' alternative the less I like it.  If we

19 get too cute E&Y will blow the whistle on our whole program.  And in

20 the unlikely event we learn we have someone in our midst with

21 [M.N.]-like tendencies, we're screwed."

22     **OVERT ACT NO. 32**: On or about January 30, 2001, defendant

23 RUEHLE sent an email to Tullos instructing her to convey to

24 defendant NICHOLAS his "serious reservations about killing the

25 golden goose."

26     **OVERT ACT NO. 33**: On or about April 2, 2001, defendants

27 NICHOLAS and RUEHLE, and others, caused to be filed with the SEC

28

1  Broadcom's 10-K for the year 2000, which understated Broadcom's

2  compensation expenses related to stock options.

3     **OVERT ACT NO. 34**: On or about November 30, 2001, defendant

4  RUEHLE informed defendant NICHOLAS that it was acceptable to

5  increase the number of options granted with the October 1, 2001

6  strike price of $18.77 from approximately two million to

7  approximately three million.

8     **OVERT ACT NO. 35**: On or about December 10, 2001, Tullos sent

9  an email to defendants NICHOLAS and RUEHLE, and H.S., attaching a

10  spreadsheet of proposed stock option grants with the October 1, 2001

11  strike price of $18.77, entitled "18.77 Proposal_v.2.xls."  In her

12  email, Tullos explained: "[H.S.] and I met for several hours and

13  went through the detailed employee option list that I gave you.  We

14  came up with the attached list as a proposal to you."

15     **OVERT ACT NO. 36**:  On or about December 13, 2001, Tullos sent

16  an email to defendants NICHOLAS and RUEHLE, and H.S., attaching a

17  revised spreadsheet of proposed stock option grants with the October

18  1, 2001 strike price of $18.77, entitled "18.77 Proposal_v.3.xls."

19  In her email, Tullos explained: "Attached is version 3 of the report

20  sent earlier this week.  I added two more names ([H.] and [H.]).  We

21  are still just short of the 2M [million]."

22     **OVERT ACT NO. 37**:  On or about December 19, 2001, Tullos sent

23  an email to defendants NICHOLAS and RUEHLE, and H.S., attaching a

24  revised spreadsheet of proposed stock option grants with the October

25  1, 2001 strike price of $18.77, entitled "18.77 Proposal_v.4.xls."

26  In her email, Tullos explained: "We need to lock these in ASAP."

27     **OVERT ACT NO. 38**: On or about December 21, 2001, Tullos sent

28  an email to defendants NICHOLAS and RUEHLE, and H.S., attaching a

revised spreadsheet of proposed stock option grants with the October 1, 2001 strike price of $18.77, entitled "18.77 Proposal_v.5.xls". In the email, Tullos explained: "Attached is the latest version (#5) of the $18.77 stock option proposal.  The change to this list includes the addition of [N.S.]."

**OVERT ACT NO. 39**:  On or about January 1, 2002, Tullos sent an email to defendant NICHOLAS, with a copy to defendant RUEHLE, in which she stated: I just got an email from Bill.  He said that the deadline for grabbing the 12/24 stock price for the cancel and re-grant program is Jan 5th.  The 12/24 closing price was $39.75. [¶] Any update on the $18.77 list?"

**OVERT ACT NO. 40**:  On or about January 2, 2002, defendant NICHOLAS sent an email to Tullos and H.S., which had the subject title, "I found my old share grant spreadsheet from before October," to which was attached a spreadsheet entitled "Nick's Final Grant Proposal.xls," and in which NICHOLAS falsely claimed that the attached spreadsheet was "the spreadsheet I developed at the option meeting months ago."

**OVERT ACT NO. 41**: On or about January 3, 2002, Tullos sent an email to defendant RUEHLE, H.S., and others explaining that defendant NICHOLAS did not want to grant options for Section 16 officers at the October 1, 2001 strike price and "would like to find another opportunistic date, say $25.55 on 10/5 or $29.25 on 10/19."

**OVERT ACT NO. 42**: On or about January 3, 2002, H.S. sent an email to defendant RUEHLE, Tullos, and others, responding to Tullos's earlier email, which was titled "RE: Section 16 Grants," and which stated: "OK, then go with the 10/19 price."

1    **OVERT ACT NO. 43**: On or about January 4, 2002, defendant RUEHLE

2    sent an email to defendant NICHOLAS, H.S., Tullos, and others

3    regarding the "Pricing of Cancel & Regrant Options," in which he

4    stated, "I VERY strongly recommend that these options be priced as

5    of Dec 24 ($39 & change).  The absolute drop dead date for this

6    decision is Friday, Jan 4."

7    **OVERT ACT NO. 44**: On or about January 4, 2002, H.S. sent an

8    email to defendants NICHOLAS and RUEHLE, Tullos, and others,

9    responding to RUEHLE's recommendation for using the December 24,

10   2001 grant date, stating, "I agree.  We may not see the $39.75 price

11   again before Jan 31.  It would be far too risky to wait and see."

12   **OVERT ACT NO. 45**:  On or about January 9, 2002, defendant

13   RUEHLE authorized Broadcom to file with the SEC a Form 8-K that

14   falsely claimed that employees who tendered their options were re-

15   granted options on December 24, 2001.

16   **OVERT ACT NO. 46**:  On or about January 22, 2002, Tullos sent

17   defendant NICHOLAS and H.S. an email to which were attached the

18   following:  a revised spreadsheet of proposed stock option grants

19   with the October 1, 2001 strike price of $18.77, entitled "18.77

20   Proposal_v.6.xls"; a spreadsheet of proposed stock option grants to

21   Section 16 officers with the October 19, 2001 strike price of

22   $29.25, entitled "$29.25 Grants.xls"; and a spreadsheet of proposed

23   stock option grants to those who had tendered options with the

24   December 24, 2001 strike price of $39.75, entitled "$39.75

25   Grants.xls."

26   **OVERT ACT NO. 47**:  On or about January 23, 2002, Tullos sent

27   defendant NICHOLAS and H.S. an email to which were attached the

28   following: a revised spreadsheet of proposed stock option grants

with the October 1, 2001 strike price of $18.77, entitled "18.77 Proposal_v.7.xls"; a revised spreadsheet of proposed stock option grants to Section 16 officers with the October 19, 2001 strike price of $29.25, entitled "$29.25 Grants_v.2.xls"; and a revised spreadsheet of proposed stock option grants to those who had tendered options with the December 24, 2001 strike price of $39.75, entitled "$39.75 Grants_v.2.xls."   In the email, Tullos falsely stated: "I wanted to confirm that I did find the attached option spreadsheets that you sent to me a few months ago.  Bill Ruehle is also aware that I found these."

**OVERT ACT NO. 48**: On or after January 23, 2002, defendant NICHOLAS and H.S. signed a UWC dated "as of" October 1, 2001.

**OVERT ACT NO. 49**: On or after January 23, 2002, defendant NICHOLAS and H.S. signed a UWC dated "as of" December 24, 2001.

**OVERT ACT NO. 50**: On or about March 19, 2002, defendants NICHOLAS and RUEHLE, and others, caused to be filed with the SEC Broadcom's 10-K for the year 2001, which understated Broadcom's compensation expenses related to stock options.

**OVERT ACT NO. 51**: On or about March 25, 2002, defendants NICHOLAS and RUEHLE, and others, caused to be filed with the SEC a proxy statement that falsely claimed to Broadcom's shareholders that the Compensation Committee, as opposed to NICHOLAS, RUEHLE, H.S., and others, were granting options to Section 16 officers.

**OVERT ACT NO. 52**: On or before May 17, 2002, defendants NICHOLAS and RUEHLE, and others, determined that May 11, 2002, would be the grant date for Broadcom's 2002 focal grant, with a strike price corresponding to the closing price on that date.

1   **OVERT ACT NO. 53**: On or about May 23, 2002, defendants NICHOLAS

2   and RUEHLE, and others, abandoned the May 11, 2002 grant date.

3   **OVERT ACT NO. 54**:   On or about July 16, 2002, defendant RUEHLE,

4   H.S., and Tullos met to discuss a double focal grant.

5   **OVERT ACT NO. 55**: On or after July 16, 2002, defendant NICHOLAS

6   and H.S. signed a UWC dated "as of" July 3, 2002.

7   **OVERT ACT NO. 56**: On or about July 31, 2002, after learning

8   that one of the two Compensation Committee members had, on July 30,

9   2002, approved a grant to Section 16 officers with a July 29, 2002

10  grant date, defendant RUEHLE directed Tullos to move the grant date

11  back to July 26, 2002, a date that had a more favorable closing

12  price.

13  **OVERT ACT NO. 57**: On or about August 5, 2002, defendant RUEHLE

14  cancelled the July 26, 2002 Compensation Committee grant and moved

15  it to August 5, 2002, which had a more favorable strike price.

16  **OVERT ACT NO. 58**: On or after August 12, 2002, defendant

17  NICHOLAS and H.S. signed a UWC dated "as of" August 5, 2002.

18  **OVERT ACT NO. 59**:   On or after August 12, 2002, defendants

19  NICHOLAS and RUEHLE, and others, caused the two members of the

20  Compensation Committee to execute a UWC dated "as of" August 5,

21  2002.

22  **OVERT ACT NO. 60**:   On or about August 14, 2002, defendants

23  NICHOLAS and RUEHLE caused to be filed with the SEC a form 10-Q that

24  falsely claimed that Broadcom's July 3, 2002, and August 5, 2002,

25  option grants were made at fair market value on the date of grant.

26  **OVERT ACT NO. 61**:   On or about November 14, 2002, defendants

27  NICHOLAS and RUEHLE caused to be filed with the SEC a form 10-Q that

28

1 falsely claimed that Broadcom's July 3, 2002, and August 5, 2002,

2 option grants were made at fair market value on the date of grant.

3    **OVERT ACT NO. 62:**   In or after November 2002, defendant

4 NICHOLAS and H.S. signed a UWC dated "as of" October 18, 2002.

5    **OVERT ACT NO. 63:**   In or after January 2003, defendant NICHOLAS

6 and H.S. signed a UWC dated "as of" November 8, 2002.

7    **OVERT ACT NO. 64:**   In or after January 2003, defendant NICHOLAS

8 and H.S. signed a UWC dated "as of" December 27, 2002.

9    **OVERT ACT NO. 65:** On or about March 31, 2003, defendant RUEHLE

10 and others caused to be filed with the SEC Broadcom's 10-K for the

11 year 2002, which understated Broadcom's compensation expenses

12 related to stock options.

13    **OVERT ACT NO. 66:** On or about March 15, 2004, defendant RUEHLE

14 and others caused to be filed with the SEC Broadcom's 10-K for the

15 year 2003, which understated Broadcom's compensation expenses

16 related to stock options.

17    **OVERT ACT NO. 67:** On or about March 1, 2005, defendant RUEHLE

18 and others caused to be filed with the SEC Broadcom's 10-K for the

19 year 2004, which understated Broadcom's compensation expenses

20 related to stock options.

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT TWO**

[18 U.S.C. § 1348]

[Securities Fraud]

133. Paragraphs 1 through 131 of this Indictment are realleged and incorporated by reference as though set forth here in full.

134. Beginning no later than on or about July 30, 2002, and continuing until at least on or about March 1, 2005, in Orange County, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with the intent to defraud, devised, executed, and participated in a scheme to defraud as to material matters and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and the concealment and non-disclosure of material facts, in connection with the purchase and sale of Broadcom stock.

1          **COUNTS THREE THROUGH SEVEN**

2          [18 U.S.C. §§ 1350 (c)(1) and 2]

3          [False Certification of Financial Reports]

4          135. Paragraphs 1 through 131 of this Indictment are realleged

5     and incorporated by reference as though set forth here in full.

6          136. On or about the dates set forth below, in Orange County,

7     within the Central District of California and elsewhere, the

8     defendants set forth below, aiding and abetting each other, falsely

9     certified that the form set forth below that was filed with the SEC

10    fairly presented, in all material respects, the financial condition

11    and results of operations of Broadcom, when in truth and in fact,

12    defendants NICHOLAS and RUEHLE knew the form set forth below was

13    false in the following material respects:

14

| COUNT | DEFENDANT | DATE | FORM | FALSE REPRESENTATION |
|-------|-----------|------|------|----------------------|
| THREE | NICHOLAS RUEHLE | 8/14/2002 | 2002 Second Quarter 10-Q | 1) 10-Q understated Broadcom's stock-based compensation expense; and 2) 10-Q claimed that the strike prices for Broadcom's July 3, 2002 and August 5, 2002 option grants were set at fair market value on the day of the grant. |

| COUNT | DEFENDANT | DATE | FORM | FALSE REPRESENTATION |
|-------|-----------|------|------|----------------------|
| FOUR | NICHOLAS RUEHLE | 11/14/2002 | 2002 Third Quarter 10-Q | 1) 10-Q understated Broadcom's stock-based compensation expense; and 2) 10-Q claimed that the strike prices for Broadcom's July 3, 2002 and August 5, 2002 option grants were set at fair market value on the day of the grant. 3) Sarbanes-Oxley certification claimed Broadcom disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls." |
| FIVE | RUEHLE | 3/31/2003 | 2002 10-K | 1) 10-K understated Broadcom's stock-based compensation expense; and 2) Sarbanes-Oxley certification claimed Broadcom disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls." |
| SIX | RUEHLE | 3/15/04 | 2003 10-K | 10-K understated Broadcom's stock-based compensation expense. |
| SEVEN | RUEHLE | 3/1/05 | 2004 10-k | 10-K understated Broadcom's stock-based compensation expense. |

1 **COUNT EIGHT**

2 [15 U.S.C. §§ 78m(a)(2) and 78ff; 17 C.F.R. §§ 240.12b-20 and

3 240.13a-13; and 18 U.S.C. § 2]

4 [False Statements in Reports Filed with the SEC]

5 137. Paragraphs 1 through 125 of this Indictment are realleged

6 and incorporated by reference as though set forth here in full.

7 138. On or about August 14, 2002, in Orange County, within the

8 Central District of California, and elsewhere, defendants NICHOLAS

9 and RUEHLE, aiding and abetting each other, knowingly and willfully

10 made and caused to be made materially false and misleading

11 statements, and omitted and caused to be omitted material facts

12 necessary to make the statements made, in light of the circumstances

13 under which the statements were made, not misleading, in a report

14 and document that was required to be filed with the SEC, namely,

15 Broadcom's quarterly report on Form 10-Q for the second quarter of

16 2002.

17 139. Specifically, in relation to options to purchase Broadcom

18 stock purportedly granted on July 3, 2002, and August 5, 2002,

19 defendants NICHOLAS and RUEHLE caused Broadcom's Form 10-Q quarterly

20 report to state that the "weighted average exercise price per share

21 for the options is $15.74, the fair market value on the date of

22 grant," when, in truth and in fact, as defendants NICHOLAS and

23 RUEHLE knew, $15.74 was not the average strike price on the date of

24 the actual grants of these options.

25

26

27

28

**COUNT NINE**

[15 U.S.C. §§ 78m(a)(2) and 78ff; 17 C.F.R. §§ 240.12b-20 and

240.13a-13; and 18 U.S.C. § 2]

[False Statements in Reports Filed with the SEC]

140. Paragraphs 1 through 126 of this Indictment are realleged and incorporated by reference as though set forth here in full.

141. On or about November 14, 2002, in Orange County, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, aiding and abetting each other, knowingly and willfully made and caused to be made materially false and misleading statements, and omitted and caused to be omitted material facts necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading, in a report and document that was required to be filed with the SEC, namely, Broadcom's quarterly report on Form 10-Q for the third quarter of 2002.

142. Specifically, in relation to options to purchase Broadcom stock purportedly granted on July 3, 2002, and August 5, 2002, defendants NICHOLAS and RUEHLE caused Broadcom's Form 10-Q quarterly report to state that the "weighted average exercise price per share for the options is $15.74, the fair market value on the date of grant," when, in truth and in fact, as defendants NICHOLAS and RUEHLE knew, $15.74 was not the average strike price on the date of the actual grants of these options.

## COUNTS TEN THROUGH TWELVE

[15 U.S.C. §§ 78m(b)(2)(B) and 78ff;

17 C.F.R. § 240.13b2-2; and 18 U.S.C. § 2]

[Lying to Accountants]

143. Paragraphs 1 through 127 of this Indictment are realleged and incorporated by reference as though set forth here in full.

144. On or about the dates listed below, in Orange County, within the Central District of California, and elsewhere, the following defendants, acting as officers of Broadcom, aiding and abetting each other, knowingly and willfully, directly and indirectly, made and caused others to make the following materially false and misleading statements to EY, and omitted to state and caused others to omit to state to EY, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, in connection with EY's review, examination, and audits of the financial statements of Broadcom:

| COUNT | DEFENDANT | DATE | False and Misleading Statements |
|-------|-----------|------|--------------------------------|
| TEN | NICHOLAS RUEHLE | 8/13/2002 | 1) "All material transactions have been properly recorded in the accounting records underlying the financial statements." 2) Broadcom's financial statements were in compliance with generally accepted accounting principles. |

| COUNT | DEFENDANT | DATE | False and Misleading Statements |
|-------|-----------|------|----------------------------------|
| ELEVEN | NICHOLAS RUEHLE | 11/14/2002 | 1)   "All material transactions have been properly recorded in the accounting records underlying the financial statements."<br>2) Broadcom's financial statements were in compliance with generally accepted accounting principles. |
| TWELVE | RUEHLE | 1/23/2003 | 1) Broadcom had "no material transactions that have not been properly recorded in the accounting records underlying the financial statements."<br>2) Broadcom's financial statements were in compliance with generally accepted accounting principles.<br>3) Broadcom had "no material weaknesses in internal control."<br>4) There was "no fraud involving management of employees who have significant roles in internal control." |

## COUNTS THIRTEEN THROUGH SEVENTEEN

[15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff;

17 C.F.R. § 240.13b2-1; and 18 U.S.C. § 2]

[Falsification of Corporate Books and Records]

145. Paragraphs 1 through 126 of this Indictment are realleged and incorporated by reference as though set forth here in full.

146. On or after the dates listed below, in Orange County, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and willfully, directly and indirectly, falsified and caused others to falsify books, records, and accounts that Broadcom was required to make and keep, and that were required, in reasonable detail, to accurately and fairly reflect the transactions of Broadcom. Specifically, on or after the dates listed below, defendants knowingly and willfully caused to be created UWCs which claimed that Broadcom's Option Committee or Compensation Committee granted on options on the date contained on the UWC when, in truth and in fact, as defendants knew, the Broadcom's Option Committee or Compensation Committee did not take action on the dates identified on the UWC:

| COUNT | DATE | UWC DATE | UWC TYPE |
|---|---|---|---|
| THIRTEEN | August 12, 2002 | August 5, 2002 | Option Committee |
| FOURTEEN | August 12, 2002 | August 5, 2002 | Compensation Committee |
| FIFTEEN | November 2002 | October 18, 2002 | Option Committee |
| SIXTEEN | January 2003 | November 8, 2002 | Option Committee |
| SEVENTEEN | January 2003 | December 27, 2002 | Option Committee |

## COUNT EIGHTEEN

### [18 U.S.C. §§ 1341, 1346, and 2]

### [Honest Services Mail Fraud]

147. Paragraphs 1 through 125 of this Indictment are realleged and incorporated by reference as though set forth here in full.

148. Beginning in at least in or around 2001 and continuing until at least 2003, in Orange County, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud Broadcom's shareholders and its board of directors of their right to honest services by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

149. On or about the date set forth below, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, for the purpose of executing and attempting to execute the above-described scheme to defraud, caused the following item to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service or to be deposited with and delivered by a commercial interstate carrier, according to the directions thereon:

| COUNT | DATE | MAILING |
|-------|------|---------|
| EIGHTEEN | 8/14/2002 | SEC Form 4, sent from Irvine, California, to Washington, DC |

## COUNTS NINETEEN THROUGH TWENTY-ONE

[18 U.S.C. §§ 1343, 1346, and 2]

[Honest Services Wire Fraud]

150. Paragraphs 1 through 128 of this Indictment are realleged and incorporated by reference as though set forth in full.

151. Beginning in at least in or around 2001 and continuing until at least 2003, in Orange County, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, and others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud Broadcom's shareholders and its board of directors of their right to honest services by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

152. On or about the dates set forth below, in Orange County, within the Central District of California, and elsewhere, defendants NICHOLAS and RUEHLE, for the purpose of executing and attempting to execute the above-described scheme to defraud, caused the following to be transmitted by means of wire communication in interstate commerce:

| COUNT | DATE | WIRING |
|---|---|---|
| NINETEEN | 11/14/2002 | Wiring of a Broadcom Form 8-K from Irvine, California, to the SEC in Virginia |
| TWENTY | 3/27/2003 | Wiring of a preliminary Broadcom proxy statement from California to the SEC in Virginia |

| COUNT | DATE | WIRING |
|---|---|---|
| TWENTY-ONE | 4/17/2003 | Wiring of a Broadcom proxy statement from California to the SEC in Virginia. |

A TRUE BILL


_____

Foreperson


THOMAS P. O'BRIEN
United States Attorney

GEORGE S. CARDONA
Chief Assistant United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


ROBB C. ADKINS
Assistant United States Attorney
Chief, Southern Division

ANDREW STOLPER
Assistant United States Attorney