1  RICHARD MARMARO (Bar No. 91387)
2  rmarmaro@skadden.com
   JACK P. DICANIO (Bar No. 138782)
3  jdicanio@skadden.com
   MATTHEW E. SLOAN (Bar No. 165165)
4  masloan@skadden.com
5  MATTHEW D. UMHOFER (Bar No. 206607)
   mumhofer@skadden.com
6  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
7  300 South Grand Avenue, Suite 3400
   Los Angeles, California 90071-3144
8  Tel: (213) 687-5000
9  Fax: (213) 687-5600

10
   Attorneys for Defendant William J. Ruehle
11

12                UNITED STATES DISTRICT COURT
13                CENTRAL DISTRICT OF CALIFORNIA
14                     SOUTHERN DIVISION

15 | UNITED STATES OF AMERICA,        | CASE NO. SACR 08-139-CJC
16 |                                  |
   |            Plaintiff,            | **WILLIAM J. RUEHLE'S NOTICE OF**
17 |                                  | **MOTION AND MOTION TO DISMISS**
   |      vs.                         | **INDICTMENT BASED ON**
18 |                                  | **PROSECUTORIAL MISCONDUCT;**
19 | HENRY T. NICHOLAS III AND        | **REQUEST FOR EVIDENTIARY**
   | WILLIAM J. RUEHLE,               | **HEARING;**
20 |                                  |
21 |            Defendants.           | **_Filed Under Separate Cover_**
   |                                  | **DECLARATION OF RICHARD**
22 |                                  | **MARMARO; and**
23 |                                  |
   |                                  | **[PROPOSED] ORDER.**
24 |                                  |
25                                     Judge: The Honorable Cormac J. Carney
26
                                       Hearing Date: December 8, 2008
27                                     Hearing Time: 9 a.m.
28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on December 8, 2008, at 9 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Cormac J. Carney, located at 411 West Fourth Street, Santa Ana, California, Defendant William J. Ruehle will, and hereby does, move pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure to dismiss the Indictment in the above-captioned matter.

Defendant William J. Ruehle, by and through his counsel, hereby submits his Motion To Dismiss Indictment Based on Prosecutorial Misconduct and Request for Evidentiary Hearing.  This motion is based on the attached memorandum of points and authorities, the declaration of Richard Marmaro and the exhibits attached thereto, the files and records in this case, and any evidence or argument that may be presented at a hearing on this matter.

Respectfully submitted,

DATED:  October 20, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Richard Marmaro
Jack P. DiCanio
Matthew E. Sloan
Matthew D. Umhofer


By: _____/s/ Richard Marmaro_____
RICHARD MARMARO
Attorneys for Defendant
William J. Ruehle

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................... iv

I.  INTRODUCTION ......................................................................................... 1

II.  FACTS .......................................................................................................... 3

   A.  The Prosecution Uses Improper Strong-Arm Tactics to Turn Normal
       Business Behavior into Alleged Criminal Conduct ............................. 5

       1.  The Prosecution Launches a Campaign to Prejudice Defendants
           Through Leaks to the Press........................................................ 5

       2.  Improper Conduct by the Prosecution Causes Nancy Tullos to
           Lose Her Job and Cooperate With the Prosecution .................. 8

       3.  The Prosecution Obtains a Guilty Plea from Nancy Tullos to a
           Non-Existent Crime .................................................................. 9

       4.  The Prosecution Threatens a Witness with "Ramifications" Unless
           She Provides Incriminating Testimony.................................. 10

   B.  The Prosecution Commits Additional Misconduct By Presenting Drug
       Allegations to the Same Grand Jury that Issued the Stock Options
       Indictment and Engaging in a Strategy to "Ice" Potential Defense
       Witnesses ............................................................................................ 11

III.  ARGUMENT............................................................................................... 12

   A.  The Prosecution Violated Grand Jury Secrecy and Abused the Grand
       Jury Process ......................................................................................... 12

       1.  The Prosecution's Leaks Violated Grand Jury Secrecy Rules ............ 12

       2.  The Prosecution Abuses the Grand Jury Subpoena Process................. 15

       3.  Mr. Ruehle Has Suffered Prejudice as a Direct Result of the Grand
           Jury Leaks and Abuse of Grand Jury Process...................... 17

   B.  The Prosecution Improperly Pressured Witnesses into Providing
       Testimony Helpful to the Prosecution............................................. 18

   C.  The Prosecution's Questionable Plea Agreements ......................... 19

   D.  The Prosecution's Additional Misconduct Before the Grand Jury ................ 22

       1.  Presentation of Stock Options and Drug Indictment to Same
           Grand Jury............................................................................. 22

2.    "Icing" Key Witnesses to the Relevant Conduct .................................. 24

E.    The Cumulative Effect of the Prosecution's Conduct ................................... 26

F.    The Prosecution's Misconduct Should be Fully Aired in an Evidentiary Hearing ......................................................................................................... 28

G.    The Prosecution's Conduct Warrants Dismissal of the Indictment ............... 29

IV.   CONCLUSION ........................................................................................... 30

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>Cases</u>

3

<u>Arthur Andersen LLP v. United States</u>,
    544 U.S. 696, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) ................................... 9, 20

4

5

<u>Bank of Nova Scotia v. United States</u>,
    487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988) .................................. 29, 30

6

<u>Barry v. United States</u>,
    865 F.2d 1317 (D.C. Cir. 1989) ................................................................................. 15

7

8

<u>Berger v. United States</u>,
    295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) ................................................ 1, 31

9

10

<u>Cacoperdo v. Demosthenes</u>,
    37 F.3d 504 (9th Cir. 1994) ....................................................................................... 29

11

<u>Douglas Oil Company of California v. Petrol Stops Northwest</u>,
    441 U.S. 211, 99 S. Ct. 1667, 60 L. Ed. 2d 156 (1979) .............................................. 14

12

13

<u>Finn v. Schiller</u>,
    72 F.3d 1182 (4th Cir. 1996) ..................................................................................... 14

14

15

<u>In re Grand Jury Investigation (Lance)</u>,
    610 F.2d 202 (5th Cir. 1980) ..................................................................................... 14

16

<u>In re Grand Jury Proceedings (Diamante; Ramos)</u>,
    814 F.2d 61 (1st Cir. 1987) ........................................................................................ 15

17

18

<u>In re Grand Jury Proceedings (Goodman v. United States)</u>,
    33 F.3d 1060 (9th Cir. 1994) ..................................................................................... 15

19

20

<u>Heckler v. Community Health Services of Crawford County, Inc.</u>,
    467 U.S. 51, 104 S. Ct. 2218, 81 L. 3d 2d 42 (1984) .................................................. 3

21

22

<u>In re John Doe Grand Jury Proceedings</u>,
    537 F. Supp. 1038 (D.R.I. 1982) ........................................................................ 12, 14

23

<u>Martin v. Consultants & Administrator, Inc.</u>,
    966 F.2d 1078 (7th Cir. 1992) ................................................................................... 12

24

25

<u>McElroy v. United States</u>,
    164 U.S. 76, 17 S. Ct. 31, 41 L. Ed. 355 (1896) .................................................. 23, 24

26

27

<u>SEC v. Dresser Industries, Inc.</u>,
    628 F.2d 1368 (D.C. Cir. 1980) ................................................................................. 12

28

Standley v. Department of Justice,
    835 F.2d 216, 218 (9th Cir. 1987) ................................................... 12

United States v. Baresh,
    595 F. Supp. 1132 (S.D. Tex. 1984) ............................................... 19

United States v. Bieganowski,
    313 F.3d 264 (5th Cir. 2002) ........................................................... 26

United States v. Bonadonna,
    775 F.2d 949 (8th Cir. 1985) ........................................................... 19

United States v. Carona,
    SA CR 06-224-AG, 2008 WL 1970205 (C. D. Cal. May 2, 2008) ........................... 30

United States v. Chapman,
    524 F.3d 1073 (9th Cir. 2008) ......................................................... 29

United States v. Cox,
    342 F.2d 167 (5th Cir. 1965) ........................................................... 17

United States v. Culliton,
    328 F.3d 1074 (9th Cir. 2003) ......................................................... 21

United States v. Dailey,
    759 F.2d 192 (1st Cir. 1985) ........................................................... 19

United States v. Diaz,
    236 F.R.D. 470 (N.D. Cal. 2006) ................................................ 12, 14

United States v. Drew,
    331 F.2d 85 (D.C. Cir. 1964) ........................................................... 23

United States v. Dynavac, Inc.,
    6 F.3d 1407 (9th Cir. 1993) ........................................................... 12

United States v. Gonzales,
    164 F.3d 1285 (10th Cir. 1999) ....................................................... 17

United States v. Halper,
    590 F.2d 422 (2d Cir. 1978) ........................................................... 23

United States v. Hammond,
    598 F.2d 1008 (5th Cir. 1979) ......................................................... 18

United States v. Hector,
    CR 04-00860 DDP, 2008 WL 2025069 (C.D. Cal. May 8, 2008) ....................... 30

United States v. Irwin,
   612 F.2d 1182 (9th Cir. 1980) ........................................................... 28

United States v. LaFuente,
   54 F.3d 457 (8th Cir. 1995) .............................................................. 15

United States v. Lartzolo,
   869 F.2d 1354 (9th Cir. 1989) ........................................................... 30

United States v. Lewis,
   787 F.2d 1318, amended by 798 F.2d 1250 (9th Cir. 1986) ................................. 23, 24

United States v. Lord,
   711 F.2d 887 (9th Cir. 1983) ............................................................ 18

United States v. Marshank,
   777 F. Supp. 1507 (N.D. Cal. 1991) ...................................................... 27

United States v. Martino,
   825 F.2d 754 (3d Cir. 1987) ............................................................. 15

United States v. McClintock,
   748 F.2d 1278 (9th Cir. 1984) ........................................................... 30

United States v. Owen,
   580 F.2d 365 (9th Cir. 1978) ............................................................ 30

United States v. Russell,
   411 U.S. 423, 93 S. Ct. 1637, 36 L. Ed. 2d 365 (1973) .................................. 27

United States v. Samango,
   607 F.2d 877 (9th Cir. 1979) ............................................................ 27

United States v. Sarkisian,
   197 F.3d 966 (9th Cir. 1999) ........................................................... 23, 24

United States v. Serubo,
   604 F.2d 807 (3d Cir. 1979) ............................................................. 31

United States v. Simpson,
   813 F.2d 1462 (9th Cir. 1987) ........................................................... 27

United States v. Spector,
   326 F.2d 345 (7th Cir. 1963) ............................................................ 23

United States v. Stein,
   541 F.3d 130 (2d Cir. 2008) ........................................................... 17, 28

United States v. Vavages,
        151 F.3d 1185 (9th Cir. 1998) .......................................................... 26

United States v. Waterman,
        732 F.2d 1527, vacated en banc,
        732 F.2d 1533 (8th Cir. 1984) .......................................................... 19

United States v. Westerdahl,
        945 F.2d 1083 (9th Cir. 1991) .......................................................... 28

Webb v. Texas,
        409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 330 (1972) ....................... 18

Williams v. Woodford,
        384 F.3d 567 (9th Cir. 2004) ............................................................ 18

**Statutes**

18 U.S.C. § 1001 ............................................................................................. 21

Fed. R. Crim. P. 6(e) ..................................................................................... 12

**Other Authorities**

U.S. Attorney's Manual, § 1-7.111 (USAM 1997) ................................. 13

U.S. Attorney's Manual, § 1-7.500 (USAM 1997) ................................. 13

U.S. Attorney's Manual, § 1-7.530 (USAM 1997) ................................. 13

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

From the beginning of its investigations into so-called stock options "backdating" cases, the prosecution has struggled with a difficult task: to transform good faith accounting mistakes made by more than 250 different companies during the same time period into allegations of criminal conduct at a tiny fraction of these companies.

Perhaps the difficulty of this task explains the prosecution's decision to conduct its investigation into the stock options program at Broadcom Corporation ("Broadcom") in a manner wholly unbecoming the Office of the United States Attorney (the "USAO" or the "prosecution").  Unable to prove its case within the rules, the prosecution went out of bounds in its investigation of this matter, and transformed the grand jury investigation from a search for the truth into a quest for a conviction at any cost.  In a case that charges the misapplication of accounting principles as criminal conduct, it is the prosecution that has violated basic principles governing the appropriate conduct of criminal investigations.

Those principles were illuminated long ago by no less an authority than the Supreme Court of the United States, in words as powerful today as the day they were written:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and *whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done*.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so.  But, *while he may strike hard blows, he is not at liberty to strike foul ones*.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935) (emphasis added).

During the course of this investigation, the prosecution has made a mockery of these words through a series of foul blows that form a single alarming narrative: faced with the reality that key witnesses did not believe a crime was committed at Broadcom, the

---

prosecution chose to build its case through improper and unethical tactics employed to bend witnesses to the prosecution's will and neutralize potential defense witnesses.  The prosecution's misconduct has been so pervasive and egregious that it has compromised the integrity of the grand jury's investigation, raised grave doubts about the grand jury's decision to indict, and violated the due process rights of William J. Ruehle and Henry T. Nicholas III.

While hard evidence of prosecutorial misconduct often proves elusive, here, the evidence of the prosecution's malfeasance is substantial, and includes letters from three distinguished former federal prosecutors expressing serious concerns about the prosecution's conduct in this case.  Those letters and the additional evidence attached to this motion demonstrate that the prosecution engaged in a pattern of misdeeds that included the following troubling episodes:

- In an attempt to coerce former Broadcom employee Nancy Tullos into providing testimony adverse to the defense, the prosecution caused Ms. Tullos to lose her job by issuing an illegitimate subpoena to her employer and then warning her employer of non-existent shareholder disclosure obligations triggered by the subpoena.

- In an effort to cement Ms. Tullos's coerced testimony, the prosecution proposed a plea to a crime that does not exist and then wrongfully advised the Court that there was no legal reason why the Court should not accept the guilty plea.

- The prosecution leaked secret grand jury details and documents to the media, resulting in newspaper articles that directly prejudiced Mr. Ruehle.

- The prosecution intimidated a witness from Broadcom's in-house legal staff by threatening serious consequences unless the witness changed her testimony, and cautioned her that she would not be a target as long as she testified the way the prosecution wanted her to.

1  Mr. Ruehle's defense has suffered real and substantial prejudice as a result of the

2  prosecution's misconduct.  By its unlawful and unjustified conduct, the prosecution has

3  transformed mere accounting mistakes made by hundreds of companies into a criminal

4  indictment against Mr. Ruehle and Dr. Nicholas.  They now face the greatest prejudice of

5  all: a trial with their liberties at stake based on an investigation irreparably stained by

6  government wrongdoing.

7  The Supreme Court has made it clear that "the Government should turn square

8  corners in dealing with the people."  Heckler v. Cmty. Health Servs. of Crawford County,

9  Inc., 467 U.S. 51, 61 n.13, 104 S. Ct. 2218, 2224 n.13, 81 L. Ed. 2d 42 (1984) (citation and

10  internal quotation marks omitted).  It is increasingly clear that the government did not do so

11  here – instead, it cut corners, and it cut them so aggressively and irresponsibly that the

12  resulting damage to the grand jury investigation, to the indictment, and to the rights of Mr.

13  Ruehle (and Dr. Nicholas) cannot be undone.

14  Only an evidentiary hearing backed by the subpoena power of the Court will ensure

15  that the truth concerning the prosecution's misconduct is revealed.  Following that hearing,

16  it will be clear that the only remedy for the prosecution's misconduct is dismissal of the

17  indictment.

18  **II.   FACTS**

19  In late 2005 and early 2006, academic studies and media reports raised questions

20  about stock options practices at a large swath of U.S. corporations.[1]  Relying on statistical

21  data, the reports suggested that more than 2,000 corporations granted stock options at low

22  prices and then failed to properly account for them.[2]  Within a year, approximately 257

23  companies had announced that they had either been the subject of government

24  investigations or had undertaken internal reviews of their accounting practices with respect

25  _____

26  [1]  See .e.g., Ex. 1, Charles Forelle & James Bandler, The Perfect Payday, Wall St. J.,
Mar. 18, 2006.  All "Ex." references herein refer to exhibits attached to the Declaration of
27  Richard Marmaro ("Marmaro  Decl.") filed concurrently herewith.

28  [2]  Ex. 2, Stephanie Saul, Study Finds Backdating of Options Widespread, N.Y.
Times, July 17, 2006.

1   to stock options.  Approximately 130 of those companies have restated their financial

2   statements to address errors in connection with their stock option accounting.  In

3   approximately 30 percent of these companies, Ernst & Young – Broadcom's outside

4   auditors – served as outside auditor for the company.  (Ex. 3, Glass Lewis Report (March

5   2007).)

6        The prosecution has taken the position that accounting errors made by companies

7   with respect to stock options expose companies and their employees to criminal liability.

8   However, of the more than 2,000 companies that statistics indicate made such accounting

9   errors and the 257 companies that were subjected to internal or external reviews, only two

10  dozen have been the subject of SEC enforcement actions, and a mere 10 companies have

11  been the subject of criminal allegations.

12       Among the few companies to draw scrutiny from criminal prosecutors was

13  Broadcom, a pathbreaking semiconductor firm with corporate headquarters in Irvine,

14  California.  In April 2006, the company announced an internal review of its stock options

15  practices, which was followed by a special committee investigation including review of

16  over 6 million pages of documents and interviews of over 40 witnesses.  After

17  approximately six months of internal review and investigation, Broadcom announced that it

18  would restate its earnings to reflect an additional $2.24 billion in non-cash stock option

19  compensation expenses during the years 1998 through 2003.  (Ex. 4, 01/23/07 Form 10-

20  K/A, at 1-4.)  Due to the hypothetical and non-cash nature of these accounting charges, the

21  restatement did not, in any way, speak to  Broadcom's financial health, and the company

22  remains a vibrant force in the marketplace to this day.

23       In the wake of Broadcom's internal review, it appears that the prosecution embarked

24  on its own investigation with the goal of transforming innocent and mistaken business

25  behavior into a criminal securities fraud case, despite the fact that the governing accounting

26  principles were fundamentally ambiguous and were widely misapplied in practice, and

27  despite the fact that there is no evidence that investors were harmed – or that Broadcom's

28

1  stock price was artificially inflated – by Broadcom's accounting errors.[3]  Rather than fairly

2  seeking to determine whether a crime had been committed, however, the prosecution

3  decided a crime had been committed and then, through various improper tactics, sought to

4  cobble together a criminal case.

5      Even with all the advantages the prosecution enjoyed as a result of Broadcom's

6  internal investigation, the prosecution's case apparently foundered when it discovered that

7  several knowledgeable insiders, whom the prosecution had planned to be the centerpiece of

8  its case, indicated that there was no criminal intent at work in Broadcom's stock options

9  program, and that, at the time, there was no belief that Broadcom's practices were improper.

10 The prosecution then resorted to strong-arming witnesses and other improper tactics aimed

11 at developing the testimony it needed to pursue a non-existent crime.

> **A.    The Prosecution Uses Improper Strong-Arm Tactics to Turn Normal Business Behavior into Alleged Criminal Conduct**

> **1.    The Prosecution Launches a Campaign to Prejudice Defendants Through Leaks to the Press**

16 The prosecution's contempt for well-defined limits on prosecutorial conduct during

17 the course of this investigation is perhaps best illustrated by its brazen and undisputed

18 violations of grand jury secrecy rules.  As the following facts and attached evidence

19 demonstrate, there is simply no question that the prosecution repeatedly leaked details of the

20 grand jury investigation, and directly prejudiced Mr. Ruehle and Dr. Nicholas by doing so.

21 The worst of the leaks occurred in early 2007.  At that time, counsel for Broadcom

22 co-founder and former co-chairman Henry Samueli was engaged in extensive discussions

23 with the prosecution concerning the possibility of an interview of Dr. Samueli by the

24 prosecution.  (Ex. 5, Letter from Brian Hennigan dated February 23, 2007, at 2.)  In the

25 midst of these private and confidential negotiations, the prosecution decided that Dr.

26 Samueli was not being cooperative, and began to pressure Broadcom to take action against

---

27      [3] Indeed, Broadcom's stock price actually increased the day after the restatement was

28 announced in January 2007, thus demonstrating that the company's stock price was not artificially inflated or and investors were not harmed by Broadcom's accounting errors.

1  Dr. Samueli, who at that time was still employed by the company.  Id.[4]  Broadcom,

2  however, was not convinced that Dr. Samueli was being uncooperative, and encouraged the

3  prosecution to work out the logistics of an interview with Dr. Samueli's counsel.  Id.

4        According to a letter written by an attorney for Broadcom, who is a highly regarded

5  former prosecutor from the USAO in Los Angeles, instead of continuing to negotiate in

6  good faith with Dr. Samueli's counsel, the prosecution called the media in an effort to

7  shame both Broadcom and Dr. Samueli into submitting to the prosecution's will.  On a

8  single day, February 16, 2007, articles appeared in both the *Los Angeles Times* and the *Wall*

9  *Street Journal*, both of which disclosed secret details of the grand jury investigation and

10 quoted verbatim from highly-confidential e-mails that Broadcom had produced to the

11 USAO during the grand jury investigation.  (See Ex. 5, attachments, E. Scott Reckard;

12 Broadcom leader said to resist probe, L.A. Times, Feb. 16, 2007 and James Bandler &

13 Charles Forelle, Probes of Backdating Move to Faster Track, Wall St. J., Feb. 16, 2007; see

14 also Ex. 6, James Bandler & Charles Forelle, Probes of Backdating Move to Faster Track,

15 Wall St. J., Feb. 16, 2007.)  In response, Broadcom's outside counsel, contacted the Acting

16 United States Attorney to express his shock at the leak, noting that the company had

17 cooperated extensively with the prosecution with the expectation that the documents it

18 produced to the prosecution and the communications it had with the prosecution would

19 remain confidential and be used only for legitimate investigatory purposes.  (Ex. 5, Letter

20 from Brian Hennigan to Acting United States Attorney George Cardona, dated February 23,

21 2007.)[5]

22

23        [4] This tactic of using pressure on a person's employer would be repeated later in the
   investigation.  See discussion *infra*, at 8-9.
24        [5] This was not the prosecution's only media leak in this case.  Apparently in an effort
   to keep pressure on former Broadcom human resources executive Nancy Tullos, even after
25 she had signed a cooperation plea agreement with the government, the prosecution leaked
   the details of the agreement to the *Los Angeles Times*, before Ms. Tullos's cooperation plea
26 agreement had even been filed.  (See Ex. 7, E. Scott Reckard, Guilty plea expected in
   Broadcom options, L.A. Times, Nov. 27, 2007.)  The article provided details about the
27 terms of the agreement and the expected date the plea would be entered, and cited as its
   source "people close to the investigation" who "spoke on condition of anonymity because
28

*(cont'd)*

1    The leaks hit Mr. Ruehle hardest of all.  In the *Wall Street Journal* article, Mr.

2  Ruehle's portrait appeared alone on the front page of the newspaper, embedded in the first

3  column of text under the headline <u>Probes of Backdating Move to Faster Track: Stock</u>

4  <u>Option E-mails At Broadcom Are Focus</u>.  The lede of the article read:

5       On Jan. 4, 2002, the chief financial officer of Broadcom Corp. tapped out an
6       email about stock options to his chief executive and others.

7       "I VERY strongly recommend that these options be priced as of December
8       24," he wrote.

9  (Ex. 6, James Bandler & Charles Forelle, <u>Probes of Backdating Move to Faster Track</u>, Wall

10  St. J., Feb. 16, 2007; <u>see also</u> Ex. 5, attachment, same.)

11    This e-mail, taken wholly out of its crucial context, incorrectly suggested that Mr.

12  Ruehle was selecting the date of a stock option grant retroactively.  Mr. Ruehle was the only

13  person identified by name and title in the first eight paragraphs of the article, which

14  included a sentence that left no question as to the source of the leak, "Prosecutors are

15  strongly considering filing criminal charges against the former Broadcom chief financial

16  officer who wrote the email, William J. Ruehle, and at least one other former executive,

17  according to people familiar with the situation."  <u>Id.</u>

18    The leaks do not present a "whodunit" question, as **the USAO has admitted that the**

19  **lead prosecutor was a source of much of the information in the *Los Angeles Times* and**

20  ***Wall Street Journal* articles**.  According to a letter written by one of Dr. Nicholas's outside

21  counsel (who is also a well-respected former federal prosecutor and former chief of the

22  Major Frauds Section of the USAO in this district), the Acting United States Attorney

23  acknowledged that the lead prosecutor spoke with reporters for the *Los Angeles Times* and

24  the *Wall Street Journal* prior to the publication of the stories and "had admitted to being the

25  source for some of the information" that appeared in the February 16 articles.  (Ex. 8, Letter

26

27  _____
(cont'd from previous page)
the agreement hasn't yet been filed."  (<u>Id.</u>)  There is every indication that the prosecution

28  was the source of this leak – indeed, the leak was made to the same *Los Angeles Times*
reporter to whom the prosecution had previously leaked grand jury secrets.

from Gregory Weingart to United States Attorney George Cardona, dated March 6, 2007, at 2.)  Thus, it is undisputed that in the midst of a grand jury investigation, the lead prosecutor deliberately engaged in the leaking of significant facts concerning the investigation, apparently in an attempt to publicly shame one target into submitting to an interview and gratuitously smear another target, before charges had even been filed.

**2.  Improper Conduct by the Prosecution Causes Nancy Tullos to Lose Her Job and Cooperate With the Prosecution**

The prosecution abused the grand jury process in a different way in its effort to harass another former Broadcom executive into cooperating with the prosecution and doing its bidding.  Nancy Tullos was the Vice President of Human Resources at Broadcom from August 1998 to June 2003.  (Ex. 4, 1/23/07 Form 10K/A, at 6.)  She left Broadcom in 2003 and started a new job at a company named QLogic in 2004.  (Marmaro Decl. ¶ 2.)  Ms. Tullos was forced to return her attention to Broadcom in 2006, however, when the prosecution commenced its investigation into Broadcom's stock option program.  Ms. Tullos had declined to be interviewed as part of Broadcom's internal investigation and apparently had refused to submit to a prosecution interview as well.  (Ex. 4, 1/23/07 10K/A, at 6.)

The prosecution was undeterred.  In or around November 2006, lead counsel for the prosecution called the general counsel of QLogic to advise him that the prosecution was about to issue a grand jury subpoena for Ms. Tullos's personnel records at QLogic.  (Marmaro Decl. ¶ 2.)[6]  The prosecutor then offered what amounted to unsolicited (and incorrect) legal advice by suggesting that as a result of the subpoena, the company could be required to make a public disclosure concerning the prosecution's investigation of Ms. Tullos.  Id.  The general counsel for QLogic recalls that the prosecutor said, "Of course, you have to be sensitive to whatever reporting obligations there may be upon receiving a subpoena."  Id.

---

[6] It is far from clear what possible relevance Ms. Tullos's personnel records at a subsequent employer could have on an investigation of stock options practices at a prior employer.

The prosecutor's unusual call had the desired effect: it caused the general counsel great anxiety, and, as the company's top lawyer, he wanted to make sure that Ms. Tullos's problem did not become QLogic's problem.  Id.  Accordingly, he immediately spoke with Ms. Tullos.  Id.  Soon thereafter, she was apparently forced to resign, if not terminated, from QLogic.  (Ex. 8, Letter from Gregory Weingart dated March 6, 2007, at 2.)  Outside counsel for QLogic has declined to provide further information on this episode absent a subpoena.  (Marmaro Decl. ¶ 3.)

After the prosecution flexed its muscle in a manner that caused Ms. Tullos to be fired and made it unlikely that she would ever hold a high-level corporate job again unless she submitted to the prosecution, Ms. Tullos participated in at least one proffer session with the prosecution pursuant to a proffer letter, and eventually entered into a cooperation plea agreement with the prosecution.  (Tullos Plea Agreement in United States v. Tullos, SA CR 07-274 CJC, Docket No. 6, filed on November 30, 2007, at ¶ 17(d).)

### 3.    The Prosecution Obtains a Guilty Plea from Nancy Tullos to a Non-Existent Crime

Despite forcing Ms. Tullos out of her job and placing enormous financial and emotional pressure on her, the prosecution still was unable to get Ms. Tullos to admit to the existence of a fraudulent scheme to backdate options or her participation in it.  Undeterred, the prosecution manufactured a *faux* crime, and strong-armed Ms. Tullos into pleading guilty to it.

Reaching back seven years (well beyond the five-year statute of limitations), to a single e-mail exchange, the prosecution offered Ms. Tullos a plea to obstruction of justice for asking another Broadcom employee to delete an e-mail.  (Tullos Plea Agreement in United States v. Tullos, SA CR 07-274 CJC, Docket No. 6 filed on November 30, 2007, at ¶ 10.)  The prosecution's plea agreement, however, had a fatal flaw: it ran afoul of Supreme Court precedent that made it clear that destroying documents well before any investigation is underway or contemplated is not a crime.  Arthur Andersen LLP v. United States, 544 U.S. 696, 697, 708, 125 S. Ct. 2129, 2131, 2137, 161 L. Ed. 2d 1008 (2005).  Despite this,

the prosecutor advised the Court that there was no legal reason why Ms. Tullos' plea could not be accepted.

### 4. The Prosecution Threatens a Witness with "Ramifications" Unless She Provides Incriminating Testimony

Invalid guilty pleas, unscrupulous leaks of information, and misuse of grand jury subpoenas were not the only means by which the prosecution sought to bend witnesses to its will. The prosecution also employed other highly inappropriate pressure tactics in an attempt to force potential defense witnesses to testify in a manner that comported with the prosecution's view of the case, rather than the witness's own honest beliefs.

Former Broadcom deputy general counsel Susan Collins was a victim of such pressure tactics. With Ms. Collins, the prosecution's pressure focused on its flawed theory that the defendants caused the creation of "Unanimous Written Consents" ("UWCs") that falsely represented that Broadcom's Compensation Committee (which was responsible for granting options to the company's Section 16 officers) met and granted options on the "as of" dates" indicated on the UWCs. (Ex. 9, October 20, 2008 Letter from Jeffrey M. Rawitz to Jack DiCanio, at Id. at 1) In proffer sessions with the prosecution, Ms. Collins informed the prosecution that she believed the Compensation Committee in fact met on the dates reflected on the UWCs. Id. The prosecution, however, did not believe her – apparently because her statement was inconsistent with the prosecution's theory of the case. Id. According to Ms. Collins's attorney, the lead prosecutor said he believed that during the events under investigation, Ms. Collins had acted under pressure from Mr. Ruehle and the general counsel of Broadcom, David Dull, and would only believe her if she testified in that vein. Id. Ms. Collins stated that she could not truthfully do so. Id. The prosecution then advised Ms. Collins and her attorney that there were "ramifications" associated with her position, intimating in not-so-subtle terms that she could be charged with a crime unless she modified her testimony. Id.

At the end of the prosecution's proffer session with Ms. Collins, the prosecution indicated that while it did not believe Ms. Collins, it would "nevertheless provide her with a witness letter if she could offer certain specified testimony" that would contradict a certain

theory of the defense.  Id. at 1.  The prosecution had thus unabashedly stated that Ms. Collins could avoid prosecution **only if** she testified to facts articulated by the prosecution – without regard to their truthfulness.  Then, after securing Ms. Collins's testimony, the lead prosecutor refused to re-confirm her status as a witness, in an apparent effort to deter her from providing any helpful testimony to the defense.  Id. at 1-2.  On the basis of this and other conduct, Ms. Collins's counsel – another distinguished attorney and former federal prosecutor – concluded that the USAO and its lead prosecutor had "engaged in significant misconduct with respect to his grand jury investigation."  Id. at 1.

**B.      The Prosecution Commits Additional Misconduct By Presenting Drug Allegations to the Same Grand Jury that Issued the Stock Options Indictment and Engaging in a Strategy to "Ice" Potential Defense Witnesses**

The prosecution's misguided effort to transform accounting mistakes into crimes led to further misconduct that continued throughout the presentation of the indictment to the grand jury, and continues to this day in its handling of potential defense witnesses.  As described further below, the prosecution has:

- presented the instant stock options indictment and a salacious drug indictment against Dr. Nicholas to the *same grand jury on the same day*, virtually ensuring prejudicial spillover from the drug indictment to the stock options case; and
- placed key defense witnesses in prosecution limbo, thereby ensuring their invocation of the Fifth Amendment if called to testify by the defense.

Perhaps the most troubling aspect of this litany of misconduct is the likelihood that it is incomplete, and that these instances are merely the tip of an iceberg of misconduct concealed under the surface of the prosecution's investigation.  An evidentiary hearing, backed by the Court's subpoena power, is therefore essential to examining and uncovering the prosecution's misconduct in this case.

# III.   ARGUMENT

## A.   The Prosecution Violated Grand Jury Secrecy and Abused the Grand Jury Process

The evidence demonstrates that the prosecution ran roughshod over grand jury secrecy rules and wielded the grand jury subpoena as a bludgeon.  Case authority leaves no question that such behavior constitutes prosecutorial misconduct.

### 1.   The Prosecution's Leaks Violated Grand Jury Secrecy Rules

The rule against spilling grand jury secrets is clear.  Rule 6(e)(2) of the Federal Rules of Criminal Procedure provides, in pertinent part:

> [A]n *attorney for the government* . . . shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules.

Fed. R. Crim. P. 6(e) (emphasis added).

What constitutes "matters occurring before the grand jury" is also clear.  First, it includes "the *identities of witnesses* or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like."  SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980) (emphasis added) (quoted in Standley v. Dep't of Justice, 835 F.2d 216, 218 (9th Cir. 1987)); see also Martin v. Consultants & Adm'r, Inc., 966 F.2d 1078, 1097 (7th Cir. 1992).

Second, the "scope and direction of the grand jury investigation," the identities of the targets and witnesses, and what was likely to occur as a result of the grand jury investigation constitute "matters occurring before the grand jury" that may not be disclosed absent a court order.  In re John Doe Grand Jury Proceedings, 537 F. Supp. 1038, 1044-45 (D.R.I. 1982) ("such things as scope and direction of the grand jury investigation constitute 'matters occurring before the grand jury' and are therefore protected from disclosure by the provisions of Rule 6(e)") (cited in United States v. Dynavac, Inc., 6 F.3d 1407, 1413 (9th Cir. 1993)) (citations omitted); United States v. Diaz, 236 F.R.D. 470, 478 (N.D. Cal. 2006) ("disclosure was permitted as long as it did not reveal the identities of the targets or subjects of the grand jury's investigation"); see also Martin, 966 F.2d at 1097 (documents protected

1   under Rule 6(e) violated by disclosure of FBI reports "where they are closely related to the

2   grand jury's investigation itself and where disclosure would reveal the identities of targets

3   and other witnesses").

4        The impropriety of the prosecution's conduct now comes into focus.  The evidence

5   described above and attached to this motion demonstrates that attorneys for the government

6   – the very individuals subject to Rule 6(e)'s secrecy requirements – repeatedly and

7   deliberately disclosed to the media and others the identities of prospective witnesses, the

8   identities of targets, the scope and direction of the grand jury's investigation, and what was

9   likely to occur as a result of the investigation, all in direct violation of Rule 6(e). [7]

10       The media leaks are the most obvious instances of  Rule 6(e) violations.  The USAO

11  has admitted that one of the  prosecutors in this case was among the sources referenced in

12  the *Los Angeles Times* and the *Wall Street Journal* articles, who unquestionably disclosed

13  grand jury materials.  (Ex. 8, Letter from Gregory Weingart dated March 6, 2007, at 2; <u>see</u>

14  <u>also</u> Ex. 5, attachments, E. Scott Reckard; <u>Broadcom leader said to resist probe</u>, L.A. Times,

15  Feb. 16, 2007 and James Bandler & Charles Forelle, <u>Probes of Backdating Move to Faster</u>

16  <u>Track</u>, Wall St. J., Feb. 16, 2007; <u>see also</u> Ex. 6, James Bandler & Charles Forelle, <u>Probes</u>

17  <u>of Backdating Move to Faster Track</u>, Wall St. J., Feb. 16, 2007.)  Tellingly, the *Wall Street*

18  *Journal* article specifically identified Mr. Ruehle "and at least one other former executive"

19  as targets, and featured photographs of only Mr. Ruehle and Dr. Nicholas – the only two

20  individuals ultimately charged in the indictment.  (Ex. 6, James Bandler & Charles Forelle,

21  _____
    [7]  It should be noted that the media leak violated not only Rule 6(e), but also the

22  Department of Justice's own rules on disclosures to the media.  The United States

23  Attorney's Manual ("USAM") expressly recognizes the need for confidentiality in grand
    jury matters, and prohibits comments to the media regarding the nature and progress of

24  ongoing investigations; any statements made by a target or the failure of a target or subject
    to make a statement; and the identities of prospective targets, subjects, or witnesses.  (Ex.

25  10, U.S. Attorney's Manual, §§ 1-7.111; 1-7.500; 1-7.530 (USAM 1997).)  Most
    importantly, the USAM makes it clear that "[a]t no time shall any component or personnel

26  of the Department of Justice furnish any statement or information that he or she knows or
    reasonably should know will have a substantial likelihood of materially prejudicing an

27  adjudicative proceeding."  <u>Id.</u>, § 1-7.500.  The USAO's leaks to the *Los Angeles Times* and

28  the *Wall Street Journal* appear to have violated every one of these prohibitions.

Probes of Backdating Move to Faster Track, Wall St. J., Feb. 16, 2007.)  The prosecution thus disclosed to the news media exactly what it expected the grand jury would do, and who it would charge, more than a year before the grand jury took that action.  The prosecution's media leak was thus a quintessential violation of Rule 6(e).  Diaz, 236 F.R.D. at 478; John Doe, 537 F. Supp. at 1044-45.

The lead prosecutor's conversation with the general counsel for QLogic also involved grand jury leaks.  The very nature of the conversation – giving advance notice to QLogic that the grand jury would be issuing a subpoena to the company for Ms. Tullos's personnel records – involved the USAO revealing what would take place before the grand jury (that is, the pending issuance of a grand jury subpoena) before it happened.  (Marmaro Decl. ¶ 2.)  More importantly, by giving the general counsel notice that QLogic may have disclosure obligations as a result of the subpoena, the prosecutor implicitly (and likely explicitly) signaled that Ms. Tullos was a target of the grand jury's investigation, and thus disclosed matters occurring before the grand jury.

A violation of Rule 6(e) is no mere foot-fault.  It is a blow to the foundation of the grand jury system, which "depends upon the secrecy of grand jury proceedings."  Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 218-19, 99 S. Ct. 1667, 1672-73, 60 L. Ed. 2d 156 (1979).  This kind of conduct has triggered severe judicial reproach in other cases:

> Courts must not tolerate violations of Rule 6(e) by anyone, especially United States Attorneys. . . .  A primary purpose of Rule 6 is to protect the unindicted, and the United States Attorney has a duty to protect the innocent as well as to prosecute those indicted by the grand jury.

Finn v. Schiller, 72 F.3d 1182, 1189 (4th Cir. 1996).  The prosecution's conduct in this case should not be tolerated.  Instead, it should be fully investigated and remedied.

The foregoing facts and law far exceed the showing required to establish a *prima facie* case of a grand jury leak.  In re Grand Jury Investigation (Lance), 610 F.2d 202, 216-19 (5th Cir. 1980) (factors in making *prima facie* showing of grand jury leak include whether disclosure involved matters occurring before the grand jury, whether it appears that

the disclosure was made by a person subject to Rule 6(e)(2)'s requirement of secrecy, whether the relief requested will interfere with the grand jury proceedings and whether the government has sufficiently rebutted the target's showing).  An evidentiary hearing is therefore required in which the prosecution will bear the burden of negating the *prima facie* case articulated here.  <u>Barry v. United States</u>, 865 F.2d 1317, 1321 (D.C. Cir. 1989).

## 2.  The Prosecution Abuses the Grand Jury Subpoena Process

Courts have warned that the abuse of the grand jury subpoena power "can form an important link in a chain of reversible prosecutorial misconduct."  <u>United States v. LaFuente</u>, 54 F.3d 457, 461-62 (8th Cir. 1995).  For that reason, courts have condemned the issuance of grand jury subpoenas for improper purposes, such as collecting evidence for a case already indicted or securing interviews outside the presence of the grand jury.  <u>Id.</u> at 461 ("it is true that the use of subpoenas to secure *ex parte* witness interviews before trial is improper") (emphasis in original); <u>United States v. Martino</u>, 825 F.2d 754, 759 (3d Cir. 1987) ("Fed. R. Crim. P. 17 does not authorize the use of grand jury subpoenas as a ploy for the facilitation of office interrogation."); <u>In re Grand Jury Proceedings (Diamante; Ramos)</u>, 814 F.2d 61, 70 (1st Cir. 1987) ("a grand jury may not conduct an investigation for the primary purpose of helping the prosecution prepare indictments for trial").

The key question, then, where the abuse of grand jury subpoenas is concerned, is whether the prosecution had a legitimate purpose in issuing the subpoena.  That question is easily answered in this case.  In the prosecution's investigation of Ms. Tullos's conduct at Broadcom, there was no conceivable legitimate purpose for a subpoena for Ms. Tullos's personnel records at her new, post-Broadcom employer.  The only possible purpose for issuing such a subpoena was to harass, intimidate, and pressure Ms. Tullos.  Subpoenas issued for such purposes are *per se* invalid.  <u>See</u> <u>In re Grand Jury Proceedings (Goodman v. United States)</u>, 33 F.3d 1060, 1063 (9th Cir. 1994) (defense must show "that the Grand Jury subpoena was issued for an improper purpose such as harassment or prosecutorial abuse").[8]

---

[8]  Even high-ranking government officials concede how extraordinary it is for the government to get a suspect fired from a job during the course of a criminal investigation.

*(cont'd)*

1   Even more troubling, however, was the prosecution's use of the grand jury subpoena

2   as a ploy to enlist QLogic in its effort to coerce Ms. Tullos's cooperation.  The stated

3   purpose of the lead prosecutor's call to the general counsel of QLogic, Ms. Tullos's new

4   employer, was apparently to foreshadow a coming grand jury subpoena for her personnel

5   record.  That cannot have been the true purpose for the call, however.  The subpoena would

6   have spoken for itself, no advance warning was required; and indeed, a prosecution warning

7   of an imminent subpoena would seem to be unusual, if not extraordinary.  Accordingly, the

8   prosecution must have had another purpose for the call.  That purpose is apparent in the

9   prosecutor's improper and misleading warnings[9] to QLogic's general counsel concerning its

10  so-called disclosure obligations to its shareholders as a result of receiving a subpoena

11  regarding a corporate officer.  It is quite clear that the purpose of the prosecution's call was

12  to frighten QLogic into putting pressure on Ms. Tullos.  The prosecution succeeded in this

13  dark purpose – it caused great anxiety to QLogic's general counsel concerning Ms. Tullos,

14  and caused her departure from QLogic.  (Marmaro Decl. ¶ 2; Ex. 8, Letter from Gregory

15  Weingart dated March 6, 2007, at 2.)[10]  The prosecution must have foreseen and intended

16  that QLogic would respond this way – as the Second Circuit recently observed in affirming

17  the dismissal of an indictment due to prosecutorial misconduct in a high-profile fraud case,

18  _____

(cont'd from previous page)

19  Recent media coverage has highlighted the government's many blunders in the course of the
    investigation of the deadly anthrax mailings of 2001.  Chief among these missteps was the

20  government's initial focus on now-exonerated Army scientist Stephen J. Hatfill, despite the
    fact that there was, in the opinion of a federal judge, "not a scintilla of evidence that would

21  indicate that Dr. Hatfill had anything to do with this."  Court filings in the civil lawsuit
    brought against the government by Dr. Hatfill revealed that in the midst of the investigation,

22  the government intervened to have Dr. Hatfill fired from his job.  In depositions taken
    before the government settled Dr. Hatfill's constitutional claims for $5.85 million, former

23  Attorney General John Ashcroft and five FBI officials "testified that they knew of no other
    instance in which the government had forced an investigative target out of a

24  nongovernmental job."  (Ex. 11, David Willman, U.S. Settles with anthrax mailings subject
    Steven Hatfill for $5.82 million, L.A. Times, June 28, 2008.)  The prosecution, however,

25  did just that in this case.

26      [9]  It should also be noted that the lead prosecutor had no place giving legal advice to

27  the general counsel of QLogic; and, indeed, it appears that the advice was wrong.

28      [10]  Outside counsel for QLogic declined to provide additional information concerning
    the Tullos incident absent a subpoena.  (Marmaro Decl. ¶ 3.)

a corporation faced with government inquiries "could be expected to do all it could . . . to placate and appease the government." United States v. Stein, 541 F.3d 130, 142 (2d Cir. 2008).

Originally intended as a shield against government excesses, the grand jury became a sword in the hands of the prosecution in this investigation, and the prosecution improperly secured the cooperation of a key witness at the point of that sword. United States v. Cox, 342 F.2d 167, 186 (5th Cir. 1965) (the grand jury "earned its place in the Bill of Rights by its shield, not by its sword") (Wisdom, J., concurring).

### 3. Mr. Ruehle Has Suffered Prejudice as a Direct Result of the Grand Jury Leaks and Abuse of Grand Jury Process

The prosecution's media leaks landed Mr. Ruehle on the front page of the *Wall Street Journal* under the headline "Probes of Backdating Move to Faster Track," and irreparably tarnished his sterling reputation well before he could fight back in court.  More importantly, the prosecution's leaks and abuse of grand jury subpoenas also helped the prosecution secure Ms. Tullos's testimony as a Broadcom insider and prosecution witness, which the prosecution believed it needed to indict Mr. Ruehle and Dr. Nicholas.

The fact of the matter is that substantial portions of the prosecution's evidence came to the prosecution through coercive circumstances that render it wholly unreliable.   The prejudice to Mr. Ruehle is unmistakable.  By misusing grand jury process and violating grand jury secrecy, the prosecution forced Ms. Tullos out of a job and thereby transformed her from a target exercising her right to refuse to speak with the prosecution into a cooperator beholden to the prosecution.  The testimony of a witness subjected to such coercive treatment simply cannot be relied upon.  United States v. Gonzales, 164 F.3d 1285, 1289 (10th Cir. 1999) (admission of coerced witness statements at trial violates the due process rights of the defendant).  And an indictment issued based in no small part on such testimony cannot be permitted to stand.

//

**B.    The Prosecution Improperly Pressured Witnesses into Providing Testimony Helpful to the Prosecution**

In addition to engaging in improper leaks and abusing grand jury procedures, the prosecution also engaged in witness intimidation in order to secure prosecution-friendly testimony.

The prosecution's conduct toward Ms. Collins displayed a lack of regard for the truth and the constitutional rights of Ms. Collins, Mr. Ruehle, and Dr. Nicholas.  As described above, Ms. Collins's initial statements contradicted the prosecution's theory of the case, and the statements were unacceptable to the prosecution for that very reason.  See supra at 9-11.  At the time she met with the prosecution, Ms. Collins was a potential defense witness.  The prosecution undertook coercive, threatening measures in order to coerce her into changing her testimony.

The Supreme Court has concluded that coercive or threatening behavior towards a potential witness may justify reversal of a defendant's conviction.  See Webb v. Texas, 409 U.S. 95, 97-98, 93 S. Ct. 351, 353-54, 34 L. Ed. 330 (1972).  By threatening Ms. Collins that her "position" – which was favorable to Mr. Ruehle – had "ramifications," the prosecution effectively interfered with a potential defense witness.  See United States v. Lord, 711 F.2d 887, 891 (9th Cir. 1983) (remanding for evidentiary hearing where "the prosecutor told him that whether he would be prosecuted depended on his testimony"); see also Williams v. Woodford, 384 F.3d 567, 601-02 (9th Cir. 2004) ("Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying."); United States v. Hammond, 598 F.2d 1008, 1013 (5th Cir. 1979) (FBI agent threatened two defense witnesses with "trouble" in pending state prosecution).

With respect to Ms. Collins, the prosecution then multiplied the problem by making a crucial witness benefit – a confirmation of non-target status – **contingent upon** a particular type of testimony helpful to the prosecution.  This conduct invited Ms. Collins to commit the crime of perjury in order to avoid criminal prosecution.  See Lord, 711 F.2d at 892-93

1  (remanding for evidentiary hearing on prosecutor's comments that apparently conditioned

2  avoidance of jail on how a witness testified); see also United States v. Bonadonna, 775 F.2d

3  949, 956 (8th Cir. 1985) (plea agreements contingent on a trial resulting in a conviction or a

4  grand jury investigation resulting in an indictment are "'nothing more than an invitation to

5  perjury having no place in our constitutional system of justice'") (quoting United States v.

6  Waterman, 732 F.2d 1527, 1531, vacated en banc, 732 F.2d at 1533 (8th Cir. 1984)); United

7  States v. Dailey, 759 F.2d 192, 201 n.9 (1st Cir. 1985) ("benefits made contingent upon

8  subsequent indictments or convictions skate very close to, if indeed they do not cross, the

9  limits imposed by the due process clause"); United States v. Baresh, 595 F. Supp. 1132,

10  1137 (S.D. Tex. 1984).

11      The prosecution's extraordinary efforts to obtain testimony that comported with its

12  view of the case and its cavalier attitude toward the truth in its dealings with Ms. Collins

13  have directly prejudiced Mr. Ruehle.  The prosecution presented what the prosecution

14  believes to be incriminating testimony from Ms. Collins after essentially telling her that she

15  would only avoid being charged with a felony if she stuck to a script written by the

16  prosecution.  The charges against Mr. Ruehle are thus based on statements and grand jury

17  testimony that has been rendered wholly unreliable by the prosecution's misconduct.

### C.    The Prosecution's Questionable Plea Agreements

18

19      The prosecution's misconduct did not stop at the courthouse doors, but continued

20  before this very Court.  Twice now, the prosecution has attempted to finalize improper plea

21  deals before this Court.  The Court rejected one of the deals as wholly inconsistent with the

22  prosecution's indictment and an unsavory attempt to put a $12 million price tag on a

23  favorable sentence in a criminal matter, even though there was no statutory or legal basis for

24  such a payment.[11]

25

26

27      [11] From comments made at a recent hearing in the Samueli matter, it has become
clear that the idea of offering Dr. Samueli a multi-million dollar way of avoiding prison

28  came solely from the prosecution.  (Transcript of Hearing in United States v. Samueli, No.
CR 08-156-CJC, RT 10/14/08: 6, lines 3-9).

1    The Court may not be aware, however, that the prosecution secured an even more

2   unsavory plea deal with Nancy Tullos – one that allowed her to plead before this Court to a

3   crime that does not exist, according to the Supreme Court.  In <u>Arthur Andersen LLP v.</u>

4   <u>United States</u>, the Supreme Court made it clear that a person cannot be guilty of obstructing

5   justice if that person "persuades others to shred documents under a document retention

6   policy when he does not have in contemplation any particular official proceeding in which

7   those documents might be material."  544 U.S. 696, 697, 708, 125 S. Ct. 2129, 2131, 2137,

8   161 L. Ed. 2d 1008 (2005) (company's destruction of documents in light of "highly

9   probable" SEC investigation did not constitute obstruction of justice because the destruction

10   did not "have in contemplation any particular official proceeding in which those documents

11   might be material").  Yet the prosecution's deal with Ms. Tullos is premised on the very

12   same statute and nearly the same facts as those at issue in <u>Arthur Andersen</u> – Ms. Tullos

13   pled guilty to obstruction of justice under 18 U.S.C. § 1512, based on an attempt to

14   persuade another to destroy an e-mail *seven* years before "any particular official

15   proceeding" was contemplated by any government agency.  Even a cursory reading of

16   <u>Arthur Andersen</u> would have told the prosecution that the Tullos factual basis was

17   insufficient – *particularly* in light of the fact that the commencement of the official

18   investigation in this case – seven years later – was even more remote from the document

19   destruction than the investigation in <u>Arthur Andersen</u> – which commenced a mere two

20   weeks later.   Despite the unmistakable invalidity of the Tullos plea agreement, the

21   prosecution represented to this Court, without hesitation, that there was no legal reason why

22   the Court could not accept the plea.  (Ex. 12, Tullos Plea Hearing, RT 1/24/08: 37, lines 3-

23   7.)

24    Applying similar scrutiny to the factual basis of the Samueli plea agreement reveals

25   that the prosecution stretched the bounds of the factual basis there as well.  That plea

26   agreement involved a prosecution effort to obtain a guilty plea from Dr. Samueli – the co-

27   founder of one of the world's leading technology companies, which continues to prosper

28   today – based on a surprisingly weak factual basis.  That prosecution-drafted factual basis

1   alleged that Dr. Samueli lied when he said he was not "involved" in making a decision on

2   grants to Section 16 officers – a statement the prosecution suggests was contradicted in an

3   e-mail chain in which Dr. Samueli made a suggestion related to grants to Section 16

4   officers.  (Samueli Plea Agreement, Docket No. 5 in <u>United States v. Samueli</u>, No. CR. 08-

5   156-CJC, filed June 23, 2008.)  Where the truthfulness or falsity of the statement turns on

6   the many and varied meanings of the vague term "involved," there are real questions as to

7   whether the prosecution could ever meet its heavy burden of proving that the statement at

8   issue was in fact false, as opposed to merely ambiguous or vague, and that it was made

9   knowingly and willfully.  <u>United States v. Culliton</u>, 328 F.3d 1074, 1078 (9th Cir. 2003)

10  (when "a question is 'excessively vague, or "fundamentally ambiguous,"' the answer may

11  not, as a matter of law, form the basis for a prosecution for perjury or false statement")

12  (citations omitted); 18 U.S.C. § 1001.  When viewed in light of the obviously invalid Tullos

13  plea, the questionable factual basis of the Samueli plea agreement suggests that despite the

14  prosecution's belief that Dr. Samueli was a co-conspirator in the conduct alleged in the

15  indictment, **the prosecution was unable to get Dr. Samueli to admit to any fraudulent**

16  **conspiracy and therefore had to construct another fictional crime in order to secure**

17  **his guilty plea**.

18          This leads to another important conclusion to be drawn from the prosecution's

19  misguided attempts to secure plea agreements from Ms. Tullos and Dr. Samueli. [12]  Despite

20  the prosecution's belief that there was a conspiracy at Broadcom to commit fraud by

21  retroactively pricing stock options grants and failing to properly account for them, and

22  despite extensive and improper efforts to pressure Ms. Tullos and Dr. Samueli, the

23  prosecution has failed to secure a single admission from Ms. Tullos or Dr. Samueli that

24  there was such a fraudulent scheme.  Put starkly, two individuals that the prosecution's

25  indictment places at the center of the alleged scheme – including one who was a member of

26

27          [12] The government is wholly to blame for the problematic Tullos and Samueli plea
28  agreements.  Defense counsel certainly cannot be blamed for entering into such incredibly
    favorable plea agreements despite their questionable legal basis.

1 the Option Committee and co-signed many of the corporate documents at issue in this case

2 – have refused to plead guilty to any involvement in such a scheme.  This fact raises real

3 questions about whether such a scheme existed, and perhaps offers some insight into why

4 the prosecution has resorted to such base tactics in its misguided attempt to convert the

5 acknowledged accounting errors at Broadcom into a crime.

6      The prosecution's willingness to create non-existent and questionable crimes in order

7 to secure Ms. Tullos's cooperation and Dr. Samueli's plea thus further illustrates how

8 willing the prosecution has been to push the envelope – and indeed, to cross the line – in

9 pursuit of convictions in this case.

10 **D.    The Prosecution's Additional Misconduct Before the Grand Jury**

11     **1.    Presentation of Stock Options and Drug Indictment to Same Grand

12        Jury**

13      When the time finally came to present the indictment in this matter to the grand jury,

14 the prosecution struck yet another foul blow.

15      The prosecution presented two indictments to the same grand jury on the same day,

16 both of them directly related to Broadcom.  The first was the indictment in this case

17 charging Mr. Ruehle and Dr. Nicholas with conduct related to Broadcom's stock option

18 program.  The second was an indictment charging Dr. Nicholas alone with several drug-

19 related offenses.  There is little question that the same grand jury heard evidence on both

20 indictments – the indictments featured the identical "October 2007 Grand Jury" identifier on

21 their caption pages, were issued on the same day, and were assigned sequential case

22 numbers.  (Indictment in <u>United States v. Nicholas and Ruehle</u>, SA CR 08-139 CJC, Docket

23 No. 2, and Indictment in <u>United States v. Nicholas</u>, SA CR 08-140 CJC, Docket No. 1, both

24 filed on June 4, 2008.)

25      The problem with the tandem presentation of both cases to the same grand jury is that

26 the drug indictment is inextricably and expressly intertwined with Broadcom Corporation,

27 and therefore was highly likely to unfairly and improperly skew a jury's perspective on the

28 Broadcom-based stock options indictment.  Broadcom appears in the very first paragraph of

1  the drug indictment, which states that Dr. Nicholas was a "co-founder of Broadcom" and

2  "served as Broadcom's Chief Executive Officer and co-chairman of Broadcom's Board of

3  Directors" from 1998 to 2003.  (Drug Indictment, at ¶ 1, Docket 1 in <u>United States v.</u>

4  <u>Nicholas</u>, SA CR 08-140 CJC, filed June 4, 2008.)  The drug allegations fall within the very

5  same time period as the options allegations: 1998 to 2003.  <u>Id.</u>  Most problematically, the

6  drug indictment is suffused with incendiary allegations linking Broadcom to drug dealing

7  and prostitution.  <u>Id.</u>

8         The analysis courts use when considering the prejudice of joining offenses for trial by

9  jury is particularly instructive when considering the prejudice that can arise from joining

10  presentations of separate but related offenses to a grand jury.  Courts have identified several

11  dangers that can result from improperly conflating the presentation of separate but related

12  offenses to the same jury, including: (1) the focus of the jury may shift to the alleged crime

13  of one defendant, creating a high risk that a jury will find guilt by association, <u>United States</u>

14  <u>v. Sarkisian</u>, 197 F.3d 966, 977 (9th Cir. 1999) ("where one defendant is charged with

15  offenses in which the other defendants did not participate, the detailed evidence introduced

16  to establish guilt of the separate offenses may shift the focus of the trial to the crimes of the

17  single defendant.  In such cases, codefendants run a high risk of being found guilty merely

18  by association."); <u>see also</u> <u>United States v. Spector</u>, 326 F.2d 345, 350-51 (7th Cir. 1963);

19  (2) the cumulation of evidence of various alleged crimes can lead a jury to conclusions that

20  would not be reached if the charges were considered separately; <u>United States v. Lewis</u>, 787

21  F.2d 1318, 1322, <u>amended by</u> 798 F.2d 1250 (9th Cir. 1986) (recognizing a high risk of

22  undue prejudice where "joinder of counts allows evidence of other crimes to be introduced

23  in a trial of charges with respect to which evidence would otherwise be inadmissible");

24  <u>United States v. Drew</u>, 331 F.2d 85, 88-89 (D.C. Cir. 1964); and (3) matters related to one

25  alleged crime and one defendant can distract the jury and lead to unreasonable conclusions

26  as to others; <u>McElroy v. United States</u>, 164 U.S. 76, 79-80, 17 S. Ct. 31, 32, 41 L. Ed. 355

27  (1896); <u>United States v. Halper</u>, 590 F.2d 422, 429-30 (2d Cir. 1978).

28

1    Every one of these dangers was present in the submission of the stock options and

2    drug indictments to the same grand jury on the same day.  The drug indictment contained

3    salacious accusations of drug buys, drug use, and prostitution at Broadcom by Broadcom

4    employees – accusations guaranteed to shift the focus to those alleged crimes and trigger the

5    dangers of guilt by association.  Sarkisian, 197 F.3d at 977.  The presentation of the bawdy

6    allegations and evidence related to the drug indictment, rife with references to Broadcom,

7    surely increased the likelihood that the evidence would cumulate and commingle with the

8    evidence related to the stock options indictment, distracting the grand jury and creating real

9    danger of results that would not have been reached had the evidence and the indictments

10   been presented separately grand juries.  Lewis, 787 F.2d at 1322; see also McElroy, 164

11   U.S. at 79-80, 17 S. Ct. at 32.  Given the divergent nature of the drug and stock options

12   allegations and the dramatic allegations in the drug indictment, the potential for prejudice

13   here was simply too great to be assuaged by a simple curative instruction.

14   These risks and dangers could have been easily avoided.  The prosecution could have

15   simply presented the indictments to separate grand juries.  The prosecution's failure to do so

16   was at best sloppy, and at worst a tactical decision to cultivate the very kind of prejudice

17   case authority courts warn against.  Either way, the conduct raises serious questions about

18   the stock option indictment's validity.  When considered in light of the prosecution's other

19   conduct, the prosecution's highly prejudicial grand jury presentation leaves dismissal of the

20   indictment as the only appropriate course of action.

### 2.    "Icing" Key Witnesses to the Relevant Conduct

21   Even in the wake of its misconduct-riddled investigation and the prejudicial-laden

22   grand jury presentation, the prosecution has continued to conduct itself in an inappropriate

23   manner aimed at stacking the deck against Mr. Ruehle and Dr. Nicholas.  The most

24   transparent misconduct can be seen in the great lengths to which the prosecution has gone to

1    "ice" Dr. Henry Samueli and David Dull and thereby neutralize them as potential defense

2    witnesses.[13]

3        As stated previously, Dr. Samueli was one of the two members of the stock option

4    committee at Broadcom, which granted the options at issue in this case.  (Dr. Nicholas was

5    the other.)  Mr. Dull was the general counsel of Broadcom and as such was responsible for

6    the creation of corporate legal documents (like UWCs).  The SEC alleged in its complaint

7    that both individuals were squarely at the center of the alleged misconduct, and the

8    indictment identifies Dr. Samueli by his initials as an unindicted co-conspirator in the

9    alleged scheme.[14]

10       As the Court is aware, the prosecution negotiated a plea deal with Dr. Samueli that

11   would have virtually ensured that Dr. Samueli would have invoked the Fifth Amendment if

12   called to testify by Mr. Ruehle and Dr. Nicholas.  Despite the Court's rejection of that plea

13   agreement and the interlocutory appeal of the Court's order, the agreement has still had the

14   desired effect of putting Dr. Samueli on ice and depriving the defense of a person who could

15   be a critical government witness.

16       What the Court may not know is that the prosecution has undertaken a similar

17   strategy with another unnamed co-conspirator – Broadcom's General Counsel David Dull.

18   Just as with Dr. Samueli, the prosecution has chosen to "ice" Mr. Dull by placing him in

19

---

20       [13] It is apparent that the government's efforts to neutralize Dr. Samueli and Mr. Dull
21   as potential defense witnesses are motivated by the fact that both gave testimony before the
     SEC that directly contradicts the government's allegation that Mr. Ruehle, Dr. Nicholas,
22   and others "knowingly created and caused to be created fraudulent corporate records that
     made it appear as though Broadcom's Option Committee had met and granted non-repriced,
23   at-the-money, options" on specified dates.  (Indictment, at ¶ 24).  Dr. Samueli and Mr.
     Dull provided testimony that directly contradicts this allegation that pervades the
24   indictment.  (See, e.g., Ex. 13, Samueli SEC Testimony, RT 5/25/07:180, lines 16-19; Ex.
25   14, Dull SEC Testimony RT 7/25/07: 237).
         [14] Mr. Ruehle wishes to make it crystal clear that he is merely stating the
26   government's allegations and does not in any way intend to suggest that the allegations the
     government has made regarding Dr. Samueli or Mr. Dull are true.  To the contrary, Mr.
27   Ruehle believes Dr. Samueli and Mr. Dull are – like Mr. Ruhele and Dr. Nicholas –
28   completely innocent and committed no crime whatsoever with respect to Broadcom's stock
     option practices.

legal limbo, despite the prosecution's apparent belief in Mr. Dull's participation in the alleged conspiracy, as reflected in the complaint filed by the prosecution's partner in this investigation, the SEC.  That complaint demonstrates that the prosecution views Mr. Dull as equally involved in the alleged conspiracy as Mr. Ruehle, Dr. Nicholas and Dr. Samueli. (Complaint in <u>SEC v. Nicholas, et al.</u>, No. SA CV 08-539-CJC (RNBx), filed May 14, 2008, at ¶¶ 2-4.)  His testimony at trial will therefore be just as crucial to the defense as Dr. Samueli's, because as the general counsel and chief legal officer, it was his responsibility to process the company's corporate documentation and ensure the company's compliance with the law.  Even after investigating this matter for more than two years, the government has failed to charge Mr. Dull or, upon information and belief, inform him that he will not be charged.  The reasonable inference from this dilatory conduct is that the government is deliberately positioning Mr. Dull – just as it has Dr. Samueli – to give him no choice but to invoke the Fifth Amendment and thereby prevent his testimony on behalf of Mr. Ruehle and Dr. Nicholas.

Given the prosecution's track record in this case, it is difficult to view its conduct toward Dr. Samueli and Mr. Dull as anything but an attempt to deny Mr. Ruehle and Dr. Nicholas critical witness testimony to which they are entitled under the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment. <u>United States v. Bieganowski</u>, 313 F.3d 264, 291 (5th Cir. 2002) (Sixth Amendment enshrines "the right to present witnesses to establish his defense without fear of retaliation against the witness by the government.") (internal quotation marks and citation omitted); <u>United States v. Vavages</u>, 151 F.3d 1185, 1188 (9th Cir. 1998) ("It is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'") (citation omitted).

### E.     The Cumulative Effect of the Prosecution's Conduct

The above-described conduct cannot be viewed as discrete (or indiscrete) instances of government bumbling.  Rather, the conduct must be viewed as a whole, and its effects must be assessed cumulatively.  Taken together, the instances of misconduct become canaries in

1  the coal mine – indicia of fatal flaws and abuses of power in the prosecution's investigation

2  of this matter.

3      When viewed as a whole, the individual examples of misconduct reveal a single

4  narrative – the prosecution, stymied in its efforts to turn accounting mistakes into federal

5  crimes and hampered by key witnesses who believed no crime occurred at Broadcom,

6  resorted to improper tactics to bully witnesses into telling a story that comported with the

7  prosecution's view of the case.  This misconduct morphed a grand jury investigation from a

8  search for the truth into a quest for convictions and compromised the integrity of the

9  criminal justice system.

10      The cumulative effect of the prosecution's wrongdoing in this case has another

11  momentous effect: it elevates the prosecution's misconduct to the level of a constitutional

12  violation.  It is beyond dispute that prosecutorial misconduct may become "so outrageous

13  that due process principles would absolutely bar the government from invoking judicial

14  processes to obtain a conviction. . . ."  United States v. Russell, 411 U.S. 423, 431-32, 93 S.

15  Ct. 1637, 1643, 36 L. Ed. 2d 365 (1973); see also United States v. Simpson, 813 F.2d 1462,

16  1464 (9th Cir. 1987); United States v. Marshank, 777 F. Supp. 1507, 1523 (N.D. Cal. 1991)

17  (outrageous government misconduct turns on the totality of the circumstances); see also

18  United States v. Samango, 607 F.2d 877, 884 (9th Cir. 1979) (court exercised supervisory

19  power to dismiss indictment where cumulative effect of errors and prosecutorial misconduct

20  was to produce a biased grand jury).

21      One of the key factors in determining whether prosecutorial misconduct rises to the

22  level of a due process violation is whether the case involved the prosecution's mere

23  "passive tolerance" of misconduct or the "conscious direction" of misconduct by

24  government agents.  Simpson, 813 F.2d at 1468.  Viewed in their totality, the instances of

25  prosecutorial misconduct identified herein were undoubtedly the result of conscious

26  direction by the prosecution – deliberate decisions made to violate rule after rule in a single-

27  minded pursuit of convictions.  Mr. Ruehle's due process rights have been violated by the

28  prosecution's conduct, and the violation must be remedied.

**F.     The Prosecution's Misconduct Should be Fully Aired in an Evidentiary Hearing**

The foregoing facts and law leave little question that an evidentiary hearing is both necessary and appropriate to permit the full airing of the prosecution's conduct in this investigation.  Evidentiary hearings are a well-established means of fleshing out and examining allegations of prosecution misconduct.  The Ninth Circuit has articulated the showing required for an evidentiary hearing:

> If, in fact, a material issue of fact were raised "which if resolved in accordance with (appellant's) contentions would entitle him to relief", an evidentiary hearing would be required. . . .  In determining . . . whether appellant was prejudiced by prosecutorial misconduct, we must assume that the factual allegations in appellant's affidavits are true.

United States v. Irwin, 612 F.2d 1182, 1187 (9th Cir. 1980) (citations omitted); see also United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir. 1991).  When the facts described above and supported by the attached exhibits are assumed to be true, there is no question that they point to serious prosecution misconduct that has prejudiced Mr. Ruehle and entitled him to substantial relief.

An evidentiary hearing is no mere formality here.  While the factual record developed herein is substantial, it is, unsurprisingly, incomplete.  It is axiomatic that in criminal investigations involving multiple potential targets and witnesses, the natural incentive of counsel and witnesses is to avoid appearing adverse to the prosecution, for fear that doing so would result in adverse decisions by the prosecution.  Stein, 541 F.3d at 142 (a corporation faced with government inquiries in a criminal matter "could be expected to do all it could . . . to placate and appease the government").  Given the prosecution's misconduct in this case, any defense counsel's fear of retribution would be particularly well founded.  The ability to compel documents and testimony will provide the necessary tools to obtain candid and complete information concerning the prosecution's misconduct, and an evidentiary hearing backed by compulsory process will permit Mr. Ruehle to ask the necessary questions and obtain the crucial documents relevant to the prosecution's misconduct during this

investigation – and, ultimately, to confirm the truth of what actually happened during the prosecution's investigation of this case.  Surely, the prosecution cannot object to a search for the truth, even when its own conduct is at issue.

Mr. Ruehle submits that the evidence attached to this motion is sufficient to warrant dismissal of the indictment on its face.  An evidentiary hearing, however, will confirm the evidence that Mr. Ruehle has obtained, provide additional details concerning the prosecution's misconduct, and assist the Court in determining the appropriate remedy.  It is to that remedy that we now turn.

### G.       The Prosecution's Conduct Warrants Dismissal of the Indictment

The evidence set forth in this motion poses a fundamental question: can an indictment based on a government investigation riddled with such misconduct be allowed to stand?

There is no question that the Court <u>can</u> dismiss the indictment because of prosecutorial misconduct.  <u>United States v. Chapman</u>, 524 F.3d 1073, 1087-88 (9th Cir. 2008) (affirming exercise of supervisory powers to dismiss indictment as appropriate remedy for government misconduct); <u>see also</u> <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 509 (9th Cir. 1994).  The only question, then, is whether the Court <u>should</u> do so here.

The Supreme Court's decision in <u>Bank of Nova Scotia v. United States</u> lights the way for this inquiry.  There, the Court observed that dismissal is appropriate where the prosecution's misconduct "substantially influenced the grand jury's decision to indict, or . . . there is grave doubt that the decision to indict was free from the substantial influence of such violations."  <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 256, 108 S. Ct. 2369, 2374, 101 L. Ed. 2d 228 (1988) (internal quotation marks and citations omitted).  The prosecution's conduct here – ranging from deliberate, tactical leaks of grand jury secrets and improper pressuring of witnesses to invalid plea deals and tainted grand jury presentations – goes to the heart of the investigation in this matter, and such conduct can only have "'substantially influenced the grand jury's decision to indict.'"  <u>Id.</u> at 256, 108 S. Ct. at 2374 (citation omitted).  At the very least, "there is 'grave doubt' that the decision to

1  indict was free from the substantial influence of such violations."  Id. (citations omitted).

2  Under such circumstances, dismissal is the only appropriate remedy.

3       Dismissal is appropriate for another, equally compelling reason: to punish the

4  prosecution and thereby deter prosecutorial misconduct and protect the integrity of the

5  judicial process.  The Ninth Circuit has noted that dismissal is particularly appropriate "as a

6  prophylactic tool for discouraging future deliberate governmental impropriety of a similar

7  nature."  United States v. Owen, 580 F.2d 365, 367 (9th Cir. 1978); see also United States v.

8  McClintock, 748 F.2d 1278, 1284-85 (9th Cir. 1984) (district court may exercise its

9  supervisory power over grand jury proceedings to deter official misconduct and protect

10 judicial integrity).  The need for deterrence is heightened here, because the conduct in this

11 case does not consist of a single isolated incident, and, moreover, because the misconduct in

12 this case does not appear to be an isolated occurrence in this district.[15]  Only dismissal will

13 sufficiently punish and deter the kind of pervasive misconduct that has marred this

14 investigation and other recent investigations and prosecutions in this district.  Nova Scotia,

15 487 U.S. at 255-59, 108 S. Ct. at 2374-2376; United States v. Lartzolo, 869 F.2d 1354,

16 1357-58 (9th Cir. 1989)  ("A constitutional violation may also be found if defendant can

17 show a history of prosecutorial misconduct that is so systematic and pervasive that it affects

18 the fundamental fairness of the proceeding . . . .").[16]

19 **IV.   CONCLUSION**

20      In a prior filing in this matter, the prosecution made the extraordinary claim that

21 "federal prosecutors have the highest interest" in doing what it takes "to secure criminal

22 convictions in a criminal case."  (Government's Motion to Intervene and Stay of Discovery

---

23
24     [15]   In two decisions handed down within days of each other recently, judges in this
district recently found that the government had committed misconduct by violating well-
25 established procedural and ethical rules.  United States v. Carona, No. SA CR 06-224-AG,
2008 WL 1970205 (C.D. Cal. May 2, 2008); United States v. Hector, No. CR 04-00860
26 DDP, 2008 WL 2025069 (C.D. Cal. May 8, 2008).  The former case involved a prosecutor
who has been heavily involved in the instant investigation.
27
28     [16] Mr. Ruehle reserves the right to seek other remedies, including suppression of
witness testimony, following an evidentiary hearing on this matter.

in <u>SEC v. Nicholas, et al.</u>, No. CV 08-539-CJC, Docket No. 34, filed July 2, 2008 at 5:10-13.)

While that statement might have been dismissed at the time as nothing more than an unfortunate turn of phrase, it now becomes clear that the statement provides a window into the prosecution's mind-set throughout the course of this investigation: conviction at any cost. That is why the prosecution did what it did in this case. That is why the prosecution has gone to such lengths to recast accounting errors as criminal conduct. That is why the prosecution leaked grand jury secrets, strong-armed witnesses, and negotiated invalid plea agreements. Not to do justice, but to serve what it views as its "highest interest" – convictions.

Over the course of a two-year investigation, the prosecution has pursued what it believes to be its "highest interest" in a manner that has destroyed Mr. Ruehle's sterling reputation – earned in over 40 years of work in the business world – and now threatens to deprive him of his liberty. Mr. Ruehle does not challenge the prosecution's authority and right to vigorously pursue criminal wrongdoing. He asks only that the prosecution conduct itself in a manner consistent with the Supreme Court's view that a prosecutor's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." <u>Berger</u>, 295 U.S. at 88, 55 S. Ct. at 633. He asks only that the prosecution be held to that standard.

It goes without saying that dismissal of an indictment can impose costs upon the government and the public. However,

> the costs of continued unchecked prosecutorial misconduct are also substantial. This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. . . . Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened [and] *dismissal of an indictment may be virtually the only effective way to encourage compliance with these ethical standards and to protect defendants from abuse of the grand jury process*.

<u>United States v. Serubo</u>, 604 F.2d 807, 817-18 (3d Cir. 1979) (emphasis added).

1    In the investigation that led to this criminal action, the prosecution wielded its

2  immense power in an irresponsible and reckless fashion.  In doing so, the prosecution cast

3  grave doubt on its investigation and the resulting indictment.  That doubt can only be

4  removed by allowing the parties to fully examine the prosecution's misconduct in an

5  evidentiary hearing, and thereby learn the truth of what took place during the course of this

6  investigation.  Such a hearing will ensure that the Court has all the information it needs to

7  preserve and vindicate the rights of Mr. Ruehle and Dr. Nicholas, and to safeguard the

8  integrity of the judicial process.

9    For the foregoing reasons, Mr. Ruehle respectfully requests that the Court grant his

10 request for an evidentiary hearing and dismiss the indictment against him.

11 DATED:  October 20, 2008

12                                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13                                Richard Marmaro
                                  Jack P. DiCanio
14                                Matthew E. Sloan
                                  Matthew D. Umhofer
15

16                                By:_____/s/ Richard Marmaro_____
17                                       RICHARD MARMARO
                                         Attorneys for Defendant
18                                       William J. Ruehle

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

I hereby certify, that I caused the foregoing to be filed with the Clerk of the Court by using the ECF system which sent notification of the filing to the following:

Brendan V. Sullivan Jr.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W., Washington, D.C. 20005

Robb C. Adkins
UNITED STATES ATTORNEY'S OFFICE
411 W. Fourth St, 8th Flr, Santa Ana, CA  92701

By: _____/s/ Richard Marmaro_____
        RICHARD MARMARO