# Exhibit 4

Exhibit
30

# BROADCOM CORP

## FORM 10-K/A
### (Amended Annual Report)

## Filed 01/23/07 for the Period Ending 12/31/05

| | |
|---|---|
| Address | 5300 CALIFORNIA AVENUE |
| | IRVINE, CA 92617-3038 |
| Telephone | 949 926 5000 |
| CIK | 0001054374 |
| Symbol | BRCM |
| SIC Code | 3674 - Semiconductors and Related Devices |
| Industry | Semiconductors |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

Exhibit
31

## CAUTIONARY STATEMENT

*All statements included or incorporated by reference in this amended Annual Report on Form 10-K/A, other than statements or characterizations of historical fact, are forward-looking statements. Examples of forward-looking statements include, but are not limited to, statements concerning projected net revenue, costs and expenses and gross margin; our accounting estimates, assumptions and judgments; the impact of new accounting rules related to the expensing of stock options on our future reported results; our success in pending litigation; the demand for our products; the effect that seasonality and volume fluctuations in the demand for our customers' consumer-oriented products will have on our quarterly operating results; our dependence on a few key customers for a substantial portion of our revenue; our ability to scale our operations in response to changes in demand for existing products and services or the demand for new products requested by our customers; the competitive nature of and anticipated growth in our markets; our ability to migrate to smaller process geometries; manufacturing, assembly and test capacity; our ability to consummate acquisitions and integrate their operations successfully; our prospective needs for additional capital; inventory and accounts receivable levels; and the level of accrued rebates. These forward-looking statements are based on our current expectations, estimates, approximations and projections about our industry and business, management's beliefs, and certain assumptions made by us, all of which are subject to change. Forward-looking statements can often be identified by words such as "anticipates," "expects," "intends," "plans," "predicts," "believes," "seeks," "estimates," "may," "will," "should," "would," "could," "potential," "continue," "ongoing," similar expressions, and variations or negatives of these words. These statements are not guarantees of future performance and are subject to risks, uncertainties and assumptions that are difficult to predict. Therefore, our actual results could differ materially and adversely from those expressed in any forward-looking statements as a result of various factors, some of which are listed under "Risk Factors" in Item 1A of this Report. These forward-looking statements speak only as of the date of this Report. We undertake no obligation to revise or update publicly any forward-looking statement for any reason, except as otherwise required by law.*

*Forward-looking statements are not the only statements you should regard with caution. The preparation of our restated consolidated financial statements required us to make judgments with respect to the methodologies we selected to calculate the adjustments contained in the restated financial statements as well as estimates and assumptions regarding the application of those methodologies. These judgments, estimates and assumptions, which are based on factors that we believe to be reasonable under the circumstances, affected the amounts of additional deferred compensation and additional stock-based compensation expense that we recorded. The application of alternative methodologies, estimates and assumptions could have resulted in materially different amounts.*

## EXPLANATORY NOTE

### Purpose of this Amended Annual Report on Form 10-K/A

We recently completed a voluntary review of our equity award practices. The voluntary review, which commenced in May 2006 and covered all grants of options to purchase shares of our Class A or Class B common stock, referred to in this amended Annual Report on Form 10-K/A, or this Report, as stock options or options, and other equity awards made since our initial public offering in April 1998, was directed by the Audit Committee of our Board of Directors. The voluntary review consisted of two components: (1) an equity award review, so-referenced in this Report, to determine whether we used appropriate measurement dates for option grants and other equity awards made under our extensive employee equity award programs, which was conducted with the assistance of outside legal counsel Irell & Manella LLP and forensic accountants FTI Consulting Inc., and (2) an investigation of the conduct and performance of Broadcom's officers, employees and directors who were involved in the stock option granting process, referred to in this Report as the conduct review, which was conducted with the assistance of independent legal counsel Kaye Scholer LLP and forensic accountants LECG, LLC.

Based on the results of the equity award review, the Audit Committee concluded that, pursuant to Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* , or APB 25, and related interpretations, the accounting measurement dates for most of the stock option grants awarded between June 1998 and May 2003, covering options to purchase 232.9 million shares of our Class A or Class B common stock, differed from the measurement dates previously used for such awards. As a result, revised measurement dates were applied to the affected option grants and Broadcom has recorded a total of $2.259 billion in additional stock-based compensation

Exhibit
32

Table of Contents

expense for the years 1998 through 2005. After related tax adjustments of $38.7 million, the restatement resulted in total net adjustments of $2.220 billion for the years 1998 through 2005. This amount is net of forfeitures related to employee terminations. The additional stock-based compensation expense is being amortized over the service period relating to each option, typically four years, with approximately 95% of the expense being recorded in years prior to 2004.

As a consequence of these adjustments, our audited consolidated financial statements and related disclosures for the three years ended December 31, 2005 and our consolidated statements of operations and consolidated balance sheet data for the five years ended December 31, 2005, included in "Selected Consolidated Financial Data" in Part II, Item 6 of this Report, have been restated. In addition, the unaudited quarterly financial information for interim periods of 2005 and 2004, included in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of this Report, has been restated. We have also restated the stock-based compensation expense footnote information calculated under Statement of Financial Accounting Standards, or SFAS, No. 123, *Accounting for Stock-Based Compensation* , or SFAS 123 , and SFAS No. 148, *Accounting for Stock-Based Compensation — Transition and Disclosure* , or SFAS 148, under the disclosure-only alternatives of those pronouncements for the years 2003 through 2005 and for interim periods of 2005 and 2004. The restated footnote information has been included in "Management's Discussion and Analysis of Financial Condition and Results of Operations" as well as in the Consolidated Financial Statements in Part II, Item 15 of this Report.

The adjustments did not affect Broadcom's previously-reported revenue, cash, cash equivalents or marketable securities balances in any of the restated periods.

Share and per share information presented in this Report has been adjusted to reflect all splits and dividends of our common stock subsequent to April 16, 1998, including the three-for-two stock split effected February 21, 2006 through the payment of a stock dividend.

## Findings of the Equity Award Review

From our initial public offering through May 2003, Broadcom's option grant processes and procedures were not formalized or consistently followed. During this period, option grants awarded to employees who were not then executive officers, as defined in Section 16 of the Securities Exchange Act of 1934, as amended, or Section 16 Officers, were approved by our Equity Award Committee (then known as the Option Committee). The committee consisted of two directors who were also Section 16 Officers, pursuant to authority delegated by the Board of Directors under Broadcom's 1998 Stock Incentive Plan, as amended and restated, or the 1998 Plan, and our 1999 Special Stock Option Plan. The Equity Award Committee did not conduct formal meetings with respect to all option grants; rather, the committee members often held informal discussions, either in person or telephonically, to determine whether option grants should be approved and priced as of that day. The Equity Award Committee members conferred frequently (often weekly) during 1998 and 1999. From 2000 through 2002, the Equity Award Committee members conferred less frequently and sometimes made option grants only once a quarter. No formal, contemporaneous written records of the Equity Award Committee discussions or meetings were kept. Instead, the Equity Award Committee relied upon, and option grant approvals were documented by, unanimous written consents, which were dated "as of" a specified date but were generally prepared after that date and signed at a later time. Thus, Broadcom has been unable to locate affirmative, contemporaneous documentation of Equity Award Committee meetings related to many past option grants.

During the equity award review, we determined that 18 grant dates were selected after the "as of" date indicated on the unanimous written consents documenting the approvals for some or all of the options granted. Accordingly, during the equity award review process, we presumed that *each* of the 96 grant dates from our initial public offering through May 2003 did not meet the measurement date criteria of APB 25 *unless* we could locate contemporaneous documentation confirming both that (1) a meeting occurred on a specified grant date and (2) the identification of employee-recipients and grant amounts were finalized by that grant date. Because we applied this presumption, a significant portion of the restatement adjustments are based upon our inability to locate such documentation.

During the same period, from our initial public offering through May 2003, option grants to Section 16 Officers and members of the Board of Directors were approved by the Board of Directors or the Compensation

2

Exhibit
33

Committee or made pursuant to the Automatic Director Grant Program under the 1998 Plan. Like the Equity Award Committee, the Compensation Committee relied upon, and option grant approvals were documented by, unanimous written consents, which were dated "as of" a specified date but generally were prepared after that date and signed at a later time. We have been unable to locate affirmative, contemporaneous documentation of Compensation Committee meetings related to several Section 16 Officer option grants. At the time of two grant dates to Section 16 Officers, a vacancy on the Compensation Committee existed; however, the vacancy had been formally filled by the time the unanimous written consents were executed by the committee members. Most grants to directors were made automatically on the dates specified under the 1998 Plan.

None of the grants requiring measurement date adjustments was made to our co-founders or any current or former member of our Board of Directors.

In June 2003 we implemented revisions to our stock option grant processes and procedures. As a result, the processes were formalized and a consistent procedure was implemented for the Equity Award and Compensation Committees. In addition, the composition of the Equity Award Committee was changed to include an independent director. Our review of the equity award practices in effect since June 2003 has determined that our equity granting processes and practices are sound and have been consistently adhered to, and we have not identified any instances of inappropriate measurement dates under APB 25 for option grants or other equity awards made since May 2003.

Currently, the Compensation Committee and Equity Award Committee each hold monthly equity award meetings based upon a predetermined schedule. The process requires that any proposed equity awards be reviewed in advance by both our Shareholder Services and Human Resources Departments, and requires communication of the details of proposed equity awards to committee members prior to each monthly meeting, as well as to award recipients promptly after the meeting. Equity awards are priced and valued based upon the closing price of our Class A common stock on the Nasdaq Global Select Market SM (previously the Nasdaq National Market) on the date of the meeting. Decisions of each committee meeting are documented by minutes.

*Adjustments to Measurement Dates*

During the course of the equity award review, we identified three reasons that led to the determination that 81 grant dates failed to meet the measurement date criteria of APB 25. None of the grants requiring measurement date adjustments was made to our co-founders or any current or former member of our Board of Directors. For some of the 81 grant dates, more than one reason applied; as a result, the grant date numbers detailed below will not total 81 grant dates. The three reasons are:

- *No Contemporaneous Documentation.* The review identified 68 grant dates for which Broadcom has been unable to locate contemporaneous documentation (beyond the "as of" dated unanimous written consents) confirming that a committee meeting occurred on the indicated grant date. We presumed that each grant date did not meet the measurement date criteria of APB 25 unless we could locate contemporaneous documentation confirming both that (1) a meeting occurred on the grant date and (2) the identification of employee-recipients and grant amounts were finalized by the grant date. The affected awards on these 68 grant dates involved 10,529 option grants covering 108.9 million shares. Of the options to purchase 108.9 million shares, options to purchase 0.4 million shares were granted to Section 16 Officers and options to purchase 108.5 million shares were granted to other employees. Among the 68 grant dates were three grant dates on which options were granted at times when the closing price of our Class A common stock was at or near the lowest price experienced during the applicable quarter or year. The three grant dates involved 1,128 option grants covering 12.5 million shares, none of which were granted to Section 16 Officers. Adjustments to the APB 25 measurement dates for the grants covered by the 68 grant dates resulted in the recording of additional deferred compensation of $1.037 billion.

- *Date Selection.* For 18 grant dates, the review identified documents and/or unusual pricing procedures that indicated that the grant date for some options was selected after the date indicated on the unanimous written consent documenting the approval of those options. The affected awards on these 18 grant dates involved 6,205 option grants covering 90.3 million shares. Of the options to purchase 90.3 million shares, options to purchase 5.1 million shares were granted to Section 16 Officers and options to purchase

3

Exhibit
34

Table of Contents

85.2 million shares were granted to other employees. Adjustments to the APB 25 measurement dates for these grants resulted in the recording of additional deferred compensation of $904.5 million.

- *Subsequent Allocation.*  In 1998, 2000, 2001 and 2002, we made large, broad-based grants of options to a substantial percentage (as high as 90%) of our employees. With respect to two of the broad-based grant dates, the review determined that we had not completed allocations of options to individual employees by the time the grant date was selected by the Equity Award or Compensation Committee. The affected awards on these two grant dates involved 4,271 option grants covering 33.7 million shares. Of the options to purchase 33.7 million shares, options to purchase 0.8 million shares were granted to Section 16 Officers and options to purchase 32.9 million shares were granted to other employees. Adjustments to the APB 25 measurement dates for these grants resulted in the recording of additional deferred compensation of $677.8 million.

The equity award review also revealed that, with respect to 14 of the grant dates discussed above, the Equity Award Committee awarded options but we intentionally did not notify some of the employee-recipients of their option grants for extended periods. We believe that notification is not an explicit criterion required by APB 25 to establish a measurement date. However, SFAS 123, if applicable, requires that there be a mutual understanding between the company and employee-recipient of the terms and conditions of option awards for there to be a grant date, and APB 25 indicates that the measurement date generally is on or after the grant date. Accordingly, we decided that for these 14 grant dates, the date of notification to the affected employees represented the best approximation of the appropriate measurement date under APB 25. The affected awards on these 14 grant dates involved 608 option grants covering 13.1 million shares. Of the options to purchase 13.1 million shares, options to purchase 1.3 million shares were granted to Section 16 Officers and options to purchase 11.8 million shares were granted to other employees. Adjustments to the APB 25 measurement dates for these grants resulted in the recording of deferred compensation of $251.1 million, included in the amounts above.

### Other Adjustments

In addition, during the course of the equity award review, we identified some instances in which adjustments to deferred compensation were required that were not related to changes in measurement dates, as follows:

- Grants made to some consultants were erroneously accounted for under APB 25 as if they had been made to employees. To correctly account for these grants in accordance with SFAS 123, we recorded $33.8 million in additional deferred compensation during 1998 through 2002.
- Some grants were made to employees upon acceptance of their employment offers at Broadcom rather than as of or after the actual commencement of employment. To correctly account for these grants in accordance with APB 25 and SFAS 123, we recorded $12.1 million in additional deferred compensation during 1998 through 2002.
- With respect to 17 option grants, modifications were made to employee stock options that were not accounted for in accordance with APB 25. The modifications included the acceleration of the vesting period of options of terminated employees or the extension of the post-service exercise period for vested stock options of terminated employees. We recorded $9.5 million in additional deferred compensation, principally in 2001 through 2003, to properly account for these modifications.

In addition, other stock-based compensation expense previously recorded in prior periods was adjusted in connection with the restatement. In connection with the termination of some employees, we recorded stock-based compensation expense resulting from the extension of the post-service exercise period for vested stock options and for acceleration of the vesting period of stock options. These modifications were accounted for correctly pursuant to APB 25. However, as a result of other adjustments made in our restatement, the previously-recorded deferred compensation was reduced by $3.1 million.

### Financial Impact of the Equity Award Review

The $2.672 billion total of the amounts shown above represents the aggregate *gross* additional deferred compensation that we recorded for the years 1998 through 2005 as a result of our equity award review. This amount does not reflect the elimination of $396.4 million in deferred compensation due to subsequent forfeitures related to

4

Exhibit
35

Table of Contents

employee terminations. In addition, the remaining amount of deferred compensation totaling $16.1 million at December 31, 2005 was eliminated in accordance with the provisions of SFAS No. 123 (revised 2004), *Share-Based Payment*, or SFAS 123R, which we adopted effective January 1, 2006. After such reductions, we recorded *net* additional stock-based compensation expense of $2.259 billion for the years 1998 through 2005 in connection with our equity award review. After related tax adjustments of $38.7 million, the restatement resulted in total net adjustments of $2.220 billion for the years 1998 through 2005. The adjustments did not affect Broadcom's previously-reported revenue, cash, cash equivalents or marketable securities balances in any of the restated periods.

**Findings of the Conduct Review**

In late July 2006, on the basis of its initial review, the Audit Committee decided to investigate the conduct and performance of Broadcom's officers, employees and directors who were involved in the stock option granting process. That investigation is referred to in this Report as the conduct review.

During the four-and-a-half month conduct review, the Audit Committee met 28 times. Its independent counsel reviewed more than six million pages of documents and electronic information, and interviewed more than forty individuals, some more than once. The conduct review was accomplished with the full support and cooperation of Broadcom's management and employees.

The Audit Committee determined that, after May 2003, Broadcom made significant corrective changes to its option granting and documentation processes. The measurement date for each grant made after May 2003 complied with prevailing accounting rules and is not subject to restatement. The Audit Committee found that Broadcom's current processes are appropriate, that effective controls are now in place, and that there is currently no known material weakness in Broadcom's option granting processes.

For the period from June 1998 through May 2003, however, the Audit Committee found that Broadcom's informal option grant procedures and processes lacked adequate controls, and that its documentation and recordkeeping were insufficient to verify most of the original measurement dates.

The Audit Committee found that, for numerous option grants made between November 3, 1998 and May 19, 2003, certain Broadcom executives and employees selected grant dates after the fact.

The Audit Committee further found that, particularly with respect to annual broad-based option grants, allocations of grants to some individuals occurred after the grant dates.

The Audit Committee found that, reflecting the lack of adequate controls, there was, at times, uncertainty and confusion among certain individuals at Broadcom as to the rules relating to accounting for options, and certain individuals at Broadcom did not appreciate, or may not have appreciated, what the appropriate accounting rules were or whether appropriate accounting charges were or should have been taken.

Option grants were documented by unanimous written consents with "as of" dates. These unanimous written consents were often prepared weeks or months after the fact, and, apparently, a number of the "as of" unanimous written consents were presented for signature at the same time.

With respect to both the Equity Award Committee and the Compensation Committee, the Audit Committee found no evidence of any attempt to falsify execution dates of the "as of" unanimous written consents, or of any effort to assert that the date of actual execution of the "as of" unanimous written consents was on the grant date or measurement date.

The Audit Committee determined that all options and other equity awards granted to Broadcom's co-founders and all current and former members of the Board of Directors were properly granted.

Based on the totality of the information available to it, the Audit Committee found that certain individuals were actively responsible for the lack of controls and the inappropriate grant practices. With respect to these individuals, the Audit Committee concluded:

- *Dr. Henry T. Nicholas III*, Broadcom's former President and Chief Executive Officer, bears significant responsibility for the lack of adequate controls in the option granting process due to the tone and style of doing business he set. There is substantial evidence that Dr. Nicholas was at times involved with the

Exhibit
36

Table of Contents

selection of grant dates after the fact and with subsequent allocations of grants. There is evidence that, on at least a couple of occasions, Dr. Nicholas sought the advice of the Chief Financial Officer and the Vice President of Human Resources regarding the process for certain option grants. He did not personally benefit from any of the restated grants. For reasons unrelated to stock options, Dr. Nicholas left Broadcom as an officer in January 2003 and did not stand for re-election as a director at the May 2003 Annual Meeting of Shareholders.

- *William J. Ruehle* , Broadcom's Chief Financial Officer from March 1998 until September 19, 2006, was at the center of the flawed option granting process. Mr. Ruehle retired from Broadcom two days before he was to be interviewed as part of the conduct review. Mr. Ruehle bears a substantial measure of responsibility for the lack of adequate controls and appropriate documentation in the option granting process. There is substantial evidence he engaged in the selection of grant dates after the fact. There is also substantial evidence that he engaged in subsequent allocations of grants. Mr. Ruehle failed to provide proper advice concerning proper accounting standards or to establish proper procedures. He was involved with grants for which the grant date was selected after the fact, and personally received options included in some of such grants.

- *Nancy M. Tullos* , Broadcom's former Vice President of Human Resources from August 1998 until June 30, 2003, also bears significant responsibility for the lack of controls and deficiencies in the option granting process. She was heavily involved in the flawed option granting process. While there is a lack of evidence that Ms. Tullos herself selected grant dates after the fact, there is substantial evidence she was heavily involved in that process, was fully aware of what was occurring, and encouraged, assisted in, and enabled it. There is also substantial evidence that Ms. Tullos was at the center of allocations of grants to individuals after the grants were made. She was involved with grants for which the grant date was selected after the fact, and personally received options included in some of such grants.

None of these individuals agreed to be interviewed by the Audit Committee's independent counsel during the conduct review.

The Audit Committee also found that a former Treasurer initiated or implemented, together with Mr. Ruehle, the selection of a few grant dates after the fact in late 2002. This Broadcom employee retired in December 2006 from his then mid-level position in the Information Technology Department as a result of the conduct review.

With respect to these individuals who were, to varying degrees, actively responsible for the lack of controls and the inappropriate grant practices, the following remedial steps were recommended by the Audit Committee and taken by Broadcom's Board of Directors in mid-December, 2006:

- Each of these individuals either left Broadcom in 2003 for reasons unrelated to stock option practices or has recently retired from Broadcom as a result of the conduct review.

- Broadcom has repriced and terminated all of Mr. Ruehle's outstanding exercisable options granted after the company's initial public offering. The net value prior to repricing of Mr. Ruehle's terminated options on December 15, 2006 exceeded $32 million. Broadcom also purchased from Mr. Ruehle at fair market value his outstanding vested options granted prior to Broadcom's initial public offering. A description of Broadcom's agreement with Mr. Ruehle pertaining to his options is included in Part III, Item 11 of this Report.

- Broadcom has terminated all of Ms. Tullos' outstanding exercisable options. The net value of Ms. Tullos' terminated options on December 15, 2006 exceeded $4 million.

- Broadcom has repriced and terminated all of the outstanding exercisable options granted after 2002 to the former Treasurer who left Broadcom because of the conduct review, and has repriced his earlier-granted options. The net value prior to repricing of his terminated options on December 15, 2006 exceeded $450,000.

6

Exhibit
37

- None of these former employees will receive any financial assistance that Broadcom may decide to make available to other employees to offset any tax consequences of the restatement.

- Dr. Nicholas has no outstanding options.

The Audit Committee also found that two other employees — who were not responsible for the selection of grant dates or initiating subsequent allocations, and who gave appropriate advice concerning option grants — could nonetheless have been more alert that option granting practices were, or may have been, questionable or lacking in adequate controls. The Audit Committee concluded that these employees did not follow up as fully as they could have to address inadequacies in the option granting process.

The Audit Committee and the Board of Directors confirmed their confidence in the ability of these individuals to fully perform their responsibilities in the future. These two individuals have voluntarily agreed to the repricing of their outstanding options to the fair market value of Broadcom's stock on the correct measurement dates and not to be included in any financial assistance that Broadcom may make available to its other employees to offset any tax consequences of the restatement.

Compensation Committee members executed "as of" unanimous written consents effecting the grants. The Audit Committee found that these Compensation Committee members reasonably relied on the advice of the responsible officers and employees and that management would present them with appropriate documents for execution.

The Audit Committee also concluded that Dr. Henry Samueli, a member of the Equity Award Committee and currently Broadcom's Chairman and Chief Technical Officer, while involved with the flawed option granting process, reasonably relied on management and other professionals regarding the correct option accounting treatment and grant approval process. The Audit Committee also found that all outside directors reasonably relied on management and other professionals regarding the correct option accounting treatment and grant approval process.

Finally, the Audit Committee concluded that both Scott A. McGregor, Broadcom's current President and Chief Executive Officer (who joined Broadcom in 2005), and Bruce E. Kiddoo, Vice President, Corporate Controller and Acting Chief Financial Officer (who assumed his position as Acting Chief Financial Officer when Mr. Ruehle retired on September 19, 2006), are appropriate individuals to certify Broadcom's financial statements.

On December 15 and 18, 2006, Broadcom's Board of Directors considered and approved each of the Audit Committee's findings and conclusions with respect to the conduct review.

### Restatement of Our Consolidated Financial Statements

As a result of the findings of our equity award review, our consolidated financial statements for the three years ended December 31, 2005 have been restated. The restated consolidated financial statements include unaudited financial information for interim periods of 2005 and 2004 consistent with Article 10-01 of Regulation S-X. We also recorded additional stock-based compensation expense and associated tax adjustments affecting our previously-reported financial statements for 1998 through 2002, the effects of which are summarized in cumulative adjustments to our additional paid-in capital, deferred compensation and accumulated deficit accounts as of December 31, 2002, in the amounts of $2.282 billion, $486.0 million and $1.796 billion, respectively. See the Consolidated Statements of Shareholders' Equity, included in Part IV, Item 15 of this Report.

Exhibit
38

# Exhibit 5

Exhibit
39

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CA 92660-6324
TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CALIFORNIA 90067-4276

TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199
WEBSITE: www.irell.com

WRITER'S DIRECT
TELEPHONE (310) 203-7159
FACSIMILE (310) 556-5244
bhennigan@irell.com

February 23, 2007

George S. Cardona, Esq.
U.S. Attorney
312 N. Spring Street
Los Angeles, CA 90017

     Re:    <u>Unauthorized Disclosure of Broadcom Material</u>

Dear Mr. Cardona:

     As you know, our firm represents Broadcom Corporation in responding to the investigations, by your Office and by Staff for the Securities and Exchange Commission, into the Company's historic options grant practices. At Broadcom's direction, we have been cooperating with authorities in both of those investigations, as discussed briefly below. Throughout the investigation, we have proceeded on the assumption that each of the Government agents and lawyers with whom we have dealt would conduct themselves in a professional and ethical manner, and would respect the expected confidential nature of our communications and of Broadcom documents shared voluntarily with them.

     Unfortunately, recent events suggest that one or more government lawyers or agents may have acted improperly. I write on behalf of Broadcom to request formally that your Office conduct a thorough investigation into the apparent improper disclosure of documents and information to the press concerning the investigation and take specific steps to assure us, and the Company, that further leaks will not occur and will not be tolerated. Specifically, two recent press articles -- the *Los Angeles Times* article of February 16, 2007 "Broadcom leader said to resist probe" (Exhibit A) and the *Wall Street Journal* article of February 16, 2007 "Bearing Down – Probes of Backdating Move to Faster Track" (Exhibit B) – each contain confidential information and references to confidential documents related to your Office's ongoing criminal investigation. Moreover, the *Los Angeles Times* article contains a detailed narrative of a portion of recent discussions between an AUSA and defense counsel, which could only have been leaked to the press by a party to those discussions.

     Over the past several months, Broadcom has voluntarily cooperated with the U.S. Attorney's Office and the SEC relative to their investigation concerning options grants at Broadcom. That cooperation has been extensive and fulsome. Indeed, to facilitate the federal investigation, Broadcom has on numerous occasions voluntarily provided its own counsel's otherwise protected work product and has responded rapidly and completely to

Exhibit
40

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

George S. Cardona, Esq.
February 23, 2007
Page 2

numerous and varied requests from both the U.S. Attorney's Office and the SEC for information and documents. The federal prosecutors have repeatedly expressed their appreciation for this extraordinary cooperation.

During the course of that cooperation, Broadcom has voluntarily produced e-mails to AUSA Andrew Stolper and to the SEC concerning the option grants under review. These e-mails have not been produced yet in any civil proceeding, although Broadcom is a defendant in numerous civil shareholder suits. As you can readily understand, Broadcom has provided the information to federal investigating authorities with the express understanding and expectation that the material would be used solely to conduct the federal investigation and would be kept confidential to the extent consistent with the Government's needs. Broadcom has repeatedly emphasized its concern that materials be kept confidential, in light of the fact that there are multiple civil actions already pending against the Company concerning the alleged backdating of options. Selective disclosure of these materials, or a portion of them out of context, plainly also can damage the Company and jeopardize the rights of interested individuals.

Quite frankly, the Company (and its counsel) were shocked to see many of these e-mails quoted verbatim on the front page of the *Wall Street Journal* article of February 16, 2007. Each of the e-mails quoted by the *Wall Street Journal* were compiled and produced to the U.S. Attorney's Office by Broadcom. In the circumstanes, given the Government's continuing requests for production of additional materials and for further cooperation from the Company, it is essential that your Office undertake to determine – and to advise us on behalf of Broadcom – whether these documents were improperly leaked to the press by any representative of the U.S. Attorney's Office.

The *Los Angeles Times* article of February 16, 2007 presents an even more shocking example of improper public disclosure of information. As you may know, over the past two months, AUSA Stolper has contacted Broadcom counsel and reported that Henry Samueli, Broadcom's Chairman, had declined a government request to be interviewed. As part of this dialog, Mr. Stolper and Gordon Greenberg, Dr. Samuelli's counsel, have provided us with their correspondence regarding Dr. Samueli's possible interview. On behalf of Broadcom, I have responded that: (a) it is unclear to us that Dr. Samueli was unwilling to cooperate; and (b) AUSA Stolper should work out the logistics of an interview with Mr. Greenberg. AUSA Stolper replied that he wants to know, from Broadcom, whether the Company intended to take action in light of Dr. Samueli's purported refusal to be interviewed by the U.S. Attorney's Office.

Incredibly, much of that discussion (to which only a handful of lawyers at this firm and your Office were privy), as well as information set forth in the private correspondence between Messrs. Stolper and Greenberg, found its way into the *Los Angeles Times'* story of February 16, 2007.

Exhibit
41

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

George S. Cardona, Esq.
February 23, 2007
Page 3

We are very troubled by these apparent leaks.  The improper disclosure of confidential communications and materials entrusted to the Government in good faith response to its requests naturally undermines the ability of a public company, like Broadcom, and others, to continue to trust the assumption that the confidentiality of such information will be respected.  Moreover, the selective disclosure of such confidential information can directly damage a public company's shareholders.

Broadcom remains committed to full and on-going cooperation with federal authorities.  Cooperation, though, is a two-way street and can only exist in an atmosphere of mutual trust.  Broadcom has voluntarily provided sensitive documents to the U.S. Attorney's Office and SEC, but those documents have found their way to literally the front page of the *Wall Street Journal*.  Broadcom's discussions with the U.S. Attorney's office concerning a highly confidential grand jury investigation were splashed across the front page of the *Los Angeles Times* Business Section.  These events seriously undermine the trust and confidence Broadcom placed in the U.S. Attorney's Office.

On a going forward basis, it is essential to re-establish the sense of mutual trust.  To that end, we do appreciate the call by AUSA Ken Julian on Friday, after he read the newspaper articles to give us his assurance that the Office – going forward -- would conduct the investigation in a professional and ethical manner.  But, frankly, that assurance, after the fact and without any effort to understand how this occurred and who is responsible, is not sufficient.

To that end, we need to know what happened – *i.e.*, did someone in the Government leak this information to the press and, if so, who?  Once that is answered, we expect to work with you to determine how to move forward in this matter.

I trust that you know I have rarely found cause or reason to complain about the work of your Office.  I truly regret that I have to do so now.  I look forward to hearing from you.

Very truly yours,

Brian J. Hennigan

BJH:cta
cc:     Andrew Stolper, Esq.
        Ken Julian, Esq.

Exhibit
42

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

George S. Cardona, Esq.
February 23, 2007
Page 4


bcc:    Gordon A. Greenberg, Esq.
        Richard Marmaro, Esq.
        John W. Spiegel, Esq.

Exhibit
43

*Los Angeles Times*                    Friday, February 16, 2007

# BUSINESS

## Broadcom leader said to resist probe

Sources say Chairman Henry Samueli has refused to be questioned in a federal inquiry into backdated options.

By E. SCOTT RECKARD
*Times Staff Writer*

Henry Samueli, the billionaire chairman of Broadcom Corp., has refused an informal request to be interviewed by federal criminal investigators looking into the manipulation of stock-option grants at the Irvine technology company, people with knowledge of the probe said.

The sticking point has been the government's refusal to assure Samueli that he is only a witness and not a subject of the investigation, these people said. The government won't make this promise, they said, because it is still scrutinizing Samueli's role.

Federal authorities have suggested to Broadcom's attorneys that the company should encourage Samueli to cooperate, asking the lawyers, "What, if anything, are you going to do about this?" one person said.

The company has attempted to stay out of the fray, this person said, saying it hoped the government and Samueli could work something out.

The people who spoke about the case did so on condition of anonymity, saying the probe by the FBI and the U.S. attorney's office was still in its early stages. The company also has disclosed that the Securities and Exchange Commission is conducting a formal review.

In an e-mail message, Samueli's attorney, Gordon A. Greenberg, called the statements about his client "highly inappropriate and misleading." He did not elaborate.

David Siegel, an outside attorney for Broadcom, said the company had no comment "except to reiterate that it is cooperating with the government authorities."

"We can also add that Dr. Samueli did cooperate fully and voluntarily with the company's internal investigation," he said.

Broadcom's explosive growth in the 1990s made Samueli, 52, an iconic figure in the Southern California technology industry. He and his wife, Susan, have become pillars of the Orange County community, donating millions of dollars to universities and charities, buying the Anaheim Ducks hockey team and funding a new venue at the Orange County Performing Arts Center.

His refusal to be interviewed stands in contrast to the actions of Apple Inc. Chairman Steve Jobs, whom federal authorities have interviewed in a similar probe related to stock options.

But securities law expert John C. Coffee said Samueli's attorneys probably advised him to avoid an unconditional interview, citing the experience of lifestyle entrepreneur Martha Stewart.

When Stewart talked to prosecutors, "She thought she was offering information that would show how she wasn't involved" in insider trading, said Coffee, a professor at Columbia University's law school.

"And she wound up being prosecuted," Coffee said. "I think a cautious criminal defense counsel would say, 'I don't want you putting yourself in those shoes.' Martha Stewart didn't go to jail for insider trading; she went to jail for making false statements to the U.S. attorney."

Because of a recent court ruling, prosecutors are limited in how hard they can push companies to hand over confidential material and implicate employees, Coffee noted.

But prosecutors still have the right to expect a company to cooperate with an investigation and could pressure Broadcom to ask Samueli — who also is the company's chief technology officer — to cooperate or step aside while the investigation progresses.

"They could reasonably say, 'You can't keep someone on the board and in high office that refuses to talk to us, that is stonewalling us,'" Coffee said.

"Martha Stewart took a leave of absence from her company's board," he said. "I think Broadcom's outside directors might be forced to do the same thing — to ask Samueli to take a leave."

Robert Friese, a San Francisco defense attorney who specializes in government investigations, said it once would have been unusual for a company chairman to refuse to speak with investigators and stay on at the firm. But because federal sentencing guidelines have made the penalties for business fraud so severe, often 10 to 25 years in prison, he said, there is less stigma attached to refusing to speak to prosecutors.

"It would depend to some extent on how valuable the individual is to the company, and how the company views his culpability or lack of it," Friese said. "If they think he's an out-and-out crook they certainly wouldn't keep him on."

Stock options are rights to buy shares at a set price during a specified period. That price is normally the market value of the stock on the date the option is granted.



KAREN TAPIA-ANDERSEN *L.A. Times*
**OPTION PROBE:** *Experts say Broadcom Chairman Henry Samueli, shown last year, probably was advised to avoid an unconditional interview.*

Broadcom is among nearly 200 companies that are the subject of internal or federal investigations into whether executives backdated grant dates when the stock price was low, thus making the options more valuable, without disclosing it to shareholders.

Samueli and former Chief Executive Henry T. Nicholas III, along with their trusts and families, control the majority of the company's voting stock. The pair were the sole members of the option committee that made what Broadcom has said were at least 18 improperly dated grants.

Last month, Broadcom said its internal investigation determined that Nicholas bore "significant responsibility" for improperly backdated options that forced the company to slice $2.2 billion off its past financial statements to reflect unreported expenses, the largest charge taken to date by any of the companies under scrutiny.

Nicholas' attorney, John Spiegel, has said his client did not knowingly engage in improper backdating.

The internal probe excused Samueli, saying he "relied on management and other professionals" in signing off on option grant dates. The inquiry also found that the backdating benefited other Broadcom employees, but not Nicholas and Samueli personally.

Unlike Samueli, Nicholas refused to be interviewed for the company's internal investigation into the backdated options, Broadcom has said.

Exhibit 44

The company also has identified two departed executives it, said were actively involved in manipulating options: Nancy Tullos, former head of human relations, and William Ruehle, former chief financial officer.

Tullos' attorney, Ismael "Izzy" Ramsey, declined to comment.

Ruehle's attorney, Richard Marmaro, said, "If he's indicted we'll go to trial."

*scott.reckard@latimes.com*

Exhibit
45

# THE WALL STREET JOURNAL

**FRIDAY, FEBRUARY 16, 2007 ~ VOL. CCXLIX NO. 39**

**BEARING DOWN**

# Probes of Backdating Move to Faster Track

## Stock-Option Emails At Broadcom Are Focus; Monster Worldwide Plea

**By James Bandler
And Charles Forelle**

On Jan. 4, 2002, the chief financial officer of Broadcom Corp. tapped out an email about stock options to his chief executive and others.

"I VERY strongly recommend that these options be priced as of December 24," he wrote.

They were, and that was fortunate for recipients. Broadcom's share price rose 23% between the two dates. The pretense that the options had been granted on the earlier date made them extra valuable.

It also violated the rationale of stock options. They give recipients a right to buy stock in the future at the price when the options are granted, so that recipients can profit only if the price of their company's stock goes up. Setting a lower "exercise price" for the options gives recipients a head start on profiting.

The Broadcom correspondence, found in an internal investigation at the maker of communication chips, is just one of a number internal documents that have drawn the attention of federal prosecutors and Federal Bureau of Investigation agents in Orange County, Calif. Prosecutors are strongly considering filing criminal charges against the former Broadcom chief financial officer who wrote the email, William J. Ruehle, and at least one other former executive, according to people familiar with the situation.

Mr. Ruehle's lawyer said his client didn't break the law.

The Broadcom probe is a sign of how long-running investigations of stock-options backdating are heating up. Yesterday, a former general counsel of Monster Worldwide Inc. pleaded guilty to securities fraud in federal court in Manhat-



*William J. Ruehle*

tan. The day before, the founder of Take-Two Interactive Software Inc. pleaded guilty to a New York State charge in a backdating scheme.

Prosecutors in a half-dozen jurisdictions are zeroing in on other cases. The filing of criminal charges in some of these in coming months would mark a watershed in the scandal, as prosecutors and regulators winnow the roster of some 140 companies with options problems to a tighter list of promising cases.

The government is nearing charges against a former official of computer-security company McAfee Inc., say people familiar with the situation, and is strongly considering bringing cases against ex-executives of Apple Inc. and semiconductor-equipment maker KLA-Tencor Corp. In St. Louis, at least one former executive of Engineered Support Systems Inc., a defense contractor now owned by DRS Technologies Inc. of Parsippany, N.J., has been told of a likely charge, says a person close to the matter.

The former Monster Worldwide general counsel who pleaded guilty yesterday is Myron Olesnyckyj, 45. He admitted that he and others conspired to systematically backdate stock options, inflate the company's earnings and mislead auditors. Separately, the Securities and Exchange Commission filed a civil complaint against him. Mr. Olesnyckyj agreed to forfeit $381,000 in personal gains. He faces sentencing in August.

Mr. Olesnyckyj, fired last year, is expected to cooperate with prosecutors investigating Monster founder Andrew McKelvey. Mr. McKelvey, who hasn't been charged, quit late

last year rather than be interviewed in an internal company probe of options. A lawyer for him declined to comment.

In a 1999 email cited by the government, Mr. Olesnyckyj wrote to a human-resources official: "No written document should ever state lowest price over next 30 days! The auditorw [sic] will view that as backdating options and we'll have a charge to earning in the amount of the difference between price on day 30 and any lower price which is used."

That's the type of evidence investigators are looking for—"plus factors" that can give a case more promise of success. Such factors might include written indications of deliberate backdating; falsified documents; efforts to hide manipulation from auditors or investigators; or indications that top executives gave themselves backdated options. With so many companies admitting to an improper options practice, investigators have an abundance of possible cases.

Broadcom illustrates some of the elements investigators are focusing on as they set their priorities. The Irvine, Calif., company is one of the biggest companies in the options spotlight. It makes chips that help power all sorts of communications devices and has a stock-

market value of more than $19 billion. The SEC in addition to the Justice Department is looking at Broadcom.

Also being investigated are Henry Nicholas—the former chief executive to whom the CFO's email was addressed—and Henry Samueli, Broadcom's chairman. Messrs. Nicholas and Samueli co-founded Broadcom. The two made up the committee that handed out options Broadcom has admitted were backdated.



*Henry Nicholas*

Mr. Nicholas said in a statement his focus was on running Broadcom, and "the minutiae of employee paperwork and documentation were not at the top of my list." Mr. Samueli's attorney declined to comment except to say that some of the Journal's information was "misleading."

Mr. Nicholas founded the company in 1991 with help from Mr. Samueli, his former engineering professor. After they took it public in 1998, its stock soared 20-fold in two years. Together the men sold more than $1 billion in Broadcom shares near the end of the tech boom. Each still holds about $1 billion of Broadcom stock.

A domineering figure, Mr. Nicholas routinely scheduled late-night staff meetings and boasted of working for days without sleep. At a yearly sales conference, he quizzed subordinates about chip designs, forcing those who erred to gulp down shots of hard liquor. He stepped down from his CEO post in 2003. Along the way, he settled into a 15,000-square-foot mansion, which he outfitted with a billionaire's toys: waterfalls, secret tunnels into the hills, a sports bar.

Exhibit
46

## Deepening Probe

Federal prosecutors are investigating whether Broadcom executives pretended stock-option grants were awarded when the company's shares were particularly low, giving the recipients a chance at extra profit. Two of the grants being examined:

● Date of grant

**Grant to nonofficer employees**



$35
30
25 — Sept. 11: terror attacks
20
15
10 — Oct. 1

Aug. 2001   Sept.   Oct.   Nov.

**Grant to executives**



$35
30
25 — Dec. 24
20
15
10

Nov. 2001   Dec.   Jan. 2002   Feb.

Jan 4: Finance chief **William Ruehle** sends email to CEO **Henry Nicholas:** "I VERY strongly recommend that these options be priced as of December 24."

Sources: FactSet Research Systems; WSJ research

---

Mr. Samueli cuts a less flamboyant figure. A leading philanthropist in Orange County, he also owns the Mighty Ducks hockey franchise. Two University of California engineering schools bear his name.

Last year Broadcom admitted rampant backdating. It restated several years of results, taking $2.24 billion in charges against earnings—the biggest restatement so far in the scandal.

Mr. Ruehle stepped down as Broadcom's chief financial officer a few days before he was to be interviewed by outside lawyers doing the internal investigation. Broadcom said in a securities filing that Mr. Ruehle was "at the center" of backdating. Mr. Ruehle's lawyer, Richard Marmaro, said that if his client is charged, he "will not plead guilty because he did not commit any crime."

Broadcom in its filing also blamed a former human-resources chief, Nancy Tullos. It said she "encouraged, assisted in and enabled" the backdating. A lawyer for Ms. Tullos, who left in 2003, declined to comment for this article. The lawyer has said previously that Ms. Tullos followed the directives of superiors, didn't select any grant dates and always acted in the company's best interests.

Broadcom's backdating, which it has said occurred from 1998 to 2003, took place amid a gyrating stock price and a heated technology industry in which valued employees were often poached by others with big options packages. Broadcom emails, described by people who have seen them, suggest that executives sometimes deliberately gave grants earlier dates and sometimes cautioned others not to mention the dating process in writing.

Broadcom's auditor, Ernst & Young, raised concerns in 2000 about an aspect of the option process and reminded executives about the rules, say people familiar with the matter. At that time, options granted at the current stock price didn't affect companies' earnings. But a grant at below-market prices was considered compensation, so that companies had to count it as an expense.

In 2000 Broadcom made a giant options grant to a large number of employees, purportedly



on a day in May when the stock had its lowest close for the quarter. Ernst discovered that the company hadn't finished divvying up the grant among employees until months later. Accounting rules say an option isn't recorded as granted until recipients are determined.

Ernst warned company officials, including Mr. Ruehle, "not to make such "subsequent allocations" again, according to people familiar with the matter. Ernst reminded executives of how options should be accounted for, taking them through the rules.

Like many stocks, Broadcom's sank after the Sept. 11,

2001, terrorist attacks. It hit its lowest price in three years on Oct. 1, before recovering and then more than doubling by year-end. Broadcom claimed to have granted a slew of options to non-officers on Oct. 1. Investigators are looking at whether the company may actually have made this grant later and backdated it, say people familiar with the situation.

Broadcom said in its federal filing that co-founder Mr. Nicholas was "at times" involved in the backdating, and bore a large responsibility for the problems because of "the tone and style of doing business he set." A person familiar with the grant dated Oct. 1 said it engendered jealousy among those who didn't get options then, and that Mr. Nicholas and others appear to have retroactively added more people to the list.

In an email on Jan. 2, 2002, Mr. Nicholas sent a list of employees included in the Oct. 1 grant to at least two people, including Ms. Tullos, say people familiar with the email's contents. "I found my old share grant spreadsheet from before October," he wrote.

But the electronic time stamp on the computer file indicated the spreadsheet had been created toward the end of 2001, long after Oct. 1, say people familiar with the matter. The discrepancy has led investigators to examine whether the email and spreadsheet might be an attempt to provide written cover for manipulated grants.

Broadcom said in its federal filing that co-founder Mr. Samueli was "involved with" the "flawed option granting process." The company cleared him, saying he "reasonably relied on management and other professionals" regarding proper treatment of the options. According to people familiar with the matter, Mr. Samueli, as a member of the Equity Award Committee, received a number of emails that discussed retroactive date selection.

Mr. Samueli cooperated with the internal probe but so far has declined a request to speak to government investigators—unusual for a sitting chairman. When weighing how much responsibility corporations themselves bear for fraudulent conduct, prosecutors are supposed to consider how cooperative top officials have been, according to Justice Department guidelines.

An outside lawyer for Broadcom said it wouldn't comment on the investigation except to say that it was cooperating fully. "Dr. Samueli did cooperate fully and voluntarily with the company's independent internal investigation," said the lawyer, David Siegel.

In any effort to link backdating to Messrs. Nicholas and Sam-

ueli, prosecutors would face a potential hurdle: The co-founders didn't regularly receive option grants themselves. The two received just one grant, for a million options each, in 2002. Broadcom has said no options to the founders or to directors were among those misdated.

Ms. Tullos and Mr. Ruehle, by contrast, received numerous options, including grants the company has said were manipulated. Mr. Ruehle had $32 million of unexercised options when he left last year. The company canceled them. Last year the company canceled $4 million of options Ms. Tullos held.

Several emails written by Ms. Tullos suggest she may have been aware the dating practices were troublesome. In a period when Broadcom's stock was falling, a business-unit head repeatedly asked her when his subordinates would get options. Eventually, she told him "I cannot tell you what we are doing" in a "post-Enron" world, according to people familiar with the matter. In a message to another employee asking about options, she wrote, "I cannot answer in writing."

Prosecutors would need more than suggestive emails to make a successful criminal case. A document that seems like a smoking gun can grow cold when the context is explained to a jury by an experienced defense lawyer.

Another obstacle for the government in prosecuting backdating is at some companies the practice was discussed openly, making it harder to argue that executives knew they were engaged in wrongful conduct.

Defense lawyers will doubtless pass blame around. Those representing CEOs are likely to argue that their clients—being business leaders, not accountants—relied on others to figure out how options should be issued and accounted for. Those representing subordinates are likely to argue that the boss made them do it.

Helping boost momentum toward the filing of charges is the statute of limitations. It's five years for securities fraud and wire fraud. But there's some flexibility, based on the notion that misdated options might affect earnings in later years.

—*Paul Davies contributed to this article*



**WSJ.COM**

# Exhibit 6

Exhibit
48

# THE WALL STREET JOURNAL.

FRIDAY, FEBRUARY 16, 2007 · VOL. CCXLIX NO. 39 · ★★★★

▲ 23.15 0.2% | NASDAQ 2497.10 ▲ 0.4% | NIKKEI 17897.23 ▲ 0.8% | DJ STOXX 50 3831.16 ▲ 0.3% | 10-YR TREAS ▲ 6/32, yield 4.706% | OIL $57.99 ▲ $0.01 | GOLD $667.30 ▲ $0.10 | EURO $1.3145 | YEN 119.

## What's News—

### ess and Finance

icials appear to be unemployment can go a they previously ithout generating induced inflation into he Fed and weaker data have led finants to boost expecta-ed will lower its a interest-rate target, , later this year. A2

rices fell in about half opolitan areas in the rter, the National Association of Realtors said. A2

BBVA was near a deal npass Bancshares for billion, which would v heft in Texas. A3

r industrials rose sts to another record 786.01, helped by Boerpillar gains. Bonds he dollar weakened. C1

is is looking to shield le-class taxpayers from ossibly by raising taxes income households. A1

ctors in Munich are business transac-veen Siemens and lecom companies. A3

r Group CEO LaSorda ints to use new alli-ore than double sales rth America. A10 overtook Daimler-n European vehicle unuary, as its new-car ings increased 21%. A10

into Broadcom is a w long-running inves-f stock-option back-heating up. Monster e's former general aded guilty to fraud. A1

hulse named Brady ead of its invest- CEO. The firm also mp in quarterly net. C1

e's practice of securi-ig in the exchange-lis arena is spreading of dollars a year. C1

is spending billions of new tracks and high-

### World-Wide

■ U.S. and Iraqi units pushed into Sunni redoubts around Baghdad.
An Iraqi official said Masri, Zarqawi's successor as head of the local al Qaeda affiliate, was wounded and a top aide killed in an operation north of the capital. Shiite militia chieftain Sadr, meanwhile, reportedly told top lieutenants to join him in Iran to wait out the security crackdown. The U.N. urged EU nations to take in more fleeing Iraqis, calling the refugee situation "grave." In the U.S., Senate Democrats plan for try to revive a resolution opposing Bush Iraq policy. House voted for Murtha plans funding restrictions to stop Bush's troop "surge."
*House Speaker Pelosi said the president would have to seek new authorization from Congress before attacking Iran. Gates denied the U.S. seeks an "excuse" for such a war. British and Iraqi troops closed Iran border crossings to stanch arms smuggling.*

■ Bush said NATO nations must send more troops to the 35,500-strong U.S.-led force in Afghanistan, and not impose rules restricting their use in combat. The U.S. has diverted 3,200 Iraq-bound troops to the fight, fearing an offensive by a Taliban fattened on opium profits.

■ Palestinian President Abbas reappointed Hamas's Haniyeh premier of a power-sharing cabinet with Fatah, but diplomats said the U.S. is warning it won't deal with officials from either faction unless the government renounces attacks on Israel. Rice is due in the region. A8

■ Israel invited Turkish inspectors and installed Webcams to reassure Muslims that Jerusalem repair work poses no threat to al Aqsa mosque.

■ Egypt rounded up Muslim Brotherhood members as April elections near. Candidates affiliated with the group rattled nerves in '05 results.

■ Russia's Putin elevated Defense Minister Ivanov to first deputy premier as maneuvering intensified for 2008 presidential elections. A6

■ Airport screeners may get unionization rights and whistleblower protections under a bill the Senate Homeland Security panel approved.

■ Senate Republicans blocked a Democratic move to modify the Patriot Act to strip the president of sole authority to fill U.S. attorneys.

■ A federal judge ordered a trial for a suit seeking $105 million from Sudan for aid to al Qaeda in the USS Cole bombing that killed 17 in 2000.

## BEARING DOWN

## Probes of Backdating Move to Faster Track

*Stock-Option Emails At Broadcom Are Focus; Monster Worldwide Plea*

**By James Bandler And Charles Forelle**

On Jan. 4, 2002, the chief financial officer of Broadcom Corp. tapped out an email about stock options to his chief executive and others.

"I VERY strongly recommend that these options be priced as of December 24," he wrote.

They were, and that was fortunate for recipients. Broadcom's share price rose 23% between the two dates. The pretense that the options had been granted on the earlier date made them extra valuable.

It also violated the rationale of stock options. They give recipients a right to buy stock in the future at the price when the options are granted, so that recipients can profit only if the price of their company's stock goes up. Setting a lower "exercise price" for the options gives recipients a head start on profiting.

The Broadcom correspondence, found in an internal investigation, is the maker of communication chips, is just one of a number internal documents that have drawn the attention of federal prosecutors and Federal Bureau of Investigation agents in Orange County, Calif. Prosecutors are strongly considering filing criminal charges against the former Broadcom chief financial officer who wrote the email, William J. Ruehle, and at least one other former executive, according to people familiar with the situation.

Mr. Ruehle's lawyer said his client didn't break the law.

The Broadcom probe is a sign of how long-running investigations of stock-options backdating are heating up. Yesterday, a former general counsel of Monster Worldwide Inc. pleaded guilty to securities fraud in federal court in Manhattan. The day before, the founder of Take-Two Interactive Software Inc. pleaded guilty to a New York State charge in a backdating scheme.

Prosecutors in a half-dozen jurisdictions are zeroing in on other cases. The filing of criminal charges in some of these in coming months would mark a watershed in the scandal, as prosecutors and regulators winnow the roster of some 140 companies with options problems to a tighter list of promising cases.

The government is nearing charges against a former official of computer-security company McAfee

Please turn to page A13



*William J. Ruehle*

### O'Keeffe Painting Is at the Center Of a Modern Fight

*Fisk University Could Use The Money, but Tennessee Delays a Deal to Sell*

**By Corey Dade**

NASHVILLE, Tenn.—Two modernist masterpieces from the early 20th century sit in a storage chamber here at a downtown museum. They have been in this city for most of the last half century, but they've been out of view long enough that many residents may have forgotten about them.

Their owner, tiny Fisk University, has decided it's too expensive to continue insuring and caring for the paint-

## Democrats Foc On Tax Relief For Middle Cla

*Bush May Acquiesc To Higher Levies on F To Pay for Curbing A*

**By Sarah Lueck**

WASHINGTON—The new I cratic-controlled Congress is lc to rein in looming tax increases middle class, possibly coverin cost by raising taxes on upper-i households. And the Bush admir tion may not stand in the way.

The possible bargain centers Alternative Minimum Tax, a kind alel lik, income tax that hit 3.5 mill taxpayers in the 2006 tax year. Co sional Democrats are eager to lo AMT from ensnaring millions mor dle-class taxpayers. They also mu a way to cover the estimated $50 cost of scaling back the tax this y

In recent days, Bush administ officials have signaled they may v pose a likely method of covering costs: raising taxes on the n wealthiest citizens. That conc could mark the beginning of a big bate on revisiting the Bush tax which could ultimately lead to rev at least some of the cuts given to up come Americans over the past six

The AMT dates back to th 1960s when Congress discovered small number of upper-income h holds had managed to avoid fede come taxes entirely by exploiti ductions, credits, loopholes, and ters. The AMT has been adjusted But because it has never been in for inflation, rapidly growing nu of taxpayers are vulnerable to it The Treasury estimates than 23 n households will be affected by th

Please turn to pag

## SIDE EFFECTS

## With a Quirk in Visa Law, Small Towns Lose Doctor

*A Program to Bring In Foreign Physicians Is Unexpectedly Hurt*

**By Miriam Jordan**

YAKIMA, Wash.—For the past de

**Dwindling Supply**
Foreign physicians in clinical traini in the U.S. on a J-1 visa:



49

MARKETPLACE

THE WALL STREET JOURNAL.

## FROM PAGE ONE

# Backdating Probes Move to Faster Track

Continued from Page One

Inc., say people familiar with the situation, and is strongly considering bringing cases against ex-executives of Apple Inc. and semiconductor-equipment maker KLA-Tencor Corp. In St. Louis, at least one former executive of Engineered Support Systems Inc., a defense contractor now owned by DRS Technologies Inc. of Parsippany, N.J., has been told of a likely charge, says a person close to the matter.

The former Monster Worldwide general counsel who pleaded guilty yesterday is Myron Olesnyckyj, 45. He admitted that he and others conspired to systematically backdate stock options, inflate the company's earnings and mislead auditors. Separately, the Securities and Exchange Commission filed a civil complaint against him. Mr. Olesnyckyj agreed to forfeit $381,000 in personal gains. He faces sentencing in August.

Mr. Olesnyckyj, fired last year, is expected to cooperate with prosecutors investigating Monster founder Andrew McKelvey. Mr. McKelvey, who hasn't been charged, quit late last year, rather than be interviewed in an internal company probe of options. A lawyer for him declined to comment.

In a 1999 email cited by the government, Mr. Olesnyckyj wrote to a human-resources official: "No written document should ever state lowest price over next 30 days! The auditors [sic] will view that as backdating options and we'll have a charge to earning in the amount of the difference between price on day 30 and any lower price which is used."

That's the type of evidence investigators are looking for—"plus factors" that can give a case more promise of success. Such factors might include written indications of deliberate backdating; falsified documents; efforts to hide manipulation from auditors or investigators; or indications that top executives gave themselves backdated options. With so many companies admitting to an improper options practice, investigators have an abundance of possible cases.

Broadcom illustrates some of the elements investigators are focusing on as they set their priorities. The Irvine, Calif., company is one of the biggest companies in the options spotlight. It makes chips that help power all sorts of communications devices and has a stock-

market value of more than $19 billion. The SEC in addition to the Justice Department is looking at Broadcom.

Also being investigated are Henry Nicholas—the former chief executive to whom the CFO's email was addressed—and Henry Samueli, Broadcom's chairman. Messrs. Nicholas and Samueli co-founded Broadcom. The two made up the committee that handed out options Broadcom has admitted were backdated.

Mr. Nicholas said in a statement his focus was on running Broadcom, and "the minutiae of employee paperwork and documentation were not at the top of my list." Mr. Samueli's attorney declined to comment except to say that some of the Journal's information was "misleading."

Mr. Nicholas founded the company in 1991 with help from Mr. Samueli, his former engineering professor. After they took it public in 1998, its stock soared 20-fold in two years. Together the men sold more than $1 billion in Broadcom shares near the peak of the tech boom. Each still holds about $1 billion of Broadcom stock.

A domineering figure, Mr. Nicholas routinely scheduled late-night staff meetings and boasted of working for days without sleep. At a year-later conference, he quizzed subordinates about chip designs, forcing those who erred to gulp down shots of hard liquor. He stepped down from his CEO post in 2003. Along the way, he settled into a 15,000-square-foot mansion, which he outfitted with a billionaire's toys: waterfalls, secret tunnels into the hills, a sports bar.

Mr. Samueli cuts a less flamboyant figure. A leading philanthropist in Orange County, he also owns the Mighty Ducks hockey franchise. Two University of California engineering schools bear his name.

Last year Broadcom admitted rampant backdating. It restated several years of results, taking $2.24 billion in charges against earnings—the biggest restatement so far in the scandal.

Mr. Ruehle stepped down as Broadcom's chief financial officer a few days before he was to be interviewed by outside lawyers conducting the investigation. Broadcom said in a securities filing that Mr. Ruehle was "at the center" of backdating. Mr. Ruehle's lawyer, Richard Marmaro, said that if his client is charged, he "will not plead guilty because he did not commit any crime."

Broadcom in its filing also blamed a former human-resources chief, Nancy Tullos. It said she "encouraged, assisted in and enabled" the backdating. A lawyer for Ms. Tullos, who left in 2003, declined to comment for this article. The lawyer has said previously that Ms. Tullos followed the directives of superiors, didn't select any grant dates and always acted in the company's best interests.

Broadcom's backdating, which it has said occurred from 1998 to 2003, took place amid a gyrating stock price and a heated technology industry in which valued employees were often poached by others with big options packages. Broadcom emails, described by people who have seen them, suggest that executives sometimes deliberately gave grants earlier dates and sometimes cautioned others not to mention the dating process in writing.

2001, terrorist attacks, it hit its lowest price in three years on Oct. 1, before recovering and then more than doubling by year-end. Broadcom claimed to have granted a slew of options to non-officers on Oct. 1. Investigators are looking at whether the company may actually have made this grant later and backdated it, say people familiar with the situation.

Broadcom said in its federal filing that co-founder Mr. Nicholas was "at times" involved in the backdating, and bore a large responsibility for the problems because of "the tone and style of doing business he set." A person familiar with the grant dated Oct. 1 said it engendered jealousy among those who didn't get options then, and that Mr. Nicholas and others appear to have retroactively added more people to the list.

In an email on Jan. 2, 2002, Mr. Nicholas sent a list of employees included in the Oct. 1 grant to at least two people, including Ms. Tullos, say people familiar with the email's contents. "I found my old share grant spreadsheet from before October," he wrote.

But the electronic time stamp on the computer file indicated the spreadsheet had been created toward the end of 2001, long after Oct. 1, say people familiar with the matter. The discrepancy has led investigators to examine whether the email and spreadsheet might be an attempt to provide written cover for manipulated grants.

Broadcom said in its federal filing that co-founder Mr. Samueli was "involved with" the "flawed option granting process." The company cleared him, saying he "reasonably relied on management and other professionals" regarding proper treatment of the options. According to people familiar with the matter, Mr. Samueli, as a member of the Equity Award Committee, received a number of emails that discussed retroactive date selection.

Mr. Samueli cooperated with the internal probe but so far has declined a request to speak to government investigators—unusual for a sitting chairman. When weighing how much responsibility corporations themselves bear for fraudulent conduct, prosecutors are supposed to consider how cooperative top officials have been, according to Justice Department guidelines.

An outside lawyer for Broadcom said it wouldn't comment on the investigation except to say that it was cooperating fully. "Dr. Samueli did cooperate fully and voluntarily with the company's independent internal investigation," said the lawyer, David Siegel.

In any effort to link backdating to Messrs. Nicholas and Sam-

ueli, prosecutors would face a potential hurdle: The co-founders didn't explicitly receive option grants themselves. The two received just one grant, for a million options each, in 2002. Broadcom has said no grants to the founders or to directors were among those misdated.

Ms. Tullos and Mr. Ruehle, by contrast, received numerous options, including grants the company has said were manipulated. Mr. Ruehle had $32 million of unexercised options when he left last year. The company canceled them. Last year the company canceled $4 million of options Ms. Tullos held.

Several emails written by Ms. Tullos suggest she may have been aware the dating practices were troublesome. In a period when Broadcom's stock was falling, a business unit head repeatedly asked her when his subordinates would get options. Eventually, she told him "I cannot tell you what we are doing" in a "post-Enron" world, according to people familiar with the matter. In a message to another employee asking about options, she wrote, "I cannot answer in writing."

Prosecutors would need more than suggestive emails to make a successful criminal case. A document that seems like a smoking gun can grow cold when the context is explained to a jury by an experienced defense lawyer.

Another obstacle for the government in prosecuting backdating is at some companies the practice was discussed openly, making it harder to argue that executives knew they were engaged in wrongful conduct.

Defense lawyers will doubtless pass blame around. Those representing CEOs are likely to argue that their clients—being business leaders, not accountants—relied on others to figure out how options should be issued and accounted for. Those representing subordinates are likely to argue that the boss made them do it.

Helping boost momentum toward the filing of charges is the statute of limitations. It's five years for securities fraud and wire fraud. But there's some flexibility, based on the notion that misdated options might affect earnings in later years.

—Paul Davies
contributed to this article.

**Deepening Probe**

Federal prosecutors are investigating whether Broadcom executives pretended stock-option grants were awarded when the company's shares were particularly low, giving the recipients a chance at extra profit. Two of the grants being examined:


Grant to nonofficer employees


Grant to executives

- Date of grant

Sept. 11 terror attacks

Oct. 1

Aug. 2001  Sept.  Oct.  Nov.

Jan. 8: Finance chief William Ruehle sends email to CEO Henry Nicholas: "I VERY strongly recommend that these options be priced as of December 24."

Dec. 24

Sources: FactSet Research Systems; WSJ research

**Dating Game**

◆ **The News:** Investigations of possible stock-options backdating intensify.

◆ **Latest Cases:** A Monster Worldwide former counsel pleaded guilty, a day after a felony guilty plea was filed by Take-Two Interactive's founder.

◆ **Heating Up:** Emails discussing options dates at Broadcom have the attention of prosecutors, who are considering filing criminal charges.

on a day in May when the stock had its lowest close for the quarter. Ernst discovered that the company hadn't finished divvying up the grant among employees until months later. Accounting rules say an option isn't recorded as granted until recipients are determined.

Ernst warned company officials, including Mr. Ruehle, not to make such "subsequent allocations" again, according to people familiar with the matter. Ernst reminded executives of how options should be accounted for, taking them through the rules.

Like many stocks, Broadcom's sank after the Sept. 11,

Broadcom's auditor, Ernst & Young, raised concerns in 2000 about an aspect of the options process and reminded executives about the rules, say people familiar with the matter. At that time, options granted at the current stock price didn't affect companies' earnings. But a grant at below-market prices was considered compensation, so that companies had to count it as an expense.

In 2000 Broadcom made a giant options grant to a large number of employees, purportedly

WSJ.COM

**ONLINE TODAY!** See a scorecard of companies that have been identified as having potential stock-option dating issues, plus complete coverage, at WSJ.com/PerfectPayday.

---

# O'Keeffe Painting Is at the Center of a Modern Fight

Continued from Page One

Booker T. Washington and historian John Hope Franklin.

"It was a very, very bitter decision" to sell them, says Fisk President Hazel O'Leary, former secretary of energy in the Clinton administration and a Fisk grad.

painting for $7 million, and the Hartley would go on the block. Both Fisk and the museum agreed to the terms, and the 30-day period begins today. Under the agreement, $560,000 from any sale will fund renovations to the gallery where the collection is housed. Mr. O'Leary says the

Ms. O'Keeffe arrived several days before the opening, she angrily made wholesale changes, repainting every wall white and ripping out ceiling lights, her letters say.

By 1972, the paintings needed to be taken down and sent to New York for resto-


Fly Free...

# Exhibit 7

Exhibit
51

entourage   **Rent DVDs from Netflix**
✓No late fees ✓Free shipping ✓Cancel anytime
NETFLIX                                                Click here

# Los Angeles Times | Business

You are here: LAT Home > Articles > 2007 > November > 27 > Business

Archive for Tuesday, November 27, 2007

# Guilty plea expected in Broadcom options

By E. Scott Reckard
November 27, 2007 *in print edition C-1*

A former **Broadcom** Corp. executive has agreed to plead guilty to obstruction of justice in connection with a federal probe into the manipulation of stock option grants at the Irvine chip maker, people close to the investigation said Monday.

As part of the deal, former Broadcom human-relations chief Nancy Tullos has agreed to cooperate with investigators examining allegations that top Broadcom executives backdated stock options to secretly benefit employees, according to three people with knowledge of the probe.

Tullos' attorneys declined to comment. Tullos, 56, who has homes in Malibu and Dana Point, has declined requests to be interviewed.

The plea agreement could come as early as this week, according to the people close to the case. They spoke on condition of anonymity because the agreement hasn't yet been filed.

In January, Broadcom reduced previous financial results by $2.2 billion. That was the largest accounting correction among the approximately 200 corporations the Securities and Exchange Commission has said it investigated for allegedly misdating stock option grants to make them more valuable.

Options are the right to buy shares at a set price in the future.

The Broadcom case is significant not only because of the $2.2-billion adjustment but because of the prominence of the firm's founders, Orange County billionaires **Henry Samueli** and Henry T. Nicholas III.

Samueli, Broadcom's chairman, owns the Anaheim Ducks hockey team and has become one of Southern California's biggest philanthropists. His attorneys have declined to comment on the investigation.

Nicholas, a major philanthropist as well, left Broadcom in 2003. Last year, his former administrative assistant Kenji Kato filed a lawsuit in Los Angeles County Superior Court alleging that Nicholas required him to oversee supplies of cocaine and other drugs, pay prostitutes from a "petty cash" fund and conceal these activities from his wife and others.

Nicholas' lawyer called the allegations "crazy" and contended that the civil suit was a $9-million extortion scheme. The charges have been sent to arbitration proceedings, which have yet to conclude.

Robert Gunther, the former chief operating officer for Nicholas' holding company, pleaded not guilty last week to a felony charge of money laundering. The charge grew out of the federal Broadcom investigation.

Court documents filed in the Gunther case show that other former aides have become cooperating witnesses in

Exhibit
52

the investigation.

A veteran human-relations executive, Tullos worked for CyberMedia Inc., Micropolis Corp. and Western Digital Corp. before joining Broadcom in September 1998.

She left the company in October 2004 and later served a stint at QLogic Corp.

Broadcom disclosed last summer that the company, Samueli and Broadcom General Counsel David Dull have been put on notice by the SEC that the agency intended to sue them for allegedly backdating options.

The SEC's so-called Wells notices give companies and individuals a chance to respond before lawsuits are filed. Defense attorneys said they would respond to the SEC and no suit had yet emerged.

The company previously said in an SEC filing that its internal investigation had implicated Tullos, Nicholas and former Chief Financial Officer William Ruehle in the mishandling of options.

In that filing, Broadcom exonerated Samueli in the options backdating allegations but found "substantial evidence that Dr. Nicholas was at times involved with the selection of grant dates after the fact."

Nicholas' attorney, John W. Spiegel, previously acknowledged that some stock option grants should have been accounted for differently but said the company's investigation showed Nicholas "did not knowingly engage in selecting grant dates after the fact."

He could not be reached for comment Monday.

—

scott.reckard@latimes.com

**Related Articles**
- Broadcom ex-exec to plead guilty Dec 01, 2007
- SEC accuses Broadcom co-founders of fraud May 15, 2008
- Broadcom defendants bring in top guns May 19, 2008
- Aide may cooperate in Nicholas probe Nov 20, 2007
- COURTS - Billionaire sought secret lair for sex, drugs, complaint says - A lawyer for the Broadcom co-founder denies the allegations. Jul 18, 2007

**More articles by E. Scott Reckard**
**More articles from the Business section**

California and the world. Get the Times from $1.35 a week

Exhibit
53

# Exhibit 8

Exhibit
54

MUNGER, TOLLES & OLSON LLP
355 SOUTH GRAND AVENUE
THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
PHONE: (213) 683-9571   FAX: (213) 593-2971

FROM:   Gregory J. Weingart

TO:   George Cardona          (213) 894-2535        (Phone: (213) 894-8323
United States Attorney's Office

DATE:   March 8, 2007

PAGES:  3

RE:   *Grand Jury Investigation of Stock Option Practices at Broadcom*

MESSAGE:

Due to a clerical printing error the letter we recently sent you included an incorrect
notation that it was privileged & work product (which it obviously was not).  Attached is
a corrected version of the letter.  Sorry for any confusion.

THIS MESSAGE IS INTENDED ONLY FOR THE INDIVIDUAL TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS
PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.  If you are not the intended recipient,
you are hereby notified that dissemination, distribution, or copying of this message is strictly prohibited and may be unlawful.  If you have
received this communication in error, please telephone us (collect) immediately and destroy the original.  Thank you.

**IF YOU HAVE EXPERIENCED A TRANSMISSION PROBLEM, PLEASE CALL (213) 683-9510**

27186-00002

1248088.1

Exhibit
55

MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

———

860 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

March 6, 2007

WRITER'S DIRECT LINE
(213) 683-9571
(213) 593-2971 FAX
Gregory.Weingart@mto.com

**BY FACSIMILE**

George Cardona
United States Attorney
U.S. Attorney's Office
1200 U.S. Courthouse
312 North Spring Street
Los Angeles, California  90012

Re:    <u>Grand Jury Investigation of Stock Option Practices at Broadcom</u>

Dear Mr. Cardona:

        Thank you for taking the time to speak with me yesterday.  As we discussed, this firm represents Dr. Henry T. Nicholas III, one of the individuals whose conduct with regard to stock option grants is the subject of a grand jury investigation by AUSAs Andrew Stolper and Ken Julian of your Office.  As I mentioned, we echo the concerns raised by counsel for Broadcom about the Office's recent leaks of material to the press – which included in the case of the February 16th Wall Street Journal article quotations from an email written by Dr. Nicholas, and a description of the issues that email was leading the criminal investigation to examine, according to "people familiar with the matter."

        In addition to being a clear violation of the U.S. Attorney's Manual, we further believe these leaks may constitute a violation of Federal Rule of Criminal Procedure 6(e).

Exhibit
56

MUNGER, TOLLES & OLSON LLP

George Cardona
March 6, 2007
Page 2

I understand from our conversation yesterday morning that AUSA Stolper has admitted being the source for some of the information in the Wall Street Journal and Los Angeles Times articles, but that you believe based on your discussion with him neither he nor anyone else on the investigative team leaked any documents to reporters. You further indicated that steps had been taken that you believe will ensure that such leaks do not happen in the future as he continues on in the investigation.

As discussed during our call, we request further information about what those unspecified remedial steps are, and why you believe they are sufficient. In particular, if one is not already underway, we request a full leak investigation in this matter as the denial that criminal investigators leaked documents or the content of documents is implausible. AUSA Stolper was admittedly the source for at least some portions of the Wall Street Journal article, but, as we understand it, denies that such leaks included anything about the emails or their contents – however, who else would have access to the emails, and a motive to leak them, other than he or some other person on the criminal investigative team and therefore was (as the article said) "familiar with the matter" as concerns Dr. Nicholas? Absent such a response, we will need to consider taking further steps either within the Department of Justice or with the Court to make sure this matter has been appropriately addressed and that Dr. Nicholas' rights in the grand jury investigation are fully protected.

In that regard, we further note one prior disturbing incident along the same lines as the press leaks. When Nancy Tullos previously refused to speak with investigators without first receiving appropriate assurances, AUSA Stolper contacted her employer (she no longer worked at Broadcom) and as we understand it suggested the company somehow had a disclosure obligation because of her refusal to speak without appropriate assurances. Seeking to avoid any entanglements with the government, the employer demanded Ms. Tullos' resignation, which she tendered. We trust you would agree that such conduct is inappropriate.

We look forward to your response. Should you wish to discuss this matter further, please feel free to call me or my partner John Spiegel.

Sincerely,

Gregory Weingart

1247334.3

Exhibit
57

MUNGER, TOLLES & OLSON LLP

George Cardona
March 6, 2007
Page 3


bcc:    Craig Gunther
        Steven Silverstein
        Robert Magnuson
        John Spiegel
        Jonathan Weiss
        Katherine Huang

Exhibit
58