# Exhibit 9

Exhibit
59

# JONES DAY

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071-2300
TELEPHONE: 213-489-3939 • FACSIMILE: 213-243-2539

Direct Number:  (213) 243-2537
jrawitz@jonesday.com

JP006369:cdc:2948963                    October 20, 2008
112148-600001

<u>VIA E-MAIL JACK.DICANIO@SKADDEN.COM</u>

Jack P. DiCanio
Skadden
300 South Grand Avenue, Suite 3400
Los Angeles, CA  90071

Re:    <u>Broadcom Investigation</u>

Dear Mr. DiCanio:

As you know, we represent Sue Collins, Vahid Manian and Marty Colombatto in connection with the government investigation of allegations of options backdating at Broadcom.  For the reasons set forth below, we believe that AUSA Stolper engaged in significant misconduct with respect to his grand jury investigation.

All three of our clients received witness letters from AUSA Stolper and, based on representations in those letters, agreed to testify before the grand jury.  In the case of Ms. Collins, the process began with a series of proffer sessions with AUSA Stolper.  The first was an attorney proffer wherein we described Ms. Collins' recollection regarding certain option grants at issue.  We explained that Ms. Collins believed that the Compensation Committee had in fact met and approved grants on the dates identified in the Unanimous Written Consents (UWCs) and it was on that basis that she prepared the paperwork documenting the grants.  AUSA Stolper did not believe the story.  He explained that if she prepared the documentation because she felt obligated or was pressured to do it he could accept that, but he did not believe she had no knowledge of what was going on.  AUSA Stolper then advised that there were "ramifications" associated with her position.  We responded that we were aware of the ramifications and had discussed them with Ms. Collins.  However, regardless of the consequences, Ms. Collins could not truthfully testify that she acted under pressure from William Ruehle and David Dull, as AUSA Stolper suggested.

At the conclusion of the meeting, AUSA Stolper explained that, though he did not believe Ms. Collins was telling the truth, he would nevertheless provide her with a witness letter if she could offer certain specified testimony.  AUSA Stolper expressly -- and we believe improperly -- conditioned Ms. Collins' witness status on her willingness to provide testimony to contradict a theory being advanced by David Dull – *i.e.* that stock option grant approvals could be and were ratified after-the-fact by UWCs.  After Ms. Collins indicated that she could truthfully provide the requested testimony, AUSA Stolper supplied the promised witness letter.  On October 3, 2007, Ms. Collins appeared before the grand jury and testified just as she had proffered.  Following her testimony, I contacted AUSA Stolper and asked him to reconfirm Ms. Collins' status.  He refused.

AUSA Stolper similarly refused my requests for reconfirmation of the witness status of Mr. Colombatto and Mr. Manian.  Like Ms. Collins, Mr. Colombatto and Mr. Manian also agreed to testify in reliance on a government witness letter.  To date – over one year after their grand jury testimony – my

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Exhibit
60

**JONES DAY**

Jack P. DiCanio
October 20, 2008
Page 2

clients' witness status remains unconfirmed.  As there is no apparent justification for AUSA Stolper's unwillingness to provide confirmation, it appears he is using this as a way to harass and intimidate our clients.

Very truly yours,

Jeffrey M. Rawitz

Exhibit
61

# Exhibit 10

Exhibit
62

US Attorneys > USAM > Title 1 > USAM Chapter 1-7.000
prev | next | Organization and Functions Manual

# 1-7.000
# MEDIA RELATIONS

1-7.001    Purpose

1-7.110    Interests Must Be Balanced

1-7.111    Need for Confidentiality

1-7.112    Need for Free Press and Public Trial

1-7.210    General Responsibility

1-7.220    Designation of Media Representative

1-7.310    Department of Justice Components

1-7.320    United States Attorneys

1-7.330    Procedures to Coordinate with OPA

1-7.400    Coordination With United States Attorneys—Issuance of Press Releases

1-7.401    Guidance for Press Conferences and Other Media Contacts

1-7.500    Release of Information in Criminal and Civil Matters— Non-Disclosure

1-7.520    Release of Information in Criminal and Civil Matters—Disclosable Information

1-7.530    Disclosure of Information Concerning Ongoing Investigations

1-7.531    Comments on Requests for Investigations

1-7.540    Disclosure of Information Concerning Person's Prior Criminal Record

1-7.550    Concerns of Prejudice

1-7.600    Assisting the News Media

1-7.700    Freedom of Information Act (FOIA)

---

## 1-7.001  Purpose

The purpose of this policy statement is to establish specific guidelines

Exhibit
63

consistent with the provisions of 28 CFR 50.2 governing the release of information relating to criminal and civil cases and matters by all components (FBI, DEA, INS, BOP, USMS, USAO, and DOJ divisions) and personnel of the Department of Justice. These guidelines are: 1) fully consistent with the underlying standards set forth in this statement and with 28 CFR 50.2; 2) in addition to any other general requirements relating to this issue; 3) intended for internal guidance only; and 4) do not create any rights enforceable in law or otherwise in any party.

## 1-7.110  Interests Must Be Balanced

These guidelines recognize three principal interests that must be balanced: the right of the public to know; an individual's right to a fair trial; and, the government's ability to effectively enforce the administration of justice.

## 1-7.111  Need for Confidentiality

Careful weight must be given in each case to protecting the rights of victims and litigants as well as the protection of the life and safety of other parties and witnesses. To this end, the Courts and Congress have recognized the need for limited confidentiality in:

- On-going operations and investigations;
- Grand jury and tax matters;
- Certain investigative techniques; and,
- Other matters protected by the law.

## 1-7.112  Need for Free Press and Public Trial

Likewise, careful weight must be given in each case to the constitutional requirements of a free press and public trials as well as the right of the people in a constitutional democracy to have access to information about the conduct of law enforcement officers, prosecutors and courts, consistent with the individual rights of the accused. Further, recognition should be given to the needs of public safety, the apprehension of fugitives, and the rights of the public to be informed on matters that can affect enactment or enforcement of public laws or the development or change of public policy.

These principles must be evaluated in each case and must involve a fair degree of discretion and the exercise of sound judgment, as every possibility cannot be predicted and covered by written policy statement.

## 1-7.210  General Responsibility

Final responsibility for all matters involving the news media and the Department of Justice is vested in the Director of the Office of Public Affairs (OPA). The Attorney General is to be kept fully informed of appropriate matters at all

Exhibit
64

Office of Public Affairs on public or other media issues.

[Added November 2003] [cited in USAM 1-7.401]

## 1-7.500  Release of Information in Criminal and Civil Matters— Non-Disclosure

At no time shall any component or personnel of the Department of Justice furnish any statement or information that he or she knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

## 1-7.520  Release of Information in Criminal and Civil Matters— Disclosable Information

Department personnel, subject to specific limitations imposed by law or court rule or order and consistent with the provisions of these guidelines, may make public the following information in any criminal case in which charges have been brought:

The defendant's name, age, residence, employment, marital status, and similar background information;

A. The substance of the charge, limited to that contained in the complaint, indictment, information, or other public documents;

B. The identity of the investigating and/or arresting agency and the length and scope of an investigation;

C. The circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of physical items seized at the time of arrest. Any such disclosures shall not include subjective observations; and

D. In the interest of furthering law enforcement goals, the public policy significance of a case may be discussed by the appropriate United States Attorney or Assistant Attorney General.

In civil cases, Department personnel may release similar identification material regarding defendants, the concerned government agency or program, a short statement of the claim, and the government's interest.

[cited in USAM 1-7.401]

## 1-7.530  Disclosure of Information Concerning Ongoing Investigations

Exhibit
65

A. Except as provided inn subparagraph B. of this section, components and personnel of the Department of Justice shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress, including such things as the issuance or seving of a subpoena, prior to the public filing of the document.

B. In matters that have already received substantial publicity, or about which the community needs to be reassured that the appropriate law enforcement agency is investigating the incident, or where release of information is necessary to protect the public interest, safety, or welfare, comments about or confirmation of an ongoing investigation may need to be made. In these unusual circumstances, the involved investigative agency will consult and obtain approval from the United States Attorney or Department Division handling the matter prior to disseminating any information to the media.

[cited in USAM 1-3.000; USAM 1-7.401]

## 1-7.531  Comments on Requests for Investigations

Individuals, groups, or organizations often send letters to the Department of Justice or a Department component requesting that a person or entity be investigated for violations of law. Sometimes, the requestor then conducts a press conference or releases a statement leaving an implication that an investigation will result. This can cause media inquiries.

Receipt of a request to open an investigation may be publicly acknowledged. Care should be taken to avoid any implication that the referral will necessarily lead to an investigation. It should be pointed out that there is a distinction between "reviewing a request for an investigation" and "opening an investigation."

Any acknowledgment should state that such requests are referred to the proper investigative agency for review but that no decision has been made whether to proceed on the specific request received. Finally, it should be noted that all substantiated allegations are reviewed in light of The Principles of Federal Prosecution (see USAM 9-27.000), and the Department does not ordinarily confirm or deny the existence or status of an investigation.

The same considerations apply if there is an investigation already underway when such a request is received. If the existence of an investigation is not public the same procedure should be followed as outlined above.

[Added November 2003] [cited in USAM 1-7.401]

## 1-7.540  Disclosure of Information Concerning Person's Prior Criminal Record

Exhibit 66

# Exhibit 11

Exhibit
67



**NETFLIX**      ◯ **Click here**

## Los Angeles Times | National

You are here: LAT Home > Articles > 2008 > June > 28 > National

Archive for Saturday, June 28, 2008

# U.S. settles with anthrax mailings subject Steven Hatfill for $5.82 million

*Prosecutors said the payout means that the former Army scientist will likely never be charged in connection with the deaths of 5 people who came in contact with the deadly spores.*

By David Willman
June 28, 2008

WASHINGTON – Dr. Steven J. Hatfill, the former Army scientist who was labeled a "person of interest" in the 2001 anthrax mailings, has won a $5.82-million settlement from the federal government, court documents filed today show.

Hatfill sued the Justice Department and FBI five years ago, alleging that repeated leaks of investigative details to the news media violated his right to privacy and ruined his reputation.

Former federal prosecutors knowledgeable about the case said that the government's payout to Hatfill signifies that, in all likelihood, he will never be charged for the crimes.

The settlement marks a turning point in the investigation of the mailings, which in the aftermath of the Sept. 11, 2001, terrorist attacks killed five people, prompted hundreds of others to seek treatment, disrupted mail service across the U.S. and closed a Senate office building in Washington for months.

More than six years after the FBI launched what would become one of its largest-ever investigations, the "Amerithrax" probe has yielded no arrests. The case remains unsolved.

A spokesman for the Justice Department, Brian Roerhkasse, said in a prepared statement that by agreeing to settle the lawsuit, the government "does not admit to any violation of the Privacy Act and continues to deny all liability in connection with Dr. Hatfill's claims." Roerhrkasse said that solving the anthrax case "remains among the department's highest law enforcement priorities."

Hatfill, who was trained as a physician and later researched how to counter the effects of deadly biological agents, has long insisted that he had nothing to do with the anthrax mailings. Hatfill's lawyer, Thomas C. Connolly, said that his client would have no comment on the settlement.

Connolly and a law firm colleague, Mark A. Grannis, oversaw depositions that elicited sworn testimony from 37 witnesses. Those who were questioned under oath included former Atty. Gen. John Ashcroft, who in August 2002

Exhibit
68

publicly labeled Hatfill a "person of interest."

"We took this case to defend very fundamental principles of fairness," Connolly said in an interview. "Whether we succeeded or not is for others to determine."

The settlement calls for the government to make an immediate $2.82-million payment to Hatfill. Beginning in 2009, the government will pay Hatfill an additional annuity of $150,000 a year for 20 years, according to court papers.

The lawsuit was filed in August 2003, but U.S. District Court Judge Reggie B. Walton did not permit Hatfill's lawyers to begin questioning FBI and Justice officials or news reporters for two more years. The government had opposed allowing agents and FBI leaders to be questioned, contending that the depositions could interfere with the investigation into the mailings.

In January, Hatfill's lawyers told Walton at a hearing that, by questioning federal investigators and several news reporters, they had identified three officials who allegedly leaked confidential information to the media. The named officials – the former U.S. attorney for Washington, Roscoe C. Howard Jr., his former criminal division chief, Daniel S. Seikaly and an FBI spokesman, Edwin Cogswell – have not commented publicly about their alleged roles.

At the end of that hearing, Walton ordered attorneys for the government and for Hatfill to try to settle the case with the help of a mediator. Walton said that without a settlement, the lawsuit could have gone to trial as early as December.

On Feb. 19, Walton, who had reviewed four still-secret FBI memos about the status of the anthrax investigation, said: "There is not a scintilla of evidence that would indicate that Dr. Hatfill had anything to do with this."

Grannis, one of Hatfill's lawyers, said today: "If anybody in the country really knew what it was like to be Steven Hatfill for the past six years, nobody would trade places with him."

The 2001 mailings – hand-addressed letters bearing tiny amounts of deadly anthrax powder – set off new waves of terror after the Sept. 11 attacks. The first letter arrived at the offices of American Media Inc. in South Florida. About Sept. 18, Robert Stevens, a 63-year-old photo editor, breathed in spores of the bacterium while examining a letter.

Stevens died on Oct. 5. Other letters laced with the same strain of anthrax were addressed to others in the media, including two network new anchors. Two other anthrax letters were addressed to members of the U.S. Senate.

Of the five anthrax-related deaths, two were of U.S. Postal Service workers in the Washington area.

Hatfill's plight recalls some of the FBI's biggest flops – including the targeting of Richard Jewell, a security guard who found a suspicious backpack just before it exploded at the 1996 Olympics in Atlanta.

Media accounts described Jewell as "the focus" of the FBI investigation into the bombing that killed one person and injured 100. Another man later confessed, and then-Atty. Gen. Janet Reno apologized to Jewell. She said the leaks harmed him and "caused the FBI extreme damage to its investigation."

Jewell's mother filed a lawsuit against the Justice Department and the FBI. In September 1999, the government settled by paying her $2,500.

*Times researcher Janet Lundblad in Los Angeles contributed to this report.*

**More articles by David Willman**
**More articles from the National section**

Exhibit
69

# Exhibit 12

Exhibit
70

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                    SOUTHERN DIVISION AT SANTA ANA

4          HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

5

6

   UNITED STATES OF AMERICA,            )

7                                        )

                   PLAINTIFF,            )

8                                        )

              VS.                        )  SACR NO. 07-00274-CJC

9                                        )

   NANCY TULLOS,                         )

10                                       )

                   DEFENDANT.            )

11   _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    SANTA ANA, CALIFORNIA

16               THURSDAY, JANUARY 24, 2008

17                        5:00 P.M.

18

19

20

21            DEBORAH D. PARKER, CSR 10342

                 OFFICIAL COURT REPORTER

22            UNITED STATES DISTRICT COURT

                 411 WEST FOURTH STREET

23                    SUITE 1-053

              SANTA ANA, CALIFORNIA 92701

24                 (714) 542-8409

              D.PARKER@IX.NETCOM.COM

25

Exhibit
71

Page 2

1    APPEARANCES OF COUNSEL:
2
3    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:
4            THOMAS P. O'BRIEN
             UNITED STATES ATTORNEY
5
             ROBB C. ADKINS
6            ASSISTANT UNITED STATES ATTORNEY
             CHIEF, CRIMINAL DIVISION
7
             ANDREW C. STOLPER
8            KENNETH JULIAN
             ROBB C. ADKINS
9            ASSISTANT UNITED STATES ATTORNEYS
             UNITED STATES DISTRICT COURT
10           8000 RONALD REAGAN FEDERAL BUILDING
             SANTA ANA, CALIFORNIA  92701
11           (714) 338-3536
12
13   FOR THE DEFENDANT, NANCY TULLOS:
14           JASON DE BRETTEVILLE
             ROBERT A. SACKS
15           SULLIVAN AND CROMWELL
             1870 EMBARCADERO ROAD
16           PALO ALTO, CALIFORNIA 94303
             (650) 461-5682
17
             ISMAIL RAMSEY
18           RAMSEY & EHRLICH, LLP
             803 HEARST AVENUE
19           BERKELEY, CALIFORNIA 94710
             (510) 548-3600
20
21
22
23
24
25

Page 3

1    SANTA ANA, CALIFORNIA; THURSDAY, JANUARY 24, 2008; 5:00 P.M.
2            THE COURT:  GOOD EVENING.
3            PLEASE BE SEATED.
4            THE CLERK:  ITEM NO. 2, SACR 07-00274-CJC, UNITED
5    STATES OF AMERICA VERSUS NANCY TULLOS.
6            COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE
7    RECORD.
8            MR. STOLPER:  GOOD EVENING, YOUR HONOR.
9            ANDREW STOLPER, ROBB ADKINS AND KEN JULIAN, ON
10   BEHALF OF THE GOVERNMENT.
11           THE COURT:  GOOD EVENING, GENTLEMEN.
12           MR. DE BRETTEVILLE:  GOOD EVENING, YOUR HONOR.
13           JASON DE BRETTEVILLE, BOB SACKS AND ISMAIL RAMSEY,
14   ON BEHALF OF NANCY TULLOS, WHO IS IN COURT AND ON HER OWN
15   RECOGNIZANCE.
16           THE COURT:  GOOD EVENING TO ALL OF YOU.
17           I KNOW WE HAVE SCHEDULED THIS FOR A CHANGE OF PLEA
18   HEARING.  BUT BEFORE WE GET TOO FAR, THERE WERE A FEW
19   QUESTIONS THAT I HAVE THAT I WANTED TO ADDRESS WITH COUNSEL.
20           I NOTE IN THE PLEA AGREEMENT, THERE IS REFERENCE
21   TO "SENIOR ENGINEER MM," "EXECUTIVE B," "EXECUTIVE A" AND
22   "BROADCOM HUMAN RESOURCES EMPLOYEE."
23           WAS IT THE PARTIES' INTENT THAT THE IDENTITY OF
24   THESE INDIVIDUALS WOULD BE REVEALED AT THIS HEARING?
25           MR. STOLPER:  IT WAS NOT, YOUR HONOR.

Page 4

1            THE COURT:  THEN, UNDER RULE 11, I GUESS I NEED TO
2    MAKE A FINDING OF GOOD CAUSE WHY THEIR IDENTITIES ARE NOT
3    BEING REVEALED IN OPEN COURT.
4            SO, WHY DON'T YOU TELL ME WHAT THE GOOD CAUSE IS.
5            MR. STOLPER:  YOUR HONOR, IT'S THE DEPARTMENT'S
6    POLICY NOT TO REVEAL THE NAMES OF INDIVIDUALS OTHER THAN
7    VICTIMS IN CHARGING DOCUMENTS.  THE RATIONALE BEHIND THAT
8    POLICY, AS I UNDERSTAND IT, IS YOU DON'T WANT TO
9    INADVERTENTLY ACCUSE SOMEONE IN A PUBLIC DOCUMENT WITHOUT
10   GIVING THEM A FAIR OPPORTUNITY TO RESPOND.
11           AS A RESULT, WHEN WE -- IN A PLEA AGREEMENT, OR AN
12   INDICTMENT, OR IN AN INFORMATION, WHEN WE DEAL WITH
13   UNINDICTED POTENTIAL CO-CONSPIRATORS, WE DON'T USE THEIR
14   NAMES UNTIL THERE IS AN INDICTMENT, AND THAT WAY THERE IS NO
15   UNDUE PREJUDICE TO SOMEONE IN THE COMMUNITY WHOSE NAME MIGHT
16   BE BESMIRCHED IN A PUBLIC DOCUMENT WITHOUT HAVING THE
17   OPPORTUNITY TO FAIRLY RESPOND.
18           DOES THAT ANSWER THE COURT'S QUESTION?
19           THE COURT:  IT DOES AND IT DOESN'T.  I ASSUME YOU
20   CERTAINLY HAVE NOBLE OBJECTIVES.  IF I UNDERSTAND YOU
21   CORRECTLY, YOU'RE SAYING YOU ARE TRYING TO PROTECT THE
22   RIGHTS OF THE OTHER INDIVIDUALS.
23           BUT THE PROBLEM I HAVE AND I CERTAINLY WANT TO
24   HEAR YOU OUT, BECAUSE THE LAST THING I'M TRYING TO BE IS BE
25   OBJECTIVE HERE, IS RULE 11 IS PRETTY CLEAR -- AT LEAST, THE

Page 5

1    WAY I READ IT -- THAT THE PLEA HAS TO BE READ IN OPEN COURT,
2    UNLESS I HAVE MADE A FINDING OF GOOD CAUSE.  I KNOW IN OTHER
3    CASES, IF YOU ARE DEALING WITH A CONFIDENTIAL INFORMANT, IF
4    YOU ARE DEALING WITH THE SAFETY OF A WITNESS -- LIKE IN SOME
5    OF THE OTHER CASES WE HAVE HAD -- OR IF YOU ARE DEALING WITH
6    NATIONAL SECURITY, I CAN WITHHOLD FROM THE PUBLIC THE
7    IDENTITY OF THESE INDIVIDUALS.
8            BUT THE PROBLEM, MR. STOLPER, THAT I AM HAVING IS:
9    I DON'T PERCEIVE ANY WITNESS SAFETY, WITNESS FLIGHT, OR
10   NATIONAL SECURITY ISSUE TO WITHHOLD THEIR IDENTITIES, AND
11   I'M CONCERNED ABOUT THAT.
12           SECONDLY, AS YOU KNOW, ON A CHANGE OF PLEA, I HAVE
13   TO TAKE A FACTUAL BASIS.  AND MS. TULLOS, PLEASE DO NOT TAKE
14   THIS THE WRONG WAY, BECAUSE YOU AND I HAVE NEVER MET, AND I
15   KNOW VERY, VERY LITTLE ABOUT THIS CASE OTHER THAN WHAT I
16   READ.  BUT WHAT HAPPENS IF DOWN THE LINE MS. TULLOS SAYS,
17   "I'M NOT SO SURE THIS IS A DEAL I SHOULD HAVE DONE.  I
18   DIDN'T UNDERSTAND IT," OR THERE IS A MISCOMMUNICATION
19   AND EXECUTIVE B WAS THIS PERSON AND YOU TELL ME, "NO, NO.
20   EXECUTIVE B IS ANOTHER PERSON."
21           I HAVE TO TAKE A FACTUAL BASIS FOR A GUILTY PLEA.
22   I NEED TO MAKE SURE THAT THERE WAS A MEETING OF THE MINDS ON
23   WHO EXACTLY THESE INDIVIDUALS WERE.  THAT'S AN ADDITIONAL
24   CONCERN I HAVE, MR. STOLPER, IS FOR ME TO MAKE SURE THAT
25   THERE IS A FACTUAL BASIS FOR A GUILTY PLEA.  I NEED TO KNOW

Exhibit
72
2 (Pages 2 to 5)

Page 6

1 WHO THESE PEOPLE ARE; AND THEN, SECONDLY, I ASSUME RULE 11
2 CONSISTENT WITH OUR CONSTITUTION IS THAT WE ARE A PUBLIC
3 FORUM; THAT YOU MUST HAVE A COMPELLING INTEREST OR GOOD
4 CAUSE NOT TO REVEAL THE IDENTITIES OF THIS PEOPLE.
5     MR. STOLPER: YOUR HONOR, I'LL TRY AND ADDRESS THE
6 COURT'S CONCERNS IN TURN.
7     WITH RESPECT TO THE COURT'S CONCERN ABOUT THE
8 PUBLIC FORUM, THE GOVERNMENT ABSOLUTELY AGREES THE PLEA
9 NEEDS TO BE DONE IN OPEN COURT, ABSENT A SHOWING OF GOOD
10 CAUSE. THIS PLEA WILL BE DONE, HOPEFULLY, IN OPEN COURT AND
11 THE IDENTITIES OF THOSE INDIVIDUALS WHO ARE REFERENCED IN
12 BOTH FACTUAL BASIS AND THE INFORMATION DOESN'T CHANGE THE
13 OPENNESS OF THE PROCEEDING. I DON'T THINK THERE IS ANY
14 REQUIREMENT IN RULE 11 THAT EVERY INDIVIDUAL BE IDENTIFIED.
15     FOR EXAMPLE, YOUR HONOR, WE OFTEN DO INDICTMENTS
16 WHERE CO-CONSPIRATORS KNOWN AND UNKNOWN TO THE GRAND JURY
17 AND THEN, WE CAN TAKE A GUILTY PLEA WITHOUT IDENTIFYING ONE
18 OF THOSE CO-CONSPIRATORS.
19     BUT I THINK THERE MAY BE A SHORT CIRCUIT TO ALLAY
20 THE COURT'S CONCERNS ABOUT THIS. IF THE COURT HAS -- I
21 THINK THIS SPEAKS MORE TO THE COURT'S SECOND CONCERN, WHICH
22 IS THE SUFFICIENCY OF THE FACTUAL BASIS. FIRST, I THINK WE
23 WOULD ARGUE THAT THE NAMES OF THE INDIVIDUALS -- I THINK WE
24 WOULD STIPULATE BOTH PARTIES KNOW EXACTLY WHO WE ARE TALKING
25 ABOUT. I DON'T THINK THERE'S GOING TO BE ANY DISPUTE ABOUT

Page 7

1 THAT.
2     BUT IN THE ABUNDANCE OF CAUTION, I THINK WHAT WE
3 CAN DO IS DO A SIDEBAR UNDER SEAL AND SIMPLY REVEAL THE
4 IDENTITIES OF THE -- BOTH PARTIES CAN STIPULATE TO THE COURT
5 WHO THOSE INDIVIDUALS ARE, AND THAT WAY THE COURT CAN BE
6 SATISFIED THAT THERE IS A FACTUAL BASIS, AND THE PUBLIC
7 INTEREST IN HAVING AN OPEN PROCEEDING CAN BE SATISFIED
8 WITHOUT UNNECESSARILY TARNISHING ANYONE'S NAME.
9     THE FINAL THING I'LL POINT OUT IS, ULTIMATELY,
10 YOUR HONOR, THE FACTUAL BASIS GOES TO WHAT THIS DEFENDANT'S
11 STATE OF MIND WAS AND WHAT HER CONDUCT WAS. THE NAMES OF
12 THE DIFFERENT INDIVIDUALS WHO ARE IDENTIFIED IN THE
13 INFORMATION, OR THE PLEA IS OF INTEREST, BUT I DON'T THINK
14 IT'S -- IT MAY NOT BE NECESSARY FOR THE COURT TO ARRIVE AT A
15 FACTUAL BASIS. FOR EXAMPLE, IF THE DEFENDANT WERE TO COME
16 IN AND SAY, "ME AND PEOPLE" -- "OTHER PEOPLE WHO I DON'T
17 WANT TO REVEAL WERE INVOLVED IN A SCHEME TO DEFRAUD, AND I'M
18 RESPONSIBLE FOR IT, AND I DID THESE THINGS WHICH MEET ALL
19 THE ELEMENTS," I DON'T THINK THAT THE COURT WOULD
20 NECESSARILY BE OBLIGED TO COMPEL THAT PERSON TO IDENTIFY ALL
21 THE INDIVIDUALS THAT SHE WAS CONSPIRING WITH.
22     WITH THAT, IF THE COURT IS -- IF THE COURT THINKS
23 THE RECORD WOULD BE STRONGER BY TAKING THESE PEOPLE'S NAME
24 AT SIDEBAR UNDER CONCERN, I THINK THAT WILL ALLAY THE
25 COURT'S PRINCIPAL CONCERN, WHICH IS A FACTUAL BASIS, AND I

Page 8

1 THINK THAT WE CAN HOPEFULLY PROCEED USING THE ANONYMOUS
2 VERSION SO WE DON'T UNFAIRLY TARNISH ANYONE'S NAME.
3     THE COURT: I CERTAINLY FEEL COMFORTABLE WITH
4 HEARING A FACTUAL BASIS, IF I HAVE MS. TULLOS IDENTIFY ON A
5 SHEET WHO THOSE PEOPLE ARE; AND THEN, WE KEEP THAT SHEET
6 UNDER SEAL. SO THAT WOULD ADDRESS MY FACTUAL BASIS CONCERN,
7 BUT I'M STILL CONCERNED ABOUT ARE WE REALLY COMPLYING WITH
8 THE SPIRIT OF RULE 11 IN THAT -- AND I'M NOT TRYING TO GET
9 ON MY HIGH HORSE, MR. STOLPER, BUT WHAT MAKES OUR COUNTRY
10 GREAT IS THAT WE ARE AN OPEN SOCIETY. WE DO NOT DO THINGS
11 IN PRIVATE, AND IT IS WHAT IT IS.
12     THE FACT THAT THESE INDIVIDUALS' NAMES WILL BE
13 NAMED ON A PUBLIC RECORD DOESN'T INDICATE WHAT THE
14 GOVERNMENT INTENDS TO DO, DOESN'T INDICATE WHETHER CHARGES
15 WILL BE BROUGHT AGAINST THESE INDIVIDUALS, AND IT IS WHAT IT
16 IS. THE FACT THAT MAYBE SOME OF THESE INDIVIDUALS ARE
17 PUBLIC FIGURES, THAT CERTAINLY CAN'T BE THE RULE. THEY
18 SHOULDN'T GET ANY OTHER SPECIAL TREATMENT THAN THE AVERAGE
19 CITIZEN WOULD.
20     WITH THAT SAID, I AM SYMPATHETIC, AND I'M NOT
21 TRYING TO BE CUTE. I UNDERSTAND YOUR COMMENTS, AS YOU ARE
22 TRYING TO BE SENSITIVE TO THESE OTHER INDIVIDUALS. IF YOUR
23 NAME IS MENTIONED IN THESE PROCEEDINGS, THAT'S NOT GOOD
24 PUBLICITY. BUT THE CONSTITUTION DOESN'T LIMIT THE PRESS TO
25 ONLY THOSE PEOPLE THAT ARE NOT OF PUBLIC CONCERN, IF YOU

Page 9

1 FOLLOW ME.
2     MR. STOLPER: I DO, YOUR HONOR. LET ME CONFER
3 WITH MY COLLEAGUES.
4     THE COURT: PLEASE. BEFORE YOU CONCUR WITH YOUR
5 COLLEAGUES, I WANT YOU TO TAKE AS MUCH TIME AS YOU NEED. I
6 HAVEN'T GIVEN THE DEFENSE A CHANCE TO CHIME IN. THEY HAVE
7 BEEN VERY CALM AND PATIENT. I DON'T KNOW IF YOU HAVE ANY
8 THOUGHTS THAT YOU WANT ME AS WELL AS THE GOVERNMENT TO
9 CONSIDER.
10     MR. DE BRETTEVILLE: YOUR HONOR, I DON'T REALLY
11 THINK IT'S ULTIMATELY OUR CONCERN. IN ALL FAIRNESS TO
12 MR. STOLPER, I DON'T SEE RULE 11 REQUIRING HIM AT THIS POINT
13 TO DISCLOSE THE IDENTITY OF THOSE INDIVIDUALS. HOWEVER, I
14 UNDERSTAND THE COURT'S CONCERN HERE. I THINK THE SOLUTION
15 THAT THE GOVERNMENT HAS SUGGESTED IS A VIABLE ONE. IF
16 THAT'S THE WAY TO ALLAY THIS COURT'S CONCERNS, THEN WE
17 SHOULD PURSUE IT.
18     THE COURT: AGAIN, MAYBE, IT'S MY READING OF
19 RULE 11. IT'S JUST RULE 11 SAYS: "PARTIES MUST DISCLOSE
20 THE PLEA AGREEMENT IN OPEN COURT WHEN THE PLEA IS OFFERED,
21 UNLESS THE COURT FOR GOOD CAUSE ALLOWS THE PARTIES TO
22 DISCLOSE THE PLEA AGREEMENT IN CAMERA."
23     AND, AGAIN, IF YOU USE -- I JUST THINK IT -- I'M
24 NOT TRYING TO BE CUTE, BUT IT'S ALMOST DISINGENUOUS IF YOU
25 HAVE A PLEA AGREEMENT, CONCEPTUALLY, AND IT HAS ALL THESE

Exhibit
3 (Pages 6 to 9)
77

## Page 10

1 CODE WORDS, THEN IT'S NOT BEING REVEALED. SO I NEED TO MAKE
2 A FINDING OF GOOD CAUSE FOR THE IDENTITIES, BECAUSE I'M NOT
3 GETTING THE COMPLETE TERMS OF THE PLEA AGREEMENT. BECAUSE I
4 ASSUME IT'S IMPORTANT, OTHERWISE IT WOULDN'T HAVE BEEN IN
5 THE FACTUAL BASIS -- THESE PEOPLE.
6          MR. DE BRETTEVILLE: CERTAINLY. IF THE COURT
7 FEELS THAT THE IDENTITIES OF THE INDIVIDUALS IDENTIFIED IN
8 THE FACTUAL BASIS ARE MATERIAL TO THE COURT'S DETERMINATION
9 OF THE ADEQUACY OF THAT FACTUAL BASIS, THEN WE SHOULD
10 PROCEED.
11          THE COURT: SEE, I THINK IT IS. I'M NOT SURE
12 RULE 11, THIS BEING AN OPEN COURT WITH A GOOD CAUSE SHOWING,
13 IS REALLY ADDRESSING MAKING SURE I HAVE A FACTUAL BASIS. I
14 THINK THE GOOD CAUSE SHOWING IS REALLY TO PROTECT THE PUBLIC
15 OR THE INTEREST OF THE PUBLIC; THAT IT HAS TO BE IN A PUBLIC
16 FORUM.
17          AND, AGAIN, MY EXPERIENCE -- AND IF ANY OF THE
18 U.S. ATTORNEYS HAVE A DIFFERENT EXPERIENCE, I CERTAINLY WANT
19 TO HEAR IT -- I HAVE DEALT WITH WITHHOLDING NAMES OF
20 INDIVIDUALS. USUALLY IT'S A MINOR. IT'S SAFETY OF THESE
21 WITNESSES. THERE IS AN ONGOING INVESTIGATION WHERE THEY ARE
22 INVOLVED, AND IT CAN JEOPARDIZE THEIR SAFETY; OR IF THESE
23 WITNESSES, ONCE THEY FIND OUT ABOUT THIS, THEY ARE GOING TO
24 FLEE THE COUNTRY. THAT'S WHERE IT COMES UP. BUT I HAVE
25 NEVER, NEVER PERSONALLY HAD A CASE WHERE I'M GOING TO

## Page 11

1 WITHHOLD IDENTITIES BECAUSE THIS COULD BE EMBARRASSING.
2 THAT'S UNFORTUNATELY OR FORTUNATELY ONE OF THE COSTS OF
3 LIVING IN AN OPEN SOCIETY. I DON'T MEAN TO TRIVIALIZE THE
4 DISCOMFORT THAT THESE INDIVIDUALS MIGHT RECEIVE, IF THIS IS
5 A PUBLIC RECORD. BUT, AGAIN, I THINK THAT'S THE RESULT OF
6 THE SOCIETY WE LIVE IN.
7          MR. STOLPER: A FEW POINTS, YOUR HONOR: ONE,
8 RESPECTFULLY, I DON'T THINK THAT RULE 11 REQUIRES THE NAMING
9 OF THESE PARTICULAR INDIVIDUALS FOR THIS TO BE AN OPEN
10 PROCEEDING. OUR OFFICE POLICY IS NOT TO REVEAL THOSE NAMES.
11 IF THE COURT THINKS THAT'S NECESSARY TO GO FORWARD, THE
12 COURT'S DECISION WILL OBVIOUSLY CONTROL. THERE'S OFFICE
13 POLICY AND THERE'S A COURT ORDER, AND THAT OBVIOUSLY TRUMPS.
14 YOUR HONOR'S WORD OBVIOUSLY TRUMPS.
15          IF THAT'S WHAT THE COURT ORDERS, THEN WE ARE
16 PREPARED TO PROCEED TODAY AND REVEAL THOSE BEFOREHAND AND
17 IDENTIFY WHO THOSE NAMES ARE AND TAKE THE PLEA.
18          THE ONE THING I WOULD JUST -- THIS IS NOT AN
19 UNUSUAL PRACTICE OF USING PSEUDONYMS IN EITHER PLEA
20 AGREEMENTS OR IN INDICTMENTS. IT'S FOR THE REASONS THAT THE
21 GOVERNMENT PREVIOUSLY STATED.
22          BUT TO ANSWER THE COURT'S CONCERNS, NONE OF THE
23 FACTORS THE COURT IDENTIFIED -- SAFETY OF WITNESS, FLIGHT
24 RISK -- WE DON'T THINK THOSE ARE NECESSARILY -- WE DON'T
25 THINK THAT THOSE COME INTO PLAY HERE. THE GOVERNMENTS

## Page 12

1 REASONS ARE, AS I STATED, TO ENSURE THAT PEOPLE'S NAMES
2 AREN'T PUT OUT THERE WITHOUT A FAIR OPPORTUNITY TO RESPOND.
3          WITH THAT SAID, IF THE COURT WOULD LIKE TO
4 PROCEED, IF THE COURT THINKS THAT THOSE NAMES ARE IMPORTANT
5 TO THE RULE 11 COLLOQUY, THERE IS NO LEGAL REASON WE CAN'T
6 GO FORWARD TODAY.
7          THE COURT: AGAIN, I APPRECIATE WHAT YOU SAID, BUT
8 UNLESS I HAVE KIND OF AUTHORITY TO SAY THE CONTRARY, I DO
9 FEEL THEY SHOULD BE REVEALED. BUT I DON'T WANT TO FORCE
10 MYSELF ON EITHER SIDE. IF EITHER SIDE WOULD LIKE TO TAKE
11 THEIR TIME AND THINK ABOUT THIS AND WE CAN COME BACK
12 TOMORROW, WE CAN COME BACK MONDAY, TUESDAY. AGAIN, I DON'T
13 WANT TO RUSH YOU. BUT BASED ON WHAT I HAVE HEARD -- AGAIN,
14 IT SOUNDS LIKE I'M CRITICIZING YOU, AND I DON'T WANT TO -- I
15 THINK YOUR OBJECTIVES ARE NOBLE, AND I MEAN THAT. BUT,
16 UNFORTUNATELY, THAT'S EMBARRASSMENT SUBJECT TO RIDICULE,
17 SUBJECT TO CONFRONTATION. THAT'S PART OF OUR SOCIETY AND
18 OUR SYSTEM. I UNDERSTAND THE POLICY, BUT I DON'T HAVE ANY
19 EXPERIENCE WITH WITHHOLDING NAMES OF WITNESSES FOR THE
20 FACTUAL BASIS JUST BASED ON, WELL, THIS COULD BE
21 EMBARRASSING TO THEM.
22          I WILL CONCEDE ARGUABLY IT MIGHT BE EMBARRASSING
23 TO PEOPLE.
24          MR. STOLPER: YOUR HONOR, I HAVE CONFERRED WITH MY
25 COLLEAGUES. IT'S AN OFFICE POLICY. WE ARE NOT AWARE OF ANY

## Page 13

1 AUTHORITY THAT REQUIRES THOSE NAMES TO BE WITHHELD. THE
2 COURT I THINK WOULD BE WITHIN ITS RIGHTS TO ORDER THOSE
3 NAMES -- THOSE NAMES TURNED OVER. CANDIDLY, WE ARE NOT
4 OPTIMISTIC WE ARE GOING TO FIND ANY CASE LAW ON THIS. IF
5 THE COURT FEELS THAT'S NECESSARY OR IMPORTANT TO MAINTAIN
6 THE OPENNESS OF THE COURT, THAT'S OBVIOUSLY A VERY IMPORTANT
7 PRINCIPLE AND ONE THAT THE COURT, CERTAINLY, IS WITHIN ITS
8 RIGHTS TO ORDER.
9          THE COURT: I APPRECIATE THAT, MR. STOLPER, AND I
10 INCORPORATE EVERYTHING YOU SAID THAT THAT IS MY THINKING IT
11 IS IMPORTANT FOR THE PUBLIC. BUT I THINK IT'S ALSO
12 IMPORTANT FOR ME TAKING A FACTUAL BASIS. IT'S NOT THAT I'M
13 UNCOMFORTABLE, BUT I JUST DON'T FEEL THAT IT'S GOING TO LOOK
14 GOOD: I'M GOING TO PASS YOU A PIECE OF PAPER NOW. GIVE ME
15 THAT PIECE OF PAPER BACK. THAT'S NOT WHAT AMERICAN JUSTICE
16 IS ALL ABOUT. FACTS ARE WHAT THE FACTS ARE. THE CASE IS
17 GOING TO HAVE TO STAND AGAINST MS. TULLOS WITH WHATEVER IT
18 IS AND AGAINST THESE OTHER INDIVIDUALS WHOEVER THEY ARE. IT
19 IS WHAT IT IS.
20          MR. STOLPER: I THINK WE ARE PREPARED TO PROCEED
21 THEN, YOUR HONOR.
22          MR. DE BRETTEVILLE: YES, YOUR HONOR.
23          THE COURT: OKAY. THEN WITH THAT, MS. TULLOS, IF
24 I COULD HAVE YOU APPROACH THE LECTERN WITH
25 MR. DE BRETTEVILLE?

Exhibit
4 (Pages 10 to 13)

## Page 14

1  MR. DE BRETTEVILLE: MR. DE BRETTEVILLE, YES.

2  THE COURT: MR. DE BRETTEVILLE.

3  MS. TULLOS, I'M GOING TO BE ASKING YOU A SERIES OF

4  QUESTIONS, MA'AM.

5  IF AT ANY TIME DURING MY QUESTIONING YOU DON'T

6  UNDERSTAND A QUESTION, WOULD YOU PLEASE LET ME KNOW. AND

7  I'LL TRY TO REPHRASE IT.

8  DEFENDANT TULLOS: YES, YOUR HONOR, I WILL.

9  THE COURT: AND THEN, ALSO, AS WE ARE GOING

10  THROUGH THIS PROCEEDING, AT ANY TIME IF YOU HAVE ANY

11  QUESTION FOR ME, PLEASE LET ME KNOW AND I WILL TRY TO ANSWER

12  THE QUESTION THE BEST I CAN.

13  DEFENDANT TULLOS: THANK YOU, YOUR HONOR.

14  THE COURT: AND THEN, FINALLY I KNOW IT'S LATE IN

15  THE EVENING, BUT I REALLY DON'T WANT TO RUSH THIS. I WANT

16  TO MAKE SURE YOU'RE COMFORTABLE, AS COMFORTABLE AS YOU CAN

17  BE, GIVEN THE CIRCUMSTANCES. SO, IF AT ANY TIME YOU WANT TO

18  TALK TO MR. DE BRETTEVILLE ABOUT ANYTHING THAT COMES UP, LET

19  ME KNOW, AND I'LL GIVE YOU AS MUCH TIME AS YOU NEED, ALL

20  RIGHT?

21  DEFENDANT TULLOS: THANK YOU VERY MUCH, YOUR

22  HONOR.

23  THE COURT: NOW, THE FIRST ORDER OF BUSINESS IS, I

24  HAVE TO PLACE YOU UNDER OATH. SO, I'M GOING TO ASK YOU TO

25  RAISE YOUR RIGHT HAND AND MY COURTROOM DEPUTY WILL SWEAR YOU

## Page 15

1  IN.

2  NANCY TULLOS, DEFENDANT WITNESS, SWORN

3  DEFENDANT TULLOS: I DO.

4  THE COURT: MS. TULLOS, YOU ARE NOW UNDER OATH,

5  MA'AM, WHICH MEANS YOU HAVE AN OBLIGATION TO ANSWER ALL MY

6  QUESTIONS TRUTHFULLY. TO THE EXTENT YOU DON'T, YOU SUBJECT

7  YOURSELF TO PROSECUTION FOR PERJURY.

8  DO YOU UNDERSTAND?

9  DEFENDANT TULLOS: YES, I DO, YOUR HONOR.

10  THE COURT: WOULD YOU PLEASE TELL ME YOUR TRUE,

11  FULL AND CORRECT NAME.

12  DEFENDANT TULLOS: NANCY TULLOS.

13  THE COURT: AND WHEN WERE YOU BORN, MA'AM?

14  DEFENDANT TULLOS: OCTOBER 26, 1951.

15  THE COURT: AND HOW MUCH EDUCATION DO YOU HAVE?

16  DEFENDANT TULLOS: MASTER'S.

17  THE COURT: IN?

18  DEFENDANT TULLOS: BUSINESS ADMINISTRATION.

19  THE COURT: AND ANY OTHER EDUCATIONAL TRAINING?

20  DEFENDANT TULLOS: NO.

21  THE COURT: NOW, I HAVE TO, UNFORTUNATELY, ASK YOU

22  A FEW PERSONAL QUESTIONS. I DON'T WANT TO NEEDLESSLY INVADE

23  YOUR PRIVACY. BUT ONE OF MY OBJECTIVES OR MY DUTIES AT THIS

24  PROCEEDING IS TO MAKE SURE YOU ARE AWARE OF THIS DEAL, THAT

25  YOU UNDERSTAND IT AND YOU UNDERSTAND THE CONSEQUENCES OF IT.

## Page 16

1  SO I'VE GOT TO ASK YOU: HAVE YOU EVER BEEN

2  TREATED FOR ANY TYPE OF MENTAL ILLNESS IN THE PAST?

3  DEFENDANT TULLOS: NO.

4  THE COURT: HAVE YOU EVER BEEN TREATED FOR ANY

5  TYPE OF DRUG OR ALCOHOL ADDICTION IN THE PAST?

6  DEFENDANT TULLOS: NO, YOUR HONOR.

7  THE COURT: NOW, WITHIN THE LAST 72 HOURS, HAVE

8  YOU TAKEN ANY DRUG OR ALCOHOL?

9  DEFENDANT TULLOS: NO, YOUR HONOR.

10  THE COURT: MR. DE BRETTEVILLE, IN YOUR DEALINGS

11  WITH MS. TULLOS, HAVE YOU HAD ANY CONCERN ABOUT WHETHER

12  SHE HAS FULL POSSESSION OF HER FACULTIES?

13  MR. DE BRETTEVILLE: NO, YOUR HONOR.

14  THE COURT: ALL RIGHT. BASED ON MS. TULLOS'

15  ANSWERS TO MY QUESTIONS, AS WELL AS THE REPRESENTATION OF

16  COUNSEL, I'LL FIND THAT SHE DOES HAVE FULL POSSESSION OF HER

17  FACULTIES AND IS MENTALLY COMPETENT TO PROCEED.

18  MS. TULLOS, I WOULD LIKE TO NEXT TALK TO YOU ABOUT

19  THE CHARGES SET FORTH IN THE INFORMATION.

20  DO YOU HAVE A COPY OF THE INFORMATION BEFORE YOU?

21  DEFENDANT TULLOS: YES, I DO, YOUR HONOR.

22  THE COURT: GREAT. ALL RIGHT. MR. STOLPER, WOULD

23  YOU BE KIND ENOUGH TO TELL US WHAT THE CHARGES ARE AND THE

24  ELEMENTS OF THE OFFENSE.

25  MR. STOLPER: YES, YOUR HONOR.

## Page 17

1  THE INFORMATION CHARGES THE DEFENDANT WITH A

2  SINGLE COUNT OF TITLE 18 UNITED STATES CODE,

3  SECTION 1512(B)(2)(B). IT'S OBSTRUCTION OF JUSTICE, YOUR

4  HONOR.

5  FOR THE DEFENDANT TO BE GUILTY OF OBSTRUCTION OF

6  JUSTICE, THE FOLLOWING MUST BE TRUE: ONE, DEFENDANT

7  ATTEMPTED TO DESTROY INFORMATION; AND TWO, WITH THE INTENT

8  TO IMPAIR THAT INFORMATION FROM BEING USED IN AN OFFICIAL

9  PROCEEDING.

10  THE COURT: ALL RIGHT. MS. TULLOS, DO YOU HAVE

11  ANY QUESTIONS FOR ME ABOUT THESE CHARGES?

12  DEFENDANT TULLOS: NO, YOUR HONOR, I DON'T.

13  THE COURT: AND YOU HAVE HAD A CHANCE TO GO OVER

14  THEM WITH YOUR COUNSEL?

15  DEFENDANT TULLOS: YES, I HAVE.

16  THE COURT: NOW, I KNOW I SAW IN THE FILE THAT YOU

17  WERE PREVIOUSLY ADVISED OF YOUR RIGHT TO BE CHARGED BY WAY

18  OF AN INDICTMENT FROM A GRAND JURY?

19  DEFENDANT TULLOS: YES.

20  THE COURT: NEVERTHELESS, I WOULD LIKE TO GO OVER

21  THAT WITH YOU QUICKLY AGAIN AND MAKE SURE YOU HAVE NO

22  QUESTIONS AND YOU REALIZE WHAT YOU ARE GIVING UP.

23  IN OUR SYSTEM, YOU HAVE THE RIGHT TO BE CHARGED BY

24  WAY OF AN INDICTMENT FROM A GRAND JURY AS OPPOSED TO A

25  FILING OF AN INFORMATION BY THE U.S. ATTORNEYS. GRAND JURY

## Page 18

1  IS AT LEAST 16 PEOPLE, NO MORE THAN 23 PEOPLE. THEN, THESE

2  CHARGES ARE SUBMITTED TO THEM. THEY NEED TO DETERMINE

3  WHETHER THERE IS PROBABLE CAUSE THAT THE OFFENSE CHARGED WAS

4  COMMITTED AND YOU WERE THE PERSON THAT COMMITTED THE

5  OFFENSE.

6      IF THIS MATTER WAS SUBMITTED TO A GRAND JURY, THEY

7  MAY OR MAY NOT COME BACK WITH AN INDICTMENT AGAINST YOU. IF

8  WE PROCEED FORWARD, MA'AM, WE ARE GOING TO BE ESSENTIALLY

9  ACTING AS IF YOU HAD BEEN CHARGED BY WAY OF AN INDICTMENT

10 FROM A GRAND JURY.

11     DO YOU UNDERSTAND THAT?

12     DEFENDANT TULLOS:  YES, I DO, YOUR HONOR.

13     THE COURT:  AND DO YOU GIVE UP YOUR RIGHT TO BE

14 CHARGED BY WAY OF AN INDICTMENT FROM A GRAND JURY?

15     DEFENDANT TULLOS:  YES, I DO, YOUR HONOR.

16     THE COURT:  OKAY.  MR. DE BRETTEVILLE, DO YOU JOIN

17 AND CONCUR IN THAT WAIVER?

18     MR. DE BRETTEVILLE:  YES, YOUR HONOR.

19     THE COURT:  I WILL FIND THAT MS. TULLOS' WAIVER OF

20 INDICTMENT IS KNOWINGLY AND VOLUNTARILY MADE AND IS HEREBY

21 ACCEPTED.

22     MS. TULLOS, I DO HAVE A COPY OF THE PLEA AGREEMENT

23 IN FRONT OF ME. THERE IS A SIGNATURE THAT PURPORTS TO BE

24 YOURS ON PAGE 17, LOOKS LIKE AROUND LINE 5.  IS THAT, IN

25 FACT, YOUR SIGNATURE, MA'AM?

## Page 19

1      DEFENDANT TULLOS:  YES, IT IS.

2      THE COURT:  AND DID YOU SIGN THIS ON OR ABOUT

3  NOVEMBER 19TH OF LAST YEAR?

4      DEFENDANT TULLOS:  YES, I DID, YOUR HONOR.

5      THE COURT:  AND PRIOR TO SIGNING THIS PLEA

6  AGREEMENT, MA'AM, DID YOU READ ALL THE TERMS OF THE PLEA

7  AGREEMENT TO YOURSELF?

8      DEFENDANT TULLOS:  YES, I DID, YOUR HONOR.

9      THE COURT:  DID YOU DISCUSS IT WITH YOUR COUNSEL?

10     DEFENDANT TULLOS:  YES, I DID, YOUR HONOR.

11     THE COURT:  I KNOW IT'S A GENERAL QUESTION, AND I

12 KNOW IT'S A MULTI-PAGE DOCUMENT.  BUT TELL ME, IS THERE ANY

13 TERM, CONDITION, OR PROVISION IN THIS PLEA AGREEMENT THAT

14 YOU ARE UNSURE ABOUT, OR YOU HAVE A QUESTION ABOUT?

15     DEFENDANT TULLOS:  NO, YOUR HONOR.

16     THE COURT:  ALL RIGHT.  AS WE GO FORWARD AND TALK

17 ABOUT SOME OF THE PROVISIONS, YOU WILL LET ME KNOW IF YOU

18 HAVE ANY QUESTION?

19     DEFENDANT TULLOS:  YES, I WILL.

20     THE COURT:  ALL RIGHT.  NOW, THE FIRST THING I

21 WANT TO MAKE SURE THAT YOU REALIZE IS THIS PLEA AGREEMENT IS

22 NOT BINDING ON ME.  IN PARTICULAR, I DO NOTICE THAT THERE IS

23 GOING TO BE CERTAIN RECOMMENDATIONS TO ME AS TO WHAT AN

24 APPROPRIATE SENTENCE IS, IF I ACCEPT A GUILTY PLEA FROM YOU.

25 YOU NEED TO UNDERSTAND THAT I'M NOT BOUND BY THOSE

## Page 20

1  RECOMMENDATIONS.  I CAN REJECT THEM.  I CAN ACCEPT THEM.  IF

2  I REJECT THEM AND I DECIDE TO MAKE YOUR SENTENCE MORE

3  LENIENT THAN WHAT'S BEING RECOMMENDED, YOU ARE NOT GOING TO

4  HAVE A PROBLEM WITH THAT.  BUT I COULD MAKE YOUR SENTENCE

5  MORE SEVERE, WHICH I THINK WOULD BE A LITTLE TROUBLING OR

6  DISCONCERTING TO YOU.  BUT EVEN IF I DO THAT, YOU ARE NOT

7  GOING TO BE ABLE TO WITHDRAW ANY GUILTY PLEA THAT YOU MIGHT

8  ENTER THIS EVENING.

9      DO YOU UNDERSTAND THAT?

10 A.  YES, I DO, YOUR HONOR.

11     THE COURT:  YOU ARE ALSO, IN YOUR PLEA AGREEMENT,

12 GIVING UP VERY IMPORTANT RIGHTS TO APPEAL OR COLLATERALLY

13 ATTACK ANY CONVICTION THAT WOULD RESULT FROM A GUILTY PLEA

14 THIS EVENING.

15     WHEN I LOOKED AT YOUR PLEA AGREEMENT ON PAGE 14,

16 THERE IS A PRETTY BROAD WAIVER OF APPEAL AND COLLATERAL

17 ATTACK RIGHTS.

18     MR. STOLPER, WOULD YOU BE KIND ENOUGH JUST TO GET

19 US ALL ON THE SAME PAGE AND TELL US WHAT THIS WAIVER

20 ENTAILS?

21     MR. STOLPER:  YES, YOUR HONOR.

22     THE GOVERNMENT'S AND THE PARTIES' WAIVER OF

23 APPELLATE AND COLLATERAL ATTACK RIGHTS APPEARS ON PAGE 14 OF

24 THE PLEA AGREEMENT.

25     PER THE AGREEMENT, YOUR HONOR, THE DEFENDANT HAS

## Page 21

1  GIVEN UP ANY RIGHT TO APPEAL ANY SENTENCE IMPOSED BY THE

2  COURT AND THE MANNER IN WHICH THE SENTENCE IS DETERMINED,

3  PROVIDED THAT THE SENTENCE IS WITHIN THE STATUTORY MAXIMUM;

4  THAT THE COURT, IN DETERMINING THE APPLICABLE GUIDELINE

5  RANGE, DOES NOT DEPART UPWARD AN OFFENSE LEVEL OR CRIMINAL

6  HISTORY CATEGORY AND DETERMINES THE TOTAL OFFENSE LEVEL IS

7  13 OR BELOW AND THAT THE COURT IMPOSES A SENTENCE WITHIN OR

8  BELOW THE RANGE CORRESPONDING TO THE DETERMINED TOTAL

9  OFFENSE LEVEL.

10     THE DEFENDANT IS ALSO GIVING UP ANY RIGHT TO BRING

11 A POST-CONVICTION COLLATERAL ATTACK ON THE CONVICTION OR

12 SENTENCE, EXCEPT A POST-CONVICTION COLLATERAL ATTACK BASED

13 UPON A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL, NEWLY

14 DISCOVERED EVIDENCE, OR AN EXPRESSLY RETROACTIVE CHANGE IN

15 THE APPLICABLE SENTENCING GUIDELINES, SENTENCING STATUTES,

16 OR STATUTES OF CONVICTION.

17     NOTWITHSTANDING THE FOREGOING, THE DEFENDANT

18 RETAINS HER ABILITY TO APPEAL THE COURT'S DETERMINATION OF

19 HER CRIMINAL HISTORY CATEGORY AND THE CONDITIONS OF

20 PROBATION AND SUPERVISED RELEASE, EXCEPT FOR THE STANDARD

21 CONDITIONS SET FORTH IN GENERAL ORDERS 318 AND 0105 AND THE

22 DRUG-TESTING CONDITION MANDATED BY 18 U.S.C. SECTIONS 356385

23 AND 3583(D).

24     YOUR HONOR, THAT WAS A LONG-WINDED WAY OF SAYING

25 THAT IF YOU SENTENCE IN ACCORDANCE WITH THE AGREEMENT, THE

Exhibit

6 (Pages 18 to 21)

Page 22

1   DEFENDANT WILL BE GIVING UP SUBSTANTIALLY ALL OF HER
2   APPELLATE RIGHTS.
3        THE COURT:  DO YOU UNDERSTAND THAT, MS. TULLOS?
4        DEFENDANT TULLOS:  YES, I DO, YOUR HONOR.
5        THE COURT:  ANY QUESTIONS ABOUT IT?
6        DEFENDANT TULLOS:  NO, SIR.
7        THE COURT:  AND THEN, EVEN IF I DON'T FOLLOW THESE
8   RECOMMENDATIONS, YOU MIGHT HAVE A RIGHT TO APPEAL, BUT YOU
9   NEED TO UNDERSTAND IT'S STILL GOING TO BE VERY, VERY
10  DIFFICULT TO UNDO THIS DEAL, IF YOU GO FORWARD AND ENTER A
11  GUILTY PLEA THIS EVENING.
12       DO YOU UNDERSTAND THAT?
13       DEFENDANT TULLOS:  I DO, YOUR HONOR.
14       THE COURT:  NOW, I NOTICED THERE WAS A PROVISION
15  IN YOUR PLEA AGREEMENT ON PAGE 11, TALKING ABOUT YOUR
16  UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE.  I KNOW THE
17  TERMS OF THIS PLEA AGREEMENT ARE GOING TO BE INCORPORATED
18  INTO THIS HEARING.
19       PLEASE, COUNSEL, IF EITHER SIDE DISAGREES WITH MY
20  CHARACTERIZATION, LET ME KNOW.
21       BUT THE WAY I READ THIS PARAGRAPH, MS. TULLOS, IS
22  THERE ARE NO PROMISES BEING MADE TO YOU.  IN OTHER WORDS,
23  WHEN I LOOK AT 18-D, IT SAYS THAT THE UNITED STATES
24  ATTORNEY'S OFFICE IS MAKING NO AGREEMENT OR REPRESENTATION
25  AS TO WHETHER ANY COOPERATION THAT YOU HAVE PROVIDED OR

Page 23

1   INTEND TO PROVIDE CONSTITUTES SUBSTANTIAL ASSISTANCE AND
2   THAT THE DECISION WHETHER YOU HAVE PROVIDED SUBSTANTIAL
3   ASSISTANCE RESTS SOLELY WITHIN THE DISCRETION OF THE UNITED
4   STATES ATTORNEY'S OFFICE.
5        DO YOU UNDERSTAND THAT, MA'AM?
6        DEFENDANT TULLOS:  YES, I DO, YOUR HONOR.
7        THE COURT:  DO YOU HAVE ANY QUESTIONS FOR ME ABOUT
8   SUBSTANTIAL ASSISTANCE?
9        DEFENDANT TULLOS:  NO, YOUR HONOR, I DON'T.
10       THE COURT:  ALL RIGHT.  NOW, I SAW IN THE PLEA
11  AGREEMENT IT SET FORTH SOME OF THE CONSEQUENCES OF ENTERING
12  A GUILTY PLEA.  I WOULD LIKE TO GO OVER THOSE WITH YOU
13  AGAIN.
14       BY ENTERING A GUILTY PLEA THIS EVENING, YOU ARE
15  GOING TO PROBABLY BE GIVING UP SOME VERY IMPORTANT CIVIL
16  RIGHTS, LIKE THE RIGHT TO VOTE, THE RIGHT TO HOLD PUBLIC
17  OFFICE, THE RIGHT TO SIT ON A JURY AND THE RIGHT TO CARRY A
18  FIREARM.
19       DO YOU UNDERSTAND THAT?
20       DEFENDANT TULLOS:  YES, I DO, YOUR HONOR.
21       THE COURT:  ALSO, THERE ARE SOME PROFESSIONS,
22  MA'AM, WHICH REQUIRE A PROFESSIONAL LICENSE.  AND BY HAVING
23  A CONVICTION OF THIS NATURE ON YOUR RECORD, IT MAY BE VERY
24  DIFFICULT, IF NOT IMPOSSIBLE, TO OBTAIN ANY SUCH LICENSE.
25       DO YOU UNDERSTAND THAT?

Page 24

1        DEFENDANT TULLOS:  YES, I DO.
2        THE COURT:  ALSO, I'M NOT FAMILIAR WITH YOUR
3   PERSONAL CIRCUMSTANCES.  I DON'T KNOW IF THERE IS ANY STATE
4   INVESTIGATION GOING ON AGAINST YOU.  BUT WHAT YOU NEED TO
5   KNOW IS THAT WHEN IT COMES TIME TO SERVE ANY SENTENCE IN
6   THIS CASE, THAT SENTENCE IS NOT GOING TO RUN CONCURRENTLY
7   WITH ANY STATE SENTENCE THAT MIGHT BE IMPOSED AGAINST YOU ON
8   ANOTHER MATTER.  THEY ARE INDEPENDENT.
9        DO YOU UNDERSTAND THAT?
10       DEFENDANT TULLOS:  YES, I DO.
11       THE COURT:  THIS MIGHT SEEM LIKE AN ODD QUESTION,
12  BUT NO ONE, HOPEFULLY, BETTER THAN YOU UNDERSTANDS WHAT HAS
13  BEEN PROMISED TO YOU.  IT IS IMPORTANT THAT I HAVE ALL THE
14  TERMS OF THE PLEA AGREEMENT BEFORE ME.  ANYTHING THAT HAS
15  BEEN PROMISED TO YOU, I NEED TO MAKE SURE I KNOW ABOUT IT.
16       TO THE BEST OF YOUR KNOWLEDGE AS YOU STAND THERE
17  THIS EVENING, HAS EVERYTHING THAT HAS BEEN PROMISED TO YOU
18  BY THE GOVERNMENT BEEN SET FORTH IN THIS PLEA AGREEMENT?
19       DEFENDANT TULLOS:  YES, YOUR HONOR.
20       THE COURT:  MR. DE BRETTEVILLE, I ASSUME THAT THE
21  PLEA AGREEMENT REFLECTS THE ENTIRE AGREEMENT, SIR?
22       MR. DE BRETTEVILLE:  YES, YOUR HONOR.
23       THE COURT:  AND YOU DISCUSSED IT WITH MS. TULLOS?
24       MR. DE BRETTEVILLE:  YES.
25       THE COURT:  YOU FEEL IT'S IN HER BEST INTEREST TO

Page 25

1   ENTER A GUILTY PLEA PURSUANT TO THAT PLEA AGREEMENT?
2        MR. DE BRETTEVILLE:  I DO.
3        THE COURT:  MR. STOLPER, I ASSUME IT IS THE ENTIRE
4   AGREEMENT, SIR?
5        MR. STOLPER:  IT IS, YOUR HONOR.
6        THE COURT:  MS. TULLOS, I NEXT NEED TO TALK TO YOU
7   ABOUT THE PENALTIES AND PUNISHMENTS THAT APPLY TO THIS
8   CHARGE THAT IS THE SUBJECT OF YOUR PLEA AGREEMENT.  I DON'T
9   WANT TO UNNECESSARILY FRIGHTEN YOU, CONFUSE YOU.  BUT YOU
10  MAY RECALL, I TOLD YOU THAT THE PLEA AGREEMENT AND THE
11  RECOMMENDATIONS AS FAR AS SENTENCING ARE NOT BINDING ON ME,
12  SO THE LAW REQUIRES THAT THIS HEARING THAT YOU BE ADVISED
13  WHAT THE WORST-CASE SCENARIO IS.  BECAUSE IF YOU ENTER A
14  GUILTY PLEA, THEN THE ONLY THING LEFT TO DO IN YOUR CASE
15  WILL BE TO SENTENCE YOU.
16       BEFORE YOU DO THAT, YOU NEED TO KNOW WHAT'S THE
17  WORST POSSIBLE SCENARIO THAT COULD HAPPEN TO YOU, ALL RIGHT,
18  MA'AM?
19       DEFENDANT TULLOS:  YES, YOUR HONOR.
20       THE COURT:  MR. STOLPER, WOULD YOU PLEASE ADVISE
21  US OF THOSE PENALTIES AND PUNISHMENTS.
22       MR. STOLPER:  YES, YOUR HONOR.
23       IF THE DEFENDANT PLEADS GUILTY TO THE INFORMATION
24  WHICH CHARGES A SINGLE VIOLATION OF TITLE 18, UNITED STATES
25  CODE SECTION 1512(B)(2)(B), STATUTORY MAXIMUM IS AS FOLLOWS:

Exhibit
7 (Pages 22 to 25)

## Page 26

1  TEN YEARS' IMPRISONMENT, A THREE YEAR PERIOD OF SUPERVISED
2  RELEASE, A FINE OF QUARTER OF A MILLION DOLLARS, OR TWICE
3  THE GROSS GAIN OR GROSS LOSS RESULTING FROM THE OFFENSE,
4  WHICHEVER IS GREATER, AND A MANDATORY SPECIAL ASSESSMENT OF
5  $100.
6      THE COURT:  IS THERE ANY ISSUE OF RESTITUTION?
7      MR. STOLPER:  THERE IS NOT AN ISSUE OF
8  RESTITUTION, YOUR HONOR.
9      THE DEFENDANT IS SETTLING SEPARATELY WITH THE
10 SECURITIES AND EXCHANGE COMMISSION AND WILL ADDRESS
11 RESTITUTION CONCERNS THERE.
12     THE COURT:  ALL RIGHT.  SO, FOR PURPOSES OF THIS
13 CRIMINAL MATTER, WE DO NOT HAVE TO WORRY ABOUT ANY ISSUE OF
14 RESTITUTION?
15     MR. STOLPER:  THAT'S CORRECT, YOUR HONOR.
16     THE COURT:  MS. TULLOS, ANY QUESTIONS FROM ME
17 ABOUT ANY OF THESE PENALTIES AND PUNISHMENTS?
18     DEFENDANT TULLOS:  NO, YOUR HONOR.
19     THE COURT:  NOW, MA'AM, I ALSO NEED TO ADVISE THAT
20 WE NO LONGER HAVE A PROGRAM OF PAROLE IN OUR FEDERAL SYSTEM.
21 PAROLE WAS A PROGRAM WHERE SOMEONE WOULD BE SENTENCED TO
22 TIME IN CUSTODY IN PRISON AND THEN THEY WOULD BE RELEASED
23 EARLY, SUBJECT TO CERTAIN TERMS AND CONDITIONS.  RIGHTFULLY
24 OR WRONGFULLY, WE HAVE GOTTEN RID OF PATROL.  SO WHAT THAT
25 MEANS IN YOUR CASE, IF YOU ARE SENTENCED TO ANY TIME IN

## Page 27

1  CUSTODY, YOU WILL NOT BE RELEASED EARLY ON A PROGRAM OF
2  PAROLE.
3      DO YOU UNDERSTAND THAT?
4      DEFENDANT TULLOS:  YES, I DO.
5      THE COURT:  ALSO, YOU WILL BE SUBJECT TO
6  SUPERVISED RELEASE, IF YOU ARE SENTENCED TO TIME IN CUSTODY,
7  AFTER YOU GET OUT OF CUSTODY; OR IF YOU ARE NOT SENTENCED TO
8  ANY TIME IN CUSTODY, YOU WILL BE WHAT WE CALL ON PROBATION.
9  WHETHER IT'S PROBATION OR SUPERVISED RELEASE, THAT MEANS
10 THERE ARE CERTAIN TERMS AND CONDITIONS THAT YOU MUST COMPLY
11 AND FOLLOW; BECAUSE IF YOU DO NOT FOLLOW THOSE TERMS AND
12 CONDITIONS OF SUPERVISED RELEASE, OR PROBATION, THE
13 CONSEQUENCES TO YOU WILL BE VERY SEVERE.  YOU WILL HAVE TO
14 SPEND SIGNIFICANT TIME IN CUSTODY AND, IN FACT, CONCEIVABLY
15 MAYBE EVEN MORE TIME IN CUSTODY THAN WHAT THE STATUTORY
16 MAXIMUM WAS FOR THIS OFFENSE.
17     DO YOU UNDERSTAND THAT?
18     DEFENDANT TULLOS:  YES, I DO, YOUR HONOR.
19     THE COURT:  OKAY.  AGAIN, I'M NOT FAMILIAR, MA'AM,
20 WITH YOUR PERSONAL HISTORY OR CIRCUMSTANCES, BUT IF YOU ARE
21 ON PROBATION, PAROLE, OR SUPERVISED RELEASE ON SOME OTHER
22 MATTER, BY ENTERING A GUILTY PLEA THIS EVENING, YOU COULD BE
23 VIOLATING THE TERMS AND CONDITIONS OF THAT OTHER SUPERVISED
24 RELEASE, PROBATION, OR PAROLE.
25     DO YOU UNDERSTAND THAT?

## Page 28

1      DEFENDANT TULLOS:  I DO, YOUR HONOR.
2      THE COURT:  OKAY.  NOW, I WOULD LIKE TO TALK TO
3  YOU VERY BRIEFLY ABOUT SENTENCING IN YOUR CASE.
4      I ASSUME MR. DE BRETTEVILLE HAS GONE OVER WITH YOU
5  OUR SENTENCING GUIDELINES?
6      DEFENDANT TULLOS:  YES.  YES, HE HAS.
7      THE COURT:  I DON'T HAVE THE BOOK, MS. TULLOS, ON
8  THE BENCH HERE, BUT IT'S A BOOK THAT I MUST CONSULT AND
9  CONSIDER WHAT THE ADVISORY GUIDELINE RANGE IS WHEN IT COMES
10 TIME TO SENTENCE YOU.  IF I ACCEPT A GUILTY PLEA FROM YOU,
11 WE WILL BE SETTING A DATE IN THE FUTURE FOR SENTENCING.
12 I'LL HAVE PROBATION PREPARE A PRESENTENCE INVESTIGATION
13 REPORT, AND IN THAT REPORT THEY WILL GIVE ME THEIR
14 RECOMMENDATION AS TO WHAT THE ADVISORY GUIDELINE RANGE IS
15 FOR YOUR CASE.
16     THE GOVERNMENT, AS WELL AS YOUR ATTORNEY, WILL
17 HAVE AN OPPORTUNITY TO COMMENT, OBJECT, AGREE TO ANYTHING
18 THAT IS IN THAT PRESENTENCE INVESTIGATION REPORT.  AND,
19 OBVIOUSLY, I WILL CONSIDER WHAT EVERYBODY HAS TO SAY,
20 INCLUDING THE RECOMMENDATIONS THAT ARE IN THE PLEA
21 AGREEMENT, MA'AM.
22     I THEN WILL ALSO HAVE TO DETERMINE WHETHER UNDER
23 THE GUIDELINES ANY DEPARTURES WOULD APPLY TO YOUR CASE, SUCH
24 AS IF THERE IS ANY MOTION FOR COOPERATION, OR SUBSTANTIAL
25 ASSISTANCE AND THEN OTHER FACTORS UNDER THE GUIDELINES THAT

## Page 29

1  I CONSIDER FOR DEPARTURE.
2      IN ADDITION TO DEPARTURES UNDER THE GUIDELINES,
3  I'M ALSO REQUIRED TO LOOK AT CERTAIN SENTENCING FACTORS --
4  THAT WE CALL THEM -- UNDER 18 U.S.C. SECTION 3553(A).  I'M
5  PROBABLY GIVING YOU MORE LAW THAN YOU CARE TO KNOW, BUT LET
6  ME TELL YOU WHAT SOME OF THESE FACTORS ARE.  I HAVE TO LOOK
7  AT THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND YOUR
8  HISTORY AND PERSONAL CHARACTERISTICS.  I NEED TO MAKE SURE
9  THAT ANY SENTENCE THAT I IMPOSE REFLECTS THE SERIOUSNESS OF
10 THE OFFENSE, PROMOTES RESPECT FOR THE LAW AND PROVIDES JUST
11 PUNISHMENT.  I NEED TO MAKE SURE THAT I PROVIDE ADEQUATE
12 DETERRENCE TO CRIMINAL CONDUCT.  I NEED TO MAKE SURE THAT I
13 PROTECT THE PUBLIC FROM FURTHER CRIMES COMMITTED BY YOU.  I
14 NEED TO MAKE SURE THAT YOU'RE PROVIDED WITH ANY NEEDED
15 EDUCATION OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER
16 CORRECTIONAL TREATMENT.  I NEED TO MAKE SURE THAT WHATEVER
17 SENTENCE I IMPOSE AVOIDS DISPARITIES WITH OTHER PEOPLE THAT
18 ARE SIMILARLY CHARGED.  AND THEN, I CONSIDER ANY OTHER
19 FACTOR THAT I THINK WOULD BE RELEVANT TO A FAIR AND JUST
20 SENTENCE IN THIS CASE.
21     OBVIOUSLY, AT THE SENTENCING HEARING, YOUR
22 ATTORNEY WILL HAVE AN OPPORTUNITY TO SPEAK TO ME; AND THEN
23 IF YOU DESIRE, I WOULD BE DELIGHTED AND I WOULD WANT TO HEAR
24 ANYTHING YOU WOULD HAVE TO SAY.
25     AFTER I CONSIDER ALL THAT INFORMATION, I THEN

Page 30

1  IMPOSE THE SENTENCE. I WOULD THINK SOMEONE IN YOUR
2  SITUATION, BEFORE THEY ENTERED A GUILTY PLEA, WOULD LIKE TO
3  KNOW WHAT THE SENTENCE WOULD BE. UNFORTUNATELY, I CANNOT
4  TELL YOU THAT. I NEED TO GET ALL THE INFORMATION BEFORE ME
5  AT THE APPROPRIATE TIME AND PLACE. ALTHOUGH I CAN'T TELL
6  YOU WHAT YOUR SENTENCE WOULD BE, I CERTAINLY CAN ANSWER ANY
7  QUESTIONS THAT YOU MIGHT HAVE FOR ME ABOUT THIS PROCESS.
8       DO YOU HAVE ANY?
9       DEFENDANT TULLOS: NO, YOUR HONOR, I DON'T.
10      THE COURT: OKAY. THEN, WHAT I WOULD LIKE TO NEXT
11  TALK TO YOU ABOUT IS GIVING UP WHAT WE CALL, MS. TULLOS,
12  WAIVING CERTAIN FUNDAMENTAL CONSTITUTIONAL RIGHTS TO A
13  TRIAL. THAT'S WHAT YOU ARE GOING TO BE DOING IF YOU GO
14  FORWARD AND ENTER A GUILTY PLEA.
15      UNDER OUR CONSTITUTION, MA'AM, YOU HAVE THE RIGHT
16  TO A PUBLIC AND SPEEDY TRIAL ON THESE CHARGES. I WOULD
17  IMPANEL 12 PEOPLE IN THE JURY BOX, LIKE THE ONE TO MY LEFT,
18  TO YOUR RIGHT; AND THEN, MR. STOLPER AND THE GOVERNMENT
19  WOULD HAVE THE BURDEN OF PROVING YOU GUILTY BEYOND A
20  REASONABLE DOUBT ON THESE CHARGES, THE HIGHEST STANDARD OF
21  PROOF WE HAVE IN OUR JUSTICE SYSTEM.
22      AT THAT TRIAL, YOU HAVE THE RIGHT TO AN ATTORNEY.
23  IF YOU COULDN'T AFFORD ONE, I WOULD APPOINT ONE FOR YOU AT
24  NO COST. YOU HAVE THE RIGHT AT THAT TRIAL TO CONFRONT AND
25  CROSS-EXAMINE ANY WITNESSES THE GOVERNMENT BRINGS IN TO

Page 31

1  COURT TO TESTIFY AGAINST YOU.
2       YOU ALSO HAVE THE RIGHT TO PRESENT YOUR OWN
3  EVIDENCE, AND I WOULD HELP YOU IN THAT REGARD. IF THERE
4  WERE ANY PEOPLE OUT THERE, MA'AM, THAT YOU WANTED TO COME
5  INTO COURT TO TESTIFY BEFORE THE JURY, I WOULD ISSUE A
6  SUBPOENA REQUIRING THOSE PEOPLE TO COME INTO COURT. IF
7  THERE WAS ANY PERSON WHO HAD ANY DOCUMENTS IN THEIR CUSTODY,
8  CONTROL, OR POSSESSION THAT YOU WANTED TO SHOW TO THE JURY,
9  I WOULD REQUIRE THAT PERSON TO COME INTO COURT AND SHOW
10  THOSE DOCUMENTS OR PHYSICAL EVIDENCE TO THE JURY. AND THEN,
11  AT A TRIAL, MA'AM, YOU ALSO HAVE THE RIGHT TO TAKE THIS
12  WITNESS STAND AND TELL THE JURY WHAT YOU DID AND WHY YOU DID
13  IT, IF YOU WANTED TO. I SAY "IF YOU WANTED TO," MA'AM,
14  BECAUSE YOU HAVE THE RIGHT TO REMAIN SILENT THROUGHOUT THE
15  TRIAL. THAT CANNOT BE USED AGAINST YOU IN ANY WAY.
16      AGAIN, YOU HAVE THE PRESUMPTION OF INNOCENCE.
17  IT'S THE GOVERNMENT'S BURDEN TO PROVE YOU GUILTY BEYOND A
18  REASONABLE DOUBT.
19      IF WE HAD A TRIAL, MA'AM, AND THE JURY CAME BACK
20  WITH A GUILTY VERDICT AGAINST YOU, YOU THEN WOULD HAVE THE
21  RIGHT TO APPEAL THAT VERDICT AS WELL AS ANY SENTENCE THAT I
22  WOULD IMPOSE AS A RESULT OF IT.
23      NOW, IF WE GO FORWARD, YOU ARE GOING TO BE GIVING
24  UP ALL THESE CONSTITUTIONAL RIGHTS.
25      DO YOU UNDERSTAND THAT, MA'AM?

Page 32

1       DEFENDANT TULLOS: YES, YOUR HONOR.
2       THE COURT: DO YOU HAVE ANY QUESTIONS ABOUT THESE
3  CONSTITUTIONAL RIGHTS?
4       DEFENDANT TULLOS: NO, YOUR HONOR.
5       THE COURT: IS IT YOUR DESIRE TO WAIVE AND GIVE UP
6  THESE CONSTITUTIONAL RIGHTS?
7       DEFENDANT TULLOS: YES, IT IS, YOUR HONOR.
8       THE COURT: MR. DE BRETTEVILLE, DO YOU JOIN AND
9  CONCUR IN THAT WAIVER?
10      MR. DE BRETTEVILLE: I DO, YOUR HONOR.
11      THE COURT: ALL RIGHT. I AM NOW READY TO HEAR A
12  FACTUAL BASIS FOR A GUILTY PLEA.
13      MR. STOLPER, I'M GOING TO TURN IT OVER TO YOU,
14  SIR. TELL ME, IF WE HAD TRIAL AGAINST MS. TULLOS, WHAT YOU
15  WOULD PROVE AGAINST HER.
16      MR. STOLPER: YOUR HONOR, IF THERE WAS A TRIAL,
17  MS. TULLOS, WE WOULD PROVE THE FOLLOWING FACTS. THIS
18  FACTUAL BASIS IS NOT MEANT TO LIMIT WHAT WE MIGHT PROVE AT
19  TRIAL.
20      FROM 1998 TO 2003, DEFENDANT MS. TULLOS WAS
21  BROADCOM'S VICE PRESIDENT OF HUMAN RESOURCES, BASED IN
22  BROADCOM'S IRVINE, CALIFORNIA HEADQUARTERS.
23      BEGINNING IN MAY OF 1999, DEFENDANT WORKED WITH
24  OTHER EXECUTIVES TO RECRUIT A SENIOR ENGINEER NAMED MEHRDAD
25  NAYEBI TO WORK FOR BROADCOM.

Page 33

1       ON MAY 25TH, 1999, DEFENDANT WROTE AN ELECTRONIC
2  MAIL TO A BROADCOM SENIOR EXECUTIVE AND BOARD MEMBER,
3  DR. HENRY SAMUELI, STATING THAT MEHRDAD NAYEBI IS, QUOTE, IN
4  JAPAN CURRENTLY BUT SAYS THAT HE NEEDS TO MAKE SOME
5  DECISIONS ABOUT JOB OFFERS HE HAS AND WANTED TO KNOW IF
6  BROADCOM WAS INTERESTED, CLOSE QUOTE.
7       DEFENDANT REQUESTED, QUOTE, DECISIONS OR FEEDBACK,
8  CLOSE QUOTE, FROM HENRY SAMUELI CONCERNING WHETHER BROADCOM
9  IS GOING TO OFFER A JOB TO MEHRDAD NAYEBI.
10      ON MAY 26TH, 1999, HENRY SAMUELI WROTE THAT HE
11  THOUGHT BROADCOM SHOULD, QUOTE, MAKE AN OFFER, CLOSE QUOTE,
12  TO MEHRDAD NAYEBI AND WANTED TO CONFIRM THAT OTHER BROADCOM
13  EXECUTIVES CONCURRED.
14      THE NEXT DAY, DEFENDANT RESPONDED TO DR. SAMUELI
15  THAT AFTER DISCUSSION, QUOTE, IN TUESDAY'S STAFF MEETING,
16  CLOSE QUOTE, CONCERNING MEHRDAD NAYEBI, THE DEFENDANT WAS
17  GOING TO, QUOTE, SET UP A TELEPHONE INTERVIEW BETWEEN
18  MEHRDAD NAEBI AND ANOTHER BROADCOM SENIOR EXECUTIVE AND
19  BOARD MEMBER, DR. HENRY T. NICHOLAS, III.
20      DEFENDANT LEFT THE COUNTRY FOR VACATION ON OR
21  ABOUT MAY 30TH, 1999. WHEN SHE RETURNED FROM VACATION,
22  JUNE 4TH, 1999 DR. NICHOLAS TOLD HER THAT MEHRDAD NAYEBI HAD
23  BEEN HIRED ON MAY 25TH, 1999.
24      DEFENDANT RELAYED REPRESENTATION SHE HAD RECEIVED
25  FROM DR. NICHOLAS CONCERNING MEHRDAD NAYEBI'S HIRE DATE TO

Exhibit
9 (Pages 30 to 33)

## Page 34

1   BROADCOM'S OUTSIDE COUNSEL AND AT HIS ASSISTANCE PREPARED
2   MEHRDAD NAYEBI'S OFFER LETTER, DATING IT MAY 25TH, 1999.
3          ON OR ABOUT JUNE 23RD, 1999, DEFENDANT RECEIVED AN
4   ELECTRONIC MAIL FROM A BROADCOM HUMAN RESOURCES EMPLOYEE WHO
5   REPORTED TO HER THAT THIS WAS, QUOTE, NOT CLEAR FROM THE
6   OFFER LETTER FROM MEHRDAD NAYEBI IF THE STOCK OPTION GRANT
7   IS TO BE EFFECTIVE FROM HIS EXPLORATORY EMPLOYMENT DATE OF
8   5/29 OR LATER DATE.  THE ELECTRONIC MAIL GOES ON TO SAY THAT
9   ANOTHER BROADCOM EMPLOYEE, QUOTE, SAID SHE THOUGHT THAT IT
10  WOULD BE EFFECTIVE FROM THE 5/25/1999 DATE, SINCE THERE WAS
11  SUCH AN ISSUE ABOUT MAKING HIS START DATE 5/25/1999, MOST
12  LIKELY TO LOCK IN A PARTICULAR PRICE.  SHE TOLD ME TO CHECK
13  WITH YOU FIRST.  I WOULD APPRECIATE IF YOU WOULD CLARIFY
14  THIS FOR ME.
15         DEFENDANT RESPONDED IN A ONE-LINE ELECTRONIC
16  E-MAIL ON THE SAME DAY.  QUOTE, PLEASE DELETE THIS MESSAGE,
17  CLOSE QUOTE.
18         DEFENDANT INSTRUCTED HER EMPLOYEE TO DELETE THE
19  JUNE 23RD, '99 MESSAGE, BECAUSE SHE WAS CONCERNED THAT
20  NOTWITHSTANDING DR. NICHOLAS' STATEMENTS, TO THE CONTRARY
21  MEHRDAD NAYEBI'S TRUE HIRE DATE WAS LATER THAN MAY 25TH,
22  1999.  DEFENDANT KNEW THAT THE ELECTRONIC MAIL SHE REQUESTED
23  BE DELETED MIGHT DAMAGE BROADCOM, IF THE UNITED STATES
24  DEPARTMENT OF JUSTICE OR OTHER FEDERAL AGENCIES WERE TO
25  OBTAIN IT AS PART OF AN OFFICIAL PROCEEDING, AND SHE WAS

## Page 35

1   ATTEMPTING TO AVOID THAT OUTCOME.
2          THE COURT:  MR. STOLPER, WHO IS THE BROADCOM HUMAN
3   RESOURCES EMPLOYEE?
4          MR. STOLPER:  I'M SORRY, YOUR HONOR.  HER NAME WAS
5   LAURA TURNER.
6          THE COURT:  LAURA TURNER.
7          MS. TULLOS, WE HEARD WHAT MR. STOLPER REPRESENTED
8   TO ME WERE THE FACTS THAT HE WOULD PROVE AT TRIAL.
9          ARE THOSE FACTS THAT HE JUST REPRESENTED TRUE,
10  MA'AM?
11         DEFENDANT TULLOS:  YES, YOUR HONOR.
12         THE COURT:  DO YOU DISPUTE ANY OF THOSE FACTS?
13         DEFENDANT TULLOS:  NO, YOUR HONOR.
14         THE COURT:  SO, IF YOU ENTER A GUILTY PLEA TO THIS
15  COUNT OF OBSTRUCTION OF JUSTICE, IT'S BECAUSE IN FACT YOU
16  ARE GUILTY OF THE CHARGE?
17         DEFENDANT TULLOS:  YES, YOUR HONOR.
18         THE COURT:  AND ARE YOU PLEADING, MA'AM,
19  VOLUNTARILY OF YOUR OWN FREE WILL?
20         DEFENDANT TULLOS:  YES, YOUR HONOR.
21         THE COURT:  HAVE THERE BEEN ANY THREATS MADE
22  AGAINST YOU, A FAMILY MEMBER, OR SOMEONE YOU HOLD DEAR TO
23  YOUR HEART TO GET YOU TO PLEAD GUILTY THIS EVENING?
24         DEFENDANT TULLOS:  NO, YOUR HONOR.
25         THE COURT:  IT'S ALSO IMPORTANT, MA'AM, THAT YOU

## Page 36

1   TOLD YOUR LAWYER EVERYTHING HE NEEDS TO KNOW ABOUT YOUR
2   CASE.
3          I KNOW HE HAS ADVISED YOU WHAT YOUR RIGHTS,
4   REMEDIES, OPTIONS AND DEFENSES ARE.  BUT THE INFORMATION
5   THAT HE HAS -- OR THE ADVICE THAT HE HAS RENDERED TO YOU IN
6   THIS CASE IS REALLY DEPENDENT ON THE INFORMATION YOU SHARED
7   WITH HIM.
8          IF YOU HAVEN'T TOLD HIM EVERYTHING HE NEEDS TO
9   KNOW ABOUT YOUR CASE, HE CANNOT EFFECTIVELY TELL YOU WHAT
10  YOUR RIGHTS, REMEDIES, OPTIONS, DEFENSES ARE.
11         HAVE YOU TOLD HIM EVERYTHING HE NEEDS TO KNOW?
12         DEFENDANT TULLOS:  YES, YOUR HONOR.
13         THE COURT:  ARE YOU SATISFIED WITH THE
14  REPRESENTATION THAT HE HAS PROVIDED TO YOU?
15         DEFENDANT TULLOS:  YES, YOUR HONOR.
16         THE COURT:  HAS HE GIVEN YOU ENOUGH TIME TO GO
17  OVER WHAT YOUR RIGHTS, REMEDIES, OPTIONS AND DEFENSES ARE TO
18  THESE CHARGES?
19         DEFENDANT TULLOS:  YES.
20         THE COURT:  I'M ABOUT READY TO TAKE A GUILTY PLEA
21  FROM YOU, MA'AM.  DO YOU HAVE ANY COMMENTS, QUESTIONS, OR
22  CONCERNS ABOUT BEFORE I DO THAT?
23         DEFENDANT TULLOS:  NO, YOUR HONOR.
24         THE COURT:  YOU REALIZE ONCE I DO THAT, THE ONLY
25  THING LEFT TO DO IN YOUR CASE WILL BE TO SENTENCE YOU AT A

## Page 37

1   LATER DATE?
2          DEFENDANT TULLOS:  YES, YOUR HONOR.
3          THE COURT:  MR. DE BRETTEVILLE, IS THERE ANY LEGAL
4   REASON WHY I CANNOT NOW ACCEPT A GUILTY PLEA?
5          MR. DE BRETTEVILLE:  NO, THERE IS NOT, YOUR HONOR.
6          THE COURT:  ALL RIGHT.  MR. STOLPER?
7          MR. STOLPER:  THERE IS NOT, YOUR HONOR.
8          THE COURT:  VERY WELL.  IF I CAN THEN HAVE US ALL
9   DIRECT YOUR ATTENTION TO THE ONE-COUNT INFORMATION,
10  MS. TULLOS, THAT CHARGES YOU, MA'AM, WITH VIOLATING
11  18 U.S.C. SECTION 1512(B)(2)(B), WHICH IS OBSTRUCTION OF
12  JUSTICE, WITH RESPECT TO THAT COUNT, MA'AM, HOW DO YOU
13  PLEAD:  GUILTY OR NOT GUILTY?
14         DEFENDANT TULLOS:  GUILTY, YOUR HONOR.
15         THE COURT:  MS. TULLOS, I'M GOING TO BE MAKING
16  CERTAIN FINDINGS, MA'AM.  IF YOU DON'T UNDERSTAND WHAT I
17  SAY, OR IF YOU DISAGREE WITH WHAT I SAY, OR SHOULD YOU
18  DESIRE TO CONSULT WITH MR. DE BRETTEVILLE, PLEASE INTERRUPT
19  ME AT ONCE OR ASK HIM TO INTERRUPT ME.
20         DEFENDANT TULLOS:  YES, YOUR HONOR.
21         THE COURT:  VERY WELL.  THE COURT HAVING
22  QUESTIONED MS. TULLOS AND HER COUNSEL ON THE OFFER OF PLEA
23  OF GUILTY TO COUNT ONE OF THE INFORMATION, MS. TULLOS AND
24  HER COUNSEL HAVING ADVISED THE COURT THEY HAVE CONFERRED
25  CONCERNING THE OFFER OF PLEA OF GUILTY AND ALL ASPECTS OF

Page 38

1   THE CHARGES AGAINST HER AND ANY DEFENSES SHE MAY HAVE AND
2   THE COURT HAVING OBSERVED MS. TULLOS' INTELLIGENCE, DEMEANOR
3   AND ATTITUDE WHILE ANSWERING MY QUESTIONS AND THE COURT
4   HAVING OBSERVED THAT MS. TULLOS DOES NOT APPEAR TO BE UNDER
5   THE INFLUENCE OF ANY MEDICINE, DRUG, OR OTHER SUBSTANCE OR
6   FACTOR WHICH MIGHT AFFECT HER ACTIONS OR JUDGMENT IN ANY
7   MANNER, THE COURT FINDS THAT THERE IS A FACTUAL BASIS FOR
8   THE PLEA.  THE COURT FINDS THAT MS. TULLOS HAS ENTERED HER
9   PLEA FREELY AND VOLUNTARILY WITH A FULL UNDERSTANDING OF THE
10  CHARGES AGAINST HER AND THE CONSEQUENCES OF HER PLEA.  THE
11  COURT FINDS THAT MS. TULLOS UNDERSTANDS HER CONSTITUTIONAL
12  AND STATUTORY RIGHTS AND WISHES TO WAIVE THEM.
13       ACCORDINGLY, IT IS ORDERED THAT THE PLEA IS HEREBY
14  ACCEPTED AND ENTERED.
15       MS. TULLOS, AS I INDICATED TO YOU EARLIER, MA'AM,
16  WE ARE NOT GOING TO BE SENTENCING YOU TODAY.
17       MICHELLE, HAVE YOU HAD A CHANCE TO GET WITH
18  EVERYONE ON A CONVENIENT DATE AND TIME?
19       THE CLERK:  ACTUALLY, NO, YOUR HONOR, BUT I HAVE
20  MAY 5TH AT 11:00 A.M.
21       THE COURT:  ALL RIGHT.  MAY 5TH, 11:00 A.M.
22       FOR TENTATIVE SCHEDULING PURPOSES, HOW DOES THAT
23  DATE WORK FOR EVERYONE?
24       MR. STOLPER:  IT'S A PLACEHOLDER, YOUR HONOR.  I
25  THINK THAT THIS DEFENDANT IS LIKELY -- DUE TO THE NATURE OF

Page 39

1   HER PLEA AGREEMENT, SHE'S A COOPERATOR.  WE'RE LIKELY GOING
2   TO WANT TO CONTINUE THAT SENTENCING DATE OUT QUITE A BIT.
3       WHY DON'T WE PICK THAT DATE AND WE CAN GO AHEAD
4   AND DO A STIPULATION TO CONTINUE THAT WORKS FOR BOTH PARTIES
5   AND THE COURT.
6       THE COURT:  SOUNDS GOOD TO ME.
7       MS. TULLOS AND MR. DE BRETTEVILLE, DOES THAT SOUND
8   ACCEPTABLE TO BOTH OF YOU?
9       MR. DE BRETTEVILLE:  YES, YOUR HONOR.
10      DEFENDANT TULLOS:  YES, YOUR HONOR.
11      THE COURT:  SO, WE'LL TENTATIVELY SET SENTENCING
12  FOR MAY 5TH, AT 11:00 A.M., OF THIS YEAR.
13      I'LL ALSO GO AHEAD AND HAVE PROBATION START
14  PREPARING A PRESENTENCE INVESTIGATION REPORT AND IN THAT
15  REPORT, MA'AM, THEY WILL BE INDICATING WHAT THEY BELIEVE IS
16  THE APPROPRIATE OFFENSE LEVEL AND CRIMINAL HISTORY CATEGORY;
17  AND THEN, THEY WILL BE TELLING ME A LITTLE BIT MORE
18  INFORMATION ABOUT YOURSELF.
19      IS THERE ANYTHING ELSE THAT I CAN HELP ANYBODY
20  WITH THIS EVENING?
21      MR. STOLPER:  NO, YOUR HONOR.  THANK YOU.
22      THE COURT:  OKAY.  ALL RIGHT.
23      THANK YOU FOR ACCOMMODATING MY TRIAL SCHEDULE.
24  SORRY TO CALL YOU IN LATE.
25      THE CLERK:  ALL RISE.

Page 40

1   (AT 6:00 P.M., PROCEEDINGS WERE ADJOURNED.)
2
3       -OOO-
4
5       CERTIFICATE
6       I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,
7   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND
8   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED
9   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE
10  TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE
11  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.
12
13  DATE: JANUARY 28, 2007
14
15
16
17       DEBORAH D. PARKER, OFFICIAL REPORTER
18
19
20
21
22
23
24
25

# Exhibit 13

Exhibit
82

**1**

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:  )
4                     ) File No. LA-03232-A
5  BROADCOM CORPORATION )
6  WITNESS:  Henry Samueli
7  PAGES:   1 through 185
8  PLACE:    Securities and Exchange Commission
9            5670 Wilshire Boulevard, 11th Floor
10           Los Angeles, California  90036
11 DATE:    Friday, May 25, 2007
12
13    The above-entitled matter came on for hearing, pursuant
14 to notice at 10:15 a.m.
15
16
17
18
19
20
21
22
23
24    Diversified Reporting Services, Inc.
25        (202) 467-9200

**2**

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      KAROL POLLOCK, ESQ.
5      MARSHALL SPRUNG, ESQ.
6      Securities and Exchange Commission
7      5670 Wilshire Boulevard, 11th Floor
8      Los Angeles, California 90036
9      (323) 965-3861
10
11 On behalf of the witness:
12     GORDON A. GREENBERG, ESQ.
13     JON DEAN, ESQ.
14     ADAM D. KAMENSTEIN, ESQ.
15     Law Offices of McDermott, Will & Emery
16     2049 Century Park East, Suite 3800
17     Los Angeles, California 90067-3218
18     (310) 551-9398
19
20
21
22
23
24
25

**3**

1            C O N T E N T S
2
3  WITNESS:              EXAMINATION
4  HENRY SAMUELI              5
5
6            EXHIBITS
7  EXHIBITS    DESCRIPTION        IDENTIFIED
8  56   Organization Chart        29
9  57   Granted Patents           32
10 58   B0022134, B0022135        57
11 59   Acquisition 1999-2002     79
12 60   1998 Stock Incentive Plan  100
13 61   1999 Special Stock Option Plan   104
14 62   B0020941-951              112
15 63   e-mail string BO22981     137
16 64   7-8-03 Letter             143
17 65   6-26-99 e-mail B0023039   148
18 66   B0013041-23042 e-mail     155
19 67   Yahoo Document high/low closing   164
20 68   10-2-01 Written Consent   167
21 69   B0022985 12-3-01 e-mail   175
22 70   1998-2004 Years Calendar  177
23
24
25

**4**

1         PREVIOUSLY MARKED EXHIBITS
2  EXHIBITS    DESCRIPTION        IDENTIFIED
3  1    Form 1662                  6
4  2    Cover Letter w/Subpoena    7
5  26   Unanimous Written Consent  160
6  31   HTNSEC0002307 e-mail 8-22-2000   159
7  32   E-mail                    166
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Unsigned

Exhibit
83

177

1  questions.
2      Q   Did there come a time when you became informed that
3  subsequent allocations result in compensation charges?
4      A   Not until very recently.
5      Q   And by "very recently," what do you mean?
6      A   Due to the restatement that we had to make here a
7  couple of months ago.
8      Q   So, at the time that Broadcom changed its processes
9  in about 2003, there was no discussion regarding subsequent
10 allocation and possible accounting consequences?
11     A   No, I don't recall any such discussion occurring.
12 Certainly not in my presence, I can't recall anything.
13     MS. POLLOCK:  I'd like to mark as Exhibit 70, a
14 calendar for the years 1998 through 2004.
15             (SEC Exhibit No. 70 was marked for
16             identification.)
17 BY MS. POLLOCK:  This has each year on one page.
18     Q   And anecdotally, we've heard that the Option
19 Committee tended to meet on Fridays, if possible?
20     A   That was the more common practice, yes.
21     Q   And so, if we look at May 26, 2000, which is on the
22 third page of Exhibit 79, that would appear, assuming this
23 calendar from the Internet is correct, that would appear to
24 be a Friday, correct?
25     A   That's correct.

178

1      Q   If we look at October 1, 2001, the UWC that was
2  Exhibit 26 -- no, it wasn't Exhibit 26.  Exhibit 26 was the
3  May 26th.  Exhibit 68.
4      October 1, 2001, appears to be on a Monday?
5      A   Yes, I see that.
6      Q   And I know you didn't say all meetings were on
7  Fridays, it was just the attempt was to be made on Friday.
8      But if we could turn to the stock chart that we
9  marked as Exhibit 67, and turn to October 1, 2001 --
10     A   Okay.
11     Q   The price is -- the closing price is $18.40, which
12 comports -- I'm reading wrong, 18.77, which is the same price
13 on UWC which is Exhibit 68.
14     A   Correct.
15     Q   Again, I'm looking at days around that October 1st,
16 and it appears to be the lowest price all around that date
17 for several weeks, anyway.
18     Do you see that?
19     A   Yes, I do.
20     Q   Do you have any understanding as to how the Option
21 Committee came to choose a date for pricing and choose a
22 number of shares that was the lowest price in a period of
23 time?
24     A   No, I don't have an explanation for that.  It just
25 happened.

179

1      Q   Was there -- it just happened?
2      A   That's the date we met.  Again, I can't predict how
3  the stock is going to fluctuate, so that's what happened.
4      Q   Was there an attempt by the Option Committee to
5  choose low price strike prices for employee options?
6      A   I'd say there was a general sense that when we
7  would meet, we would sometimes decide not to grant on this
8  day and then decide to meet next week and make a decision
9  then and sometimes even not again.
10     So, there were oftentimes when we did meet in my
11 office or Nick's office, and we would talk and say, "Well,
12 the stock market's heading down, let's wait a week and do it
13 next week."  So, that often happened.
14     MR. GREENBERG:  Do you mind if I ask one follow-up
15 question?
16     MS. POLLOCK:  Go ahead.
17     MR. GREENBERG:  You pick out two dates.  We have
18 charts that show at different times there were dates around
19 when it wasn't low; in other words, it was a bad date
20 selection during those years.
21     Ultimately, are you aware that there were days, in
22 hindsight, that showed not good days for the employees or not
23 the bad days for the employees?
24     THE WITNESS:  Extensive.  There were literally
25 years that people had under-water options because dates were

180

1  chosen at very high prices, so it went both ways.
2      MS. POLLOCK:  And I know that.  For example, this
3  18.77 is quite a bit lower now than the prior May 26th, 2000
4  we looked at.
5      But I'm looking at this in relation to dates in the
6  several weeks before and after, it seems to be the low price.
7      In both of those, the May 26, 2000 and October 1,
8  2001, are very large numbers of employees involved in the
9  grants.
10     Q   I understand your response that you often, many
11 times if the market was going down, you'd wait before you
12 made your grant.
13     My question now is, did you ever reach back and
14 pick a day because the price was going up and there was a
15 lower price in the past?
16     A   No, that was not our practice.  We did not look
17 back at dates.  We would meet and decide whether the price on
18 that day or not and, potentially, we'd wait, but we did not
19 look back.
20     Q   And you said it wasn't your practice.  Do you know
21 if it ever occurred?
22     A   I can't say for 100 percent certainly that I know
23 it never occurred because I don't have a recollection of
24 every single grant meeting that we had made.
25     I just know it wasn't our practice, so I would be

185

1        REPORTER'S CERTIFICATE

2

3        The undersigned Certified Shorthand Reporter

4    licensed in the State of California does hereby certify:

5        That the foregoing proceeding was taken before me

6    at the time and place therein set forth, at which time the

7    witness was duly sworn;

8        That the testimony of the witness and all

9    objections made at the time of the examination were recorded

10   stenographically by me and were thereafter transcribed, said

11   transcript being a true copy of my shorthand notes thereof.

12       That the dismantling of the original transcript

13   will void the reporter's certificate.

14       I further declare that I have no interest in the

15   outcome of the action.

16       In witness whereof, I have subscribed my name this

17   _____ day of _____, 2007.

18

19       _____

20       Paulette Vanton

21       CSR No. 6962

22

23

24

25

# Exhibit 14

Exhibit
86

**Page 1**

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3  In the Matter of:        )

4                           ) File No. LA-03232-A

5  BROADCOM CORPORATION  )

6  WITNESS: David Dull

7  PAGES:   1 through 206

8  PLACE:   Securities and Exchange Commission

9        Room 11-A

10        5600 Wilshire Boulevard

11       Los Angeles, California

12 DATE:   Tuesday, July 3, 2007

13

14

15       The above-entitled matter came on for hearing, pursuant

16 to notice, at 10:10 a.m.

17

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25            (202) 467-9200

**Page 2**

1  APPEARANCES:

2

3  On behalf of the Securities and Exchange Commission:

4       JUNLING MA, ESQ.

5       MARSHALL SPRUNG, ESQ.

6       KAROL L.K. POLLOCK, ESQ.

7       Division of Enforcement

8       Securities and Exchange Commission

9       5600 Wilshire Boulevard, Suite 1100

10      Los Angeles, California  90036

11      (323) 965-3861

12

13 On behalf of the Witness:

14      SETH ARONSON, ESQ.

15      J. JORGE DeNEVE, ESQ.

16      LOUISE C. CHEN, ESQ.

17      JAMES R. ASPERGER, ESQ.

18      O'Melveny & Myers, LLP

19      400 South Hope Street

20      Los Angeles, California  90071

21      (213) 430-7670

22

23

24

25

**Page 3**

1              C O N T E N T S

2  WITNESS                    EXAMINATION

3  David Dull                 8

4              EXHIBITS

5  EXHIBITS:   DESCRIPTION          IDENTIFIED

6  101   Form 8-K filed by Broadcom in      28

7        January 2007 for the years

8        1998 through 2005

9  102   Form 10-K/A in January 2007 for    28

10       the fiscal year 2005

11 103   Summary of interview with David    34

12       Dull dated August 19, 2006 by

13       Robert Burns of Kaye Scholer

14 104   E-mail from Carol Prado dated      66

15       March 10th, 1999 to Nancy Tullos

16 105   Series of e-mails                  74

17 106   E-mail from David Dull dated       88

18       August the 5th, 1999 to Bruce

19       Hallet

20 107   E-mail exchange between David Dull  89

21       and Jim Adler dated January 25th,

22       2001

23 108   E-mail exchanges between David Dull 93

24       and Bill Ruehle dated October 23rd,

25       1998 and October 22nd, 1998

**Page 4**

1              EXHIBITS

2  EXHIBITS:   DESCRIPTION          IDENTIFIED

3  109   E-mail from Carol Prado to David Dull   96

4        dated September the 1st, 1999

5  110   Series of e-mails, one from Bill        99

6        Ruehle dated September 8th, 1999 to

7        Carol Prado and Nancy Tullos

8  111   E-mail from Carol Prado to David Dull   103

9        dated October 7th, 1999

10 112   List of option grants from             109

11       1998 to 2003

12 113   E-mail from Carol Prado dated          114

13       July 26th, 2000 to David Dull

14 114   Series of e-mails                  116

15 115   Series of e-mails, one e-mail          126

16       from David Dull dated September

17       12th, 2000 to Bill Ruehle

18 116   E-mail from Carol Prado dated          137

19       September the 15th, 2000 to David

20       Dull, cc Roxene Volk

21 117   E-mail from David Dull to Fred         138

22       Whittlesey

23 118   Series of e-mails responding to        140

24       e-mails in Exhibit 116

25

Unsigned

Exhibit
87

49

1 the UWC by the members of the committee that was issuing the
2 UWC.
3    Q   So for the UWCs, what do you think is the effective
4 date, would be the as-of date?
5    A   I believe the effective date of the UWC is the
6 as-of date, unless it states otherwise.
7    Q   And would the board members need to do something to
8 make the effective date the as-of date?
9    A   I believe from a legal point of view, again,
10 distinguishing this from the accounting issues, that a UWC is
11 effective as of the date indicated on it.
12    Q   Regardless of whether they knew or they took action
13 prior to that?
14    A   Regardless of whether they took action previously,
15 regardless of whether it was signed later.  Because the UWC
16 is either a -- evidence of an action that was taken or it's a
17 ratification of that action.  And either way, under the law,
18 it's effective as of the date so indicated on the UWC.
19    Q   But whether you have a composition -- accounting
20 consequences, would that depend on whether the -- action
21 of approval occurred on the as-of date?
22    A   Well, I'm not an accountant, and so I really
23 shouldn't speak to that question.  You know, I will say that
24 I believe, based on what I have learned in the last year,
25 that that is the current view.  But I don't know that that is

50

1 actually the view that was taken in the early years of the
2 company by -- by E&Y or even how it was viewed in the
3 accounting profession generally.
4    Q   So what was your understanding during that relevant
5 period?
6    A   On the issue of whether an as-of UWC would trigger
7 an accounting consequences.
8    A   I think that would be a function of the specific
9 circumstances, and those were the discussions that finance
10 would have with E&Y, and they would come to a determination.
11    Q   And you didn't have any particular understanding as
12 to the consequences of the date of the UWC or the date of
13 the -- date of the actual approval?
14    A   I think that the -- I think I understand where
15 you're going with the question, but I think that in practice,
16 you have to look at all of the circumstances that relate to
17 any particular grant in order to be able to understand what
18 the correct accounting for that grant would be.
19    Q   But I think it actually is quite simple and
20 straightforward.  Basically, my understanding of the rule is,
21 even though you could have a UWC effective as-of date which
22 is signed after fact, the option committee always thought
23 that they approved that on the particular grant date
24 as -- which is as of the date.  So independent of the
25 signing --

51

1    A   I'm sorry.  You lost me with that question.
2    MR. ASPERGER:  Wait, wait, wait, wait.  Don't
3 answer yet.
4    MS. MA:  No.  My -- let me just reclarify.
5    MR. ASPERGER:  Let her finish, and then --
6    THE WITNESS:  Okay.
7    BY MS. MA:
8    Q   So to me, to be able to have a UWC using the as-of
9 date, there has to be an independent approval occurring on
10 the as-of date by the option committee members.  And was that
11 your understanding during that relevant period?
12    MR. ASPERGER:  Let me just interject here, Junling.
13 I mean, you've said a lot in what you've just said, and
14 it's -- there are multiple components to that question, so I
15 don't think the record is clear on that.
16    And let me state, number two, I'm not sure what
17 you're saying is simple or not simple, but the one thing I
18 will beg to differ with you on is whether APB-25, how it's
19 applied, how it's applied for mass grants, for employee
20 grants, in my view is not simple at all.  There are lots of
21 complexities, and there have been lots of changes in the way
22 that's been applied, interpreted over time.
23    So, you know, I think what we need to do is keep it
24 simple with David's understanding at the time versus now.
25 He's perfectly willing to explain that to you, but I think

52

1 that question is both compound and not clear.  So I just want
2 to make sure that we have a very clear record here.
3    MS. MA:  Okay.  I understand.  I am sure the APB-25
4 could be complicated, and there were lots of interpretations.
5 But I think to us, the focus actually centers on the
6 definition of measurement date.  Basically, you know, at the
7 time of the grant -- at the date of the grant date, was there
8 an action by the option committee to approve the grant?  So
9 that is -- that's the only issue that's -- that we are
10 talking about today.
11    MR. ASPERGER:  So are you asking him did he believe
12 the option committee took action?
13    MS. MA:  On the grant date.
14    THE WITNESS:  As a factual matter?
15    MS. MA:  As a factual matter.
16    THE WITNESS:  I mean, it was my understanding and
17 belief that that was occurring generally.  Okay.  With
18 respect, let's say, to new hire grants.  And I think we
19 talked last time about the fact that the meat, quote, quote,
20 meat, in the context of the way this company operated
21 informally didn't mean a formal noticed meeting.  It could
22 easily mean a discussion between Nick and Henry, who were the
23 two members of the option committee.  On a particular day,
24 you know, we're going to make a grant to Mr. Asperger of
25 25,000 shares.

205

1           PROOFREADER'S CERTIFICATE

2

3    In the Matter of:   BROADCOM CORPORATION

4    Witness:       David Dull

5    File Number:       LA-03232-A

6    Date:          Tuesday, July 3, 2007

7    Location:       Los Angeles, California

8

9

10        This is to certify that I, Laurie Andrews (the

11   undersigned), do hereby swear and affirm that the attached

12   proceedings before the U.S. Securities and Exchange

13   Commission were held according to the record and that this is

14   the original, complete, true and accurate transcript that has

15   been compared to the reporting or recording accomplished at

16   the hearing.

17

18

19

20   _____     _____

21   (Proofreader's Name)       (Date)

22

23

24

25

Unsigned

Exhibit
89

207

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:        )
4                           ) File No. LA-03232-A
5  BROADCOM CORPORATION     )
6  WITNESS:  David Dull
7  PAGES:   207 through 401
8  PLACE:   Securities and Exchange Commission
9          5670 Wilshire Boulevard
10          Los Angeles, California
11  DATE:   Wednesday, July 25, 2007
12
13      The above-entitled matter came on for hearing, pursuant
14  to notice, at 9:15 a.m.
15
16
17
18
19
20
21
22
23
24      Diversified Reporting Services, Inc.
25          (202) 467-9200

208

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JUNGLING MA, ATTORNEY
5      KAROL POLLOCK, ATTORNEY
6      Office of Enforcement
7      Securities and Exchange Commission
8      5670 Wilshire Boulevard
9      Los Angeles, California 90036
10
11  On behalf of the Witness:
12      JAMES R. ASPERGER, ATTORNEY
13      SETH AARONSON, ATTORNEY
14      JORGE DE NEVE, ATTORNEY
15      LOUISE C. CHEN, ATTORNEY
16      O'Melveny & Myers LLP
17      400 South Hope Street
18      Los Angeles, California 90071-2899
19
20
21
22
23
24
25

209

1              C O N T E N T S
2
3  WITNESS:                    EXAMINATION
4  David Dull                     214
5
6  EXHIBITS:    DESCRIPTION            IDENTIFIED
7    160    Series of e-mails, top from
8           Collins, 1/4/02          214
9    161    2/27/02 e-mail from Collins
10          to Ruehle                238
11    162    1/8/02 e-mail exchange, Tullos
12          and Watkins              251
13    163    1/8/02 e-mail from Watkins     256
14    164    4/15/02 e-mail from Tullos to
15          Manian                   260
16    165    7/1/02 e-mail exchange with Tullos   265
17    166    7/16/02 e-mail exchange -- Patton,
18          Collins, Ruehle          266
19    167    7/19/02 e-mail to Tullos, with
20          attachment               271
21    168    7/19/02 e-mail exchange, Ruehle
22          and Tullos               272
23    169    7/24/02 e-mail exchange, Thermond
24          and Tullos               283
25    170    7/30/02 e-mail exchange with Tullos   287

210

1  EXHIBITS:    DESCRIPTION            IDENTIFIED
2    171    8/5/02 e-mail from Josephson   289
3    172    Compensation Committee, Action by
4           Unanimous Consent, 8/5/02    291
5    173    9/24/02 e-mail exchange with
6           Josephson                295
7    174    12/29/00 e-mail exchange with Ruehle   300
8    175    Series of e-mails, top from Tullos,
9           1/4/01                   304
10    176    Series of e-mails, top from
11           Lindenfelser, 2/1/01     307
12    177    1998 Stock Incentive Plan,
13           Form Plan Documents      313
14    178    Minutes, board of directors,
15           10/23/98                 316
16    179    10/8/98 e-mail to Prado and Ruehle   319
17    180    10/23/98 e-mail to Prado     321
18    181    7/26/99 e-mail from Prado to Ruehle   322
19    182    Number not used          ---
20    183    Compensation Committee, Action by
21           Unanimous Consent, 11/3/98   325
22    184    1/29/99 e-mail from Prado, with
23           attachment               326
24    185    1/29/99 e-mail from Prado to
25           Bancroft                 329

235

1  question, my instinctive response was, you know, you have
2  Nicholas taking action to talk to the other board members and
3  to appoint Werner. Why would he just, you know, respond with
4  you with an e-mail saying this has been done a long time ago?
5     A   Right, why would he not respond?
6     Q   It was done in October, 2001. Why are you still
7  writing e-mails in November, 2001 and December, 2001?
8     A   I appreciate your perspective. You would have to
9  know Henry Nicholas to understand how that could happen,
10 okay. I wrote many, many e-mails over the years to Nick to
11 which he never responded. It was one of the frustrating
12 things about working for him. There were many positives, but
13 one of the frustrating things is he responded to everything
14 in his own time. It didn't mean that he hadn't necessarily
15 acted on it. In many cases I found out that he had taken
16 action. I just didn't know about it. But it was sometimes
17 very frustrating to get a response.
18        The other thing to remember is -- and I don't mean
19 to belittle your concern at all, because I understand it's a
20 serious concern -- but, you know, we're talking about a
21 handful of e-mails pulled out of a flow of many thousands of
22 e-mails. I think when I really looked at my e-mails last
23 year for this period of time, it was easily in the hundreds
24 of thousands. Maybe you guys remember how many, but several
25 hundred thousand e-mails, I think.

236

1        Then somebody does a search and they search for the
2  word "option" or "grant", or something like that, and those
3  all get pulled up and then people focus on those. But when
4  you look at it in the broader context you have to remember
5  that this was really, again, a very -- not a momentous thing
6  for the company but just, you know, a clean up item.
7  BY MS. POLLOCK:
8     Q   Mr. Dull, do you consider backdating corporate
9  records a clean up item?
10    A   Backdating corporate records in the sense of -- in
11 what sense?
12    Q   Well, I'm seeing a document, a UWC, signed on March
13 1st. I'm seeing pretty clear e-mail traffic that the action
14 taken in that document certainly -- well, I think Doctor
15 Samueli responded to an e-mail in November; so that was kind
16 of the first response anyone gave to your question, has Mr.
17 Wolfen been appointed. And, so, it just looks to me that
18 this action of appointing Mr. Wolfen on October 12th was a
19 backdated action.
20        MR. ASPERGER: Perhaps -- I don't know if you've
21 had this e-mail or not, but you might want to mark it as an
22 Exhibit and ask the witness about that, because I think that
23 helps explain the context and answers your question, Karol.
24        MS. MA: I was going to use this later on, but we
25 can mark this as an Exhibit.

237

1        MR. ASPERGER: Yeah, and the reason, just to
2  clarify, I don't think you're talking about a backdating
3  here, because when you look at whatever you want to mark this
4  as an Exhibit, you're seeing it -- again, Sue goes to David
5  and asks him about this. And the e-mail speaks for itself
6  about what David says and David can put that in context for
7  you.
8        THE WITNESS: So, to respond to your question
9  directly, if by backdating you mean creating a record later
10 that is a document of something that never happened, no, I
11 don't consider that appropriate. But that's not what
12 happened in this case, okay. In this case we believe that
13 what happened -- I believe what happened -- is there was
14 simply, you know, an information disconnect. And as this
15 e-mail indicates, this one from -- has this been marked; 161,
16 is that what it is?
17        MR. ASPERGER: Yeah, 161.
18        MS. MA: The document that Mr. Asperger handed to
19 me has been marked as Exhibit 161, even though I used my
20 version of it because it has a Bates number. The Bates
21 number is BC0084769. And this is a one page document which
22 purports to contain an e-mail from Sue Collins, dated
23 February the 27th, 2002, to Bill Ruehle regarding "Prep for
24 upcoming board meeting".
25

238

1        (SEC Exhibit No. 161 was marked
2  for identification.)
3        MR. ASPERGER: Just for the record, the e-mails
4  substantively are the same. It looks like a different
5  version of it that was sent -- Exhibit 161 looks like a
6  different version of it that was -- than the one that I
7  handed to Mr. Dull. But the text and the substance -- from
8  Sue Collins to Bill Ruehle, February 27th, 2002 -- appear to
9  be the same.
10       BY MS. MA:
11    Q   So, in this e-mail Sue said: "David suggested that
12 I contact you to see if you knew Werner Wolfen was appointed
13 to the compensation committee on the board. My understanding
14 was that it was prior to the October 19th, 2001 grants, but I
15 needed the exact date for the action by unanimous written
16 consent that appoints him."
17    A   Yes. And this is an e-mail from Sue Collins to
18 Bill Ruehle on which I'm not copied. So, I think that what
19 this e-mail demonstrates is that Sue and I were still, at the
20 end of February, trying to ascertain exactly when Werner
21 Wolfen was appointed in the board to the committee. And
22 she was communicating with Bill asking him for that
23 information.
24       So, there's not, from our perspective -- I mean,
25 this is not a situation where we are pulling a date out of

399

1  contact Mr. Asperger.  Mr. Dull, do you wish to clarify
2  anything, to add anything to the statements you have made
3  today?
4       MR. ASPERGER:  At this point are you too tired to
5  think about whether there might be something you'd want to
6  clarify?
7       THE WITNESS:  Yeah, but I think Ms. Ma and I are in
8  competition as to who is more tired at this point.  I think
9  we have covered the issues very well today and over the
10  preceding two days, and I can't think now of anything
11  specifically that I want to amplify or elucidate.
12      MR. ASPERGER:  But, obviously, we'll think further
13  about that and I know you will as well, and we'll be in
14  touch.
15      MS. MA:  Okay, so does any counsel want to ask any
16  clarifying questions?
17      MR. ASPERGER:  Not at this time.
18      MR. AARONSON:  Not at this time.
19      MS. MA:  That's a consensus.  So, thank you very
20  much.  We're off the record at 5:16, on July the 25th, 2007.
21      (Whereupon, at 5:16 p.m., the hearing in the
22  above-entitled matter was concluded.)
23
24
25

400

1            PROOFREADER'S CERTIFICATE
2
3  In the Matter of:  BROADCOM CORPORATION
4  Witness:       David Dull
5  File Number:    LA-03232-A
6  Date:          Wednesday, July 25, 2007
7  Location:       Los Angeles, California
8
9
10      This is to certify that I, Laurie Andrews (the
11  undersigned), do hereby swear and affirm that the attached
12  proceedings before the U.S. Securities and Exchange
13  Commission were held according to the record and that this is
14  the original, complete, true and accurate transcript that has
15  been compared to the reporting or recording accomplished at
16  the hearing.
17
18
19
20  _____    _____
21  (Proofreader's Name)         (Date)
22
23
24
25

Unsigned

Exhibit
92