1  THOMAS P. O'BRIEN
   United States Attorney
2  ROBB C. ADKINS (194576)
   Assistant United States Attorney
3  Chief, Santa Ana Office
   ANDREW STOLPER (205462)
4  GREG STAPLES (155505)
   Assistant United States Attorneys
5       411 West Fourth Street, 8th Floor
        Santa Ana, California 92701
6       Telephone: (714) 338-3536
        Facsimile: (714) 338-3708
7       E-mail: Andrew.Stolper@usdoj.gov

8  Attorneys for Plaintiff
   United States of America

9

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                  SOUTHERN DIVISION

13 UNITED STATES OF AMERICA,    )   No. SA CR 08-139-CJC
                                )
14             Plaintiff,        )   NOTICE TO COURT RE POTENTIAL
                                )   CONFLICT; MEMORANDUM OF POINTS
15             v.                )   AND AUTHORITIES; DECLARATION OF
                                )   ANDREW STOLPER
16 HENRY T. NICHOLAS, III,       )
   and                          )
17 WILLIAM J. RUEHLE,            )
                                )
18             Defendants.       )
                                )
19 _____)

20      Plaintiff United States of America ("the government"), by

21 and through its counsel of record, Assistant United States

22 Attorneys Andrew Stolper, Robb Adkins, and Greg Staples,

23 respectfully submits its notice re potential conflict in this

24 matter.  In particular, the government requests that this court

25 conduct an inquiry during the upcoming status conference, or as

26 soon thereafter as is practicable, to advise defendant Dr. Henry

27 T. Nicholas, III on the record of a potential conflict of

28 interest involving counsel Williams & Connolly, and ensure that

1  any waiver of that conflict by the defendant is knowing and

2  intelligent.

3      This notice is based upon the attached Memorandum of Points

4  and Authorities, the files and records in this case, and any

5  further evidence and argument that may be presented at the

6  hearing related to this notice.

7

8  DATED: January 7, 2009        Respectfully submitted,

9                                THOMAS P. O'BRIEN
                                  United States Attorney
10
                                  ROBB C. ADKINS
11                                Assistant United States Attorney
                                  Chief, Santa Ana Office
12

13                                _____/S/_____
                                  ANDREW STOLPER
14                                ROBB C. ADKINS
                                  GREG STAPLES
15                                Assistant United States Attorneys

16                                Attorneys for Plaintiff
                                  United States of America
17

18

19

20

21

22

23

24

25

26

27

28

1                    <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2  **I.   INTRODUCTION AND FACTUAL BACKGROUND**

3       Defendant Henry T. Nicholas, III ("defendant") was named by

4  the grand jury in separate indictments on June 4, 2008.  Prior to

5  indictment, defendant Nicholas was represented by Munger, Tolles,

6  & Olson in connection with both the grand jury and SEC

7  investigations.  Shortly before indictment, Williams & Connolly

8  ("WC") wrote the government a letter informing it that it would

9  be serving as defendant's counsel in the event of indictment.

10  Since indictment, WC has served as defendant Nicholas's criminal

11  counsel.[1]

12       In addition to representing defendant Nicholas, WC also

13  serves as counsel for Irell & Manella LLP ("Irell") in <u>Charter</u>

14  <u>Communications v. Irell & Manella</u>, CV 07-402-AG.  Stolper Decl.

15  Ex. A.  In this ongoing litigation, Charter alleges that Irell

16  committed professional malpractice from 1999 to 2002, resulting

17  in damages exceeding $150 million.  <u>Id.</u>

18       The government is likely to call one or more current or

19  former partners from Irell to testify at trial in the above

20  captioned matter.  This raises the question of whether WC may be

21  in a position to provide conflict-free representation at trial

22  because WC represents both defendant and likely trial witnesses.[2]

23  _____

24       [1]  Defendant Nicholas also retained James Riddet to serve as
     local counsel.  WC has been the primary point of contact with the
25  government on all substantive issues with respect to defendant
     Nicholas.
26
        [2]  The government has a duty to bring the risk of a conflict
27  of interest to the attention of the trial judge.  <u>Mannhalt v.</u>
     <u>Reed</u>, 847 F.2d 576, 583-84 (9th Cir. 1988).  The government
28  previously raised this issue with defendant Nicholas's counsel
     and was informed that "Dr. Nicholas was aware of that

                                   1

This concern is compounded because WC's representation of Irell concerns the same period alleged in the indictment.  WC may therefore have information involving Irell witnesses that would be useful to defendant Nicholas, which it cannot use because it was obtained as a result of its representation of Irell.

As is the case with any potential conflict it is difficult to anticipate all the eventualities that might give rise to an actual conflict.  Below are a few possibilities:

- It may be in defendant's interests to claim that Irell provided him and Broadcom incorrect advise concerning options practices;

- It may be in defendant's interests to argue that Irell was aware of the fraudulent scheme and assert an advice of counsel defense; and

- It may be in defendant's interests to claim that Irell improperly influenced witnesses or Broadcom's internal investigation.

Any of these arguments may be unavailable to defendant Nicholas due to the selection of WC as his counsel, creating a conflict of interests.

**II.   THIS COURT SHOULD INQUIRE AS TO THE POTENTIAL FOR A CONFLICT OF INTEREST**

The Supreme Court has held that a criminal defendant's Sixth Amendment right to the assistance of counsel includes an entitlement to "representation that is free from conflicts of

---

representation at the time he retained Williams & Connolly to represent him in this matter."  Stolper Decl. Ex. B.  As described below, this assurance is insufficient under applicable law.

2

interest," that is, to representation by an attorney who pursues the defendant's interest "single-mindedly," and whose strategic decisions are uninfluenced by obligations to others.  <u>Wood v. Georgia</u>, 450 U.S. 261, 271-72 (1981).  A "court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel."  <u>Wheat v. United States</u>, 486 U.S. 153, 160 (1988).

As the Supreme Court explained, federal courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  <u>Id.</u>  In addition, trial courts have "an institutional interest in the rendition of just verdicts in criminal cases," and in seeing that these verdicts "remain intact on appeal."  <u>Id.</u> at 160-61.  Even if a defendant provides a waiver of the conflict, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  <u>Id.</u> at 160.

The Fifth Circuit set forth the necessary requirements for a colloquy to pass constitutional muster as follows:

> [T]he district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest.  The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation.  Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. . . .  It is,

3

```
         of course, vital that the waiver be established by
         "clear, unequivocal, and unambiguous language." . . .
         Mere assent in response to a series of questions from
         the bench may in some circumstances constitute an
         adequate waiver, but the court should nonetheless
         endeavor to have each defendant personally articulate
         in detail his intent to forego this significant
         constitutional protection.
```

United States v. Garcia, 517 F.2d 272, 276 (5th Cir. 1975).

The Supreme Court in Wheat noted that a district judge's predicament is particularly acute given the difficulty of foreseeing whether and, to what extent, potential conflicts will ripen into actual conflicts in subsequent proceedings. In view of these difficulties, the Supreme Court held that district courts have "substantial latitude" in determining whether to allow a criminal defendant to be represented by counsel burdened by a potential conflict of interest. 486 U.S. at 163. "The District Court must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." Id. at 164; see also United States v. Kenney, 911 F.2d 315, 321 (9th Cir. 1990).

The government makes no allegations in this regard and takes no position on the issue, other than that any waiver of the potential conflict must comport with the legal standards set forth above.

**III. CONCLUSION**

For these reasons, the government respectfully requests that this court conduct a hearing as described above and that the court, in conducting that inquiry, advise the defendant of the specific nature of the conflict of his attorney, and further advise defendant, among other things, that:

4

(a)  his attorney previously and currently represents likely witnesses in this case and may be limited in the types of defenses that can be presented as a result of this simultaneous representation;

(b) defendant faces potential dangers of representation by counsel with a conflict of interest, including that his attorney may be ethically prohibited from violating any attorney-client communications through the use or derivative use of information or materials obtained during or as a result of his attorney's firm's representation of Irell;

(c)  he has the right to new conflict-free counsel;

(d)  he has discussed the matter with his attorneys;

(f)  he has the right to have an independent attorney advise him about the conflict;

(g)  he knowingly, intelligently, and voluntarily waives his Sixth Amendment protections as related to the potential conflict.

The government also requests that the court ask if the defendant has any questions about the nature and consequences of the potential conflict and that the court seek a narrative response indicating that the defendant has been advised of his rights and understands the conflict and perils of his present representation.  If, after this inquiry, it appears that there is a potential conflict of interest that threatens the integrity of these proceedings and the defendant's Sixth Amendment rights, the government reserves its right to recommend that the court disqualify WC in favor of new counsel.  The government takes no such position at this time.

**<u>DECLARATION OF ANDREW STOLPER</u>**

I, Andrew Stolper, declare as follows:

1.   I am an Assistant United States Attorney assigned to <u>United States v. Dr. Henry T. Nicholas III</u>, SA CR 08-139-CJC.

2.   Attached as Exhibit A to my declaration is a true and correct copy of the complaint in <u>Charter Communications v. Irell & Manella</u>, CV 07-402-AG.

3.   Attached as Exhibit B to my declaration is correspondence between me and counsel for defendant Nicholas concerning the potential conflict.

The foregoing is true and correct to the best of my knowledge.

Dated:   January 7, 2009                    _____/S/_____
                                            ANDREW STOLPER

FILED

DAVID A. ROBINSON, ESQ. (SBN 107613)
**ENTERPRISE COUNSEL GROUP**
Five Park Plaza, Suite 450
Irvine, California 92614-5976
Telephone: (949) 833-8550
Facsimile: (949) 833-8540
drobinson@enterprisecounsel.com

2007 APR -6 PM 4:01

CLER'...
CENTRA...
S.A.N.A...

DAVID FREISHTAT, ESQ.
STACIE F. DUBNOW, ESQ.
**FREISHTAT, MULLEN & DUBNOW, LLC**
Executive Plaza I, Suite 1000
11350 McCormick Road
Hunt Valley, Maryland 21031
Telephone: (410) 727-7740
Facsimile: (410) 727-7356
dfreishtat@freishtatlaw.com
sfdubnow@freishtatlaw.com

STEPHEN B. HIGGINS, ESQ.
STEVEN M. SHERMAN, ESQ.
**THOMPSON COBURN LLP**
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000
shiggins@thompsoncoburn.com
ssherman@thompsoncoburn.com

Attorneys for Plaintiffs **CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS HOLDING COMPANY, LLC,
CHARTER COMMUNICATIONS HOLDINGS, LLC, and CC V
HOLDINGS, LLC**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

SACV07-402 AG(ANx)

| | |
|---|---|
| CHARTER COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS HOLDING COMPANY, LLC; CHARTER COMMUNICATIONS HOLDINGS, LLC, and CC V HOLDINGS, LLC, <br><br> Plaintiffs, | Case No.: <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

7

EXHIBIT A

```
 1
 2    v.
      IRELL & MANELLA, LLP,
 3
                     Defendants.
 4
```

5      Plaintiffs Charter Communications, Inc., Charter Communications Holding Company,

6    LLC, Charter Communications Holdings, LLC and CC V Holdings, LLC, allege as follows:

7

8                              **THE PARTIES**

9      1.      Plaintiff Charter Communications, Inc. ("Charter") is a corporation organized

10   under the laws of the State of Delaware and has its principal place of business at 12405

11   Powerscourt Drive, St. Louis, Missouri 63131.  Charter owns approximately 56.4% of the

12   outstanding equity of Charter Communications Holding Company, LLC ("HoldCo").

13     2.      Plaintiff HoldCo is a limited liability company existing under the laws of the State

14   of Delaware.  The members of HoldCo are plaintiff Charter, Charter Investment, Inc., a Delaware

15   corporation with its principal place of business at 505 Fifth Avenue South, Suite 900, Seattle,

16   Washington, 98104, and Vulcan Capital III, a corporation organized and existing under the laws

17   of the State of Washington with its principal place of business at 505 Fifth Avenue South, Suite

18   900, Seattle, Washington, 98104.

19     3.      Plaintiff Charter Communications Holdings, LLC ("Holdings") is a limited

20   liability company existing under the laws of the State of Delaware with its principal place of

21   business at 12405 Powerscourt Drive, St. Louis, Missouri 63131.  The sole member of Holdings

22   is CCHC, LLC, also a Delaware limited liability company with its principal place of business at

23   12405 Powerscourt Drive, St. Louis, Missouri 63131.

24     4.      Plaintiff CC V Holdings, LLC ("CC V") is a limited liability company existing

25   under the laws of the State of Delaware with its principal place of business at 12405 Powerscourt

26   Drive, St. Louis, Missouri 63131.  CC V is an indirect subsidiary of Holdings.  CC V owns 100%

27   of the common equity of a lower-tier subsidiary by the name of CC VIII, LLC ("CC VIII"), also

28

                                        8    - 2 -                      EXHIBIT A

1  a Delaware limited liability company. CC VIII is an entity created by Charter for the specific
2  purpose of holding a group of cable systems ("the Bresnan Systems").

3       5.     Defendant Irell & Manella LLP is a limited liability partnership which is
4  registered to do business and has its principal place of business in the State of California. All of
5  Irell's partners are citizens of the State of California, or of states other than Delaware and
6  Missouri. The terms "Irell" and/or "Defendant" as used herein, shall refer to Irell & Manella
7  LLP.

8                          **JURISDICTIONAL STATEMENT**

9       6.     The Court has jurisdiction over the subject matter of this civil action pursuant to
10 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy
11 exceeds $75,000.00, exclusive of interest and costs.

12      7.     Personal jurisdiction is proper over Defendant because it is a citizen of the State of
13 California.

14      8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is
15 subject to personal jurisdiction in the Central District of California and because a substantial part
16 of the events giving rise to the claims herein occurred within the Central District of California.

17      9.     Defendant is a resident of the Southern Division of the Central District of
18 California because it maintains offices in Orange County, California.

19
20                        **FACTS COMMON TO ALL COUNTS**
21                **Course of Dealing Between Charter and Irell**

22      10.    Charter is a telecommunications company operating in the United States.
23 Through its broadband network, Charter offers customers cable video programming, high-speed
24 cable Internet access, advanced broadband cable services, telephone and other services.

25      11.    Charter's Chairman and controlling shareholder is Paul G. Allen ("Allen").
26      12.    In the late 1990s, Charter began implementing a plan to build a nationwide cable
27 television company through the acquisition of existing cable systems. The acquisition of these
28 systems continued through 2000.

9   - 3 -

**EXHIBIT A**

1        13.     Irell represented Charter, Charter's affiliated companies and Allen as legal

2   counsel in these acquisitions, including the consolidation of cable systems acquired by Charter

3   into HoldCo. During the relevant time period, Irell served as Charter's principal corporate

4   counsel, representing it in virtually all material transactional matters involving the Company.

5        14.     Irell's legal representation of Charter and its affiliated companies included

6   negotiating acquisitions, drafting transaction documents, creating various corporate entities

7   necessary to complete transactions, documenting debt financings, preparing and amending

8   limited liability company agreements, preparing documents filed with the United States

9   Securities and Exchange Commission (the "SEC") and addressing other corporate matters and

10  litigation matters.

11       15.     Irell's long time representation of Charter and its affiliated companies in complex

12  acquisitions and other transactions established a course of dealing giving rise to a reasonable

13  expectation by Plaintiffs that Irell would *inter alia*: follow their instructions, prepare

14  transactional documents in accordance with the economic and other terms agreed upon by the

15  parties and, when circulating transactional documents to Charter and its affiliated companies for

16  approval, present "blacklined" documents that accurately highlighted all changes made to the

17  documents.

18       16.     Based upon this course of dealing, Charter and Charter's affiliated companies

19  developed a relationship of trust and confidence in Irell, making it both reasonable and

20  foreseeable that Charter and its affiliated companies would rely upon Irell, as their transactional

21  attorneys, to protect their legal interests.

22       17.     Between October 1999 and October 2002, Irell billed Charter legal and related

23  fees in excess of $18 million. During the entirety of their relationship, Charter paid Irell more

24  than $55 million in legal and related fees.

25       18.     At all relevant times, Irell and its attorneys were additionally obligated to comply

26  with California Rule of Professional Conduct 3-110 or similar rules of professional conduct that

27  Charter reasonably expected Irell and its attorneys to follow. California Rule of Professional

28  Conduct 3-110 provides:

10  - 4 -

**EXHIBIT A**

(A)     A member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence.

(B)     For purposes of this rule, "competence" in any legal service shall mean to apply the 1) diligence, 2) learning and skill, and 3) mental, emotional, and physical ability reasonably necessary for the performance of such service.

The duties set forth in rule 3-110 include the duty to supervise the work of subordinate attorney and non-attorney employees or agents.

19.     At all relevant times, Irell and its attorneys were additionally obligated to comply with California Rule of Professional Conduct 3-500 or similar rules of professional conduct that Charter reasonably expected Irell and its attorneys to follow. California Rule of Professional Conduct 3-500 provides:

A member shall keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed.

20.     At all relevant times, Irell and its attorneys were additionally obligated to comply with California Rule of Professional Conduct 3-310(c) or similar rules of professional conduct that Charter reasonably expected Irell and its attorneys to follow. California Rule of Professional Conduct 3-310(c) provides:

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter

### The Original Structure of the Bresnan Transaction

21.     In 1999, Charter began the process of acquiring a group of cable systems known as the "Bresnan Systems."

11   - 5 -

EXHIBIT A

1    22.    The Bresnan Systems were owned by three groups of investors: affiliates of
2    AT&T Corp. (the "AT&T Sellers"); Bresnan family members; and other investors (collectively,
3    the "Sellers").

4    23.    To effect the purchase of the Bresnan Systems Irell devised a transaction structure
5    (the "Bresnan Transaction" or "the Transaction"), under which the Sellers would receive an
6    equity interest in HoldCo (the "HoldCo Units") plus cash and other consideration, in exchange
7    for transferring their entire interest in the Bresnan Systems to HoldCo. This transaction structure
8    was similar to that utilized in Charter's earlier acquisition of cable properties.

9    24.    The Bresnan Transaction was intended to give the Sellers the right to either
10   exchange their HoldCo Units for Charter stock, or to "put" their HoldCo Units to Allen for cash
11   at a predetermined price. This would give the Sellers the ability to liquidate the HoldCo Units
12   and ensure they would receive a guaranteed minimum value for these units regardless of
13   fluctuations in the market price of Charter stock.

14   25.    On November 4, 1999, Charter's Board of Directors reviewed and approved the
15   principal terms of the Bresnan Transaction.

16   26.    The closing of the Bresnan Transaction was set for early 2000.

17   27.    Under the structure as it was initially intended, upon consummation of the
18   Bresnan Transaction the following would take place: (1) the Sellers would receive cash and
19   HoldCo Units that they subsequently could put to Allen for cash or exchange for publicly-traded
20   Charter stock; (2) HoldCo would acquire ownership of one hundred percent (100%) of the
21   Bresnan Systems; and, (3) if the put were exercised, Allen would receive equity in Charter and
22   HoldCo, companies in which he already held a controlling interest.

23   28.    Plaintiffs intended and Irell understood that Holdings would become the direct
24   owner of one hundred percent (100%) of CC VIII. CC VIII was an entity created as part of the
25   Bresnan Transaction for the specific purpose of holding the Bresnan Systems.

26   29.    Between approximately January 28, 2000 and February 14, 2000, Irell attorneys
27   were substantially involved in negotiating, structuring, drafting and reviewing the Bresnan

28

12  - 6 -

EXHIBIT A

1   Transaction documents, including but not limited to the HoldCo and CC VIII Limited Liability
2   Company Agreements.

### The Modified Structure of the Bresnan Transaction

4       30.     Shortly before the scheduled closing of the Transaction, the AT&T Sellers
5   informed Charter that their acquisition of HoldCo Units created a potential regulatory problem.
6   At the time, the Federal Communications Commission (the "FCC") restricted cable system
7   ownership by limiting the number of cable subscribers that any single owner of multiple cable
8   systems could serve (the "Attribution Rules").

9       31.     The AT&T Sellers expressed concern that by acquiring Units of HoldCo, AT&T
10  would exceed the maximum allowable number of served cable subscribers permitted by the
11  FCC's Attribution Rules.

12      32.     As a result, the parties agreed to modify the original structure of the Transaction
13  to avoid attribution to the AT&T Sellers of HoldCo's systems other than the Bresnan Systems.

14      33.     Charter instructed Irell to modify the terms of the Transaction to accommodate
15  AT&T's concerns about attribution with the specific direction that the modifications be "net
16  neutral" and not alter the material economic terms of the Transaction.

17      34.     Specifically, the parties determined that the Attribution Rule issue could be
18  resolved if the AT&T Sellers received equity in CC VIII, the lower-tier HoldCo subsidiary that
19  would own the Bresnan Systems, rather than a direct equity interest in HoldCo.

20      35.     To implement this, Irell modified the structure of the Bresnan Transaction such
21  that the AT&T Sellers would receive Class A, non-voting preferred units of CC VIII equal in
22  value to approximately thirty percent (30%) of the Bresnan systems (the "CC VIII Units").

23      36.     To preserve the AT&T Sellers' ability to convert CC VIII Units to cash, the
24  Transaction as modified gave them the right to exchange their CC VIII Units for Charter stock,
25  or to "put" their CC VIII Units to Allen within two years of closing at the same fixed price that
26  had been established for the equity interests in HoldCo under the original Transaction (the "Put
27  Agreement").

28

13   - 7 -

EXHIBIT A

1      37.    All of the parties to the Bresnan Transaction as modified understood that the CC

2  VIII Units held by the AT&T Sellers would ultimately be exchanged for cash or stock in Charter.

3      38.    To ensure that Charter and HoldCo ended up in the same economic position as

4  intended under the original Transaction, Irell added two provisions to the Transaction documents

5  (the "Automatic Exchange Provisions") related to the AT&T Seller's Put to Allen.

6      39.    Specifically, the Automatic Exchange Provisions required that upon the exercise

7  of the AT&T Sellers' Put, the CC VIII Units sold to Allen would be automatically exchanged for

8  newly issued Units in HoldCo. In this way, HoldCo and its subsidiaries would obtain ownership

9  of one hundred percent (100%) of the Bresnan Systems as intended; and Allen, also as intended,

10  would acquire additional equity in HoldCo, a company in which he already was a controlling

11  shareholder.

12      40.    Irell was aware that the Automatic Exchange Provisions in the HoldCo Limited

13  Liability Company Agreement were critical to effect the intent of the parties to the Bresnan

14  Transaction.

15      41.    In particular, the Automatic Exchange Provisions were essential to preserve the

16  economic neutrality of the Transaction and to provide Charter and HoldCo the benefit of what

17  they bargained for with the Bresnan Sellers. Without these provisions, Allen would end up

18  owning thirty (30%) of the Bresnan Systems upon the AT&T Sellers' put of their CC VIII Units

19  to him and HoldCo and its subsidiaries would not acquire one hundred percent (100%) ownership

20  of the Bresnan Systems as agreed.

21      42.    Both Charter and HoldCo agreed to the addition of the Automatic Exchange

22  Provisions to the HoldCo Limited Liability Company Agreement on Irell's representation that the

23  modified Transaction would not require any additional consideration to or from any party, but

24  instead would merely accommodate the AT&T Sellers' regulatory concern without changing the

25  original economics of the Transaction. In other words, although Plaintiffs understood that some

26  of the mechanics of the Transaction would change, they also understood that the substance of the

27  Transaction would not.

28

14  -8-

EXHIBIT A

43. Irell drafted the Automatic Exchange Provisions, which became Sections 3.1.1(e) and 3.6.2(d) of the HoldCo Limited Liability Company Agreement.

44. A revised blacklined draft of the HoldCo Limited Liability Company Agreement highlighting this addition was circulated internally among the Irell attorneys working on the Bresnan Transaction, as well as to various officers of Charter and others. Charter reviewed and approved these newly added provisions.

**The Negligent Deletion of the Automatic Exchange Provisions**

45. Subsequently, the HoldCo Limited Liability Company Agreement underwent further revisions as a result of continuing negotiations with the Sellers. None of these additional revisions resulted in any changes to the Automatic Exchange Provisions.

46. As part of these subsequent revisions, Irell directed an associate (the "Associate") to remove certain provisions in the HoldCo Limited Liability Company Agreement wholly unrelated to the Automatic Exchange Provisions.

47. Several Irell partners were responsible for overseeing the legal work of the Associate.

48. In the course of revising the documents, the Associate mistakenly and negligently deleted the Automatic Exchange Provisions from the HoldCo Limited Liability Company Agreement.

49. Numerous Irell partners and associates received copies of the HoldCo Limited Liability Company Agreement following the inadvertent and negligent deletion by the Associate of the Automatic Exchange Provisions.

50. Irell was responsible for reviewing and approving prior to closing the HoldCo Limited Liability Company Agreement, as well as the other Bresnan Transaction documents, to ensure that these documents accurately reflected the negotiated and agreed upon terms of the Transaction.

51. Despite their review of the Transaction documents prior to the closing of the Bresnan Transaction, Irell attorneys did not notice the deletion of the Automatic Exchange Provisions from the HoldCo Limited Liability Company Agreement.

15    - 9 -

EXHIBIT A

1      52.    The deletion of these critical provisions was not disclosed to Plaintiffs or Allen

2   before the closing of the Bresnan Transaction and the execution of the HoldCo Limited Liability

3   Company Agreement, nor was it highlighted (blacklined) in any drafts furnished to Plaintiffs.

4      53.    Defendant's actions and inactions, including the Associate's deletion of the

5   Automatic Exchange Provisions from the HoldCo Limited Liability Company Agreement, failure

6   to notice said deletion, failure to identify for Charter the deletion of the Automatic Exchange

7   Provisions in the redrafts of the HoldCo Limited Liability Company Agreement, and approval of

8   the documentation presented to Charter as final and complete, are each and all acts of negligence

9   and/or malpractice committed by Defendant in that they fall beneath the reasonable standard of

10  care for such professionals.

11     54.    In addition, as a result of its failure to carefully review the transactional

12  documents its lawyers drafted, Irell misrepresented to Plaintiffs that the Bresnan Transaction

13  documents, including the HoldCo Limited Liability Company Agreement, contained all of the

14  necessary and appropriate terms to implement the Transaction in accordance with: (a) the

15  agreement reached by the parties; (b) Plaintiffs' instructions to Irell; and (c) Irell's

16  representations to Plaintiffs that the modified structure of the Transaction would leave the parties

17  in the same economic position as the original structure of the Transaction.

18     55.    Because the Automatic Exchange Provisions disappeared from the HoldCo

19  Limited Liability Company Agreement without their deletion having been blacklined or

20  otherwise highlighted, the Bresnan Transaction closed on February 14, 2000 without Plaintiffs'

21  knowledge that the Transaction documents omitted these crucial provisions.

22     56.    No one discovered until early 2002 that Defendant had deleted these critical

23  provisions.

24     57.    As fully detailed in the Facts Common to All Counts, the deletion of the

25  Automatic Exchange Provisions amounted to a critical error in drafting the Transaction

26  documents and, coupled with Defendant's failure to identify or correct that error before their

27  execution, caused Plaintiffs substantial and recurring harm.

28

16  - 10 -

EXHIBIT A

PAGE 10/31 * RCVD AT 4/6/2007 6:56:25 PM [Central Daylight Time] * SVR:FAX1/9 * DNIS:7000 * CSID:9498338540 * DURATION (mm-ss):08-30

### Irell's Negligent Drafting of the HoldCo and
### CC VIII Limited Liability Company Agreements

58.     In addition to negligently deleting the Automatic Exchange Provisions and the other negligent actions and inactions identified above, Irell further failed to exercise reasonable care in coordinating the terms of the various transactional documents that it prepared to effect the Bresnan Transaction.

59.     The inclusion of the Automatic Exchange Provisions (§§ 3.1.1(e) and 3.6.2(d)) in the HoldCo Limited Liability Company Agreement conflicted with Section 3.6.4 of the CC VIII Limited Liability Company Agreement.

60.     Section 3.1.1(e) of the HoldCo Limited Liability Company Agreement mandated that once Allen acquired CC VIII Class A units from the AT&T Sellers, those Class A units would be automatically exchanged for HoldCo units.

61.     Section 3.6.4 of the CC VIII Limited Liability Company Agreement provided otherwise.  It mandated that any CC VIII Class A non-voting units put to Allen by the AT&T Sellers would automatically convert to CC VIII Class B voting units.

62.     Not only did the Bresnan Transaction documents fail to specify an order of operation for these two provisions, but regardless of the order in which these two provisions operated, they both could not be given effect at the same time.

63.     As a result, in addition to the mistaken and negligent deletion of the Automatic Exchange Provisions from the HoldCo Limited Liability Company Agreement, the Transaction documents contained inconsistent provisions resulting from Defendant's actions and inactions.

### Irell's Failure to Provide for the Ultimate Disposition of the CC VIII Units

64.     In addition to its critical errors in drafting the Bresnan Transaction documents and other actions and inactions pleaded above, Irell further failed to include a provision in the Transaction documents specifying whether the CC VIII Units HoldCo was to obtain under the parties' agreement would continue to be held by HoldCo, or would be transferred to Holdings or another subsidiary.

17   - 11 -

EXHIBIT A

65.     At the time Irell prepared the Bresnan Transaction documents, Irell knew Charter intended that Holdings would become the direct owner of the Bresnan systems.

66.     Irell's failure to include such a provision was contrary to Plaintiffs' understanding that Holdings would ultimately own the entirety of the Bresnan systems.

67.     The omission of such a provision further hindered Charter's efforts to resolve the issues caused by Irell's negligent drafting of the Transaction documents and caused Charter to incur significant legal fees.

### Harm to Plaintiffs

68.     On April 12, 2002, the AT&T Sellers exercised their right to put the CC VIII Units to Allen. The Put Transaction closed on June 6, 2003.

69.     As a result of the Put, and because the Automatic Exchange Provisions had been deleted, Allen obtained ownership of CC VIII Class A Units rather than HoldCo Units, providing him with direct ownership of thirty percent (30%) of the Bresnan Systems.

70.     Accordingly, because Irell deleted the Automatic Exchange Provisions, Plaintiffs did not obtain the one hundred percent (100%) ownership of the Bresnan Systems that they bargained for in the Bresnan Transaction. Rather, HoldCo and its subsidiaries obtained only a seventy percent (70%) ownership interest of these cable systems.

71.     Irell's negligence further damaged Charter by creating serious legal, financial and governance problems for the Company.

72.     Among other problems, Allen's holding of the Class A CC VIII Units entitled him to a payment priority in Charter's corporate structure ahead of other Charter shareholders, equity holders and public debt holders.

73.     Allen's ownership of the Class A preferred Units also entitled him to a preference on distributions upon a sale or liquidation of CC VIII or the Bresnan Systems.

74.     Further, Irell's failure to consider and address in the Transaction documents the question of the ultimate disposition of the CC VIII Units created a myriad of legal and governance issues for Plaintiffs, requiring Plaintiffs to incur substantial legal fees to investigate, analyze and rectify these issues.

18 - 12 -

EXHIBIT A

**Irell's Failure to Disclose its Negligence After Completion of the Transaction**

75.   At all relevant times, Irell and its attorneys were obligated to act in conformance with the standard of care for such professionals, including, but not limited to, their obligations to act in conformance with the State of California's Rules of Professional Conduct.

76.   At all relevant times, Rule 3-500 of California's Rules of Professional Conduct provided, in relevant part:

> A member shall keep a client reasonably informed about significant developments relating to the employment or representation. . . .

77.   Irell learned of its the critical errors in drafting the Transaction documents between February and April of 2002.

78.   Nevertheless, Irell failed to disclose its knowledge of its negligence and the related impact of its negligence to Plaintiffs.

79.   Irell's failure to make such disclosures to Plaintiffs was negligent, grossly negligent, reckless, and/or done knowingly and intentionally.

80.   Irell's concealment violated California Rule of Professional Conduct 3-500 and the standard of care required of similarly situated attorneys.

81.   At all relevant times, one or more officers, directors or managing partners of Irell authorized the conduct described herein and/or knew of and approved such conduct after it occurred.

82.   Between February and October 2002, Irell further failed to disclose to Plaintiffs and, on information and belief, knowingly and intentionally concealed from Plaintiffs, and Plaintiffs remained unaware, that the executed Bresnan Transaction documents provided a thirty percent (30%) ownership interest in the Bresnan Systems to Allen upon the AT&T Sellers' put of their CC VIII Units to Allen, and that HoldCo and its subsidiaries would not acquire the one hundred percent (100%) ownership of the Bresnan Systems for which they had bargained.

83.   Upon information and belief, senior Irell partners were made aware of Irell's negligence and acquiesced in the decision not to disclose the deletion of the Automatic Exchange Provisions to Plaintiffs.

19  - 13 -

EXHIBIT A

1      84.    Upon information and belief, Irell attorneys and staff further worked, without

2  Plaintiffs' knowledge or authorization, to investigate possible ways to rectify the critical errors in

3  drafting the Transaction documents in the context of another Charter transaction.

4      85.    Upon information and belief, Irell billed Plaintiffs for the time associated with this

5  work.

6      86.    Upon information and belief, Irell was aware or should have been aware upon its

7  discovery of the critical errors in drafting the Transaction documents in the Bresnan Transaction

8  that Allen's direct ownership of a portion of the Bresnan cable systems created numerous legal,

9  financial and governance problems for Plaintiffs.

10     87.    Upon information and belief, between February and October of 2002, Irell knew

11  or should have known that Plaintiffs continued to hold the mistaken belief that HoldCo and its

12  subsidiaries had acquired one hundred percent (100%) ownership of the Bresnan Systems.

13     88.    Upon information and belief, Irell was aware that its silence concerning its

14  negligence would risk causing Charter to make financial and governance decisions on materially

15  false information.

16     89.    Irell's failure to disclose its critical errors and other negligence in drafting and

17  reviewing the Transaction documents deprived Plaintiffs of the opportunity to address the errors

18  as well as the serious legal, financial and governance problems arising therefrom at an earlier

19  date.

20     90.    Compounding Irell's failure to disclose its critical errors in drafting the

21  Transaction documents to from Plaintiffs identified above, on June 11, 2002 Elliot Freier

22  ("Freier"), an Irell tax partner who worked on the Bresnan Transaction and who was aware of

23  Irell's negligence, attended a tax planning meeting at which the Bresnan Transaction was

24  discussed. Throughout this meeting, Freier failed to disclose Irell's negligence to representatives

25  of Charter, Allen and Charter's outside auditors who attended this meeting.

26     91.    Irell's continued failure to disclose the critical errors in drafting the Transaction

27  documents during this meeting further injured Plaintiffs because Allen's attorneys relied upon the

28  documents generated in connection with this June 2002 tax meeting to support their contention

20  - 14 -

EXHIBIT A

1   that the critical errors in drafting the Transaction documents did not occur and that the parties

2   intended for Allen to receive CC VIII Units.

3       92.     Additionally, at numerous other meetings that occurred between Irell's discovery

4   of its critical drafting errors and its disclosure of such errors to Charter, Irell partners Alvin G.

5   Segel and Richard C. Wirthlin failed to disclose those errors to Charter executives and counsel.

6                           **Irell's Conflict of Interest**

7       93.     At all relevant times, Irell and its attorneys were obligated to act in conformance

8   within the standard of care for such professionals, including, but not limited to, California Rule

9   of Professional Conduct 3-310(c), which provides:

10      (C) A member shall not, without the informed written consent of each client:

11              (1) Accept representation of more than one client in a matter in which the interests
                of the clients potentially conflict; or

12

13              (2) Accept or continue representation of more than one client in a matter in which
                the interests of the clients actually conflict; or

14              (3) Represent a client in a matter and at the same time in a separate matter accept
                as a client a person or entity whose interest in the first matter is adverse to the

15              client in the first matter.

16      94.     Irell's critical error in drafting the Transaction documents benefited Allen to

17  Plaintiffs' detriment. It was in Allen's interest to hold the parties to the terms of the Transaction

18  documents as drafted. In contrast, it was in Plaintiffs' interest to reform the Transaction

19  documents as economically and as quickly as possible so as to receive the benefit of their bargain

20  and to mitigate the potential harmful consequences to Plaintiffs from Irell's critical drafting error.

21      95.     This conflict between the interests of its clients required Irell's withdrawal from

22  its representation of Plaintiffs and Allen, as well as Charter's engagement of independent

23  counsel.

24      96.     Further, once Irell discovered the deletion of the Automatic Exchange Provisions,

25  an irrevocable conflict of interest arose between Irell's desire to refrain from disclosing its

26  negligence and Plaintiffs' right to full knowledge of all material facts.

27      97.     This conflict required Irell's withdrawal from the representation of Plaintiffs.

28

                            21  - 15 -                       EXHIBIT A

98.    Despite Irell's conflicts of interest, it continued to represent Plaintiffs and Allen between approximately February 2002 and October 2002 and thereafter.

99.    During this period, Irell similarly failed to disclose to Plaintiffs the existence and potential consequences of its conflicts of interest.

100.    Irell's failure to disclose to Plaintiffs its actual and potential conflicts of interest violated California Rule of Professional Conduct 3-310(c) and failed to comply with the standard of care required of similarly situated attorneys.

101.    Nor did Irell disclose its inability to exercise undivided loyalty and independent professional judgment on behalf of Plaintiffs.

102.    In doing so, Irell negligently, recklessly, and on information and belief, knowingly and intentionally, placed its own self-interest above that of Plaintiffs.

103.    Irell failed to disclose these conflicts and withdraw from its representation of Charter even though it was aware or should have been aware that its negligence in drafting the Bresnan Transaction documents was material information needed by Plaintiffs to make financial and business decisions.

104.    Had Irell promptly disclosed its negligence and its conflicts of interest, Plaintiffs would have been better positioned to have settled the dispute with Allen over the proper ownership of the CC VIII Class A Preferred Units in a more timely and less expensive manner.

105.    Not until Irell was pressed in October 2002 to provide information in response to analysts' questions about the impact of the exercise of the AT&T Sellers' Put did Irell disclose its negligence and conflicts of interest.

**Irell Admits its Negligence**

106.    On December 4, 2002, Irell partner Milton B. Hyman, representing Irell, gave a four-hour presentation to lawyers representing Charter and Allen. Hyman's presentation documented Irell's critical errors in drafting the Transaction documents. The presentation was the product of extensive effort; according to Irell's billing records, five Irell partners spent more than 70 hours preparing the presentation.

22  - 16 -

EXHIBIT A

PAGE 16/31 * RCVD AT 4/6/2007 6:56:25 PM [Central Daylight Time] * SVR:FAX1/9 * DNIS:7000 * CSID:9498338540 * DURATION (mm-ss):08-30

107. At the December 4, 2002 presentation, Hyman presented the participants with a 1027 page compendium. The compendium established in detail the circumstances of Irell's errors. Throughout this meeting, Irell repeatedly admitted and did not once deny its critical errors in drafting the Transaction documents.

108. After this meeting, Charter's Board of Directors formed a Special Committee of independent directors to resolve the dispute with Allen, Charter's Chairman, arising from Irell's critical errors in drafting the Transaction documents.

109. The Special Committee retained the law firm of Dow Lohnes & Albertson, PLLC as independent counsel to provide advice as to Charter's legal rights and remedies.

110. On August 7, 2003 Plaintiffs and Irell entered into an agreement tolling the limitations period applicable to any claims Plaintiffs may have against Defendant relating to the Bresnan Transaction and any and all related matters.

111. Plaintiffs have complied with the terms of the tolling agreement.

112. Charter, on behalf of itself and its subsidiaries, entered into discussions with Allen in an attempt to reacquire the direct equity interest in approximately thirty percent (30%) of the Bresnan Systems that Plaintiffs should have acquired but for Defendant's critical errors in drafting the Transaction documents.

113. In October 2005, Plaintiffs and Allen settled their dispute over the ownership of the CC VIII Units that Allen acquired as the result of Defendant's critical errors in drafting the Transaction documents. In the settlement, HoldCo and its subsidiaries recovered approximately seventy percent (70%) of the CC VIII Units obtained by Allen as a direct result of Irell's negligent drafting of the Bresnan Transaction documents.

114. As the result of Defendant's critical errors in drafting the Transaction documents, Plaintiffs suffered a net loss of more than $150,000,000, which includes the value of the CC VIII Units Allen retained in the settlement, the value of a note that a wholly owned HoldCo subsidiary was required to issue to Allen as part of the settlement, and legal fees associated with the representation of the Special Committee in connection with its investigation, the dispute with

23  - 17 -

**EXHIBIT A**

1    Allen, and the resolution of the legal, financial, and governance issues created by Defendant's

2    negligence.

3          115.   These damages were a direct and proximate result of Defendant's negligence.

4          116.   Plaintiffs suffered additional damages when Defendant improperly charged

5    Plaintiffs legal fees in connection with its investigation and research of the consequences to

6    Charter of Defendant's own negligence.  Defendant also improperly charged Plaintiffs legal fees

7    in connection with Defendant's efforts to protect its own interests following its discovery of its

8    negligence.  Defendant did so during a period in which it had undisclosed and irrevocable

9    conflicts of interest.

**COUNT I**

**LEGAL MALPRACTICE**

**(All Plaintiffs against Defendant)**

13         117.   Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1

14   through 116.

15         118.   At all times relevant hereto, an attorney-client relationship existed between

16   Defendant and Plaintiffs.

17         119.   As counsel to Plaintiffs, Defendant owed to them a duty to exercise that degree of

18   care, knowledge, skill, competence and diligence in representing their interests used by similarly

19   employed attorneys in the legal profession.

20         120.   Defendant further owed to Plaintiffs a duty to comply with the standard of care of

21   attorneys specializing in complex business transactions for the telecommunications and

22   technology industries.

23         121.   Defendant and its attorneys also were required to comply with the rules of

24   professional and ethical conduct applicable in the jurisdictions in which its attorneys were

25   admitted to practice and were practicing law.

26         122.   Specifically, Irell and its attorneys were obligated to comply with California Rule

27   of Professional Conduct 3-110, which provides:

28

24  - 18 -

EXHIBIT A

(A)    A member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence.

(B)    For purposes of this rule, "competence" in any legal service shall mean to apply the 1) diligence, 2) learning and skill, and 3) mental, emotional, and physical ability reasonably necessary for the performance of such service.

123.    Defendant and its attorneys were also required to comply with Rule 3-500 of California's Rules of Professional Conduct, which provided at all relevant times:

A member shall keep a client reasonably informed about significant developments relating to the employment or representation. . .

124.    Defendant and its attorneys were also required to comply with California Rule of Professional Conduct 3-310(C), which provided at all relevant times:

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

125.    Defendant owed Plaintiffs a duty to represent their interests honestly and in good faith and to make full disclosure of all known information that was important and material to Plaintiffs' affairs.

126.    Defendant breached its duty of care to Plaintiffs by engaging in conduct more fully described in the Facts Common to All Counts of this Complaint, including but not limited to:

(a)    negligently deleting the Automatic Exchange Provisions from the HoldCo Limited Liability Company Agreement without the direction, authority, consent or knowledge of Plaintiffs;

(b)    negligently preparing and reviewing the HoldCo Limited Liability Company Agreement;

(c)    negligently reviewing the CC VIII Limited Liability Company Agreement;

1          (d)     negligently coordinating the terms of the HoldCo Limited Liability

2  Company Agreement with the terms of the CC VIII Limited Liability Company Agreement;

3          (e)     continuing to represent Plaintiffs and Allen following its discovery of

4  critical errors in drafting the Bresnan Transaction documents;

5          (f)     failing to disclose its negligence to Plaintiffs for six months;

6          (g)     failing to disclose the nature of its conflicts of interest and the potential

7  consequences thereof to Plaintiffs for more than six months; and

8          (h)     in such other respects as are supported by the facts set forth in this

9  Complaint and as will be proven at trial.

10      127.    Defendant's conduct as described in the Facts Common to All Counts violated

11  California Rules of Professional Conduct 3-110, 3-500 and 3-310(C) and otherwise fell beneath

12  the applicable standard of care.

13      128.    As a direct and proximate result of Defendant's negligence, Plaintiffs have

14  suffered damages as described with more particularity in the Facts Common to All Counts.

15      129.    Plaintiffs demand a jury trial on Count I.

16      WHEREFORE, Plaintiffs request that this Court enter judgment in their favor for

17  damages in excess of $150,000,000.00, prejudgment interest and such other and further relief as

18  is just and proper.

19                                   **COUNT II**

20                        **BREACH OF FIDUCIARY DUTY**

21                        **(All Plaintiffs against Defendant)**

22      130.    Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1

23  through 129.

24      131.    At all times relevant hereto, an attorney-client relationship existed between

25  Defendant and Plaintiffs.

26      132.    As Plaintiffs' counsel, Defendant owed Plaintiffs a fiduciary duty, including but

27  not limited to a duty to act and give advice for their benefit, to act in good faith and in their best

28  interests, to exercise independent professional judgment and undivided loyalty on their behalf, to

                                      26   - 20 -                    EXHIBIT A

1    pursue their lawful objectives, to represent no adverse interests and to make full disclosure to

2    Plaintiffs of all known information that was important and material to their affairs.

3        133.    Defendant further had a duty to deal honestly with Plaintiffs and to disclose to

4    them all material information concerning their financial and business interests that came into its

5    possession.

6        134.    Defendant and its attorneys additionally had a duty to comply with the rules of

7    professional and ethical conduct applicable in the jurisdictions in which its attorneys were

8    admitted to practice and in which they were practicing law.

9        135.    Specifically, Defendant and its attorneys were required to comply with Rule 3-500

10   of California's Rules of Professional Conduct, which provided at all relevant times:

11       A member shall keep a client reasonably informed about significant developments
         relating to the employment or representation. . .

12

13       136.    Defendant and its attorneys were also obligated to act in conformance with

14   California Rule of Professional Conduct 3-310(C), which provided at all relevant times:

15       (C) A member shall not, without the informed written consent of each client:

16           (1) Accept representation of more than one client in a matter in which the interests
             of the clients potentially conflict; or

17
             (2) Accept or continue representation of more than one client in a matter in which
18           the interests of the clients actually conflict; or
             (3) Represent a client in a matter and at the same time in a separate matter accept
19           as a client a person or entity whose interest in the first matter is adverse to the
             client in the first matter.

20       137.    Following Defendant's discovery of its critical errors in drafting the Bresnan

21   Transaction documents, Defendant breached its fiduciary duty as more fully described in the

22   Facts Common to all Counts of this Complaint, including, but not limited to:

23           (a)    knowingly, intentionally and in bad faith concealing its negligence from

24   Plaintiffs for a period of more than six months;

25           (b)    knowingly representing clients having conflicting interests;

26           (c)    knowingly representing clients whose interests conflicted with

27   Defendant's interests;

28

27   - 21 -

EXHIBIT A

1       (d)    failing to exercise independent judgment and undivided loyalty on behalf

2 of Plaintiffs;

3       (e)    failing to deal honestly with Plaintiffs;

4       (f)    failing to disclose to Plaintiffs facts and information sufficient to permit

5 them to appreciate the nature and possible consequences of its conflicts of interests;

6       (g)    knowingly placing its interests in protecting its financial welfare and

7 reputation before the best interests of Plaintiffs;

8       (h)    charging Plaintiffs for legal services performed to address its own

9 negligence after concealing such negligence from its clients for more than six months;

10      (i)    failing to disclose all material information in its possession concerning

11 Plaintiffs' financial and business interests;

12      (j)    knowingly and intentionally exposing Plaintiffs to financial, legal and

13 regulatory danger following the discovery of Defendant's negligence by permitting Plaintiffs to

14 continue to operate based on materially false information concerning the Bresnan Transaction;

15 and

16      (k)    in such other respects as will be proven at trial.

17    138.    Defendant's conduct as described in the Facts Common to All Counts violated

18 California Rules of Professional Conduct 3-500 and 3-310(c).

19    139.    Defendant's knowing and intentional concealment from Plaintiffs of its conflicts

20 of interests and its negligence in the Bresnan Transaction, for a period of more than six months

21 after discovering such negligence, was malicious, oppressive, despicable, fraudulent and done

22 with a willful and knowing disregard of Plaintiffs' rights.

23    140.    Defendant understood the impact that any material change in Allen's ownership

24 interest would have on Plaintiffs' corporate structure, governance, and relationships with

25 shareholders, bondholders and other interested parties.

26    141.    Defendant was also aware of the potentially grave financial and economic

27 consequences of its fraudulent concealment.

28

28  - 22 -

EXHIBIT A

1       142.   Despite this, Defendant deliberately failed to avoid these potential consequences

2 through prompt and full disclosure to Plaintiffs of its negligence in the Bresnan Transaction.

3       143.   These breaches of fiduciary duty were a substantial factor in causing Plaintiffs to

4 suffer damages as described with more particularity in the Facts Common to All Counts.

5       144.   Plaintiffs demand a jury trial on Count II.

6       WHEREFORE, Plaintiffs request that this Court enter judgment in their favor for

7 damages in excess of $150,000,000.00, prejudgment interest, punitive damages and such other

8 and further relief as is just and proper.

9 **COUNT III**

10 **BREACH OF CONTRACT**

11 **(Charter, Holdings, and HoldCo against Defendant)**

12       145.   Charter, Holdings and HoldCo reallege and incorporate herein the allegations

13 contained in Paragraphs 1 through 144.

14       146.   Between approximately 1999 and approximately 2003, Charter, Holdings and

15 HoldCo had a contractual, attorney-client relationship with Defendant pursuant to which

16 Defendant represented them in a variety of transactional and corporate matters.

17       147.   Defendant impliedly promised Charter, Holdings and HoldCo that it would render

18 legal services on their behalf in accordance with the standards required by the legal profession at

19 large, as well as required by attorneys professing to have the expertise in complex transactional

20 matters represented by Defendant.

21       148.   Defendant further promised to protect Charter's, Holdings' and HoldCo's interests

22 in the Bresnan Transaction by drafting the transactional documents in a manner that would

23 provide to HoldCo and/or its subsidiaries one hundred percent (100%) ownership of the Bresnan

24 Systems.

25       149.   Defendant had a contractual obligation to follow Charter's, Holdings' and

26 HoldCo's specific instruction to modify the structure of the Bresnan Transaction in a manner that

27 would preserve the Transaction's economics and ensure that Plaintiffs received one hundred

28 percent ownership of the Bresnan Systems.

29  - 23 -

EXHIBIT A

150.   Defendant further had a contractual obligation to accurately prepare the closing documents in accordance with Charter's, Holdings' and HoldCo's express instructions.

151.   Defendant materially breached its contractual obligations to Charter, Holdings and HoldCo by failing to follow Plaintiffs' instructions as more fully described in the Facts Common to All Counts.

152.   As a direct and proximate result of Defendant's breaches, Plaintiffs have suffered damages as described with more particularity in the Facts Common to All Counts.

153.   Plaintiffs demand a jury trial on Count III.

WHEREFORE, Charter, Holdings and HoldCo request that this Court enter judgment in their favor for damages in excess of $150,000,000.00, prejudgment interest and such other and further relief as is just and proper.

## COUNT IV

### NEGLIGENT MISREPRESENTATION

#### (Charter, Holdings and HoldCo against Defendant)

154.   Charter, Holdings and HoldCo reallege and incorporate herein the allegations contained in Paragraphs 1 through 153.

155.   As counsel to Charter, Holdings and HoldCo, Defendant owed Plaintiffs a duty to act in their best interests, to provide them with truthful, accurate and complete information concerning the subject of their representation and to disclose all known information that was important and material to Charter's, Holdings' and HoldCo's affairs.

156.   Defendant further owed Plaintiffs a duty to exercise that degree of care, knowledge, skill, competence and diligence in representing Plaintiffs used by similarly employed attorneys holding themselves out as experts in transactional work of this nature.

157.   Defendant breached its duty to Plaintiffs by representing the following material facts:

(a)   that the modification of the structure of the Bresnan Transaction was consistent with Plaintiffs' instructions and was "net neutral";

30  - 24 -

EXHIBIT A

1              (b)     that the blacklined drafts of the Bresnan Transaction documents accurately

2  highlighted all additions to and deletions from those documents;

3              (c)     that following the closing of the Bresnan Transaction the executed

4  documents accurately reflected the parties' agreement and gave Plaintiffs, directly or indirectly,

5  the one hundred percent ownership of the Bresnan Systems for which they bargained in the

6  Transaction; and

7              (e)     in such other respects as will be proven at trial.

8         158.     These represented facts were false at the time made.

9         159.     Defendant made these representations without a reasonable basis.

10         160.     Defendant intended for Plaintiffs to rely on these representations and/or knew or

11  should have known that they likely would do so.

12         161.     Plaintiffs were unaware of the falsity of these representations.

13         162.     Defendant knew that if the information it provided and the representations it made

14  to Plaintiffs concerning the terms of the Bresnan Transaction were false, then Plaintiffs likely

15  would be damaged.

16         163.     As more fully described in the Facts Common to All Counts, Plaintiffs acted in

17  reliance on these false representations and were justified in doing so.

18         164.     Had Plaintiffs known the documents as drafted would result in their obtaining less

19  than a one hundred percent ownership in the Bresnan Systems, they would not have entered into

20  the Bresnan Transaction.

21         165.     Further, Defendant's misrepresentations regarding the Bresnan Transaction

22  between its discovery of its critical errors in drafting the Transaction documents and October

23  2002 prevented Plaintiffs from addressing the numerous governance issues created by the errors.

24         166.     As a direct and proximate result of Defendant's negligence, Plaintiffs have

25  suffered damages as described with more particularity in the Facts Common to all Counts.

26         167.     Plaintiffs demand a jury trial on Count IV.

27

28

EXHIBIT A

1    WHEREFORE, Charter, Holdings and HoldCo request that this Court enter judgment in

2    their favor for damages in excess of $150,000,000.00, prejudgment interest and such other and

3    further relief as is just and proper.

### COUNT V

### FRAUDULENT CONCEALMENT

#### (All Plaintiffs against Defendant)

7    168.    Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1

8    through 167.

9    169.    As a result of the existence of an attorney-client relationship between Defendant

10   and Plaintiffs, Defendant owed a duty to Plaintiffs to promptly disclose all known information

11   that was material to Plaintiffs' affairs and that would enable them to make informed business and

12   financial decisions.

13   170.    Defendant additionally had a duty to comply with the rules of professional and

14   ethical conduct applicable in the jurisdictions in which its attorneys were admitted to practice and

15   in which they were practicing law.

16   171.    Specifically, Defendant and its attorneys were required to comply with Rule 3-500

17   of California's Rules of Professional Conduct, which provided at all relevant times:

18       A member shall keep a client reasonably informed about significant developments
         relating to the employment or representation. . .
19

20   172.    Defendant were also obligated to act in conformance with California Rule of

21   Professional Conduct 3-310(C), which provided at all relevant times:

22       (C) A member shall not, without the informed written consent of each client:

23           (1) Accept representation of more than one client in a matter in which the interests
             of the clients potentially conflict; or
24

25           (2) Accept or continue representation of more than one client in a matter in which
             the interests of the clients actually conflict; or
26

             (3) Represent a client in a matter and at the same time in a separate matter accept
27           as a client a person or entity whose interest in the first matter is adverse to the
             client in the first matter.
28

32  - 26 -

EXHIBIT A

173. The Defendant's negligent failure to include the Automatic Exchange Provisions in the HoldCo Operating Agreement was a material fact that Defendant had a duty to disclose to Plaintiffs.

174. The Defendant's conflicts of interest that arose following the discovery of its negligent drafting of the Bresnan Transaction documents also were material facts that required disclosure.

175. Plaintiffs were unaware of these material facts before their disclosure in October 2002.

176. Defendant was aware of the potentially grave financial and economic consequences to Plaintiffs of its fraudulent concealment of Defendant's negligence and conflicts of interest.

177. Nevertheless, Defendant knowingly, intentionally, and deliberately concealed this material information from Plaintiffs between February or April 2002 and October 2002.

178. This concealment included, but was not limited to Freier's withholding his knowledge of Defendant's negligence at the June 11, 2002 tax meeting.

179. Had Plaintiffs known these material facts, they would have refused to pay Defendant's fees to investigate its own malpractice, would have immediately formed the Special Committee, would have begun the process of attempting to resolve their dispute with Allen over ownership of the CC VIII Preferred Units six months earlier, and would have taken immediate steps to resolve the numerous governance issues that resulted from Defendant's negligence.

180. On information and belief, Defendant concealed these material facts from Plaintiffs with the intention and for the purpose of defrauding Plaintiffs.

181. On information and belief, Defendant knew that Plaintiffs likely would not continue to engage the firm as counsel and likely would seek compensation from Defendant for their substantial losses in the Bresnan Transaction if it disclosed this material information to Plaintiffs

182. As a result of their attorney-client and fiduciary relationships with Defendant, Plaintiffs justifiably relied on Defendant's misrepresentations and concealment of material facts.

33   - 27 -

EXHIBIT A

183. Defendant's conduct as described in the Facts Common to All Counts violated California Rules of Professional Conduct 3-500 and 3-310(c).

184. Defendant's fraudulent concealment from Plaintiffs of Defendant's conflicts of interest and negligence in the Bresnan Transaction for six to eight months after discovering such negligence was malicious and despicable and was done with a willful and knowing disregard of the rights of Plaintiffs.

185. As a result of Defendant's fraudulent concealment, Plaintiffs have suffered damages as described with more particularity in the Facts Common to All Counts.

186. Plaintiffs demand a jury trial on Count V.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor for damages in excess of $150,000,000.00, prejudgment interest, punitive damages and such other and further relief as is just and proper.

## PRAYER

WHEREFORE, plaintiffs pray for judgment as follows:

### COUNT I

#### (Legal Malpractice)

1. Damages according to proof at trial, but in no event less than $150,000,000;

2. For reasonable attorneys' fees;

3. For costs of suit incurred herein;

4. For pre-judgment interest according to law;

5. For such other relief as the Court may deem proper.


### COUNT II

#### (Breach of Fiduciary Duty)

1. Damages according to proof at trial, but in no event less than $150,000,000;

2. Punitive damages in an amount to punish or set an example in an amount subject to proof at trial;

3. For reasonable attorneys' fees;

34   - 28 -

EXHIBIT A

1    4.    For costs of suit incurred herein;

2    5.    For pre-judgment interest according to law;

3    6.    For such other relief as the Court may deem proper.

4                              **COUNT III**

5                         **(Breach of Contract)**

6    1.    Damages according to proof at trial, but in no event less than $150,000,000;

7    2.    For reasonable attorneys' fees;

8    3.    For costs of suit incurred herein;

9    4.    For pre-judgment interest according to law;

10   5.    For such other relief as the Court may deem proper.

11                             **COUNT IV**

12                     **(Negligent Misrepresentation)**

13   1.    Damages according to proof at trial, but in no event less than $150,000,000;

14   2.    For reasonable attorneys' fees;

15   3.    For costs of suit incurred herein;

16   4.    For pre-judgment interest according to law;

17   5.    For such other relief as the Court may deem proper.

18                              **COUNT V**

19                       **(Fraudulent Concealment)**

20   1.    Damages according to proof at trial, but in no event less than $150,000,000;

21   2.    Punitive damages in an amount to punish or set an example in an

22   amount subject to proof at trial;

23   3.    For reasonable attorneys' fees;

24   4.    For costs of suit incurred herein;

25

26

27

28

                              35  - 29 -

                                                        EXHIBIT A

5.   For pre-judgment interest according to law;

6.   For such other relief as the Court may deem proper.

Respectfully submitted,

Dated: April 6, 2007

DAVID A. ROBINSON
ENTERPRISE COUNSEL GROUP

By: _____
    Donald P. Wagner
    Five Park Plaza, Suite 450
    Irvine, California 92614-5976
    Phone: 949/833-8550
    FAX: 949/833-8540


FREISHTAT, MULLEN & DUBNOW, LLC

David Freishtat, Esq.
Stacie F. Dubnow, Esq.
Executive Plaza I, Suite 1000
11350 McCormick Road
Hunt Valley, Maryland 21031
Phone: 410/727-7740
FAX: 410/727-7356


THOMPSON COBURN LLP

Stephen B. Higgins, Esq.
Steven M. Sherman, Esq.
One US Bank Plaza
St. Louis, Missouri 63101
Phone: 314/552-6000
FAX: 314/552-7000


Attorneys for Plaintiffs Charter Communications, Inc,
Charter Communications Holding Company, LLC,
Charter Communications Holdings, LLC, and
CC V Holdings, LLC

36   - 30 -

EXHIBIT A

1

## DEMAND FOR JURY

2

Plaintiffs hereby demand trial by jury.

3

4      Dated: April 6, 2007                    DAVID A. ROBINSON
                                               ENTERPRISE COUNSEL GROUP
5

6                                              By:
7                                                  Donald P. Wagner
                                                   Five Park Plaza, Suite 450
8                                                  Irvine, California 92614-5976
                                                   Phone: 949/833-8550
9                                                  FAX: 949/833-8540

10

11                                             FREISHTAT, MULLEN & DUBNOW, LLC

12                                                 David Freishtat, Esq.
                                                   Stacie F. Dubnow, Esq.
13                                                 Executive Plaza I, Suite 1000
                                                   11350 McCormick Road
14                                                 Hunt Valley, Maryland 21031
                                                   Phone: 410/727-7740
15                                                 FAX: 410/727-7356

16                                             THOMPSON COBURN LLP

17                                                 Stephen B. Higgins, Esq.
                                                   Steven M. Sherman, Esq.
18                                                 One US Bank Plaza
                                                   St. Louis, Missouri 63101
19                                                 Phone: 314/552-6000
                                                   FAX: 314/552-7000
20

21                                             Attorneys for Plaintiffs Charter Communications, Inc,
                                               Charter Communications Holding Company, LLC,
22                                             Charter Communications Holdings, LLC, and
                                               CC V Holdings, LLC
23

24

25

26

27

28

- 31 -

37

EXHIBIT A



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

| | |
|---|---|
| *Andrew Stolper* | *United States Courthouse, 8ᵗʰ Floor* |
| *Assistant United States Attorney* | *411 West Fourth Street* |
| *(714) 338-3536* | *Santa Ana, California 92701* |
| *Andrew.Stolper@usdoj.gov* | |

**VIA ELECTRONIC MAIL**

October 1, 2008

James Riddet, Esq.
3 MacArthur Place, Suite 750
Santa Ana, CA 92707

      Re:    <u>United States v. Dr. Henry T. Nicholas, III,</u>
                    08-139-CJC

Dear Mr. Riddet:

      I write in response to your letter dated September 18, 2008. In this letter, based on "recent developments" you assert that the USAO "improperly accessed" materials concerning Mehrdad Nayebi and Elizabeth Kuhns from Irell & Manella ("Irell") because such materials are subject to Dr. Nicholas's privilege. You further request the USAO sequester any information we received from Irell relating to these individuals as well as a listing of anyone in the government who "had access" to this information. Finally, you request information relating to the USAO's discussions with Irell on a number of topics, as well as "all documents relating to steps taken to respect Dr. Nicholas' personal rights." We do not believe Dr. Nicholas ("defendant") has any standing to assert privilege with respect to Irell's representation of Broadcom on the Mehrdad Nayebi and Elizabeth Kuhns matters. We also see no basis for your questions concerning the USAO's communications with Irell, or to the remainder of your requests.

      Your letter claims that Irell represented defendant in connection with Mehrdad Nayebi's dispute with Broadcom in connection with the termination of his employment. In support of this assertion, you provide the declaration that was attached to Dr. Nicholas's Reply to our Opposition to your disqualification motion. Based on, among other things, our discussions with Irell and the timing of your privilege assertion claim, we believe that your privilege assertion is without merit as to Mehrdad Nayebi.

      You also now assert privilege with respect to Irell's representation of Broadcom in connection with Elzabeth Kuhns's departure from Broadcom. Other than the bare assertion in your letter, there is no evidence to substantiate your claim that Irell represented defendant in connection with this matter. There is, however, considerable evidence that Irell was not

38

EXHIBIT B

representing defendant in this matter, including Irell's denial of representation and the fact that defendant appears to have retained his own individual counsel to assist him with respect to Ms. Kuhns. Absent some showing on your part, we are unable to credit your claims of privilege between Dr. Nicholas and Irell with respect to Elizabeth Kuhns at this time.

As to the remainder of your requests for information, we see no basis to respond to them at this time. If you have authority suggesting that the government has an obligation to respond to these requests, please let us know so that we may review it and comply with any applicable law.

Finally, it increasingly appears that defendant is taking positions adverse to Irell. We understand that defendant's primary criminal counsel, Williams & Connolly, currently represents Irell in connection with a malpractice claim in <u>Charter Communications v. Irell & Manella</u>, SA CV 07-402-AG. This creates a potential conflict. Please advise us what steps you have taken with regard to this potential conflict so we may determine whether it is necessary to raise it with the court.

Very truly yours,

THOMAS P. O'BRIEN
United States Attorney

ANDREW STOLPER
Assistant United States Attorney

cc:    Molly White, Esq.

EXHIBIT B

STOKKE & RIDDET

November 4, 2008
Via Facsimile and U.S. Mail

Andrew D. Stolper, Esq.
United States Attorney's Office
411 West Fourth Street, 8th Floor
Santa Ana, CA 92701

Re:   *United States v. Nicholas, SA CR 08-139 CJC* and
      *United States v. Nicholas, SA CR 08-140 CJC*

Dear Mr. Stolper:

This letter responds to your October 1 letter.

You are on notice that Dr. Nicholas understands that he was represented by Irell with respect to the Mehrdad Nayebi and Elizabeth Kuhns matters, and the government violates his rights with respect to those matters at its own risk. In any event, I understand that the government has agreed to turn over all of the interview reports of Irell attorneys, whether or not they are discoverable under Jencks, when the government discloses the remainder of the Jencks material in this case, so that we may determine whether to file a motion to suppress or for other appropriate relief.

With respect to Williams & Connolly LLP's representation of Irell & Manella LLP in an unrelated matter, you can be assured that Dr. Nicholas was aware of that representation at the time he retained Williams & Connolly to represent him in this matter. If you have particular concerns in this regard, please feel free to raise them with the Court.

Very truly yours,

JAMES D. RIDDET

EXHIBIT B