UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>vs.<br>HENRY T. NICHOLAS, III and<br>WILLIAM J. RUEHLE et al.<br>    Defendants. | Case No.: SACR 08-00139-CJC<br><br>**ORDER SUPPRESSING PRIVILEGED COMMUNICATIONS** |

## INTRODUCTION

The California Rules of Professional Conduct protect clients, promote public confidence in the legal profession, and ensure the fair administration of justice. The most fundamental of these rules is a lawyer's duty of undivided loyalty to his client. A lawyer must do everything legally possible to protect a client. A lawyer can never assume a position adverse to the client or disclose client confidences without the client's knowing,

intelligent, and voluntary consent in writing. Unfortunately, in this case, a law firm breached its duty of loyalty to a client in several respects.

In May 2006, Irell & Manella LLP ("Irell") undertook three separate, but inextricably related, representations of Broadcom Corporation ("Broadcom") and its Chief Financial Officer, Defendant William J. Ruehle. More specifically, Irell represented Broadcom in connection with the company's internal investigation of its stock option granting practices. At the same time, Irell also represented Mr. Ruehle in connection with two shareholder lawsuits filed against him regarding those same stock option granting practices. Prior to undertaking these representations of clients with adverse interests, Irell failed to obtain Mr. Ruehle's informed written consent.

In June of 2006, Irell lawyers met with Mr. Ruehle at his office to discuss the stock option granting practices at Broadcom. During this meeting, Mr. Ruehle told the Irell lawyers about Broadcom's stock option granting practices and his role in them. Before questioning Mr. Ruehle, however, the Irell lawyers never disclosed to him that they were representing only Broadcom at the meeting, not him individually, and that whatever he said to them could be used against him by Broadcom or disclosed by the company to third parties. Subsequently, Broadcom directed Irell to disclose statements Mr. Ruehle made to the Irell lawyers about Broadcom's stock option granting practices to Broadcom's outside auditors, Ernst & Young, as well as to the Securities and Exchange Commission ("SEC") and the United States Attorney's Office (the "Government"). Prior to making these disclosures, Irell never obtained Mr. Ruehle's consent.

The Government now argues that it can use Mr. Ruehle's statements to the Irell lawyers against him at the trial in this criminal case. The Government is mistaken. Mr. Ruehle's statements to the Irell lawyers are privileged attorney-client communications. Mr. Ruehle reasonably believed that the Irell lawyers were meeting with him as his

personal lawyers, not just Broadcom's lawyers. Mr. Ruehle had a legitimate expectation that whatever he said to the Irell lawyers would be maintained in confidence. He was never told, nor did he ever contemplate, that his statements to the Irell lawyers would be disclosed to third parties, especially not the Government in connection with criminal charges against him. Irell had no right to disclose Mr. Ruehle's statements, and Irell breached its duty of loyalty when it did so. Accordingly, the Court must suppress all evidence reflecting Mr. Ruehle's statements to the Irell lawyers regarding stock option granting practices at Broadcom.

But the Court has a further obligation in this case. The Court must also ensure the fair administration of justice and promote the public's confidence in the legal profession. By failing to comply with its duties under the Rules of Professional Conduct, Irell compromised these important principles. The Court simply cannot overlook Irell's ethical misconduct in this regard and must refer Irell to the State Bar for appropriate discipline.

**BACKGROUND**

Both Broadcom and Mr. Ruehle had long-standing relationships with Irell.[1] Beginning in 2002, Irell represented both Broadcom and Mr. Ruehle personally in several securities-related actions ("Warrants Litigation"). (Ex. A.)[2] Irell represented Mr. Ruehle in a deposition taken in connection with the Warrants Litigation. (Tr. 36:12-16 Feb. 24, 2009.) In the course of this representation, Irell informed Mr. Ruehle in writing of the potential for conflicts inherent in dual representation and obtained Mr. Ruehle's informed

---

[1] In fact, Broadcom sold 225,000 shares of Broadcom stock to Irell in 1997, before its initial public offering ("IPO"). The aggregate purchase price for this stock was $1,050,000 or $4.67 per share. (Ex. 1.) It is not clear if or when Irell sold its Broadcom stock, but in the first six months after the IPO, Broadcom's share price increased dramatically, and at various times traded at over $70 per share.

[2] Mr. Ruehle presented many exhibits, some of which are privileged. All privileged exhibits are identified by letters, and all non-privileged exhibits are identified by numbers.

written consent to proceed with the representation. (Exs. A, B.) The Warrants Litigation concluded at the end of 2005. (Ex. E.)

In the spring of 2006, after a series of articles related to the stock option granting practices both at Broadcom and other corporations, Broadcom was aware that it might be investigated by the Government or sued on the basis of its stock option granting practices. (Tr. 8:10-13, Feb. 25, 2009.) In mid-May 2006, Broadcom retained Irell to investigate its stock option granting practices on behalf of the corporation. (Tr. vol. 2, 4:19-21, Feb. 23, 2009.) Shortly thereafter, on May 25, 2006, a group of shareholders filed a derivative action against Mr. Ruehle and other current and former officers of Broadcom ("Derivative Action") concerning the corporation's stock option granting practices. (Ex. 18.) On May 26, 2006, an amended complaint was filed in *Jin v. Broadcom Corp., et al.* ("Jin Action"), naming Mr. Ruehle personally and asserting substantially similar claims regarding stock option practices at Broadcom. (Ex. 14.) In addition to its representation of Broadcom in connection with the internal investigation, Irell accepted individual representation of Mr. Ruehle in both the Jin Action and the Derivative Action, accepting service on his behalf and appearing as counsel of record until September 2006.[3] (Tr. vol. 2, 26:15-27:25, Feb. 23, 2009.) During the entire period of these representations, Irell never obtained Mr. Ruehle's informed written consent to its dual representation of him and the company as required by Rule 3-310(C) of the Rules of Professional Conduct. (*Id.* 36:5-11.)

In late May of 2006, Mr. Ruehle received several emails regarding Irell's representation of him and Broadcom in connection with stock option practices at the company. (Exs. F-K.) On May 30, 2006 at 5:28 p.m., David Dull, General Counsel of

---

[3] The parties vigorously dispute when the attorney-client relationship between Mr. Ruehle and Irell was formed, but did not dispute that Irell was Mr. Ruehle's personal counsel in both the Derivative Action and the Jin Action until September 2006. (Tr. vol. 2, 32:7-12, Feb. 23, 2009.)

Broadcom, sent an email to several people at Broadcom, including Mr. Ruehle, and on which David Siegel, an Irell litigation partner, was copied. (Ex. G.) The email provided information about the nature of the Jin Action and the Derivative Action and assessed the relative strengths and weaknesses of the judge assigned to the case. (*Id.*) Confirming Mr. Ruehle's understanding that Irell would represent Broadcom's officers individually as they had in past litigation, Mr. Dull directed "anyone who has any concerns" to "contact me or any of the Irell lawyers." (*Id.*) Four minutes later, at 5:32 p.m. on May 30, 2006, Kenneth R. Heitz, a litigation partner at Irell, sent Mr. Ruehle an email, on which Mr. Siegel, Mr. Dull, and Daniel P. Lefler, another Irell litigation partner, were copied. (Ex. F.) In the email, Mr. Heitz updated Mr. Ruehle about the progress of Irell's interviews of other witnesses with knowledge of the stock option granting practices at Broadcom and requested a time to discuss these issues with Mr. Ruehle. (*Id.*)

On May 31, 2006, the day before his first interview with the Irell lawyers, Mr. Ruehle received three emails from Mr. Heitz. (Exs. I-K.) The first, on which Mr. Lefler and Mr. Siegel were copied, updated Mr. Ruehle on the Irell lawyer's progress in their interviews of witnesses with knowledge of the stock option granting practices at Broadcom. (Ex. I.) The next, asked Mr. Ruehle to review his personal records for information related to a stock option grant in 2000 and advised him of the relevance of such information to Irell's investigation. (Ex. J.) In the final email Mr. Ruehle received from Mr. Heitz on May 31, 2006, Mr. Heitz provided a further update on Irell's fact-gathering with respect to Broadcom's stock option granting practices. (Ex. K.)

On June 1, 2006, Mr. Heitz and Mr. Lefler met with Mr. Ruehle and interviewed him regarding Broadcom's stock option granting practices. (Tr. vol. 2, 9:15-20, Feb. 23, 2009.) The Irell lawyers did not tell Mr. Ruehle that they were not his lawyers. (*Id.* 15:5-10.) The Irell lawyers did not suggest that Mr. Ruehle might want to consult with his own lawyer before speaking with them. (*Id.* 17:21-23.) After their meeting, Mr.

Heitz had subsequent conversations with Mr. Ruehle in June 2006 about Broadcom's stock option granting practices and never disclosed to Mr. Ruehle in any of these conversations that his statements to him would be disclosed to third parties. (*Id.* 33:7-25.)

On June 13, 2006, the SEC commenced its investigation of the stock option granting practices at Broadcom. Throughout June and July 2006, Mr. Ruehle continued to receive legal advice from Irell. (Exs. L-O.) On June 13, 2006, Mr. Ruehle sent an email to Mr. Siegel, on which he copied Mr. Dull, seeking legal advice regarding the SEC's investigation. (Ex. L.) On the same day, Mr. Lefler sent an email to Mr. Ruehle asking him to consent to Irell's acceptance of process on his behalf in the Jin Action. (Ex. M.) On June 28, 2006, Mr. Ruehle received an email from Mr. Siegel, on which Mr. Heitz was copied, that offered detailed strategic advice regarding the SEC investigation. (Ex. N.) Finally, on July 25, 2006, Mr. Dull forwarded an email to Broadcom's board of directors from Mr. Lefler that detailed Irell's strategy for the Derivative Action and the Jin Action. (Ex. O.) Mr. Lefler's memorandum assessed the merits of the actions, considered the strengths and weaknesses of the judge assigned to the case, and outlined the specific litigation tactics Irell planned to employ in these actions. (*Id.*)

In August of 2006, at Broadcom's direction, Irell disclosed the substance of Mr. Ruehle's interviews with Mr. Heitz and Mr. Lefler to Broadcom's outside auditors, Ernst & Young. (Tr. vol. 2, 38:18-23, Feb. 23, 2009.) Thereafter, again at Broadcom's direction, Irell disclosed the same information to the SEC and the United States Attorney's Office in connection with their investigations of stock option granting practices at Broadcom. (*Id.* 40:9-19.) The Government's interviews of Mr. Heitz and Mr. Lefler regarding their conversations with Mr. Ruehle in June 2006 were summarized

in FBI Form FD-302 memoranda. (Exs. Q, R.) Ruehle did not consent to any of these disclosures. (Tr. vol. 2, 40:9-19, Feb. 23, 2009.)

Mr. Ruehle first learned that the Government intended to use his statements to Irell against him when the FBI Form FD-302 memoranda were produced to him in December 2008 in connection with the Government's criminal case. Mr. Ruehle promptly objected and asserted that his conversations with Irell were privileged communications. Mr. Ruehle previously litigated the issue in the Derivative Action before a Special Master, who found Mr. Ruehle's communications were, in fact, privileged.[4] Nonetheless, the Government contended that Mr. Ruehle's assertion of the privilege was not well taken and filed an *ex parte* application for an evidentiary hearing in this Court to determine the applicability of the privilege. The Court held an evidentiary hearing on February 23, 24, and 25, 2009 to determine whether Mr. Ruehle's statements to the Irell lawyers were subject to the attorney-client privilege.

## ANALYSIS

### A. Mr. Ruehle's Statements to the Irell Lawyers are Privileged Attorney-Client Communications

The attorney-client privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States*, 425 U.S. 391, 403 (1976). To sustain a claim of privilege, the party seeking to assert the privilege must first establish the existence of an attorney-client relationship. *Id.* Determining whether an attorney-client relationship exists depends on the reasonable expectations of the client. *Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 652 (N.D. Cal. 1993).

---

[4] The Special Master's order has not yet been reviewed by a district judge and the Derivative Action has been stayed pending resolution of the criminal charges against Mr. Ruehle.

The existence of an attorney-client relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *United States v. Evans*, 113 F.3d 1457, 1465 (7th Cir. 1997). To determine the reasonable expectations of a client, courts look to "circumstantial evidence, taking into account all kinds of indirect evidence and contextual considerations that appear relevant to determining whether it would have been reasonable for the person to have inferred that she was the client of the lawyer." *Sky Valley*, 150 F.R.D. at 652. Second, the party seeking to assert the privilege must demonstrate that the communication was made in order to obtain legal advice. When a lawyer consults with a client for purposes of "fact-finding" in order to provide legal advice, the discussion between the lawyer and client qualifies as one undertaken for the purpose of seeking legal advice. *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996). "Although some commentators . . . continue to distinguish between fact-finding and lawyering, federal judges cannot." *Id.* at 1296. As the Supreme Court of the United States observed, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn Co. v. United States*, 449 U.S. 383, 390-91 (1981) (internal citations omitted). Finally, in order for the privilege to apply, the communication must be intended to remain confidential. CAL. EVID. CODE § 952. Under California law, communications made in the course of an attorney-client relationship are presumed confidential. CAL. EVID. CODE § 917(a).

There is no serious question in this case that when Mr. Ruehle met with the Irell lawyers on June 1, 2006, Mr. Ruehle reasonably believed that an attorney-client relationship existed, he was communicating with his attorneys in the context of this relationship for the purpose of obtaining legal advice, and that any information he

provided to Irell would remain confidential. Mr. Ruehle testified that he understood Irell would be representing him in both the Jin Action and the Derivative Action. (Tr. 65:1-10 Feb. 25, 2009.) Prior to his initial meeting with the Irell lawyers, Mr. Ruehle received an email from Broadcom's General Counsel, Mr. Dull, on which an Irell litigation partner was copied, confirming that Irell would be representing him personally in both litigations. (Ex. G.) In the days leading up to their June 1, 2006 interview, the Irell lawyers frequently updated Mr. Ruehle on the progress of their investigation of the stock option practices at Broadcom. (Exs. F, I, K.) But more than mere progress reports, Mr. Heitz discussed his strategy for defending the corporation and its directors and summarized the fact-finding that would be necessary to support that strategy. (Exs. F, I, J.) In these emails, which were sent to Mr. Ruehle individually as opposed to the entire board of directors, Mr. Heitz asked Mr. Ruehle to review and obtain specific information and advised him how this information would be relevant to preparing a defense. (*Id.*) The evidence establishes that Mr. Ruehle had a reasonable belief that an attorney-client relationship existed prior to his initial interview with the Irell lawyers on June 1, 2006.

Second, Mr. Ruehle testified that he believed that the interviews were being conducted to gather information in preparation for the litigations and for the purpose of obtaining legal advice. (Tr. 71:4-8, Feb. 25, 2009.) Mr. Ruehle was first asked by the Irell lawyers to schedule a meeting with them in an email that he received 4 minutes after he received an email from Mr. Dull informing Mr. Ruehle that Irell would be representing him personally in the pending litigations. (Exs. F, G.) Mr. Heitz and Mr. Lefler requested a time to discuss Broadcom's stock option granting practices, the exact same subject matter of the two pending civil lawsuits in which Irell represented Mr. Ruehle individually. (Tr. vol. 2, 9:15-20, Feb. 23, 2009.) Mr. Ruehle was never advised that he should have another lawyer present at the meeting to represent his interests. (*Id.* 15:5-10, 17:21-23.) Based on these communications, Mr. Ruehle reasonably understood the Irell lawyers to be gathering facts and information for his defense against the claims

asserted against him as well as for the company's own internal investigation.[5] (Tr. 79:20-24, Feb. 25, 2009.)

Finally, Mr. Ruehle intended his statements to be confidential, and he had no reason to suspect that his conversations with the Irell lawyers would be disclosed to third parties. (*Id.* 76:19-21.) Mr. Ruehle testified that had he understood that the Irell lawyers might disclose his statements to third parties, "at a minimum [he] would have stopped and asked some very serious questions at that time." (*Id.* 78:12-13.) Mr. Ruehle was an experienced corporate officer and had substantial prior experience with civil litigation. He knew he was being personally investigated regarding Broadcom's stock option granting practices, and he would never have agreed to provide information that Irell could then turnover to the Government should it commence a criminal investigation of him.[6]

The Government nevertheless suggests that because the Irell lawyers supposedly gave Mr. Ruehle an *Upjohn* warning, his statements to the Irell lawyers are not privileged communications. A so-called *Upjohn* warning or "Corporate Miranda" is ordinarily given to inform a "constituent member or an organization that the attorney represents the organization and *not* the constituent member." (Decl. of Prof. Adam Winkler ("Winkler Decl.") ¶ 20.) The warning is intended to make clear to the individual being interviewed that the corporation, and not the individual employee, is the client and therefore "controls the privilege and the confidentiality of the communication." (Ex. 33.) An *Upjohn* warning apprises a corporate employee that no attorney-client relationship exists, and any

---

[5] Although the Government disputes when Mr. Ruehle may have first reasonably believed Irell represented him in the Derivative Action and the Jin Action, there is no dispute that at some point in June 2006 Irell began representing Mr. Ruehle in an individual capacity on these matters and that Irell appeared as counsel of record for him until September 2006. (Tr. vol. 2, 26:15-27:25, Feb. 23, 2009.)

[6] The Government argues that Mr. Ruehle knew that Irell would make some disclosure to Ernst & Young in connection with its investigation, and therefore Mr. Ruehle knew that his statements were not confidential. This argument is unpersuasive. Mr. Ruehle never understood that Irell might disclose statements adverse to Mr. Ruehle's interests to the Government for use in a criminal case against him.

communication between the lawyer and the individual may be disclosed to third parties at the corporation's discretion. (Winkler Decl. ¶ 24.) In this case, the Government's reliance on the alleged *Upjohn* warning is misplaced.

As an initial matter, the Court has serious doubts whether any *Upjohn* warning was given to Mr. Ruehle. Mr. Ruehle did not remember being given any warning, no warning is referenced in Mr. Lefler's notes[7] from the meeting, and no written record of the warning even exists. (Tr. 76:6-11, Feb. 25, 2009; Tr. vol. 2, 20:12-14, Feb. 23, 2009.) But even if an *Upjohn* warning were provided to Mr. Ruehle, the substance of the warning Mr. Heitz testified he gave is woefully inadequate under the circumstances. Mr. Heitz testified that he advised Mr. Ruehle on June 1, 2006 that he and Mr. Lefler were interviewing him on behalf of Broadcom in connection with their investigation of Broadcom's stock option granting practices. (Tr. vol. 2, 15:5-10, Feb. 23, 2009.) Mr. Heitz further testified that he never told Mr. Ruehle that he and Mr. Lefler were not Mr. Ruehle's lawyers or that Mr. Ruehle should consult with another lawyer. (*Id.* 15:5-10, 17:21-23.) Most importantly, neither Mr. Heitz nor Mr. Lefler ever told Mr. Ruehle that any statements he made to them could be shared with third parties, including the Government in a criminal investigation of him. As Mr. Ruehle testified, had he comprehended the substance of the admonition that Mr. Heitz testified he gave, Mr. Ruehle would never have agreed to the interview and would have sought the advice of another lawyer before providing any information. (Tr. 76:6-11, 78:4-13, Feb. 25, 2009.)

Perhaps most critically, however, whether an *Upjohn* warning was or was not given is irrelevant in light of the undisputed attorney-client relationship between Irell and Mr. Ruehle. An *Upjohn* warning is given to a non-client to advise the employee that he is not communicating with his personal lawyer, no attorney-client relationship exists, and

---

[7] Mr. Heitz did not take notes at the June 1, 2006 meeting. (Tr. vol. 2, 20:1-3, Feb. 23, 2009.)

-11-

any communication may be revealed to third parties if disclosure is in the best interest of the corporation. (Winkler Decl. ¶ 24.) Here, Mr. Ruehle was represented by Irell in litigations related to the identical subject matter as Irell's internal investigation on behalf of Broadcom. An oral warning, as opposed to a written waiver of the clear conflict presented by Irell's representation of both Broadcom and Mr. Ruehle, is simply not sufficient to suspend or dissolve an existing attorney-client relationship and to waive the privilege. (Winkler Decl. ¶¶ 19, 32.) An oral warning to a current client that no attorney-client relationship exists is nonsensical at best—and unethical at worst.

### B. Irell Breached Its Duty of Loyalty to Mr. Ruehle

The most fundamental aspect of the attorney-client relationship is the duty of undivided loyalty owed by a lawyer to his client, and ultimately all of the ethical rules are derived from this fundamental principle. *See Flatt v. Superior Court*, 9 Cal. 4th 275 (Cal. 1994). The duty of loyalty requires a lawyer "to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client." *Anderson v. Eaton*, 211 Cal. 113, 116 (Cal. 1930). Thus, a lawyer may not assume "any relation which would prevent him from devoting his entire energies to his client's interests." *Id.* "So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can an attorney evade it." *Flatt*, 9 Cal. 4th at 288. Simply put, a lawyer cannot, consistent with the duty of loyalty, "jettison[] one client in favor of another." *In re Grand Jury Subpoena*, 415 F.3d 333, 340 (4th Cir. 2005). All clients are equal under the Rules of Professional Conduct, and no lawyer can sacrifice the interests of one client for those of another.

In this case, Irell committed at least three clear violations of its duty of loyalty to Mr. Ruehle. First, Irell failed to obtain Mr. Ruehle's informed written consent to Irell's simultaneous representation of Mr. Ruehle individually in the Jin Action and Derivative

Action, on the one hand, and Broadcom in its internal investigation, on the other hand. Under the Rules of Professional Conduct, a lawyer may not simultaneously represent two clients whose interests actually or potentially conflict without each client's informed written consent. Rule 3-310(C) provides:

> A member shall not, without the informed written consent of each client:
>> (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or
>>
>> (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or
>>
>> (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

CAL. RULES OF PROF'L CONDUCT R. 3-310(C). The Rule also specifies:

> For purposes of this rule:
>> (1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;
>>
>> (2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure.

CAL. RULES OF PROF'L CONDUCT R. 3-310(A). To obtain informed written consent, the client must make his decision "on the basis of adequate knowledge of the facts and an awareness of the consequences of the decision." *Sharp v. Next Entm't, Inc.*, 163 Cal. App. 4th 410, 430 (Cal. Ct. App. 2008). "Once the client has been provided with sufficient information about the situation, the client can make a rational choice, based upon full disclosures as to the risks of the representations, the potential conflicts involved, and the alternatives available as required by the particular circumstances." *Id.*

The disclosure and consent must be in writing so that the client understands the seriousness of the decision and to avoid disputes or ambiguities. *Id.*

By the spring of 2006, Broadcom was acutely aware of the possibility that it might be investigated or sued on the basis of its stock option granting practices. (Tr. 8:10-13, Feb. 25, 2009.) At the time Irell accepted representation of Broadcom and Mr. Ruehle in May 2006, Irell knew or should have known that Broadcom's interests and Mr. Ruehle's interests conflicted and were adverse to each other. If there were any wrongdoing committed in connection with Broadcom's stock option practices, Broadcom might contend that Mr. Ruehle was responsible for it and that he acted without the knowledge and approval of the company. In these circumstances, Irell had a clear duty to disclose to Mr. Ruehle the potential conflict of interest created by the dual representation and obtain Mr. Ruehle's informed written consent to that conflict. Irell readily admits, however, that it did not apprise Mr. Ruehle of that conflict nor did it obtain his written waiver of the conflict.[8] (Tr. vol. 2, 36:5-11, Feb. 23, 2009.)

Second, Irell breached its duty of loyalty to Mr. Ruehle, a current client, by interrogating him for the benefit of another client, Broadcom. The duty of loyalty requires every lawyer "to protect each of his or her clients in every possible way." *Gilbert v. Nat. Corp. for Hous. P'ships*, 71 Cal. App. 4th 1240, 1253 (Cal. Ct. App. 1999). Thus, "[i]t is a clear violation of that duty for the attorney to assume a position

---

[8] Even if Mr. Heitz did give Mr. Ruehle an *Upjohn* warning, such a warning would not suffice to waive the conflict of interest created by the dual representation. The oral warning Irell claims to have given Mr. Ruehle was not sufficient to apprise him of the potential consequences of the dual representation. Mr. Heitz testified that he merely advised Mr. Ruehle that he and Mr. Lefler were interviewing him on behalf of Broadcom in connection with their investigation of Broadcom's stock option granting practices. (Tr. vol. 2 15:5-10, Feb. 23, 2009.) He did not disclose the specific risks of and alternatives to Irell's representation of both the company and Mr. Ruehle. (*Id.*) Indeed, Mr. Ruehle testified that he did not understand that as a result of the dual representation he might not be able to assert the attorney-client privilege over statements he made to the Irell lawyers. (Tr. 76:6-11, 78:4-13, Feb. 25, 2009.)

adverse or antagonistic to the client without the latter's free and intelligent consent, given with full knowledge of all the facts and circumstances." *Id.*

In *Gilbert v. National Corp. for Housing Partnerships*, a lawyer represented an employee, Franklin, in an action against his employer regarding alleged discrimination and harassment. *Id.* at 1244. After arbitration, the parties entered into a settlement agreement, which required the parties to keep the terms of the settlement agreement confidential. *Id.* at 1245. After the settlement agreement was executed, a second employee contacted the lawyer, seeking representation in a separate action involving similar allegations of discrimination against the same employer. *Id.* The lawyer accepted representation on behalf of that employee as well. *Id.* Before trial on the second employee's claims, the lawyer indicated that he would call Franklin "to testify about complaints he had heard" and his own "observations of alleged racial discrimination." *Id.* at 1246. The lawyer never obtained informed written consent to the conflict posed by the lawyer's continuing representation of both Franklin and the second employee. *Id.* at 1255. The employer filed a motion to disqualify the lawyer, which the trial court granted. *Id.* at 1247. The California Court of Appeal affirmed, holding that the dual representation posed "tremendous risks" to both Franklin and the second employee. *Id.* at 1252. The court went on to discuss the nature of the conflict:

> As an advocate for [the second employee], counsel's duty was to utilize the available witnesses to attempt to support [the second employee's] claims against [the employer]. As an advocate for Franklin and the other maintenance supervisors, on the other hand, counsel's duty was to assist in avoiding potential liability for breaching the Settlement Agreement he himself had negotiated on their behalf. [The second employee] wanted her attorney's other clients to testify in her own case, even though they risked violating the Settlement Agreement and compromising their own interests by doing so.

*Id.* at 1254. By attempting to mine information from one client to that client's possible detriment in order to help another client, the court concluded that the lawyer "violated his duty of loyalty." *Id.* Furthermore, because "[t]he paramount concern . . . must be the preservation of public trust in the scrupulous administration of justice and the integrity of the bar," disqualification of the lawyer was an appropriate remedy for the ethical violation. *Id.* at 1255.

The Fourth Circuit addressed a similar ethical issue in *In re Grand Jury Supboena*. In that case, a law firm undertook an investigation on behalf of a corporation, but did not represent the officers. *In re Grand Jury Subpoena*, 415 F.3d at 335. Before interviewing the corporation's officers, however, the lawyers told the corporate officers that the firm did not represent the officers currently, but assured the corporate officers that the firm could represent them individually. *Id.* at 336. The Fourth Circuit, seemingly incredulous that such assurances were given, noted that it did not implicitly accept "the watered-down '*Upjohn* warnings' the investigating attorneys" provided to the corporate officers. *Id.* at 340. The Fourth Circuit went on to note that it "would be hard pressed to identify how investigating counsel could robustly investigate and report to management or the board of directors of a publicly-traded corporation with the necessary candor if counsel were constrained by ethical obligations to individual employees." *Id.* The duty of loyalty prohibits a lawyer refrain from "jettison[ing] one client in favor of another." *Id.* [9]

---

[9] It should be noted that the rules regarding conflicts of interest and the duty of confidentiality are also relevant here. Rule 3-310(E) prohibits a lawyer, without a client's informed written consent, from accepting "employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." CAL. RULES OF PROF'L CONDUCT R. 3-310(E). This rule is based on the notion that a lawyer may not use information learned in the course of representing a client to that client's detriment in another action. *See, e.g., Sharp*, 163 Cal. App. 4th at 427-28, *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832, 1839 (Cal. Ct. App. 1995). Again, a lawyer may not sacrifice the interests of a former or existing client by using confidential information obtained in the course of the attorney-client relationship to benefit another client.

Absent informed written consent and waiver of the conflict of interest, Irell should not have interviewed Mr. Ruehle on behalf of Broadcom alone. In effect, Irell was interrogating one client to benefit another client. The Rules of Professional Conduct simply do not allow for such subordination. When Irell interviewed Mr. Ruehle about the stock option granting practices at Broadcom, it should have known that in the course of the interview, Mr. Ruehle might provide incriminating evidence about his role in those practices. Irell should never have permitted Mr. Ruehle, let alone encouraged him, to disclose his role without full knowledge of the consequences. Indeed, had Mr. Ruehle understood that he was communicating with Irell in its capacity solely as Broadcom's lawyer and that what he said to Irell could be disclosed to the Government as part of a criminal investigation of him, he never would have agreed to speak to Irell. (Tr. 76:6-11, 78:4-13, Feb. 25, 2009.) By sacrificing the interests of Mr. Ruehle in favor of those of Broadcom, Irell breached its duty of loyalty to him.

Finally, Irell disclosed Mr. Ruehle's privileged communications to third parties without his consent. An attorney has a duty to "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." CAL. BUS. & PROF. CODE § 6068(e). Only with a client's permission may a lawyer disclose confidential communications. CAL. EVID. CODE § 954; CAL. RULES OF PROF'L CONDUCT R. 3-100. A lawyer's duty to preserve confidences persists beyond the end of the attorney-client relationship. CAL. BUS. & PROF. CODE § 6068(e). Attorneys are bound by the ethical rule against disclosure of client confidences and disclosure of privileged client confidences may result in "State Bar disciplinary proceedings." *Fox Searchlight Pictures, Inc. v. Paladino*, 89 Cal. App. 4th 294, 309 (Cal. Ct. App. 2001).

In August of 2006, Irell disclosed the statements Mr. Ruehle made to Irell to Broadcom's outside auditors, Ernst & Young. (Tr. vol. 2, 38:18-23, Feb. 23, 2009.) Even worse, Irell later disclosed the same information to the Government as part of its criminal

prosecution of him. (*Id.* 40:9-19.) Mr. Ruehle did not consent to any of these disclosures. (*Id.*) Mr. Ruehle had substantial experience in similar litigation, and he spoke with Irell believing that his statements would be kept in confidence. Had Mr. Ruehle suspected that his statements would be turned over to the Government in a criminal proceeding, he never would have made them to Irell. (Tr. 76:6-11, 78:4-13, Feb. 25, 2009.) In any event, Mr. Ruehle never gave Irell permission to jettison his rights for those of Broadcom and disclose the confidential information that he shared with Irell to the Government and other third parties. For Irell to have done so without Mr. Ruehle's consent was wrong and a clear breach of its duty of loyalty to him.

Irell's ethical breaches of the duty of loyalty are very troubling. Mr. Ruehle's confidential and privileged information has been disclosed to numerous third parties, most notably the Government in connection with its criminal prosecution against him. The Government's case against Mr. Ruehle is a serious one, and Mr. Ruehle faces a significant prison sentence if convicted on all counts charged in the indictment. It must be disconcerting to Mr. Ruehle to know that his own lawyers at Irell disclosed his confidential and privileged information to the Government, lawyers whom Mr. Ruehle trusted and believed would never do anything to hurt him. And now the Court has had to intervene and suppress relevant evidence in the Government's case against Mr. Ruehle. The Government's burden is not an easy one, as it has to prove the charges against Mr. Ruehle beyond a reasonable doubt. Suppressing relevant evidence is obviously not helpful to the Government in that regard, but more importantly, it hinders the adversarial process and the jury's search for the truth. Irell should not have put the parties and the Court in this position. The Rules of Professional Conduct are not aspirational. The Court is at a loss to understand why Irell did not comply with them here. Because Irell's ethical misconduct has compromised the rights of Mr. Ruehle, the integrity of the legal profession, and the fair administration of justice, the Court must refer Irell to the State Bar for discipline. Mr. Ruehle, the Government, and the public deserve nothing less.

## CONCLUSION

For the foregoing reasons, all evidence reflecting Mr. Ruehle's statements to Irell regarding the stock option granting practices at Broadcom is suppressed.[10]  Irell is hereby referred to the State Bar for appropriate discipline.

DATED: April 1, 2009

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[10] The Court expects that the Government will return all privileged documents to Mr. Ruehle within 14 days, unless otherwise directed by the Court of Appeals for the Ninth Circuit.

# NOTICE PARTY SERVICE LIST

**Case No.** SACR 08-00139-CJC    **Case Title** U.S.A. v. Henry T. Nicholas, III, et al

**Title of Document** Order Suppressing Privileged Communications

| | |
|---|---|
| | ADR |
| | BAP (Bankruptcy Appellate Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | MDL Panel |
| | Ninth Circuit Court of Appeal |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

**ADD NEW NOTICE PARTY**
(if sending by fax, mailing address must also be provided)

Name: State Bar of California

Firm:

Address *(include suite or floor)*: 1149 South Hill St.

Los Angeles, CA 90015

*E-mail:

*Fax No.:

* For CIVIL cases only

***JUDGE / MAGISTRATE JUDGE (list below):***

**Initials of Deputy Clerk** mu

G-75 (08/08)    NOTICE PARTY SERVICE LIST