1                **UNITED STATES DISTRICT COURT**

2                **CENTRAL DISTRICT OF CALIFORNIA**

3                **SOUTHERN DIVISION AT SANTA ANA**

4          HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

5

6
UNITED STATES OF AMERICA,          )

7                                   )
                PLAINTIFF,          )

8                                   )
          VS.                       ) SACR NO. 08-00139-CJC

9                                   ) VOLUME II
WILLIAM J. RUEHLE,                  )

10                                  )
                DEFENDANT.          )

11  _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                SANTA ANA, CALIFORNIA

16               FRIDAY, OCTOBER 23, 2009

17                    1:00 P.M.

18

19
              **DEBORAH D. PARKER, CSR 10342**

20              **OFFICIAL COURT REPORTER**
            **UNITED STATES DISTRICT COURT**

21              **411 WEST FOURTH STREET**
                    **SUITE 1-053**

22          **SANTA ANA, CALIFORNIA 92701**
                  **(714) 542-8409**

23              **D.PARKER@IX.NETCOM.COM**

24

25

1    APPEARANCES OF COUNSEL:

2

3        FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

4                            GEORGE CARDONA
                             UNITED STATES ATTORNEY
5
                             ROBB C. ADKINS
6                            ASSISTANT UNITED STATES ATTORNEY
                             CHIEF, CRIMINAL DIVISION
7
                             ANDREW D. STOLPER
8                            GREGORY W. STAPLES
                             ASSISTANT UNITED STATES ATTORNEY
9                            UNITED STATES DISTRICT COURT
                             8000 RONALD REAGAN FEDERAL BUILDING
10                           SANTA ANA, CALIFORNIA 92701
                             (714) 338-3500
11

12       FOR THE DEFENDANT, WILLIAM J. RUEHLE:

13                           RICHARD MARMARO
                             MATTHEW DONALD UMHOFER
14                           JACK P. DICANIO
                             SKADDEN ARPS SLATE & MEAGHER, LLP
15                           300 SOUTH GRAND AVENUE
                             LOS ANGELES, CALIFORNIA 90071
16                           (213) 687-5535

17

18

19

20

21

22

23

24

25

1    SANTA ANA, CALIFORNIA; FRIDAY, OCTOBER 23, 2009; 1:00 P.M.

2        *(THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT*

3        *IN THE PRESENCE OF THE JURY:)*

4            THE COURT:  PLEASE BE SEATED.

5            MR. MARMARO, WHEN YOU ARE READY, PLEASE PROCEED,

6    SIR.

7            MR. MARMARO:  THANK YOU, YOUR HONOR.

8            GOOD AFTERNOON, LADIES AND GENTLEMEN.  IN MY

9    EAGERNESS TO GET UP THIS MORNING AND SPEAK WITH YOU, I

10   NEGLECTED TO INTRODUCE TO YOU AN IMPORTANT MAN OF OUR TEAM,

11   AARON SHORR, WHO IS THE GENTLEMAN IN THE CORNER THERE

12   WORKING THE ELECTRONICS.  HE'S THE PERSON WHO'S GOING TO PUT

13   THESE THINGS ON THE SCREEN THROUGHOUT THE TRIAL.  AND I

14   APOLOGIZE TO HIM FOR NOT INTRODUCING HIM.

15           I NOTICE IT IS THE TOUGHEST PART OF THE DAY TO

16   SPEAK AND TO LISTEN RIGHT AFTER LUNCH.  AS I SAID TO YOU

17   YESTERDAY, RIGHT AFTER -- SO I APPRECIATE YOUR ATTENTION AND

18   I CONTINUE TO APPRECIATE IT.

19           WE LEFT OFF ON THE MAY 26, 2000 GRANT, THE SINGLE

20   BIGGEST GRANT IN BROADCOM'S HISTORY TO THAT POINT.  NOW,

21   BROADCOM HAD DECIDED BY MAY OF 2000 THAT IT WAS GOING TO

22   ALLOCATE ABOUT SEVEN MILLION SHARES TO THAT GRANT.  BUT IT

23   DIDN'T DECIDED WHO WAS GOING TO GET THOSE SHARES.  IT DIDN'T

24   HAVE THE INDIVIDUAL ALLOCATIONS MADE.

25           NOW, THE FIRST THING THAT NEEDS TO BE DONE AT THAT

1    POINT WAS TO GET A GRANT, TO GET AN OPTION PRICE.  AND THAT

2    OPTION COMMITTEE WAS DR. NICHOLAS AND DR. SAMUELI.  THESE

3    ARE THE ONLY TWO PEOPLE ON THE STOCK OPTION COMMITTEE,

4    LADIES AND GENTLEMEN.  BILL RUEHLE WAS NOT ON THAT

5    COMMITTEE.  HE HAD NO DECISION-MAKING AUTHORITY WHATSOEVER.

6         THROUGHOUT THE GOVERNMENT'S OPENING, YOU KNOW, WE

7    HEARD A LOT ABOUT CO-CONSPIRATORS, AND WHEN BILL RUEHLE

8    DIDN'T DO SOMETHING HIMSELF, HE WAS ALWAYS LUMPED IN WHEN

9    SOMEONE ELSE DID IT BY THE STATEMENT, *WELL, HE'S A*

10   *CO-CONSPIRATOR.*

11        LET ME MAKE ONE THING VERY CLEAR TO YOU.

12   BILL RUEHLE HAD NO OPTION GRANTING AUTHORITY IN THIS CASE.

13   NONE.  THE BOARD OF DIRECTORS OF BROADCOM DELEGATED THE DUTY

14   AND OPPORTUNITY TO GRANT OPTIONS TO TWO PEOPLE, THE

15   COFOUNDERS OF THE COMPANY.

16        BILL RUEHLE'S ONLY ROLE IN RECOMMENDING TO THEM

17   WAS TO RECOMMEND HOW MANY SHARES THE COMPANY COULD AFFORD,

18   BECAUSE BILL RUEHLE WAS THE KEEPER OF THE DILUTION.

19        "DILUTION" IS A CONCEPT YOU'LL HEAR ABOUT DURING

20   THE TRIAL.  LET ME SPEND ONE MINUTE ON IT NOW.  THE MORE

21   SHARES A COMPANY GRANTS, THE MORE DILUTED THE OTHER

22   SHAREHOLDERS' INTEREST IS IN THE COMPANY.  THAT'S CALLED

23   DILUTION.  BILL RUEHLE WAS THE PROTECTOR OF THAT NUMBER.  HE

24   WANTED TO MAKE SURE THAT THE SHAREHOLDERS OF BROADCOM DID

25   NOT HAVE THEIR SHARES UNDULY DILUTED.

1        NOW, THERE'S ALWAYS SOME DILUTION WHEN YOU GIVE A

2   GRANT.  HE WANTED TO MAKE SURE IT WASN'T TOO MUCH DILUTION.

3   AND THAT WAS HIS RESPONSIBILITY TO ADVISE THE MEMBERS OF THE

4   STOCK OPTION COMMITTEE.

5        SO GRANT DECISION COMES AND IT HAPPENS ON MAY 26,

6   2000.  NOW, THE PROSECUTOR SPENT A LOT OF TIME TALKING ABOUT

7   THIS IS A CASE ABOUT BACKDATING.  WELL, FIRST OF ALL,

8   BACKDATING IS NOT ILLEGAL.  BACKDATING IS NOT ILLEGAL.  THE

9   POINT OF THIS GRANT AND THE POINT THAT I WANT YOU TO KEEP IN

10  MIND IS THAT THIS GRANT WAS MADE CONTEMPORANEOUSLY.  AND I'M

11  GOING SHOW YOU THE EVIDENCE OF THAT.

12       CAN WE GO TO THE NEXT SLIDE PLEASE, AARON.

13       *NOW* -- AND IT'S A GRAPH THAT REALLY SHOWS THE

14  DANGER IN JUMPING TO CONCLUSIONS.  IF I ASKED YOU -- THAT'S

15  THE GRANT DATE, MAY 26.  I SAID TO YOU AT THIS POINT, IF I

16  SAID, *DO YOU THINK THE MAY 26 GRANT WAS BACKDATED*? -- AND

17  AGAIN, BACKDATING IS NOT ILLEGAL -- BUT IF I ASKED THAT

18  QUESTION, MOST PEOPLE WOULD SAY, *BOY, EITHER THAT, OR THEY*

19  *WERE VERY LUCKY,* BECAUSE THAT'S WHAT IT LOOKS LIKE.  WE'RE

20  GOING TO SHOW YOU EVIDENCE THAT THIS DATE WAS ACTUALLY

21  PICKED BY THE OPTION COMMITTEE CONTEMPORANEOUSLY.

22       AARON, COULD WE GO TO THE NEXT CHART, PLEASE.

23       THIS IS A CALENDAR OF MAY 2000.  AND IT SHOWS THE

24  OPTION COMMITTEE DECISION WAS MADE ON MAY 26, 2000, AND THE

25  DATE OF THIS E-MAIL -- IT'S TOO SMALL TO READ, BUT WE HAVE

1    CAPTURED THE HIGHLIGHT -- IS MAY 30TH.

2            NOW MAY 30 HAPPENS TO BE THE FIRST BUSINESS DAY

3    AFTER MAY 26.  SO IT'S THE FIRST TIME THAT THE GRANT COULD

4    HAVE REALLY BEEN ANNOUNCED OTHER THAN A WEEKEND WHERE ONLY

5    THE ENGINEERS WERE WORKING.  SO ON MAY 30TH, THE GRANT DAY

6    IS ANNOUNCED.  IF YOU LOOK AT THE STOCK CHART, IT SURE LOOKS

7    LIKE BACKDATING, DOESN'T IT?

8            BUT IN FACT THERE IS THE EVIDENCE THAT THESE

9    GENTLEMEN MADE THEIR OPTIONS-GRANTING DECISION ON MAY 26.

10   AND IT WASN'T BILL RUEHLE WHO APPROVED THE GRANTS ON MAY 26,

11   IT WAS THE OPTION COMMITTEE BECAUSE IT WAS DR. SAMUELI AND

12   NICHOLAS' RESPONSIBILITY AND THEIRS ALONE.

13           NOW BACK TO THE CHART.  THANK YOU.

14           SO WHAT HAPPENS AFTER THIS?  REMEMBER I TOLD YOU

15   THAT THEY DIDN'T HAVE ALL THE ALLOCATIONS MADE.  THEY KNEW

16   THE GRANT PRICE, BUT THEY DIDN'T KNOW WHO EXACTLY WAS GOING

17   TO GET THE GRANTS.  BUT WHAT HAPPENED WAS THESE EMPLOYEES

18   WERE SUFFERING.  I SHOWED YOU A COUPLE OF E-MAILS BEFORE THE

19   BREAK.  AND SO WORD GOT OUT OF THIS VERY GOOD GRANT PRICE.

20           "118."  AND THAT'S HOW YOU WILL SEE FROM THE

21   EVIDENCE PEOPLE REFERRED TO OPTIONS.  NOT BY THE DAY, NOT BY

22   MAY 25TH.  BUT BY THE 118S.  WHY IS THAT?  BECAUSE THAT'S

23   THE RELEVANT THING.  WHAT'S THE PRICE?  WORD OF THESE 118S

24   SPREAD LIKE WILDFIRE WITHIN BROADCOM.  YOU COULD IMAGINE.

25           THINK ABOUT IT THIS WAY.  YOU'RE AN ENGINEER.

1   YOU'RE BEING ASKED TO WORK DAY AND NIGHT TO DESIGN THE NEXT

2   GREAT CHIP.  YOUR OPTIONS ARE SERIOUSLY UNDER WATER.  YOU'VE

3   GOT VERY LITTLE INCENTIVE TO DO ANYTHING BUT LEAVE THE

4   COMPANY AND GO TO ONE OF THE COMPETITORS.  BUT NOW YOU HEAR

5   THERE'S A BIG GRANT COMING, AND IT'S AT THE 118S.  THAT'S

6   GOOD NEWS.

7          SO ANOTHER POINT I WANT TO TELL YOU ABOUT, THE

8   OPTION PROCESS AT BROADCOM, WAS THAT BROADCOM'S A COMPANY

9   MADE UP MOSTLY OF ENGINEERS.  SEVENTY PERCENT OF THE

10  EMPLOYEES AT BROADCOM WERE ENGINEERS.  VERY FEW OF THE

11  EMPLOYEES WERE ADMINISTRATIVE TYPES.  AND DR. NICHOLAS

12  PARTICULARLY LOOKED DOWN ON THE ADMINISTRATIVE PROCESS, AND

13  THAT'S NOT TO CRITICIZE HIM.  THAT'S HOW HE WAS.  HE WAS AN

14  ENGINEER AND A BUSINESSMAN BY TRAINING.

15          I WANT TO SHOW YOU AN E-MAIL WHICH GIVES YOU A

16  LITTLE BIT OF A WINDOW INTO DR. NICHOLAS' MIND.

17          THIS IS AN E-MAIL FROM NANCY TULLOS TO MARTY

18  COLOMBATTO.  NOW, THIS IS A LITTLE BIT LATER, BUT IT

19  DESCRIBES WHAT'S IN DR. NICHOLAS' MIND.  IT SAYS, *LAST TIME*

20  *I ASKED NICK* -- AND THAT'S WHAT THEY CALLED HIM -- *ABOUT*

21  *SETTING UP AN ANNUAL PROCESS* -- THEY'RE TALKING ABOUT AN

22  ANNUAL PROCESS TO GRANT OPTIONS -- *HE DIDN'T WANT TO BECAUSE*

23  *HE DOESN'T WANT MANAGERS FOCUSING ON SALARY REVIEWS INSTEAD*

24  *OF DESIGNING CHIPS.*  THAT WAS HIS ATTITUDE.

25          HE WANTED HIS ENGINEERS SPENDING THEIR TIME UNDER

1    THEIR MICROSCOPE DESIGNING CHIPS AND NOT SPENDING TIME ON

2    SALARY REVIEWS.  BUT THIS HAD TO GET DONE.  SO WHAT

3    HAPPENED?  AND THIS LEADS TO TRUTH NUMBER 4 IN WHAT I HAVE

4    TALKED TO YOU ABOUT THIS MORNING, AND THAT IS THAT THE

5    OPTION-GRANTING PROCESS WAS FULL OF DELAYS AND

6    FRUSTRATION --

7            AND CAN WE PUT THAT GRAPH UP ON THE SCREEN,

8    PLEASE.  LET'S PULL IT ALL OUT AND THEN WE'LL TALK ABOUT IT.

9            THERE ARE THREE COMPONENTS OF THE OPTION GRANTING

10   PROCESS, AND YOU'RE GOING TO HEAR WITNESS AFTER WITNESS TALK

11   ABOUT IT.  THERE'S HUMAN RESOURCES, NANCY TULLOS AND HER

12   GROUP.  THEY GATHERED THE GRANT LISTS.  THEY FIGURED OUT

13   WITH THE BUSINESS UNIT MANAGERS, WHO SHOULD GET HOW MANY

14   OPTIONS.

15           HUMAN SERVICES WAS CAROL PRADO.  SHE HAD TO PUT

16   THOSE LISTS IN A NICE, NEAT FORMAT.  SHE HAD TO ENTER IT

17   INTO THE BROADCOM COMPUTER AND ULTIMATELY SHE HAD TO PREPARE

18   THE OPTIONS AGREEMENT.

19           AND THEN, THERE'S ACCOUNTING, LED BY GAIL PATTON.

20   THAT WAS BILL'S ORGANIZATION, BUT GAIL WAS PRIMARILY

21   RESPONSIBLE.

22           NOW, IN THE MAY 26 GRANT, THE PROCESS WAS VERY

23   SLOW.  THEY ONLY HAD A GRANT DATE, BUT HUMAN RESOURCES

24   COULDN'T GET THE GRANT LISTS FROM ALL OVER THE WORLD.  SO --

25   AND THEY COULDN'T GET DR. NICHOLAS TO GET HIS GRANT LIST IN.

1    SO -- AND THE REASON FOR THAT IS SOMETHING YOU ARE GOING TO

2    HEAR TIME AND AGAIN FROM THE WITNESSES.  DEADLINES WERE A

3    PROBLEM FOR DR. NICHOLAS.  HE DIDN'T THINK LIKE THAT.  IT

4    WASN'T HIS MAKEUP.

5              COULD WE GO TO THE DR. NICHOLAS SCREEN?

6              I JUST WANT TO TALK A LITTLE BIT ABOUT

7    DR. NICHOLAS.  I'M NOT GOING TO CALL HIM A CO-CONSPIRATOR.

8    I'M JUST GOING TO CALL HIM THE COFOUNDER OF THE COMPANY.

9              HE WAS BRILLIANT.  HE WAS A VISIONARY.  AND JUST

10   TO GIVE YOU AN EXAMPLE OF HOW SIGNIFICANT WHAT HE

11   ACCOMPLISHED WAS, HE STARTED THIS COMPANY FROM SCRATCH IN

12   1991.  BY THE YEAR 2000, BROADCOM HAD $1 BILLION IN REVENUE.

13   $1 BILLION.  THEY GOT A PLAQUE FROM MORGAN STANLEY, ONE OF

14   THE INVESTMENT BANKING FIRMS, AND THE PLAQUE COMMEMORATED

15   THE COMPANY, THE FASTEST COMPANY TO 1 BILLION IN REVENUE

16   FROM A MICROPROCESSOR OR COMPUTER CHIP COMPANY.  AND THAT

17   INCLUDES INTEL.

18             THINK ABOUT THAT ACCOMPLISHMENT, FROM A SPARE

19   BEDROOM TO $1 BILLION IN REVENUE IN NINE YEARS.  HE WAS AN

20   INCREDIBLE VISIONARY.

21             BUT SOME OF THE THINGS THAT MADE HIM A GENIUS ALSO

22   MADE HIM VERY DIFFICULT TO WORK WITH.  AND I'M GOING TO TIE

23   THIS INTO WHAT HAPPENED IN THIS CASE IN A MOMENT, BUT I HAVE

24   TO TALK TO YOU A LITTLE BIT ABOUT DR. NICHOLAS.  HE WAS

25   INTENSE.  HE WAS ERRATIC.  HE WAS INTIMIDATING.  HE WAS

1    DEMANDING.  WE PROBABLY ALL KNOW BOSSES LIKE THAT.  AND HE

2    WAS VERY DIFFICULT TO GET TIMELY DECISIONS FROM.  NOT JUST

3    ABOUT STOCK OPTIONS, ABOUT ANYTHING.

4              IN FACT, I'M GOING TO GIVE YOU A GLIMPSE INTO AN

5    E-MAIL FROM NANCY TULLOS TO A NUMBER OF PEOPLE, OR ACTUALLY

6    TO JENNIFER WATKINS, REGARDING HENRY NICHOLAS.  IT REALLY

7    SPEAKS VOLUMES: *BILL SPOKE TO NICK THIS MORNING WHO*

8    *PROMISES TO E-MAIL HIS LIST TODAY.  HOPE SPRINGS ETERNAL.*

9              THIS IS DATED JANUARY 21, 2002.  THE LIST THAT

10   NANCY IS TALKING ABOUT IS DR. NICHOLAS' LIST FOR THE

11   OCTOBER 1ST GRANT.  THINK ABOUT THAT.  HE'S THREE MONTHS

12   LATE ON THE LIST.

13             NOW, THE GOVERNMENT CALLS THESE KINDS OF E-MAILS

14   "TOOLS OF A CONSPIRACY."  THAT'S GOING TO ULTIMATELY BE FOR

15   YOU TO DECIDE.  BUT I WOULD SUBMIT TO YOU THAT YOU ARE GOING

16   TO SEE E-MAIL AFTER E-MAIL OF A STOCK OPTION PROCESS WHICH

17   WAS BROKEN WHICH WAS ADMINISTRATIVELY CHALLENGED BUT WHICH

18   WAS NOT CRIMINAL.

19             NOW, CAN WE GO TO EXHIBIT 82, PLEASE.

20             THIS IS ANOTHER WINDOW INTO DR. NICHOLAS' STATE OF

21   MIND.  THIS IS FROM NANCY TULLOS, AGAIN, TO A BUSINESS UNIT

22   MANAGER, ONE OF THE SENIOR EXECUTIVES OF THE COMPANY:

23   *YOU'RE RIGHT.  THERE ARE SIMILARITIES BETWEEN NICK AND*

24   *DAVID* -- DAVID IS DAVID DULL.  THE GOVERNMENT CALLS HIM A

25   CONSPIRATOR.  HE'S THE GENERAL COUNSEL OF THE COMPANY -- *BUT*

1  *NICK AVOIDS MAKING ANY DECISION AT ALL UNTIL HE ANALYZES*

2  *EVERY DETAIL.*  AND THAT WAS DR. NICHOLAS.

3          NOW, IF WE COULD GO TO THE BOTTOM OF THAT CHART.

4          WHAT IS THE SIGNIFICANCE OF ALL THIS?  WHY AM I

5  TELLING YOU ABOUT NICK AND ABOUT HIS DIFFICULTY IN RELEASING

6  DECISIONS?  SO I'M GOING TO SHOW YOU THE EFFECT THAT IT HAD

7  ON A STOCK OPTION PROCESS AND WHAT BILL RUEHLE DID TO HELP

8  THAT OUT.

9          SO WE TALKED ABOUT BILL'S BEING INVOLVED IN

10  HELPING TO DETERMINE THE NUMBER OF SHARES AVAILABLE.  THEN

11  WE HAVE HUMAN RESOURCES DEALING WITH THE BUSINESS UNIT

12  MANAGERS TO FIGURE OUT WHO GETS THE GRANTS.  AND THEN WE

13  HAVE SHAREHOLDER SERVICES DEALING WITH PUTTING TOGETHER THE

14  GRANT LISTS TO PROVIDE TO THE STOCK OPTION COMMITTEE.  AND

15  THEN WE HAVE THE STOCK OPTION COMMITTEE, AND THAT'S

16  DR. NICHOLAS AND DR. SAMUELI.

17          NOW, THERE WAS A BOTTLENECK IN THE PROCESS.  NOT

18  JUST IN ONE GRANT.  BUT IN VIRTUALLY EVERY GRANT YOU'RE

19  GOING TO HEAR ABOUT, THERE WAS A BOTTLENECK AND IT OCCURRED

20  RIGHT THERE.

21          CAN WE CONTINUE TO PULL THAT OUT, AARON?

22          SO DAYS WOULD GO BY.  SOMETIMES WEEKS WOULD GO BY

23  AND NO WORD FROM DR. NICHOLAS.  NOW BILL RUEHLE HAD NO ROLE

24  IN THIS PROCESS NORMALLY.  BUT HE WAS INSERTED INTO THE

25  PROCESS TO BREAK THE LOGJAM.  AND YOU'LL SEE THAT'S THE

1    NOTATION THERE.

2           AND ONCE THAT LOGJAM WAS BROKEN AND THE

3    INFORMATION FROM DR. NICHOLAS WAS OBTAINED, THEN OTHER

4    PEOPLE COULD DO THEIR JOB.  AND THAT'S EXACTLY WHAT HAPPENED

5    HERE, LADIES AND GENTLEMEN.  GRANT, AFTER GRANT, AFTER

6    GRANT.  YOU WILL SEE E-MAIL AFTER E-MAIL FROM SHAREHOLDER

7    SERVICES, *WHEN DID THEY GRANT?  WHEN DID THEY GRANT?*

8           NOW YOU MIGHT SAY -- YOU MIGHT SAY, *WELL, WHY IS*

9    *IT BILL RUEHLE WHO HAS TO COMMUNICATE THIS INFORMATION?  WHY*

10   *NOT THE ADMINISTRATIVE ASSISTANT OR SOMEONE ELSE?*

11          LET ME TELL YOU WHAT THE EVIDENCE IS GOING TO SHOW

12   ABOUT THAT, LADIES AND GENTLEMEN.

13          FIRST OF ALL, BILL RUEHLE WAS CAROL PRADO'S BOSS.

14   CAROL NEEDED THE INFORMATION.  SHE'S AT SHAREHOLDER

15   SERVICES.  SHE NEEDS THAT INFORMATION TO GIVE IT TO

16   ACCOUNTING.  BILL RUEHLE SAT NEXT TO DR. NICHOLAS.  HIS

17   OFFICE WAS LITERALLY NEXT TO HIM.

18          BILL RUEHLE WAS ONE OF THE FEW OLDER EMPLOYEES AT

19   BROADCOM.  BROADCOM WAS A COMPANY THAT WAS INFUSED WITH

20   YOUNG, TALENTED ENGINEERS.  MOSTLY OF A DIFFERENT GENERATION

21   THAN BILL.  AND DR. NICHOLAS COULD BE VERY VOLATILE.  HE

22   COULD SCREAM.  HE COULD YELL.  HE COULD BE ABUSIVE.  BUT

23   THERE WAS ONE PERSON IN THE COMPANY THAT DR. NICHOLAS DIDN'T

24   TALK THAT WAY TO.  THERE WAS ONE PERSON WHOM HE RESPECTED

25   ENOUGH TO TALK TO HIM AS AN EQUAL, AS A HUMAN BEING, AND

1    THAT WAS BILL RUEHLE.

2          BUT THAT'S NO DIFFERENT THAN HOW EVERYONE FELT

3    ABOUT BILL.  PEOPLE RESPECTED BILL.  BUT DR. NICHOLAS DID

4    NOT RAISE HIS VOICE TO BILL.  NEVER FIRED BILL.  YOU'LL HEAR

5    WITNESS AFTER WITNESS TALK ABOUT DR. NICHOLAS FIRING THEM

6    AND THEN BEING REHIRED.  NOT SO WITH BILL.

7          SO CAROL PRADO KNEW THAT BILL RUEHLE COULD GET THE

8    INFORMATION THAT SHE NEEDED TO DO HER JOB.  SO WHAT DID SHE

9    DO?

10          CAN WE GO TO ONE OF THE REMINDER E-MAILS, PLEASE?

11          SHE GAVE REMINDERS.  NOW, THE GOVERNMENT CALLS

12    THESE TOOLS OF A CONSPIRACY NOW.  SOME SORT OF A BAD

13    CRIMINAL THING.  BUT LET'S LOOK AT IT.  SO THIS IS AN E-MAIL

14    THAT IF YOU JUST LOOKED AT IT AS A NORMAL PERSON, IT LOOKS

15    LIKE A COMPANY E-MAIL.  IT'S FROM CAROL PRADO.  IT'S TO

16    BILL.  JENNIFER STALLINGS AND NANCY TULLOS ARE TWO OTHER

17    BROADCOM EMPLOYEES.  JENNIFER WORKED IN SHAREHOLDER

18    SERVICES.  NANCY WAS THE HEAD OF HR, AND SHE IS TELLING BILL

19    WHAT THE OPTION GRANTS PENDING ARE, WHAT SHE NEEDS TO DO HER

20    JOB.

21          NOW, SHE TELLS HIM SOME INFORMATION THAT'S

22    RELEVANT, WHEN THE LAST GRANT WAS.  AND IT'S A REMINDER.

23    IT'S CALLED *I'M REMINDING YOU ABOUT THIS.*  AND THEN SHE

24    GIVES A LIST OF FRIDAY DATES: FMVS.  IT'S A VERY IMPORTANT

25    TERM HERE "FMV," FAIR MARKET VALUES.  AND THAT'S WHAT THESE

1    GRANTS WERE BELIEVED TO BE AT THE TIME.

2           AND WHAT SHE'S SAYING IS, THESE ARE THE FRIDAYS

3    AND THESE ARE THE PRICES.  BECAUSE DR. NICHOLAS DIDN'T THINK

4    ABOUT DATES.  HE THOUGHT ABOUT PRICES BECAUSE PRICES IS WHAT

5    EVERYONE THOUGHT ABOUT AT BROADCOM, NOT DATES.  AND THEN THE

6    END OF THE MONTH IS LISTED ALSO, BECAUSE YOU'LL HEAR ON

7    OCCASION, GRANTS WERE MADE AT THE END OF THE MONTH.

8           NOW, WHY DID CAROL DO THIS?  WHY NOT JUST GIVE --

9    THIS WERE A BACKDATING CASE WHERE THE COMPANY CRIMINALLY WAS

10   REACHING BACK, WHY DON'T YOU JUST GIVE A LIST OF THE LOWEST

11   PRICE FOR THE ENTIRE TIME PERIOD?  WHY NOT GIVE EVERY DAY?

12   WHY GIVE FRIDAY PRICES?

13          AND THAT'S BECAUSE THERE WAS A PROCESS IN PLACE.

14   IT WASN'T THE BEST PROCESS.  IT GOT BETTER.  BUT THERE WAS

15   AN UNDERSTANDING THAT THE STOCK OPTION COMMITTEE MADE THEIR

16   GRANTING DECISIONS ON FRIDAY.  THEY BUMP INTO EACH OTHER IN

17   THE HALL.  THEY TALK ON THE TELEPHONE.  AND YOU'LL SEE THAT

18   IN THE DOCUMENTATION.  THERE WAS AN UNDERSTANDING THAT THAT

19   WAS STOCK OPTION GRANTING DECISION DAY.

20          NOW, CAN WE SEE ONE OTHER REMINDER, BY WAY OF AN

21   EXAMPLE.

22          YOU'RE GOING TO SEE SEVERAL OF THESE.  BUT AGAIN,

23   THEY ALL START WITH THE REMINDER.  AND THEY'RE ALL FROM

24   CAROL TO BILL.  AND WHEN CAROL PRADO TESTIFIES, I SUSPECT,

25   SHE'LL TELL YOU ABOUT HER FRUSTRATION.  HER INABILITY TO GET

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1       THESE GRANT PRICES PREVENTED HER FROM DOING HER JOB.

2       BILL RUEHLE STEPPED IN AND GOT THE PRICE FOR HER BY TALKING

3       TO DR. NICHOLAS.

4               NOW IT DIDN'T ALWAYS HAPPEN RIGHT AWAY.  IN FACT,

5       VERY RARELY DID IT HAPPEN RIGHT AWAY.  BUT WHEN IT HAPPENED,

6       THE BOTTLENECK WAS REMOVED.  SHAREHOLDER SERVICES GOT THEIR

7       INFORMATION, FINANCE GOT THEIR INFORMATION AND THE OPTIONS

8       COULD BE PROCESSED AND THE EMPLOYEES COULD GET THEIR GRANTS.

9               NOW, LET'S NOW GO BACK TO THE MAY 26TH GRANT

10      BECAUSE THIS IS ALL PART OF THE MAY 26 STORY.  I WANT TO

11      TALK ABOUT THE DELAYS IN FINALIZING THE MAY 26 GRANT.

12              NOW, THESE DELAYS, WHAT YOU DO, NOT WITH THE GRANT

13      PRICE BUT WITH THE ALLOCATIONS.  AND I'VE TOLD YOU ALREADY

14      ABOUT DR. NICHOLAS' ATTITUDE TOWARDS PROCESS.

15              SO NOW I WANT TO TURN TO AN E-MAIL THAT GAIL

16      PATTON WROTE IN JUNE OF 2000.  IT'S A VERY IMPORTANT E-MAIL

17      BECAUSE IT GIVES YOU A WINDOW INTO WHAT WAS HAPPENING IN THE

18      PEOPLE'S MINDS AT THE TIME.

19              GAIL PATTON WRITES IT TO FRED WHITTLESEY.  FRED

20      WORKED IN THE HR DEPARTMENT.  HE WAS AN EXPERT ON GRANT

21      STOCK OPTIONS.  GAIL WAS IN THE ACCOUNTING DEPARTMENT:  *HI,*

22      *FRED, WELCOME ABOARD.  I IMAGINE WE WILL BE TALKING SOON*

23      *ABOUT THE FOCAL AND UNDERWATER GRANTS.  I BELIEVE THE GOAL*

24      *WAS TO USE THE MAY GRANT DATE AND PRICE.*

25              RIGHT THEN AND THERE, IT'S JUNE 17TH, 2000.  AND

1  THE CHIEF FINANCIAL REPORTING PERSON IN THE COMPANY IS

2  SAYING, *WE'RE GOING TO USE THE MAY 26 DATE.  THIS MEANS WE*

3  *HAVE TO GET EVERYTHING OUT NOW BY THE END OF JUNE, FIRST*

4  *PART OF JULY BEFORE THE AUDITORS COME IN TO REVIEW THE*

5  *QUARTER END RESULTS.*

6          SO THERE WAS BELIEVED TO BE AT THE TIME SOME TIME

7  THAT THEY COULD FINISH THEIR GRANTS.  AND THE END OF THE

8  QUARTER WAS THE KEY METRIC FOR GAIL PATTON.

9          CAN WE GO TO EXHIBIT 32, PLEASE.

10         AGAIN SHOWING, THE TOTALLY INFORMAL HONEST, OPEN

11 WAY THEY DEALT WITH THIS GRANT, FRED WRITES AN E-MAIL TO

12 NANCY, HIS BOSS, ABOUT STOCK OPTION WORKSHEET, AND HERE ARE

13 THE ACTIVITIES PLAN TO FINALIZE THIS MAY 26 GRANT.  AND IT'S

14 A BUNCH OF STUFF.  THE DETAILS AREN'T IMPORTANT NOW BUT WILL

15 COME OUT IN THE EVIDENCE.  I SHOW THIS TO YOU TO SHOW YOU

16 THAT IT'S ALL PART OF A REGULAR PATTERN.  IT DOESN'T FEEL OR

17 LOOK LIKE A CONSPIRACY.

18         LET'S GO FORWARD, PLEASE.

19         SO WHAT HAPPENS?  JULY 2000, THE MAY 26 GRANT HAS

20 STILL NOT BEEN MADE.  KEEP THAT IN MIND.  BUT WHAT HAPPENS

21 IN JULY?

22         ERNST & YOUNG COMES AROUND FOR THEIR QUARTERLY

23 REVIEW AND THEY GET INVOLVED.  NOW ERNST & YOUNG IS SOME

24 ORGANIZATION THAT YOU DIDN'T HEAR ANYTHING ABOUT IN THE

25 PROSECUTOR'S OPENING, BECAUSE THEY DIDN'T GIVE YOU THE FULL

1    STORY.

2              ERNST & YOUNG IS AN INTEGRAL PART OF THIS STORY,

3    AND I'M GOING TO TELL YOU HOW THEY FIT IN.  THEY ARE ONE OF

4    THE LEADING ACCOUNTING FIRMS IN THE WORLD.  ONE OF THE TOP

5    FOUR OR FIVE.

6              NOW, WHAT HAPPENS IS THAT -- CAN YOU READ THAT,

7    LADIES AND GENTLEMEN?  IS THAT TOO SMALL?

8              I'M GOING TO READ IT FOR YOU.  I'M GOING TO -- I'M

9    GOING TO --

10             YOUR HONOR, MAY I?

11             THE COURT:  ABSOLUTELY.

12             MR. MARMARO:  THIS IS AN IMPORTANT E-MAIL SO I

13   WANT TO TAKE YOU THROUGH IT LINE BY LINE.  IT'S FROM

14   BILL RUEHLE -- I'M SORRY, IT'S FROM GAIL PATTON TO

15   BILL RUEHLE AND NANCY TULLOS AND SCOTT POTERACKI.  SCOTT WAS

16   THE CONTROLLER OF BROADCOM.  HE WAS GAIL PATTON'S IMMEDIATE

17   BOSS.

18             *EY REVIEWED THE FOCAL GRANTS.*

19             SO SHE IS UPDATING HER BOSS, THE HEAD OF HR, AND

20   HER BOSS'S BOSS ON WHAT THE STATUS IS*:  AS EXPECTED, I'M*

21   *EXPERIENCING RESISTANCE FROM EY ON OUR FOCAL GRANT.  THE*

22   *BASIC CONCERN IS MEASUREMENT DATE OF THESE GRANTS, MAY 26.*

23   *EY FEELS THE GRANTS SHOULD BE PRICED BASED ON THE DATE GIVEN*

24   *TO THE EMPLOYEES.*

25             LET ME STOP RIGHT THERE.  I'M GOING TO SHOW YOU

1   LATER AND YOU'RE GOING TO HEAR IN THE EVIDENCE THAT THAT WAS

2   A MISCONCEPTION BY ERNST & YOUNG. THERE IS NOTHING IN

3   OPINION 25 THAT REQUIRES A GRANT TO BE PRICED ON THE DATE

4   YOU ANNOUNCE IT TO THE EMPLOYEE. BUT THEY WERE WORKING

5   UNDER A MISCONCEPTION.

6          GAIL SAYS: *MY POSITION TO THEM IS THAT THE*

7   *PROGRAM AND GRANTS WERE APPROVED ON MAY 26; HOWEVER, WE*

8   *UNDERESTIMATED THE ADMINISTRATIVE EFFORT THAT WAS REQUIRED*

9   *IN TRANSITIONING TO THE NEW FOCAL PROGRAM.*

10         IN OTHER WORDS, WHAT SHE'S SAYING IS THIS IS

11  SOMETHING WE'VE NEVER DONE BEFORE. SEVEN MILLION SHARES.

12  THE ENTIRE COMPANY NOW GROWS TO 2000 EMPLOYEES AND WE

13  UNDERESTIMATED HOW LONG IT WOULD TAKE.

14         LET'S GO FORWARD.

15         *I'M HOPING TO CONVINCE THEM THAT THE MAY 26 DATE*

16  *IS THE TRUE GRANT DATE.*

17         WELL, I SHOWED YOU THE DOCUMENT. IT WAS THE TRUE

18  GRANT DATE. *HAVING COPIES OF MINUTES FROM THE STOCK*

19  *COMPENSATION COMMITTEE APPROVED IN THE PLAN INCLUDED*

20  *BUDGETED ALLOCATIONS BY DEPARTMENT, BY PERSON WOULD BE*

21  *BETTER, WOULD BE VERY HELPFUL TO THIS POINT. EY'S POSITION*

22  *IS WE NEED TO KNOW HOW MANY SHARES ARE GRANTED TO EACH*

23  *INDIVIDUAL TO ACTUALLY SET A MEASUREMENT DATE.*

24         THAT WAS THEIR POSITION THAT THEY TOOK AT THE

25  TIME, THAT YOU NEED TO KNOW THE SHARES TO EACH INDIVIDUAL.

1    THERE ARE TWO RISKS HERE.  THEY TALK ABOUT A

2    POOLING RISK, AND I'LL LET THE EVIDENCE EXPLAIN WHAT THAT

3    MEANS.  IT'S A LITTLE BIT COMPLICATED.

4    BUT THE SECOND ONE, *THEY MAY REQUIRE US TO TAKE A*

5    *COMPENSATION EXPENSE BETWEEN THE DIFFERENCE BETWEEN MAY 26*

6    *AND THE PRICE WHEN THE OPTIONS ARE ACTUALLY FINALIZED OR*

7    *WHEN THE EMPLOYEES ARE NOTIFIED.*

8    AGAIN, AS I'VE MENTIONED, NOTIFICATION ISN'T EVEN

9    A REQUIREMENT IN THE OPINION.

10   *COMPENSATION EXPENSE COULD BE OVER 700 MILLION*

11   *BASED ON THE MAY 26 PRICE AND THE CURRENT PRICE*, EXCLAMATION

12   POINT.  IN OTHER WORDS, YOU GUYS GOT TO PAY ATTENTION TO

13   THIS.

14   *PLEASE LET ME KNOW HOW YOU WOULD LIKE TO PROCEED.*

15   SO WHAT DOES BILL RUEHLE DO?  WHAT DOES

16   BILL RUEHLE DO WHEN HE GETS THIS E-MAIL?  HE DOES WHAT ANY

17   RESPONSIBLE EXECUTIVE WOULD DO, HE WRITES AN E-MAIL TO HIS

18   BOSS.

19   CAN WE SHOW THAT E-MAIL?

20   NOW, IT'S THE ONE TO HENRY NICHOLAS.

21   LET ME NOW ASK AARON TO PUT APB 25 ON THE SCREEN.

22   REMEMBER I INTRODUCED THIS OPINION AT THE VERY

23   BEGINNING OF WHEN I SPOKE, OPINION 25, AND I TOLD YOU THIS

24   CASE IS ABOUT THIS AND HOW IT TRIPPED UP OVER 200 COMPANIES.

25   THE WORDS OF THE OPINION ARE:  *THE MEASUREMENT*

1  *DATE FOR DETERMINING COMPENSATION COST IN STOCK OPTION PLANS*

2  *IS THE FIRST DATE ON WHICH ARE KNOWN BOTH.  THE NUMBER OF*

3  *SHARES THAT AN INDIVIDUAL EMPLOYEE IS ENTITLED TO RECEIVE*

4  *AND THE OPTION PRICE.*

5           IT SAYS THOSE TWO THINGS.  IT DOESN'T SAY ANYTHING

6  ABOUT COMMUNICATION.  IT SAYS YOU NEED TO KNOW THE SHARES TO

7  THE EMPLOYEE AND THE OPTION PRICE.

8           NOW, AS I MENTIONED EARLIER, THIS IS THE OPINION

9  THAT TRIPPED UP ALL THOSE COMPANIES.  LET ME SHOW YOU WHAT

10 ERNST & YOUNG, THE EXPERTS, SAID ABOUT THIS OPINION, AFTER

11 THE FACT IN 2003*:  THE INTRINSIC VALUE OF ACCOUNTING MODEL*

12 *UNDER OPINION 25 HAS RESULTED IN A LARGE NUMBER OF PRACTICE*

13 *ISSUES.  FASB AND EITF --* THOSE ARE TWO BODIES OF

14 ACCOUNTANTS WHO INTERPRET ACCOUNTING LITERATURE *-- ISSUED*

15 *OVER 200 PAGES OF ACCOUNTING RULES.  THE MODEL HAS BECOME*

16 *MUCH TOO COMPLEX AND RULES-BASED, A SITUATION THAT OFTEN*

17 *RESULTS IN AN UNINTENTIONAL MISAPPLICATION OF THE RULES.*

18           THAT'S WHAT THIS CASE IS ABOUT, LADIES AND

19 GENTLEMEN.  I COULD NOT HAVE SAID IT BETTER.  AND

20 ERNST & YOUNG SAID IT IN FEBRUARY 11 OF 2003.  THIS CASE IS

21 ABOUT AN UNINTENTIONAL MISAPPLICATION OF THE RULES.

22           BUT LET'S GO BACK TO THE MAY 26 GRANT AND SEE HOW

23 THIS -- THE APB 25 FITS INTO THE MAY 26 GRANT.  SO WE ARE IN

24 JULY AND GAIL PATTON HAS TOLD HER BOSS AND HER BOSS'S BOSS

25 AND THE HEAD OF HR, THERE MAY BE AN ISSUE.  SO FRED

1  WHITTLESEY OF HR WRITES TO NANCY TULLOS OF HR -- AND IT'S A

2  LITTLE BIT LATER IN JULY.  HE SAYS: *BEYOND THE ISSUES*

3  *CREDITED BY THE FOCAL GRANT, THE UNDERWATER GRANTS ARE*

4  *ALREADY BEING COMMUNICATED.*

5          REMEMBER THE PROSECUTOR SPOKE ABOUT DON'T PUT

6  THINGS IN E-MAIL.  HR PEOPLE WERE VERY CONCERNED ABOUT

7  COMMUNICATING GRANT DATES IN E-MAILS, BECAUSE IT CREATED AN

8  EXPECTATION AND MAYBE A LEGAL OBLIGATION OF THE COMPANY THAT

9  THEY WERE VERY AFRAID OF.  SO HERE'S WHAT HE SAYS ABOUT

10 THAT.  HE SAYS: *IF THEY ARE COMMUNICATING THE 118 PRICE* --

11 NOTICE HE DOESN'T SAY THE MAY 26TH GRANT.  HE SAYS THE 118

12 PRICE -- *AND IT IS LATER PROHIBITED, WE MAY BE SUPPLEMENTING*

13 *THE 206 GRANTS WITH 240 GRANTS* -- BECAUSE THE PRICE HAD

14 RISEN.  *I CAN'T IMAGINE THE EXTENT OF THE LIABILITY WE MIGHT*

15 *HAVE WITH THESE VERBAL CONTRACTS.*

16          THAT'S WHAT HR IS CONCERNED ABOUT.  THIS

17 LIABILITY.  IT'S NOTHING CRIMINAL.  THERE'S NOTHING ILLEGAL.

18 THEY ARE CONCERNED ABOUT THE LIABILITY THEY MAY HAVE TO THE

19 BROADCOM EMPLOYEES WHO THINK THEY'RE GETTING THE 118S.

20          OKAY.  SO WHAT DO WE HAVE NEXT?

21          WE HAVE GOT BILL AND THE FINANCE DEPARTMENT OF

22 BROADCOM NOT BELIEVING THAT A COMPENSATION CHARGE IS

23 REQUIRED.  NOT BELIEVING THAT THIS IS "IN-THE-MONEY" GRANT.

24 REMEMBER THE PROSECUTION TALKED ABOUT "IN-THE-MONEY" AND

25 "NEXT-TO-MONEY"?

```
 1              BUT WHAT'S THE PROBLEM HERE?

 2              THE PROBLEM IS THE STOCK PRICE HAS RISEN NOW TO

 3     $240 A SHARE.  SO WHAT DOES BILL DO?

 4              IF WE GO TO EXHIBIT 84.

 5              BILL WRITES AN E-MAIL TO HIS BOSS.  LOOK AT THE

 6     MEASURED TONES AND HOW BILL RUEHLE TALKS TO HIS BOSS.  HE

 7     SAYS:  *NICK, WE NEED TO GIVE TO EY A LIST OF THE APPROVED*

 8     *GRANTS FOR THE 526 FOCAL REVIEWS.  THEY ARE MAKING NOISES.*

 9     *WE'LL HAVE TO TAKE A COMPENSATION HIT FOR THE DIFFERENCE*

10     *BETWEEN THE 526 PRICE AND THE CURRENT PRICE BECAUSE WE HAVE*

11     *NOT YET COMPLETED THE GRANTS.  THIS WOULD RESULT IN A CHARGE*

12     *OF OVER 700 MILLION,* EXCLAMATION POINT.

13              AND THAT'S THE SAME THING THAT GAIL DID WITH BILL.

14     THIS IS TO GET HIS ATTENTION.  *OBVIOUSLY, WE'RE NOT GOING TO*

15     *LET THIS HAPPEN.*

16              BECAUSE IN THEIR HEART, THEY DIDN'T BELIEVE IT WAS

17     APPROPRIATE.  THEY DIDN'T BELIEVE THE CHARGE NEEDED TO BE

18     TAKEN.

19              *WE HAVE COMPLETED ALL THE NONEXECUTIVE GRANTS AND*

20     *ARE JUST ABOUT READY TO GO WITH THOSE.  NANCY HAS BEEN*

21     *TRYING TO GET WITH YOU ABOUT THE EXECUTIVE GRANTS FOR WHICH*

22     *HAVE BEEN RESERVED A MILLION SHARES.  WHEN CAN WE REVIEW*

23     *THESE?*

24              PLUS THAT MESSAGE.  *NICK, WE NEED YOUR GRANTS*

25     *LIST.*
```

1           NOW, THIS IS TWO MONTHS AFTER THE GRANT DATE.

2     AND HENRY NICHOLAS HAS NOT GIVEN HIS GRANT LIST YET.

3           THAT'S WHAT BILL RUEHLE IS ASKING HIS BOSS FOR.

4     AND THAT'S ALL HE'S ASKING HER FOR -- HIM FOR.

5           NOW, CAN WE GO TO EXHIBIT 42?

6           I'M GOING TO TAKE YOU THROUGH A CHRONOLOGY AND

7     THEN YOU'LL SEE THE PUNCH LINE AND WHY IT IS SO IMPORTANT.

8           AGAIN, THIS IS AN ORGANIZATION.  THIS IS AN

9     HONEST, DECENT ORGANIZATION REACTING TO A BUSINESS PROBLEM.

10    GAIL PATTON WRITES TO BILL, NANCY, CAROL AND FRED: *MARK*

11    *BRYANT IS WORKING WITHIN EY TO TRY TO GET COMFORTABLE WITH*

12    *THE 526 GRANT* -- MEASUREMENT DATE ISSUE.  *AS YOU KNOW, WHEN*

13    *CLIFF PIKE* -- HE'S ANOTHER EY PERSON -- *WAS CONSULTED, HE*

14    *DID NOT FEEL THE MEASUREMENT DATE CRITERIA WAS MET.  CLIFF,*

15    *HOWEVER, IS NOT THE PARTNER WHO SIGNS OFF ON THE AUDIT*

16    *(BRUCE STUMP IS, AND MARC HAD SOME DISCUSSIONS WITH HIM*

17    *TODAY).  ALTHOUGH NO ASSURANCE HAS BEEN PROVIDED THAT EY*

18    *WILL SIGN OFF ON THE PROGRAM, MARK HAS RECOMMENDED THAT WE*

19    *PULL TOGETHER ALL THE INFORMATION WE HAVE ON THE PROGRAM SO*

20    *THEY CAN REVIEW A COMPLETE PACKAGE AND DETERMINE WHAT TO DO.*

21           AND YOU WILL SEE EVIDENCE OF THEM DOING JUST THAT:

22    PULLING TOGETHER INFORMATION ON THE PROGRAM.  PERHAPS THE

23    SINGLE MOST IMPORTANT FACT THAT YOU NEED TO KNOW ABOUT THIS

24    GRANT IS THAT ERNST & YOUNG KNEW THAT THE INDIVIDUAL

25    ALLOCATIONS HAD NOT BEEN MADE BY JULY.  REMEMBER I SHOWED

```
 1   YOU OPINION 25.  IT SAID YOU HAVE TO HAVE THE INDIVIDUAL
 2   ALLOCATIONS DONE.
 3           WE GO TO EXHIBIT 43, PLEASE, AARON.
 4           THIS IS A WORK PAPER FROM ERNST & YOUNG.  THIS
 5   HANDWRITING IS AN ERNST & YOUNG AUDITOR'S HANDWRITING, AND
 6   I'M GOING TO READ IT TO YOU.  IT'S DATED JULY 17TH, 2000:
 7   PER GAIL, THIS REPRESENTS THE MAXIMUM AVAILABLE GRANTS
 8   BUDGETED TO BE ISSUED UNDER THE -- I CAN'T READ THOSE WORDS,
 9   BUT WHAT SHE'S SAYING IS THAT THERE'S A -- THERE'S A NUMBER
10   OF SHARES, SEVEN MILLION, AND THAT'S THE APPROXIMATE NUMBER
11   OF SHARES THAT HAVE BEEN BUDGETED TO BE GRANTED.
12           THAT DOCUMENT AND ALL CONVERSATIONS AROUND IT PUT
13   ERNST & YOUNG ON NOTICE THAT ONE OF THE TWO REQUIREMENTS OF
14   OPINION 25 HAD NOT BEEN MET, AND THAT'S IN JULY OF 2000, TWO
15   MONTHS AFTER THE GRANT DATE.
16           SO, ERNST & YOUNG KNOWS FOR SURE THAT BROADCOM IS
17   BEHIND.  LET'S JUST CALL IT FOR WHAT IT WAS.  BROADCOM WAS
18   BEHIND.  SERIOUSLY BEHIND.  THEY WEREN'T BEHIND IN THEIR
19   CHIP DESIGN, BUT THEY'RE BEHIND IN THEIR PROCESSING OF THE
20   PAPERWORK.
21           SO NOW, WE ARE IN JULY OF 2000.  ERNST & YOUNG
22   KNOWS THAT BROADCOM HAS NOT MET ONE OF THE TWO REQUIREMENTS
23   OF OPINION 25.  THEY HAVE A DECISION TO MAKE.  DO THEY ALLOW
24   BROADCOM TO CALL THE MAY 26 GRANT A FAIR MARKET VALUE GRANT
25   AND NOT REQUIRE A COMPENSATION CHARGE DESPITE WHAT
```

1   OPINION 25 LITERALLY SAYS, AND THAT DECISION WAS MADE BY

2   ERNST & YOUNG.

3           AND THIS COMES BACK TO ONE OF THE TRUTHS I SAID

4   THIS MORNING, TRUTH NUMBER 5.  NO ONE FOCUSED ON OPINION 25.

5   BUT WHEN THEY DID, IT TURNED OUT THAT THE OUTSIDE EXPERTS

6   GAVE THE WRONG ADVICE.  BECAUSE WHAT THEY SAID WAS *BROADCOM,*

7   *THE MAY 26 DATE IS OKAY.  YOU DON'T NEED TO TAKE A*

8   *COMPENSATION CHARGE.  IT'S A FAIR MARKET VALUE GRANT.  IT'S*

9   *NOT A BACKDATED GRANT.  YOU DIDN'T DO ALL THE THINGS YOU*

10  *WERE SUPPOSED TO DO IN TERMS OF ALLOCATIONS, BUT YOU DON'T*

11  *NEED TO TAKE A COMPENSATION CHARGE.*

12          SO ON THAT LINE, ON THE FINANCIAL STATEMENTS THAT

13  THE GOVERNMENT RAILED ABOUT THIS MORNING, THEY PUT A BIG,

14  FAT ZERO INSTEAD OF 700 MILLION.  AND IT WAS BLESSED BY

15  ERNST & YOUNG WITH FULL KNOWLEDGE BY ERNST & YOUNG.

16          NOW, WHY DO I SPEND SO MUCH TIME TALKING ABOUT

17  THIS ONE GRANT?

18          FIRST OF ALL, IT'S A MICROCOSM CASE.  BUT

19  SECONDLY, IT SHOWS HOW THINGS WORKED AT BROADCOM DURING

20  THESE YEARS BEFORE THE WORLD CHANGED IN 2006.  IT SHOWS AN

21  ISSUE BEING RAISED.  FIRST, IT SHOWS BROADCOM FALLING

22  HOPELESSLY BEHIND IN THE PAPERWORK.  IT SHOWS AN ISSUE BEING

23  RAISED HONESTLY AMONG BROADCOM EMPLOYEES, DISCUSSED OPENING

24  IN E-MAILS, NOT IN DARK CORNERS.

25          THE AUDITORS ARE BROUGHT INTO THE ISSUE AND IT IS

1    DISCUSSED WITH THEM OPENLY AND HONESTLY.  NOTHING IS

2    CONCEALED FROM THE AUDITORS.  NO LIES ARE MADE TO THE

3    AUDITORS AND THE AUDITORS COME OUT WITH THEIR JUDGMENT.

4              AS FAR AS BROADCOM WAS CONCERNED, THIS OPINION

5    NO. 25 THAT IN 2006 BECAME SOMETHING TOTALLY DIFFERENT WAS A

6    FLEXIBLE RULE.  IT INVOLVED THE FACTS AND CIRCUMSTANCES.  IT

7    INVOLVED A RULE OF REASONABLENESS.  IT WAS NOT A HARD AND

8    FAST RULE.

9              NOW, YOU ARE GOING TO HEAR A LOT ABOUT ACCOUNTING.

10   ONE OF THE THINGS YOU ARE GOING TO HEAR ABOUT IS THAT

11   ACCOUNTING IS NOT MATH.  ACCOUNTING IS NOT JUST ADDING UP

12   NUMBERS.  IT'S MADE FROM JUDGMENTS.  IT'S MADE FROM

13   JUDGMENTS BASED ON THE INFORMATION AVAILABLE.

14             ON THIS GRANT, THE SINGLE BIGGEST GRANT IN

15   BROADCOM'S HISTORY, A JUDGMENT WAS MADE, AN HONEST JUDGMENT.

16   IT WAS MADE BY BROADCOM'S ACCOUNTING DEPARTMENT.  IT WAS

17   BLESSED BY BILL RUEHLE AND THE OTHER SENIOR EXECUTIVES.  IT

18   WAS DISCLOSED TO ERNST & YOUNG AND IT WAS BLESSED BY THEM.

19             NOW, REMEMBER THAT $2.2 BILLION NUMBER THAT

20   MR. STOLPER TALKED ABOUT THIS MORNING?

21             I'M GOING TO TALK A LOT MORE ABOUT IT IN SEVERAL

22   MINUTES.  I WANT TO TELL YOU SOMETHING ABOUT IT RIGHT NOW.

23   OVER $600 MILLION OF THAT NUMBER WAS THIS GRANT.  OVER

24   ONE-QUARTER OF THE RESTATEMENT EXPENSES THAT HAD TO BE

25   CORRECTED IN 2006 WAS THIS GRANT.

1          CAN WE GO TO THE UNDERWATER CHART ON 104?

2          THAT WAS THE GRANT DATE.  ALL OF THESE OPTIONS

3   BECAME UNDERWATER OPTIONS.  AS IT TURNED, THE MARKET TURNED

4   AGAINST BROADCOM AND IT TURNED AGAINST ALL STOCKS.  THE

5   BUBBLE HAD BURST AND EVERYONE WAS STRUGGLING.  AND THIS

6   OPTION GRANT, THESE SEVEN MILLION SHARES, WERE NEVER

7   EXERCISED.

8          I WANT TO SHOW YOU ONE OTHER THING ABOUT THE

9   MAY 26 GRANT AS A POSTSCRIPT.

10          CAN WE GO TO EXHIBIT 47?

11          THIS IS NOW IN SEPTEMBER.  ERNST & YOUNG HAS MADE

12   ITS DECISION.  THE GRANT IS A FAIR MARKET VALUE GRANT AS OF

13   MAY 26.  SO GAIL IS WRITING TO NANCY AND BILL AND FRED

14   WHITTLESEY AND CAROL PRADO.  AND SHE SAYS, *JUST TO CONFIRM,*

15   *IN ORDER TO PRESERVE THE MEASUREMENT DATE OF THE FOCAL*

16   *GRANTS ON MAY 26, THESE GRANTS MUST BE COMMUNICATED*

17   *IMMEDIATELY TO THE EMPLOYEES.*

18          WELL, LADIES AND GENTLEMEN, I JUST SHOWED YOU

19   PARAGRAPH 10-B.  I JUST EXPLAINED TO YOU, AND YOU'RE GOING

20   TO HEAR IT FROM THE EXPERTS, THAT COMMUNICATIONS TO THE

21   EMPLOYEES IS NOT AN ELEMENT.  BUT THE BROADCOM ACCOUNTING

22   DEPARTMENT WAS TOLD THAT IT WAS AN ELEMENT BY ERNST & YOUNG.

23   AND SO WHAT GAIL WAS SAYING IS, *WE'VE GOT TO GET THESE*

24   *GRANTS COMMUNICATED.*

25          THIS MAYBE GIVES YOU A WINDOW INTO WHY OPINION 25

1    TRIPPED UP SO MANY COMPANIES.  BECAUSE IT SEEMS PRETTY

2    SIMPLE TO RECITE; BUT IN THE APPLICATION, IT'S NOT SO

3    SIMPLE.  AND THAT'S WHY 200 COMPANIES GOT IT WRONG.  THEY

4    WEREN'T CRIMINAL.  THEY WEREN'T CONSPIRATORS.  BUT THEY WERE

5    FIXATED ON THE WRONG THING.  IN 2000 -- IN THE YEAR 2000,

6    ERNST & YOUNG WAS FIXATED ON COMMUNICATING THE GRANTS.

7           SO WHAT DOES BILL RUEHLE DO?

8           WHEN HE GETS THIS E-MAIL, HE WRITES AN E-MAIL TO

9    HIS BOSS.  THE RESPONSIBLE THING TO DO.  LOOK HOW HE

10   COMMUNICATES TO NICK.  ALL CAPS.  HE ENCLOSES GAIL'S E-MAIL

11   TO HIM AND HE SAYS:  *FYI.  WE HAVE PUSHED EY AS FAR AS WE*

12   *CAN.  NOTE THEIR REQUIREMENT THAT THE GRANTS BE COMMUNICATED*

13   *TO THE EMPLOYEES IMMEDIATELY.*

14          WHAT'S HE SAYING TO HENRY NICHOLAS?

15          GET YOUR GRANT LISTS IN AND COMMUNICATE THE

16   GRANTS.  AND HE'S DOING IT IN A RESPECTFUL WAY, IN THE ONLY

17   WAY THAT HE KNOWS HOW.  HE'S DEALING WITH A VERY DIFFICULT

18   BOSS.  BUT IN HIS OWN CRYPTIC WAY HE SAID, *GET THESE GRANTS*

19   *COMMUNICATED*.

20          AS IT TURNS OUT, EVEN BILL WAS WRONG ABOUT THAT.

21   COMMUNICATION WASN'T EVEN AN ELEMENT OF APB 25, OR

22   OPINION 25.

23          SO LET'S NOW LOOK AT BROADCOM'S STOCK CHART FROM

24   2000 TO 2002, IF WE CAN.

25          IF I OVERLAID THE NASDAQ STOCK CHART, WE'D SEE THE

1    SAME THING.  I DON'T WANT YOU TO THINK THAT BROADCOM WAS

2    DOING BAD, WHILE ALL THESE OTHER COMPANIES WERE DOING GREAT.

3    IN FACT, BROADCOM WAS DOING GREAT.  ITS REVENUES WERE GOING

4    THROUGH THE ROOF.  NEW CUSTOMERS, NEW PRODUCTS.

5            BUT THE MARKET TANKED.  AND THIS TIME PERIOD OF

6    2001 AND 2002 CREATED TREMENDOUS CHALLENGES TO THE COMPANY.

7    THEY NEEDED TO CONTINUE TO MOTIVATE THEIR EMPLOYEES.  THEY

8    COULDN'T DO ANYTHING ABOUT THE STOCK PRICE.  IT WAS WHAT IT

9    WAS.  AND THEY COULDN'T DO ANYTHING ABOUT DR. NICHOLS.  HE

10   WAS GOING TO RELEASE HIS GRANTING DECISION WHEN HE WAS GOOD

11   AND READY.

12           I WANT TO TOUCH ON A COUPLE OF THINGS THAT THE

13   PROSECUTOR SAID THIS MORNING.  BECAUSE ONE OF THE THINGS

14   ABOUT THIS CASE THAT'S IMPORTANT IS CONTEXT.  CONTEXT.

15   REMEMBER I TOLD YOU OPTION GRANTS, I'LL GIVE YOU THE SUBJECT

16   OF THIS CASE, BUT THEY WERE REALLY A VERY SMALL PIECE, AT

17   LEAST THE ACCOUNTING OF IT, WAS A VERY SMALL PIECE OF

18   BROADCOM.

19           HE MENTIONED SOMETHING CALLED DOUBLE-UP AND CANCEL

20   AND PRESENTED IT TO YOU AS SOMETHING CRIMINAL.  I THINK HE

21   SAID A SECRET DEAL BETWEEN THE CONSPIRATORS AND A FEW

22   SELECTED EMPLOYEES, OR SOMETHING LIKE THAT.

23           LET ME GIVE YOU THE CONTEXT OF A DOUBLE-UP AND

24   CANCEL.  AND THE CONTEXT IS THIS:  IN LATE 2000 AND EARLY

25   2001, BROADCOM STOCK WAS HERE (INDICATING).  BROADCOM'S

1    ENGINEERS HAD OPTIONS AT THIS PRICE.  WHAT DOES THAT MEAN?

2            THAT MEANS THEIR OPTIONS ARE WORTHLESS.  NOW, IF

3    THEY HAD BIG CASH SALARIES, THAT WOULDN'T MATTER.  BUT THEY

4    HAD VERY SMALL CASH SALARIES.  SO THESE ENGINEERS LITERALLY

5    COULDN'T PAY THEIR BILLS.

6            NOW, THAT'S A RISK TO BROADCOM AND ITS

7    SHAREHOLDERS, BECAUSE THEY'RE GOING TO LEAVE AND THEY'RE

8    GOING TO GO TO THE COMPETITION AND GET NEWLY PRICED OPTIONS.

9    BROADCOM'S EXECUTIVES, ONE THING YOU COULD SAY ABOUT THEM,

10   IS THEY CARED ABOUT THEIR EMPLOYEES AND THEY WERE FAIR TO

11   THEIR EMPLOYEES.  SO THEY GOT TOGETHER WITH THE HR

12   DEPARTMENT AND THEY STARTED FIGURING OUT ALTERNATIVES.

13           DO WE HAVE THE SCREEN THAT SHOWS THE STOCK

14   UNDERWATER PROGRAM?

15           THIS WAS A PRESENTATION MADE IN EARLY 2001.  IT'S

16   CALLED THE UNDERWATER OPTION PROGRAM.  THERE WERE ABOUT 22

17   ALTERNATIVES THAT BILL AND DR. NICHOLAS AND DR. SAMUELI AND

18   THE OTHER GOOD AND DECENT PEOPLE OF BROADCOM THOUGHT ABOUT

19   TO HELP THEIR EMPLOYEES, 22 OF THEM, AND THEY WERE ALL

20   INCLUDED IN THIS PRESENTATION.

21           THEY END UP WITH SOMETHING CALLED A TENDER OFFER,

22   AND I'M GOING TO EXPLAIN THAT TO YOU IN A MOMENT.  BUT ONE

23   OF THE NOT-SO-SMART IDEAS IS SOMETHING CALLED "DOUBLE-UP AND

24   CANCEL."

25           NOW, UNLESS YOU ARE CONCERNED THAT THE AUDITORS

1   WEREN'T INVOLVED AND WEREN'T LOOKING AT THIS, BILL RUEHLE

2   NOT ONLY HAD HIS OWN AUDITORS, ERNST & YOUNG LOOK AT THIS,

3   THEY HIRED A SECOND AUDITOR, DELOITTE TOUCHE, A SEPARATE

4   AUDITOR, TO COME IN -- EXCUSE ME, ARTHUR ANDERSEN, TO COME

5   IN AND TO LOOK AT THESE PROGRAMS TO GIVE EXTRA ADVICE ON THE

6   PROPRIETY AND THE APPROPRIATENESS OF THE PROGRAMS.

7           BUT THERE WAS ONE THAT THE PROSECUTOR TALKED ABOUT

8   THAT I HAVE TO TELL YOU ABOUT.  BECAUSE HE ONLY GAVE YOU A

9   LITTLE PIECE OF THE PICTURE AND THE PIECE HE GAVE YOU MADE

10  IT LOOK BAD.

11          SO DR. NICHOLAS WAS A GENIUS.  HE WAS

12  ADMINISTRATIVELY CHALLENGED, BUT HE WAS ALWAYS COMING UP

13  WITH IDEAS.  AND HERE WAS HIS IDEA.  IT WAS CALLED THE

14  DOUBLE-UP AND CANCEL.  THIS WASN'T BILL'S IDEA.

15          HE THOUGHT, WHY DON'T WE PICK OUR SUPERSTAR

16  ENGINEERS AND GIVE THEM AN EXTRA CREDIT AND KEEP IT ON THE

17  QT, KEEP IT QUIET, DON'T LET THEM TELL OTHERS, TRUST THEM

18  THAT THEY'LL KEEP IT QUIET.  AND THAT WAY WE'LL AT LEAST

19  KEEP OUR SUPERSTARS.

20          WELL, REMEMBER ONE OF THE THINGS I TOLD YOU ABOUT

21  BILL IN THE BEGINNING WAS THAT -- YOU'RE GOING TO HEAR FROM

22  EMPLOYEE AFTER EMPLOYEE.  HE CARED ABOUT THE INTERESTS OF

23  ALL EMPLOYEES.  HE DIDN'T CARE ABOUT SPECIAL INTERESTS.  HE

24  DIDN'T CARE ABOUT SINGLING OUT PEOPLE TO GIVE SPECIAL

25  TREATMENT TO THEM.  BILL DIDN'T LIKE THAT PROGRAM ONE BIT,

```
1   NOT ONE BIT.  NEITHER DID NANCY TULLOS.  BUT BILL
2   PARTICULARLY DIDN'T LIKE IT.
3           BUT YOU CAN'T JUST TELL YOUR BOSS IT'S A STUPID
4   IDEA.  THERE IS A CERTAIN WAY YOU TALK TO YOUR BOSS.  AND SO
5   WHAT BILL WAS CONCERNED ABOUT WAS THAT IF THIS PROGRAM, THIS
6   DOUBLE-UP AND CANCEL, GOT ANY TRACTION WITH DR. NICHOLAS,
7   THE AUDITORS WOULDN'T LIKE IT.  AND WHAT WOULD THE AUDITORS
8   DO?
9           THEY WOULD KILL THE ENTIRE UNDERWATER PROGRAM.
10  THEY WOULDN'T STOP THE STOCK OPTION PROGRAM.  AUDITORS CAN'T
11  STOP A COMPANY FROM GRANTING STOCK OPTIONS.  BUT THEY KILLED
12  THESE OTHER 21 IDEAS.  AND BILL KNEW HE NEEDED THE AUDITORS
13  TO BLESS WHATEVER PROGRAM WAS DECIDED.  AND I'M GOING TO
14  TELL YOU WHAT PROGRAM WAS DECIDED UPON IN A MOMENT.  BUT
15  BILL WAS SMART ENOUGH TO KNOW THE AUDITORS, WE NEEDED THEIR
16  BLESSING.
17          AND IF WE HAVE SOMEONE IN OUR MIDST LIKE A MEHRDAD
18  WHO WAS VIEWED IN THE ORGANIZATION AS A LIAR AND AS SOMEONE
19  WHO WAS A BIG MOUTH, THEN THEY WOULD TELL OTHER PEOPLE AND
20  THEN THE AUDITORS WOULD KNOW WE DID SOMETHING SPECIAL FOR
21  JUST A FEW EMPLOYEES, AND YOU CAN'T DO THAT.
22          THAT'S THE CONTEXT OF THAT E-MAIL, LADIES AND
23  GENTLEMEN.  AND THAT'S ALL THERE IS TO IT.  BUT YOU KNOW,
24  IT'S INTERESTING IF YOU JUST -- IF YOU DON'T LOOK AT CONTEXT
25  AND YOU JUST LOOK AT SOMETHING PULLED OUT OF CONTEXT, IT
```

1   COULD LOOK BAD.

2         AND THAT'S WHY I URGE YOU, NOT ONLY ON THIS

3   TRANSACTION, BUT ON EVERY PIECE OF THIS CASE, TO KEEP AN

4   OPEN MIND, AND TO LISTEN TO WHAT THE EVIDENCE IS ON THAT.

5         NOW, DO WE HAVE BILL'S E-MAIL ABOUT NOT LIKING IT

6   ONE BIT?

7         SO THE GOVERNMENT DOESN'T LIKE THE FACT THAT BILL

8   SAID NO.  BILL DIDN'T SAY "YES" TO THIS.  HE SAID "NO."

9   THEY JUST DON'T LIKE THE WAY HE SAID IT.  AND WHAT HE SAID

10  WAS CRYSTAL CLEAR.  IT WAS WRITTEN OPENLY IN AN E-MAIL TO

11  HEAD OF HR AND TO HERB HOWLEY (SIC), WHO HAD JUST BEEN HIRED

12  BY THE COMPANY.  IT'S NOT A TOOL OF A CONSPIRACY.  BILL IS

13  GIVING HIS HONEST VIEW.  THE MORE I THINK ABOUT "DOUBLE-UP

14  AND CANCEL," THE LESS I LIKE IT.  IT'S JUST TOO CUTE.  AND

15  THAT'S A HUGE STATEMENT.  HE DIDN'T GO ALONG WITH NICK'S

16  IDEA.  HE PUT THE KIBOSH TO IT.  AND FOR THAT, HE IS NOW

17  BEING CRITICIZED BECAUSE OF THE WORDS HE CHOSE TO PUT THE

18  KIBOSH TO IT.

19        NOW LET'S GO BACK TO THE UNDERWATER PROGRAM --

20  PLEASE, IF YOU DON'T MIND, AARON -- BECAUSE I PROMISED YOU

21  THAT I WOULD TELL YOU WHAT THESE -- WHAT THESE PEOPLE AT

22  BROADCOM DID TO TAKE CARE OF THEIR EMPLOYEES.

23        NOW, THE GOVERNMENT CALLS IT A REPRICING AND

24  SOMETHING CRIMINAL, AND THEY TALKED ABOUT THAT DECEMBER 24

25  PRICE.  REMEMBER THAT?  THAT WAS ONE OF THE GRANTS AND HOW

1    THEY HAVE GRABBED A PRICE.

2         BUT WHAT THEY DIDN'T TELL YOU IS THAT THE STORY

3    ABOUT THE DECEMBER 24 GRANT STARTS SIX MONTHS EARLIER.  AND

4    IT WAS APPROVED BY THE LAWYERS AND BY THE ACCOUNTANTS, TWO

5    SETS OF ACCOUNTANTS.  IT'S CALLED THE TENDER OFFER.  AND

6    IT'S A WAY THAT BROADCOM AND MANY OTHER COMPANIES AT THE

7    TIME UTILIZED TO REPRICE THEIR UNDERWATER OPTIONS LEGALLY.

8         NOW, WHAT DID IT REQUIRE?

9         I'M NOT GOING TO GO INTO THE DETAILS EXCEPT TO

10   TELL YOU TWO THINGS:  ONE, IT REQUIRED ALL THE EMPLOYEES WHO

11   PARTICIPATED TO GIVE UP THEIR OPTIONS.  ALL OF THEIR

12   UNDERWATER OPTIONS, TURN THEM IN.  THEY NOW HAVE NO OPTIONS.

13        SECOND, IT REQUIRED THE COMPANY TO WAIT A MINIMUM

14   OF SIX MONTHS AND A DAY.  SOMETIMES YOU'LL HEAR ABOUT THAT

15   PROGRAM CALLED THE SIX-MONTH-AND-A-DAY PROGRAM.

16        OKAY.  SO THE OPTION TO THE TENDER OFFER BEGAN ON

17   JUNE 24, 2001.  AND YOU ARE GOING TO HEAR EVIDENCE THAT THE

18   GOVERNMENT DIDN'T TELL YOU.  THE EVIDENCE IS THAT FROM THE

19   VERY OUTSET, THE INTENT WAS TO PRICE -- IT'S CALLED A

20   REPRICING -- TO REPRICE THE FIRST DAY AVAILABLE.  WHAT WAS

21   THE FIRST DAY AVAILABLE FROM JUNE 24, IF YOU HAVE TO WAIT

22   SIX MONTHS AND A DAY?

23        YOU GOT IT.  DECEMBER 24TH, 2001 WAS THE FIRST DAY

24   AVAILABLE.

25        AND YOU'LL HEAR WITNESSES TELL YOU THAT IT WAS

1    ALWAYS THE INTENT OF THE OPTION COMMITTEE TO PRICE ON

2    DECEMBER 24, 2001.  IT WASN'T GRABBED ON JANUARY 5TH, LIKE

3    THE PROSECUTOR SUGGESTED.  IT WAS ALWAYS THE INTENT, AND

4    YOU'RE GOING TO HEAR THAT FROM THE WITNESS STAND.

5            NOW THEN, LET'S GO TO BILL'S E-MAIL.

6            WE'LL SKIP IT FOR NOW.

7            BUT THEY SHOWED YOU THE E-MAIL WHERE BILL SAID, *I*

8    *RECOMMEND GRABBING THE PRICE*.

9            REMEMBER THAT?  BUT WHAT THEY DIDN'T TELL YOU WAS

10   THAT THE PRICE HAD ALREADY BEEN AGREED UPON.  HADN'T BEEN

11   AGREED UPON MONTHS EARLIER.  THEY MADE IT LOOK LIKE HE WAS

12   LOOKING BACK.

13           AND IN FACT, THIS GOES BACK TO MY POINT ABOUT

14   DR. NICHOLAS.  DR. NICHOLAS WAS GIVING -- MAKING NOISES OF

15   WANTING TO WAIT A LITTLE BIT.  AND WHAT BILL -- AND YOU'LL

16   HEAR EVIDENCE DAVID DULL AND NANCY TULLOS AND OTHER PEOPLE

17   WERE SAYING IN THIS TIME PERIOD WAS, *YOU CAN'T DO THAT.*

18   *YOU'VE GOT THESE EMPLOYEES THAT WE PROMISED TO GET GRANTS*

19   *BACK TO.  DECEMBER 24 IS THE FIRST DAY WE CAN.  DON'T BE*

20   *WAITING.  DON'T WAIT UNTIL THE END OF JANUARY.*

21           AND THAT'S WHAT THEY WERE TALKING ABOUT AND

22   NOTHING MORE.

23           BUT NOW, IN THIS POST-2006 WAY OF LOOKING AT

24   THINGS, THEY MAKE THAT LOOK EVIL.  THEY MAKE IT LOOK EVIL

25   THAT BROADCOM INTENDED TO GIVE A GRANT ON DECEMBER 24TH, BUT

DR. NICHOLAS HADN'T RELEASED ON IT UNTIL EARLY JANUARY.  AND

IN AN ATTEMPT TO GET HIM TO RELEASE ON IT, THEY SAID, *YOU'VE*

*GOT TO GRAB THAT PRICE*.

NOW, I WANT TO TURN TO THE EVENTS OF 2003.  THE

PROSECUTOR GLOSSED OVER THEM, BUT I'M GOING TO SPEND JUST A

LITTLE TIME ON THEM.  BECAUSE ONE THING THAT I NEED TO TELL

YOU ABOUT THESE EVENTS IS FOUR THINGS HAPPENED IN 2003.

NOW, THIS IS IN THE MIDDLE OF WHAT THE GOVERNMENT

ALLEGES WAS A CRIMINAL CONSPIRACY.  AND BILL AND OTHERS WERE

THE CONSPIRATORS.  FOUR THINGS HAPPENED:  IN JANUARY,

DR. NICHOLAS LEAVES.  IN OCTOBER -- ACTUALLY A LITTLE BIT

EARLIER IN '02, NICOLE BONSNESS HAD ARRIVED.  SHE WAS THE

HEAD OF SHAREHOLDER SERVICES, THE NEW ONE.  AND SHE WAS

TERRIFIC.  SHE MAY TESTIFY.  IF SHE DOESN'T TESTIFY, YOU'LL

HEAR ABOUT IT.  SHE WAS TERRIFIC.

SARBANES-OXLEY LEGISLATION.

AS A RESULT OF THE REAL FALL-OUTS THAT OCCURRED IN

THIS COUNTRY, LIKE ENRON AND WORLDCOM, CONGRESS PASSED

SARBANES-OXLEY.  AND ONE OF THE VERY, VERY GOOD THINGS ABOUT

SARBANES-OXLEY WAS IT FORCED COMPANIES, INCLUDING BROADCOM,

TO FOCUS ON THEIR PROCESS.

NOW, REMEMBER, WHAT WAS THE BIGGEST CHALLENGE TO

THE STOCK OPTION PROCESS PRIOR TO 2003?

IT WAS DR. NICHOLAS.  BUT NOW HE WAS GONE.

BILL RUEHLE WASN'T THE PROBLEM WITH THE STOCK OPTION

1    PROCESS.  HE WAS NEVER THE PROBLEM WITH THE STOCK OPTION

2    PROCESS.  SO -- AND THEN NANCY TULLOS LEFT.  AND YOU WILL

3    HEAR SOME TESTIMONY ABOUT THAT AND THE FACT THAT SHE WAS

4    FIRED IN MID-2003 AND SHE WAS REPLACED WITH A NEW HR

5    DIRECTOR.

6            SO ALL OF THIS CREATED A GREAT OPPORTUNITY TO

7    CLEAN UP THE PROCESS.  NOT TO STOP COMMITTING A CRIME, IF NO

8    ONE BELIEVED THERE WAS A CRIME, BUT TO CLEAN UP THE PROCESS.

9            AND IF WE COULD GO IN AND THE GRAPHIC ON THE 2003

10   TO 2006 PRICE.

11           YOU WILL HEAR EVIDENCE THAT IN THE HEART OF THIS

12   ALLEGED CONSPIRACY, EVERY GRANT THAT WAS MADE AFTER THE

13   BEGINNING OF 2003, OR EARLY 2003, IS 186 GRANTS.  IT TOTALS

14   ALMOST 100 MILLION SHARES OF BROADCOM STOCK.  NOT ONE OF

15   THEM WAS RESTATED.  NOT ONE OF THEM HAD A PROBLEM.

16           NOW I WANT TO GO BACK TO WHERE I STARTED WITH THE

17   NOW VERSUS THEN BECAUSE THAT'S REALLY WHAT THIS CASE IS

18   ABOUT.  SO NOW WE'RE IN 2006.  AND PEOPLE ARE LOOKING BACK

19   ON ACTIVITIES IN THIS TIME PERIOD WITH A NEW PERSPECTIVE ON

20   OPINION 25, A PERSPECTIVE THAT NO ONE HAD IN 2000 OR 2002.

21   IT'S THE "NOW VERSUS THEN" MENTALITY.

22           AND SO, I WANT TO FOCUS AND TELL YOU A LITTLE

23   STORY ABOUT ERNST & YOUNG, BECAUSE THEY RESURFACED.

24   REMEMBER I TOLD YOU THAT ERNST & YOUNG WERE THE AUDITORS.

25           WELL, IN 2006, THERE WERE TWO AUDIT FIRMS LOOKING

1    AT THESE STOCK OPTION RATES.  AND ERNST & YOUNG WAS ONE OF

2    THEM.  AND SO ERNST & YOUNG WAS CONFRONTED WITH THE FACTS

3    ABOUT THE MAY 26 GRANT.  WE JUST SPENT A LOT OF TIME TALKING

4    ABOUT THAT.  AND DO YOU KNOW WHAT POSITION THEY TOOK IN

5    2006?

6            YOU GOT IT.  THAT THEY SHOULD HAVE TAKEN A $700

7    MILLION DOLLAR COMP, OR 619 COMP CHARGE.

8            THINK ABOUT THIS.  THE SAME ACCOUNTING FIRM WHICH

9    IN 2000, KNOWING ALL THE FACTS, TOLD BROADCOM *YOU DON'T HAVE*

10   *TO TAKE A COMP CHARGE, BROADCOM*, IN 2006 SAID, *YOU SHOULD*

11   *HAVE TAKEN A COMP CHARGE.*

12           NOW, THINGS WERE DIFFERENT IN 2006.  THE

13   GOVERNMENT WAS BREATHING DOWN PEOPLE'S NECKS.  THE SEC WAS

14   BREATHING DOWN PEOPLE'S NECKS.  AND ALL THESE AUDITORS APB

15   OR OPINION 25 THROUGH A DIFFERENT LIGHT.  THE LIGHT THEY

16   LOOKED AT IT IN 2000 WAS IT WAS A FLEXIBLE RULE.  YOU DON'T

17   HAVE THE ALLOCATIONS DONE FOR A FEW MONTHS, NO PROBLEM.  DO

18   THE BEST YOU CAN.

19           BUT IN 2006, IF EVERY PIECE OF PAPER WASN'T

20   EXACTLY RIGHT, YOU'VE GOT A PROBLEM.  SO IT'S NOW VERSUS

21   THEN, LADIES AND GENTLEMEN.

22           AND I WANT TO SHOW YOU ONE OF THE INTERESTING,

23   IRONIC FACTS OF THIS CASE.

24           IF WE COULD GO TO EXHIBIT 58, AARON.

25           NOW, THIS WAS WRITTEN IN OCTOBER OF 2006.  THIS IS

1    BY ERNST & YOUNG, AND IT'S TALKING ABOUT OPINION 25.  AND

2    LET ME READ IT TO YOU:

3            *DETERMINING THE MEASUREMENT DATE FOR STOCK-BASED*

4    *COMPENSATION.  THE DETERMINATION OF THE APPROPRIATE*

5    *MEASUREMENT DATE UNDER OPINION 25 --* SKIP A PARAGRAPH *-- IS*

6    *HIGHLY DEPENDENT ON THE SPECIFIC FACTS AND CIRCUMSTANCES AND*

7    *OFTEN INVOLVES COMPLEX JUDGMENTS STEMING FROM BOTH*

8    *ACCOUNTING AND LEGAL CONSIDERATIONS.  ACCORDINGLY, WE*

9    *STRONGLY RECOMMEND THAT CLIENTS AND OTHERS CONSIDER ALL*

10   *RELEVANT FACTS AND CIRCUMSTANCES AND CONSULT AS APPROPRIATE*

11   *IN ANY GIVEN OCCASION.*

12           ONE OF THE ULTIMATE IRONIES IN THIS CASE, LADIES

13   AND GENTLEMEN.  WE HEAR ABOUT ACCOUNTING FOR STOCK OPTIONS.

14   ERNST & YOUNG WERE BROADCOM'S AUDITORS IN 2000, AND

15   THROUGHOUT THE ENTIRE TIME.  BUT THEY NEVER GAVE ADVICE ON

16   OPINION 25 THAT WASN'T ANYTHING OTHER THAN INCORRECT WHEN IT

17   COMES TO THIS SPECIFIC ISSUE.  AND THEN IN 2006 IS THE FIRST

18   TIME THAT THEY WRITE A RELEASE TO THEIR CLIENTS SAYING IT'S

19   HIGHLY DEPENDENT ON THE SPECIFIC FACTS AND CIRCUMSTANCES.

20           THIS STUFF IS NOT SIMPLE.  THIS IS THE REASON WHY

21   IT TRIPPED UP SO MANY COMPANIES.

22           I WANT TO SHIFT GEARS, BECAUSE I WANT TO TALK

23   ABOUT HOW THIS COULD HAPPEN.  HOW COULD ALL OF THESE

24   COMPANIES HAVE GOTTEN THIS ACCOUNTING OPINION SO WRONG AT

25   THE SAME TIME INVOLVING THE SAME ISSUE?  AND THEY ALL HAD

1    EXPERT ACCOUNTING FIRMS.

2          AND I THINK YOU WILL FIND A CLUE WHEN BROADCOM

3    MADE ITS RESTATEMENT.  BECAUSE REMEMBER THE ALLEGATION IS

4    THAT BROADCOM CRIMINALLY UNDERSTATED ITS COMPENSATION

5    EXPENSES.  I THINK HE USED "INSIDE OUTSIDE" OR WHATEVER.

6    THAT THE INSIDE WAS THIS BUT THE OUTSIDE WAS HERE.  THE

7    EVIDENCE IS GOING TO SHOW THAT THE INSIDE AND THE OUTSIDE

8    WAS BELIEVED TO BE THE SAME AT BROADCOM.

9          BUT THEIR THEORY IS THAT THEY WERE CRIMINAL IN NOT

10   PUTTING THESE COMPENSATION CHARGES ON THEIR BOOKS.  SO YOU

11   WOULD THINK THAT ONCE THEY DID THEIR RESTATEMENT AND THEY

12   CORRECTED THEIR ACCOUNTING, WHICH IS WHAT "RESTATEMENT" IS,

13   THAT THEIR STOCK WOULD PLUMMET.  AFTER ALL, IN ENRON AND

14   WORLDCOM, WHICH WERE REAL FRAUDS, WHEN THE TRUTH, WHEN THE

15   EVIDENCE OF THE FRAUD CAME OUT, WE ALL KNOW WHAT HAPPENED

16   WITH THOSE TWO COMPANIES AND THEIR STOCK.  THEY WENT DOWN TO

17   ZERO.

18         SO LET'S SEE WHAT HAPPENED TO BROADCOM ON THE DAY

19   THAT THEY MADE THE RESTATEMENT.  AND THERE'S $2.2 BILLION

20   RESTATEMENT.  THAT'S THE DAY OF THE ANNOUNCEMENT.  THAT'S

21   THE NEXT DAY.  THE STOCK PRICE ROSE 4.2 PERCENT.

22         NOW, YOU MIGHT THINK, WELL, THAT'S JUST ONE DAY.

23   MAYBE SOMETHING HAPPENED THEREAFTER.  THIS IS THE MONTH.  IT

24   ROSE SEVERAL MORE PERCENT, 23.5 PERCENT.  THIS IS AFTER THEY

25   ADDED $2.2 BILLION TO THEIR BOOKS.

1          SO THERE HAS GOT TO BE SOMETHING MORE TO THE

2   STORY.   THERE HAS GOT TO BE SOMETHING THAT THEY HAVE LEFT

3   OUT IN THE WAY THEY PUT TOGETHER THIS NEAT LITTLE

4   INSIDE-OUTSIDE CONSPIRACY THEORY.

5          AND HERE IS WHAT IS MORE TO THE STORY.   IT

6   INVOLVES WHAT THAT $2.2 BILLION IS.   THAT $2.2 BILLION ARE

7   NOT DOLLARS.   THEY CALL THEM DOLLARS, BUT THEY'RE NOT

8   DOLLARS.   THEY'RE CALLED NONCASH EXPENSES.   I'M NOT GOING TO

9   SPEND A LOT OF TIME THIS MORNING TALKING ABOUT NONCASH

10  EXPENSES.   YOU'RE GOING TO HEAR THE EVIDENCE WHAT THAT IS.

11  BUT I'M GOING TO TELL YOU RIGHT NOW THAT THEY WERE NOT REAL

12  DOLLARS.   THE REAL DOLLARS ARE WHAT'S IN BROADCOM'S BANK

13  ACCOUNT.

14          SO I'M GOING TO SHOW YOU A CHART WHICH SHOWS THE

15  EFFECT OF THE RESTATEMENT ON BROADCOM'S BANK ACCOUNT.

16          DO YOU HAVE THAT?

17          SO THIS IS THEIR CASH.   THIS IS THE MONEY THEY

18  HAVE.   THIS IS THE TIME PERIOD THAT BILL RUEHLE WAS THEIR

19  CHIEF FINANCIAL OFFICER.   YOU CAN SEE THAT THEIR CASH IS

20  CONSTANTLY OR GENERALLY INCREASING.

21          BY 2005, THEY HAD $1.8 BILLION CASH IN THE BANK.

22  THEY DID THEIR RESTATEMENT.   OKAY.   YOU ADD THIS $2.2

23  BILLION SOMETHING ONTO THEIR BOOKS, AND WHAT HAPPENS?

24          THE SAME CASH IS IN THE BANK.   THIS SAME CASH IS

25  IN THE BANK.   THE DIFFERENCE IS ZERO.   SO THERE'S GOT TO BE

1    MORE TO THIS STORY THAN THAT.

2         AND THAT GOES TO WHAT INVESTORS REALLY FOUND

3    SIGNIFICANT.  AND WHAT INVESTORS REALLY FIND SIGNIFICANT --

4    AND YOU WILL HEAR A LOT OF EVIDENCE IN THIS CASE IS A

5    COMPANY'S CASH, A COMPANY'S CASH FLOW, A COMPANY'S FUTURE

6    PROSPECTS, A COMPANY'S PRODUCTS, A COMPANY'S COMPETITION.

7    HISTORICAL STUFF LIKE NONCASH EXPENSES ARE NOT MATERIAL OR

8    SIGNIFICANT TO INVESTORS.

9         NOW, IN ORDER TO FULLY APPRECIATE THAT, YOU NEED

10   TO -- WE NEED TO UNDERSTAND WHY THAT IS.  ONE IS, IT'S

11   NOT -- IT'S A NONCASH ITEM.  BUT TWO IS, IT'S LARGELY A

12   HYPOTHETICAL EXPENSE, AND I'M GOING TO SHOW YOU WHY.

13        AARON, COULD WE GO TO THE GRAPHIC ON MAY 26, 2000?

14        THIS IS THE RESTATEMENT AMOUNT JUST FOR THE MAY 26

15   GRANT, THE ONE THAT ERNST & YOUNG ADVISED BROADCOM BUT THEY

16   DIDN'T HAVE TO TAKE THE EXPENSE ON; THAT THEY COULD CHANGE

17   THEIR MIND ON SIX YEARS LATER.  $619 MILLION OF NONCASH

18   EXPENSES HAD TO BE PUT BACK ON THE BOOKS.

19        HERE ARE THE NUMBER OF SHARES THAT WERE EXERCISED

20   FOR THAT GRANT.  ZERO.  AND THAT'S IN PART WHY INVESTORS

21   DON'T PUT MUCH CONFIDENCE IN NONCASH EXPENSES, BECAUSE THEY

22   ARE NOT REAL.  THEY ARE HYPOTHETICAL.

23        NOW, IF WE GO TO THE NEXT CHART, WHICH IS THE

24   GRANT --

25        YOU WILL SEE ALL OF THE MAY 26 GRANTS WERE

1    UNDERWATER.  NONE WERE EVER EXERCISED.  SO WHAT DO INVESTORS

2    LOOK AT?

3              YOU MAY HEAR EVIDENCE ABOUT SOMETHING CALLED A

4    PRO FORMA BOTTOM LINE.  PRO FORMA BOTTOM LINE.  I'M NOT

5    GOING TO GIVE YOU THE ACCOUNTING TUTORIAL NOW.  I DON'T EVEN

6    UNDERSTAND IT MYSELF.  THE EXPERTS WILL EXPLAIN IT.

7              BUT WHAT IT IS IS THEY LOOK AT THE FUNDAMENTALS OF

8    A COMPANY AND THEY TAKE OUT, THEY STRIP OUT, THE THINGS THAT

9    ARE NOT FUNDAMENTAL, LIKE NONCASH EXPENSES.

10             SO BACK TO MY QUESTION.  HOW COULD THESE COMPANIES

11   HAVE GOTTEN IT WRONG?

12             WELL, NOW I'VE TOLD YOU THAT IT INVOLVES SOMETHING

13   THAT'S NOT CASH, SO IT'S NOT THAT IMPORTANT OR MATERIAL TO

14   INVESTORS.

15             AND THE SECOND WAY THEY GOT IT WRONG -- IF WE CAN

16   GO TO THE GRAPHIC ON APRIL 1ST, 1999, UWC.

17             THIS IS AN EXAMPLE OF A UWC, DATED APRIL 1ST,

18   1999, AND IT TALKS ABOUT THE GRANT BEING MADE AS OF THE FAIR

19   MARKET VALUE.

20             THROUGHOUT THIS CASE, LADIES AND GENTLEMEN, THE

21   ACCOUNTING DEPARTMENT AT BROADCOM BELIEVED THAT AS LONG AS

22   THE GRANT PRICE THAT WAS STATED ON THE OPTIONS COMMITTEE'S

23   FORMAL DOCUMENT, THE UWC, AS LONG AS THAT GRANT PRICE,

24   MATCHED THE FAIR MARKET VALUE ON THE DATE THAT IT STATES,

25   APRIL 1ST, THEN THAT MEANT IT WAS A FAIR MARKET VALUE GRANT.

1    REMEMBER I STARTED BY TALKING A LITTLE BIT ABOUT

2    MICROSOFT.  MICROSOFT HAD A PRACTICE OF LOOKING BACK 30 DAYS

3    FOR THE BEST PRICE.  BUT WHEN THEY ACCOUNTED FOR THAT

4    PRACTICE, THEY CALLED THEM FAIR MARKET VALUE GRANTS BECAUSE

5    THERE WAS A MISUNDERSTANDING AS TO WHAT FAIR MARKET VALUE

6    CAME TO MEAN AFTER 2006.  THIS ISN'T JUST MICROSOFT AND

7    BROADCOM.  OVER 200 COMPANIES KEEP THE SAME KINDS OF THINGS.

8    NOW, IN 2006, EVERYONE SEES THINGS VERY CLEARLY,

9    HOW CLEAR OPINION 25 IS.  BUT AT THAT TIME, PEOPLE DIDN'T

10   SEE THINGS THAT WAY.

11   NOW, I WANT TO HIT SOME TOPICS VERY BRIEFLY THAT

12   THE PROSECUTOR TOUCHED ON AND THEN I WANT TO CONCLUDE.

13   THE PROSECUTOR TOLD YOU THAT BILL RUEHLE WAS

14   INVOLVED IN A CRIMINAL CONSPIRACY TO REAP OR CONCEAL OPTION

15   EXPENSES.  BUT HE DIDN'T SHOW YOU E-MAILS LIKE THIS.  AND

16   WE'LL SHOW YOU SEVERAL.  I'M JUST GOING TO GIVE YOU ONE BY

17   EXAMPLE.

18   THIS IS AN E-MAIL FROM CAROL PRADO TO HER BOSS

19   BILL RUEHLE AND TO ANOTHER PERSON IN THE ACCOUNTING

20   DEPARTMENT, COPYING SEVERAL OTHERS.  AND IT'S TALKING ABOUT

21   ONE PARTICULAR OPTION GRANT.

22   IT SAYS:  BILL, JUST WANTED TO CONFIRM IT'S OKAY

23   TO GRANT OPTIONS TO NONEMPLOYEES COMP EXPENSE.  THAT'S

24   SAYING, WE'RE *GOING TO TAKE A COMP EXPENSE FOR THIS.  IS*

25   *THAT OKAY?*

1          AND BILL RUEHLE'S RESPONSE, *CAROL, THANKS FOR*

2    *CHECKING.  WE HAVE AUTHORIZED THESE EVEN WITH THE COMP*

3    *CHARGE.*

4          YOU ARE GOING TO FIND SLEWS OF EVIDENCE, DOCUMENT

5    AFTER DOCUMENT, WHERE THIS COMPANY WASN'T AFRAID TO TAKE

6    COMPENSATION EXPENSES IF THEY WERE APPROPRIATE.  THEY DIDN'T

7    TAKE COMPENSATION EXPENSES WHERE THEY DIDN'T THINK IT WAS

8    APPROPRIATE.

9          AND JUST IN CASE YOU THINK THAT IS ONE ISOLATED

10   EXAMPLE, LET ME SHOW YOU THE NEXT CHART, WHICH IS CALLED:

11   ALL THE NONCASH EXPENSES THEY DID TAKE.  BROADCOM REGULARLY

12   TOOK NONCASH STOCK OPTIONS EXPENSES.  OVER THE TIME PERIOD

13   OF THIS ALLEGED CONSPIRACY, BROADCOM TOOK OVER $1.6 BILLION

14   IN NONCASH COMP CHARGES.  ON THEIR BOOKS, INSIDE-OUTSIDE,

15   WHATEVER HE TALKED ABOUT, THEY'RE ON THEIR REPORTS AND THEY

16   WERE DEAD SOLID CORRECT.  THEY WERE CHECKED BY THE

17   ACCOUNTANTS.  THEY WERE APPROVED BY THE AUDITORS.  THIS

18   WASN'T A COMPANY THAT HAD A CRIMINAL CONSPIRACY TO EXCLUDE

19   COMP CHARGES.  IF IT WERE, THEY WOULDN'T HAVE 1.6 BILLION ON

20   THEIR BOOKS.

21          NOW IF WE CAN GO BACK TO EXHIBIT 14.

22          THIS TAKES ME BACK TO A POINT THAT I STARTED WITH.

23   BILL RUEHLE SAID, *WHATEVER IT IS, WE WENT BY THE AUDITORS.*

24   AND YOU'RE GOING TO HEAR THAT TIME AND AGAIN.

25          NOW, THE PROSECUTOR TALKED ABOUT OPTION COMMITTEE

1   MEETINGS, AND HE SAID, *THEY WEREN'T MEETING.  THAT WAS A*
2   *COVER STORY.*

3        IF I'M GOING TO DECIDE A DOCUMENT LOOKS OKAY AND
4   YOU CALL IT A FALSE DOCUMENT, IT LOOKS BAD.  THE OPTION
5   COMMITTEE HAD TWO PEOPLE ON IT:  DR. NICHOLAS AND
6   DR. SAMUELI.  TO ASK THE QUESTION WHEN WERE THEY READING IS
7   THE WRONG QUESTION.

8        HERE IS WHAT THE EVIDENCE IS GOING TO SHOW.
9   WHENEVER THEY MET, WHENEVER THEY HAD A DISCUSSION, WHENEVER
10   THAT DATE WAS, SOMETIME THEREAFTER THEY COMMUNICATED THEIR
11   DECISION TO BILL.  THAT'S WHAT THEY DID.  AND THEN SOMETIME
12   AFTER THAT, THEY CONFIRMED THEIR DECISION IN WRITING.

13        CAN WE PUT UP EXHIBIT 61.

14        SO WHAT YOU HAVE, LADIES AND GENTLEMEN, IS YOU
15   HAVE ORAL REPRESENTATIONS AND THEN WRITTEN REPRESENTATIONS
16   BY THE FOUNDERS OF THE COMPANY, BY THE ONLY TWO PEOPLE WHO
17   ARE AUTHORIZED TO GRANT STOCK OPTIONS, TELLING BILL RUEHLE,
18   THIS IS WHEN WE GRANT IT.

19        NOW THE GOVERNMENT CALLS THIS ALL A COVER STORY.
20   NOT SO.  NOT SO.

21        NOW I WANT TO TOUCH ON A COUPLE OTHER POINTS.
22   ONE, PROSECUTOR SUGGESTED THAT BILL RUEHLE MADE ALL THIS
23   MONEY ON THIS CONSPIRACY, AND HE SAID -- IT'S A GOOD
24   SUGGESTION.  I THINK HE PUT 77 MILLION ON THE BOARD.

25        LET ME TELL YOU A COUPLE OF POINTS ON THIS.  AND

1    WE'RE GOING TO TOTALLY PROVE THIS AT TRIAL, BUT LET ME JUST

2    GIVE YOU HIGHLIGHTS.  NUMBER ONE, VIRTUALLY EVERY PENNY THAT

3    BILL RUEHLE MADE FROM BROADCOM STOCK OPTIONS CAME FROM HIS

4    PRE-IPO OPTION GRANT WHEN HE FIRST JOINED THE COMPANY.

5    THOSE OPTIONS ARE NOT AT ISSUE IN THIS CASE, NOT A ONE OF

6    THEM.

7           OF THE OPTIONS AT ISSUE IN THIS CASE, BILL RUEHLE

8    CASHED OUT APPROXIMATELY $115,000 PURSUANT TO A NORMAL,

9    REGULAR PROGRAM.

10          NOW, THE PROSECUTOR TALKED ABOUT THE OPTIONS THAT

11   HE HAD GRANTED.  BUT WHAT HE DIDN'T TELL YOU IS THE OPTIONS

12   HE DIDN'T EXERCISE.  500,000 GRANTED -- 485,000.  DURING

13   THIS CRIMINAL CONSPIRACY THAT HE SAYS EXISTED WHEN

14   BILL RUEHLE WAS MOTIVATED TO STEAL MONEY AND MAKE THE

15   PROCEEDS OF THIS ALLEGED CRIME, HE ONLY EXERCISED 15,000

16   SHARES.

17          AND THE PROSECUTOR DIDN'T TELL YOU THAT OF 77

18   MILLION THAT HE MADE ON HIS PRE-IPO SHARES WHAT HE DID WITH

19   THAT MONEY.  YOU ARE GOING TO SEE EVIDENCE THAT BILL RUEHLE

20   GAVE $18 MILLION OF THAT TO CHARITY.

21          HE MENTIONED THIS FELLOW NAMED NAYEBI.  AND HE

22   SAID YOU ARE GOING TO HEAR ABOUT THIS CONSPIRACY AND HE BLEW

23   A WHISTLE. LET ME JUST TELL YOU A FEW THINGS ABOUT MEHRDAD

24   NAYEBI.  NUMBER ONE, BILL RUEHLE WAS NOT INVOLVED IN HIS

25   HIRE.  IN FACT, WHEN THERE WAS A REQUEST MADE TO BACKDATE

1   HIS OPTION GRANT, I'M GOING TO SHOW YOU WHAT RUEHLE SAID,

2   BILL RUEHLE SAID WHEN A REQUEST WAS MADE TO BACKDATE

3   NAYEBI'S OPTION GRANT.

4          *DEAR JENNIFER* -- THIS IS FROM NAYEBI SAYING -- MY

5   HIRE DATE WAS 5/25, NOT 5/28.

6          IT WAS NAYEBI WHO ASKED THAT HIS OPTIONS --

7   CHANGED THAT DATE.

8          LET'S LOOK AT THOSE RESPONSES TO THAT LINE.

9          HARRIS SAYS:  *PER BILL, WE GRANT OPTIONS ONLY AS*

10  *OF THE FRIDAY CLOSE FOR EMPLOYEES WHO BEGAN WORK THAT WEEK.*

11  *WE DO NOT SINGLE OUT INDIVIDUALS TO BE GRANTED OPTIONS ON*

12  *THEIR HIRE DAY.*

13         HIS MAY 28 GRANT IS NOT TO BE CHANGED.  THAT'S

14  WHAT BILL SAID.

15         NOW, YOU WILL HEAR EVIDENCE THAT BILL WAS

16  OVERRULED.  BILL WASN'T THE FINAL VOICE AT BROADCOM.  BILL

17  COULD ONLY DO SO MUCH.  IT TURNS OUT THAT THE GRANT DATE WAS

18  CHANGED TO MAY 25 AND THERE WAS A BELIEF, AT LEAST FROM

19  DR. NICHOLAS' PERSPECTIVE, THAT HE WAS HIRED OR HE STARTED

20  WORKING ON THAT DAY.

21         BUT THAT DOESN'T REALLY MATTER FOR MY PURPOSES

22  NOW.  WHAT MATTERS IS WHAT WAS IN BILL'S HEART.  BILL SAID,

23  *THIS GRANT DATE IS NOT TO BE CHANGED.*

24         AND SO THEN THE PROSECUTOR SAID, *SO THIS GUY GETS*

25  *FIRED.  HE SUES BROADCOM, AND THEY HAVE THIS GRAND*

1  *CONSPIRACY TO COVER UP THE LAWSUIT.*

2          ALL I'M GOING TO SAY ABOUT THAT IS THAT IT'S

3  ANOTHER EXAMPLE OF PUTTING A NEGATIVE CRIMINAL SPIN ON

4  INNOCENT CONDUCT.  YOU'RE GOING TO HEAR HOW THAT SUIT

5  SETTLED.  BILL RUEHLE WAS VIRTUALLY UNINVOLVED IN THE

6  SETTLEMENT.  IT'S A DR. NICHOLAS DEAL.  NANCY TULLOS WAS

7  INVOLVED, BECAUSE SHE WAS IN HR.  AND THE LAWYERS WERE

8  INVOLVED.  AND IT WAS PAPERED LIKE ANY OTHER SETTLEMENT OF

9  ANY OTHER LAWSUIT.  THERE WAS A CONFIDENTIALITY PROVISION.

10 IT WASN'T BANG SILENCE.  IN VIRTUALLY EVERY

11 CONFIDENTIALITY -- EXCUSE ME, IN VIRTUALLY EVERY EMPLOYMENT

12 LAWSUIT THAT GETS FILED, WHEN IT IS SETTLED, THERE'S A

13 COMMON CLAUSE THAT SAYS, *THIS IS CONFIDENTIAL.*

14         NOW THEY MAKE IT SOUND SO CRIMINAL.  THEY MAKE IT

15 SOUND THEY WERE BUYING THIS GUY'S SILENCE.

16         SO THE LAST SUBSTANTIVE POINT I WANT TO MENTION

17 FROM WHAT HE SAID.  HE COVERED A BUNCH OF POINTS.  THE

18 EVIDENCE IS GOING TO ANSWER THEIR POINTS, LADIES AND

19 GENTLEMEN.  I AM CONFIDENT WHEN YOU HEAR THE EVIDENCE THAT

20 YOU WILL HAVE ANSWERS FOR EVERYTHING THAT THEY SAID.

21         BUT I WANT TO TALK ABOUT BILL'S INTERVIEW, BECAUSE

22 THEY MADE IT SEEM LIKE BILL WAS A CRIMINAL FOR NOT GIVING AN

23 INTERVIEW IN SEPTEMBER OF 2006.  REMEMBER, HE LED UP TO IT.

24 WE'LL HAVE A LITTLE GET-TOGETHER.  WE SET UP TENT, OR

25 WHATEVER HE CALLED IT.  AND BILL SAID NO.  HE WAS A

1    CRIMINAL.

2             WELL, WHAT IS THE EVIDENCE GOING TO SHOW?

3             THE EVIDENCE IS GOING TO SHOW THAT AT THAT TIME,

4    THERE WAS THIS MENTALITY THAT SOMETHING WRONG IN THE

5    COMPANY, AT ALL THESE COMPANIES, MUST HAVE OCCURRED.  AND

6    ALL THESE COMPANIES WERE DOING INVESTIGATIONS.  SO THE --

7    WHAT IS THE PRUDENT THING FOR AN EXECUTIVE WHO'S INVOLVED IN

8    ONE OF THOSE THINGS TO DO?

9             HIRE A LAWYER.  AND THE EVIDENCE IS GOING TO SHOW

10   THAT BILL RUEHLE DIDN'T SIT DOWN FOR THAT INTERVIEW FOR ONE

11   REASON AND ONE REASON ONLY.  BECAUSE HIS LAWYER ADVISED HIM

12   NOT TO.  AND AS IT TURNED OUT, IT WAS PRUDENT ADVICE.

13            BUT THE GOVERNMENT TURNS THAT, LIKE THEY TURN

14   EVERY INNOCENT E-MAIL, TO MAKE IT SEEM LIKE A TOOL OF THE

15   CONSPIRACY.  LIKE HE MUST BE A CRIMINAL BECAUSE HE FOLLOWED

16   HIS LAWYER'S ADVICE.  NOT SO.

17            NOW I WANT TO TALK A LITTLE BIT ABOUT THE TRIAL

18   PROCESS.  I'M DONE TALKING ABOUT THE EVIDENCE.  THE EVIDENCE

19   IS GOING TO COME OUT IN THE NEXT TWO MONTHS, AND I'M

20   CONFIDENT YOU WILL HEAR IT.

21            I WANT TO TALK TO YOU A LITTLE BIT ABOUT THE TRIAL

22   PROCESS.  HIS HONOR TOLD YOU ABOUT THE IMPORTANCE OF THE

23   BURDEN OF PROOF AND THE IMPORTANCE OF THE PRESUMPTION OF

24   INNOCENCE.  AT THIS POINT, YOU HAVE HEARD NO EVIDENCE.  AT

25   THIS POINT, BILL RUEHLE HAS A CLEAN SLATE.

1         AND ALL I ASK YOU TO DO IS TO KEEP THAT IN MIND

2    AND TO HEAR THE EVIDENCE KIND OF IN -- KEEP IT IN MIND, BUT

3    DON'T FORM ANY CONCLUSIONS ON IT UNTIL YOU HEAR THE END OF

4    THE CASE.

5         IT'S KIND OF LIKE A SITUATION WHERE A KID COMES TO

6    A PARENT AND SAYS, *MY BROTHER DID THIS TO ME.*

7         NO RESPONSIBLE PARENT SAYS, *OH, I'M GOING TO*

8    *PUNISH HIM* UNTIL HEARING THE OTHER SIDE, RIGHT?

9         AND THAT'S WHAT WE ASK OF YOU.  BECAUSE WE KNOW

10   THAT IF YOU HEAR BOTH SIDES, YOU WILL COME TO AN INNOCENT

11   CONCLUSION.  AND OF COURSE THAT'S WHAT THE LAW REQUIRES.

12   THE LAW REQUIRES THAT YOU KEEP AN OPEN MIND THROUGHOUT THIS

13   CASE.

14        NOW, THE GOVERNMENT GOES FIRST, BECAUSE IT IS

15   THEIR BURDEN.  THEY OPENED FIRST.  THEY GET TO CLOSE LAST,

16   BECAUSE IT'S THEIR BURDEN.  BUT WE GET TO CROSS-EXAMINE THE

17   WITNESSES.  SO THE TYPICAL THING THAT'S GOING TO HAPPEN,

18   YOU'RE GOING TO SWEAR A WITNESS.  WE'RE GOING TO HAVE SOME

19   EVIDENCE ON DIRECT EXAMINATION; AND THEN, WE'RE GOING TO

20   CROSS-EXAMINE.

21        NOW, I'M GOING TO TELL YOU IN ADVANCE SO THAT YOU

22   DON'T GET ANGRY AT ME OR MY TEAM THROUGHOUT THIS CASE, OUR

23   EXAMINATION IS GOING TO BE A LITTLE LONGER THAN THEIRS.  WE

24   WANT EVERY FACT TO COME OUT BEFORE YOU.

25        MR. STOLPER:  YOUR HONOR, I APOLOGIZE.  THIS IS

1    ARGUMENT.

2              THE COURT:  DULY NOTED.

3              MR. MARMARO:  WE NEED TO HAVE EXAMINATIONS THAT

4    ARE LONGER.  AND HERE'S THE REASON WHY.  THE GOVERNMENT GETS

5    TO MEET WITH ITS WITNESSES.  THEY GET TO PREPARE THEIR

6    WITNESSES.  WE DON'T GET THAT LUXURY.  SO YOU ARE GOING TO

7    SEE ME AT THIS PODIUM FOR MAYBE A DAY TALKING WITH A WITNESS

8    THAT MR. STOLPER HAD FOR HALF A DAY.  BUT HE MET WITH HER

9    SEVEN TIMES TO PREPARE FOR THIS.  SHE WOULDN'T TALK TO ME

10   ONCE.

11             SO, PLEASE, JUST -- I'M TELLING YOU THAT SO YOU

12   BEAR IN MIND HOW THE PROCESS GOES.  AND THAT'S GOING TO

13   HAPPEN OVER AND OVER.

14             NOW, HERE IS THE FINAL THING I WANT TO LEAVE YOU

15   WITH, AND THEN I'M GOING TO THANK YOU FOR YOUR ATTENTION.

16   IF YOU KEEP AN OPEN MIND IN THIS ENTIRE CASE, AS YOU

17   PROMISED YOU WOULD, YOU'RE GOING TO SEE THE EVIDENCE POINTS

18   TO ONLY ONE CONCLUSION, AND THAT IS INNOCENCE.

19             AT THE END OF THE CASE, I GET A CHANCE TO TALK TO

20   YOU AGAIN.  THE NEXT TIME I'M GOING TO TALK TO -- WE TALKED

21   IN VOIR DIRE.  WE'RE TALKING NOW.  THE NEXT TIME THE JUDGE

22   WILL ALLOW ME TO ACTUALLY TALK TO YOU LIKE I AM TODAY IS IN

23   CLOSING ARGUMENT.  THAT'S ABOUT TWO MONTHS FROM NOW.

24             I'M GOING TO TELL YOU WHAT I'M GOING TO DO THEN.

25   I'M GOING TO SUMMARIZE THE EVIDENCE.  I'M GOING TO TELL YOU

1   WHAT I BELIEVE THE EVIDENCE HAS SHOWN, WHY I BELIEVE THE

2   GOVERNMENT HAS NOT COME CLOSE TO MEETING ITS BURDEN.  AND

3   THEN, I'M GOING TO ASK YOU TO SET BILL RUEHLE FREE.  THAT'S

4   WHAT I'M GOING TO DO.  I'M TELLING YOU RIGHT NOW.  I'M GOING

5   TO ASK YOU TO WALK HIM OUT THAT DOOR A FREE MAN JUST AS HE

6   IS TODAY.

7          I THANK YOU NOW, AND I THANK YOU FOR YOUR

8   ATTENTION FOR THE NEXT TWO MONTHS.

9          THANK YOU, YOUR HONOR.

10          THE COURT:  VERY WELL.  LADIES AND GENTLEMEN, WHY

11   DON'T WE TAKE A BREAK.

12          THE CLERK:  ALL RISE.  THIS COURT IS NOW IN

13   RECESS.

14      (RECESS TAKEN.)

15      (AT 2:24 P.M., PROCEEDINGS WERE ADJOURNED.)

16

17                          -OOO-

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2            I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 3    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

 4    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

 5    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

 6    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

 7    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9    DATE:  OCTOBER 24, 2009

10

11

12                         _____

13                         DEBORAH D. PARKER, OFFICIAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```