UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. CORMAC J. CARNEY, JUDGE PRESIDING


UNITED STATES OF AMERICA,          )
                                   )
                   PLAINTIFF,      )
                                   )
          VS.                      ) NO. SACR 08-00139-CJC
                                   )     VOLUME I
WILLIAM J. RUEHLE,                 )
                   DEFENDANT.      )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY,OCTOBER 23, 2009

9:00


MARIA BEESLEY-DELLANEVE, CSR 9132
        OFFICIAL FEDERAL REPORTER
        RONALD REAGAN FEDERAL BUILDING
        411 W. 4TH STREET, ROOM 1-053
        SANTA ANA, CA  92701
        (714) 564-9259

 1    **APPEARANCES:**

 2    **FOR THE PLAINTIFF:**    THOMAS P. O'BRIEN
                              UNITED STATES ATTORNEY
 3                            BY:  ANDREW STOLPER
                              AND   ROBB ADKINS,
 4                                GREG STAPLES,
                              ASSISTANT UNITED STATES ATTORNEY
 5                            411 W. 4TH STREET, 8TH FLOOR
                              SANTA ANA, CALIFORNIA 92701
 6

 7

 8

 9

10    **FOR THE DEFENDANT RUEHLE:** SKADDEN ARPS SLATE MEAGHER
                              **BY:**   RICHARD MARMARO, ESQ.
11                            AND   JACK DICANIO, ESQ.
                                MATTHEW UMHOFER, ESQ.
12                            300 SOUTH GRAND AVENUE
                              LOS ANGELES, CALIFORNIA 90071
13                            (213)687-5535

14

15

16

17

18

19

20                                    I N D E X

21

22                            OPENING STATEMENTS

23                                              PAGE

24    MR. STOLPER...................................19

25    MR. MARMARO...................................66

Page 3

1          SANTA ANA, CALIFORNIA; FRIDAY, OCTOBER 23, 2009

2                          (JURY IN.)

3          **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.  FIRST

4    ORDER OF BUSINESS, LADIES AND GENTLEMEN, IS I'D LIKE TO READ SOME

5    PRELIMINARY INSTRUCTIONS TO YOU.  AND THEN WE WILL HAVE THE

6    SUMMARY OF THE CHARGES READ, AND THEN WE'LL PROCEED TO OPENING

7    STATEMENTS.

8          YOU DON'T HAVE TO TAKE NOTES OF THESE PRELIMINARY

9    INSTRUCTIONS; IF YOU COULD JUST SIT BACK, AND LISTEN.

10         LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE,

11   AND I WANT TO TAKE A FEW MINUTES TO TELL YOU SOMETHING ABOUT YOUR

12   DUTIES AS JURORS AND TO GIVE YOU SOME INSTRUCTIONS.  THESE ARE

13   PRELIMINARY INSTRUCTIONS.  AT THE END OF THE TRIAL, I WILL GIVE

14   YOU MORE DETAILED INSTRUCTIONS.  THOSE INSTRUCTIONS WILL CONTROL

15   YOUR DELIBERATIONS.

16         YOU SHOULD NOT TAKE ANYTHING I MAY SAY OR DO DURING THE

17   TRIAL AS INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT YOUR

18   VERDICT SHOULD BE.

19         AS YOU KNOW, THIS IS A CRIMINAL CASE.  THERE ARE THREE

20   BASIC RULES ABOUT A CRIMINAL CASE THAT YOU MUST KEEP IN MIND.

21         FIRST, MR. RUEHLE IS PRESUMED INNOCENT UNLESS AND UNTIL

22   PROVEN GUILTY.  THE INDICTMENT AGAINST HIM BROUGHT BY THE

23   GOVERNMENT IS ONLY AN ACCUSATION, NOTHING MORE.  IT IS NOT PROOF

24   OF GUILT OR INNOCENCE.  HE THEREFORE STARTS OUT WITH A CLEAN

25   SLATE.

1            SECOND, THE BURDEN OF PROOF IS ON THE GOVERNMENT.

2      MR. RUEHLE HAS NO BURDEN TO PROVE HIS INNOCENCE OR TO PRESENT ANY

3      EVIDENCE OR TO TESTIFY.  SINCE HE HAS THE RIGHT TO RIGHT TO REMAIN

4      SILENT, THE LAW PROHIBITS YOU FROM ARRIVING AT YOUR VERDICT BY

5      CONSIDERING THAT HE MAY NOT HAVE TESTIFIED.

6            THIRD, THE GOVERNMENT MUST PROVE MR. RUEHLE'S GUILT

7      BEYOND A REASONABLE DOUBT.  I WILL GIVE YOU FURTHER INSTRUCTIONS

8      ON THIS POINT LATER, BUT BEAR IN MIND THAT, IN THIS RESPECT, A

9      CRIMINAL CASE IS DIFFERENT FROM A CIVIL CASE.

10           THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

11     **FACTS ARE CONSIST OF:**

12           NUMBER ONE, THE SWORN TESTIMONY OF ANY WITNESS;

13           NUMBER TWO, THE EXHIBITS WHICH ARE RECEIVED INTO

14     EVIDENCE;

15           AND, NUMBER THREE, ANY FACTS TO WHICH ALL THE LAWYERS

16     STIPULATE.

17           THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MUST NOT

18     **CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THIS CASE:**

19           NUMBER ONE, STATEMENTS AND ARGUMENTS OF THE ATTORNEYS;

20           NUMBER TWO, QUESTIONS AND OBJECTIONS OF THE ATTORNEYS;

21           NUMBER THREE, TESTIMONY THAT I INSTRUCT YOU TO

22     DISREGARD;

23           AND, NUMBER FOUR, ANYTHING YOU MAY SEE OR HEAR WHEN THE

24     COURT IS NOT IN SESSION, EVEN IF WHAT YOU SEE OR HEAR IS DONE OR

25     SAID BY ONE OF THE PARTIES OR BY ONE OF THE WITNESSES.

Page 5

1          SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE

2     ONLY.  WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN

3     ADMITTED FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT

4     LIMITED PURPOSE AND FOR NO OTHER.

5          THERE WERE MANY SIDEBARS YESTERDAY, LADIES AND

6     GENTLEMEN, IT IS NOT MY INTENT TO HAVE SIDEBARS IN THE FUTURE

7     UNLESS ABSOLUTELY NECESSARY.  BUT, FROM TIME TO TIME DURING THE

8     TRIAL, IT MAY BECOME NECESSARY FOR ME TO TALK WITH THE ATTORNEYS

9     OUT OF THE HEARING OF THE JURY, EITHER BY HAVING A CONFERENCE AT

10    THE BENCH WHEN THE JURY IS PRESENT IN THE COURTROOM OR BY CALLING

11    A RECESS.

12         MOST OFTEN, THESE CONFERENCES WILL INVOLVE DETERMINATION

13    AS TO WHETHER EVIDENCE IS ADMISSIBLE UNDER THE RULES OF EVIDENCE.

14    IT IS APPROPRIATE TO TAKE THESE MATTERS UP OUTSIDE THE PRESENCE OF

15    THE JURY.  SHOULD I CONCLUDE THAT A MORE PROLONGED DISCUSSION IS

16    NECESSARY, I MAY EXCUSE YOU FROM THE COURTROOM.

17         WE WILL, OF COURSE, DO WHAT WE CAN TO KEEP THE NUMBER

18    AND LENGTH OF THESE CONFERENCES TO A MINIMUM.  I MAY NOT ALWAYS

19    GRANT AN ATTORNEY'S REQUEST FOR A CONFERENCE.  DO NOT CONSIDER MY

20    GRANTING OR DENYING A REQUEST FOR A CONFERENCE AS ANY INDICATION

21    OF MY OPINION OF THE CASE OR WHAT YOUR VERDICT SHOULD BE.

22         EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

23    EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS

24    ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

25         CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS,

1    IT IS PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

2    FACT.  YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

3    EVIDENCE.  THE LAW PERMITS YOU TO GIVE EQUAL WEIGHT TO BOTH, BUT

4    IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

5             THERE ARE RULES OF EVIDENCE WHICH CONTROL WHAT CAN BE

6    RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR OFFERS

7    AN EXHIBIT INTO EVIDENCE, AND A LAWYER ON THE OTHER SIDE THINKS IT

8    NOT IS PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER MAY OBJECT.

9             IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE

10   ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE OBJECTION, THE

11   QUESTION CANNOT BE ANSWERED AND THE EXHIBIT CANNOT BE RECEIVED.

12   WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST IGNORE THE

13   QUESTION AND MUST NOT GUESS WHAT THE ANSWER WOULD HAVE BEEN.

14             SOMETIMES I MAY ORDER THAT THE EVIDENCE BE STRICKEN FROM

15   THE RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

16   MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT CONSIDER

17   THE EVIDENCE WHICH I TOLD YOU TO DISREGARD.

18             IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

19   DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

20   BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF

21   IT, OR NONE OF IT.

22             IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

23   **TAKE INTO ACCOUNT:**

24             NUMBER ONE, THE OPPORTUNITY AND THE ABILITY OF THE

25   WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

Page 7

1              NUMBER TWO, THE WITNESS'S MEMORY;

2              NUMBER THREE, THE WITNESS'S MANNER WHILE TESTIFYING;

3              NUMBER FOUR, THE WITNESS'S INTEREST IN THE OUTCOME OF

4    THE CASE AND ANY BIAS OR PREJUDICE;

5              NUMBER FIVE, WHETHER OTHER EVIDENCE CONTRADICTED THE

6    WITNESS'S TESTIMONY;

7              NUMBER SIX, THE REASONABLENESS OF THE WITNESS'S

8    TESTIMONY IN LIGHT OF ALL THE EVIDENCE;

9              AND, NUMBER SEVEN, ANY OTHER FACTORS THAT BEAR ON

10   BELIEVABILITY.

11             THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

12   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

13             I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

14             FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL.  DO NOT

15   DECIDE WHAT THE VERDICT SHOULD BE UNTIL AND YOUR FELLOW JURORS

16   HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE CASE.

17             SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

18   THE EVIDENCE RECEIVED IN THE CASE, AND ON MY INSTRUCTION AS TO THE

19   LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION

20   ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING THE COURSE OF

21   YOUR JURY DUTY.

22             THUS, UNTIL THE END OF THE CASE, OR UNTIL I TELL YOU

23   OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY, AND DO NOT

24   LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY, ABOUT THE MERITS

25   OF THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING

Page 8

1    THE CASE IN PERSON, IN WRITING BY PHONE, OR ELECTRONIC MEANS VIA

2    E-MAIL, TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE

3    OR OTHER FEATURE.  THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW

4    JURORS UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES

5    TO COMMUNICATING WITH ANYONE ELSE, INCLUDING YOUR FAMILY MEMBERS,

6    YOUR EMPLOYER, AND THE PEOPLE INVOLVED IN THE TRIAL, ALTHOUGH YOU

7    MAY NOTIFY YOUR FAMILY AND YOUR EMPLOYER THAT YOU HAVE BEEN SEATED

8    AS A JUROR IN THIS CASE, BUT IF YOU ARE ASKED OR APPROACHED IN ANY

9    WAY ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST

10   RESPOND THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THIS MATTER AND

11   TO REPORT THE CONTACT TO THE COURT.

12           BEFORE YOU RECEIVE ALL THE EVIDENCE AND LEGAL

13   INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN -- BECAUSE YOU

14   WILL RECEIVE ALL THE EVIDENCE AND LEGAL INSTRUCTION YOU PROPERLY

15   MAY CONSIDER TO RETURN A VERDICT, DO NOT READ, WATCH, OR LISTEN TO

16   ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR

17   ANYTHING TO DO WITH IT.  DO NOT DO ANY RESEARCH, SUCH AS

18   CONSULTING DICTIONARIES, SEARCHING THE INTERNET, OR USING OTHER

19   REFERENCE MATERIALS, AND DO NOT MAKE ANY INVESTIGATION OR IN ANY

20   WAY TRY TO LEARN ABOUT THE CASE ON YOUR OWN.

21           THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE

22   PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH

23   PARTY HAS AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

24   RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS.  IF

25   ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY THE

Page 9

1  COURT IMMEDIATELY.

2          AT THE END OF THE TRIAL, YOU WILL HAVE TO MAKE YOUR

3  DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL NOT

4  HAVE A WRITTEN TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY CLOSE

5  ATTENTION TO THE TESTIMONY AS IT IS GIVEN.  IF YOU WISH, YOU MAY

6  TAKE NOTES TO HELP YOU REMEMBER WHAT WITNESSES SAID.  IF YOU DO

7  TAKE NOTES, PLEASE KEEP THEM TO YOURSELF UNTIL YOU AND YOUR FELLOW

8  JURORS GO TO THE JURY ROOM TO DECIDE THE CASE.

9          DO NOT LET NOTE TAKING DISTRACT YOU SO THAT YOU DO NOT

10 HEAR OTHER ANSWERS BY WITNESSES.  WHEN YOU LEAVE, YOUR NOTES

11 SHOULD BE LEFT IN THE COURTROOM.  WHETHER OR NOT YOU TAKE NOTES,

12 YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT WAS SAID.  NOTES ARE

13 ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED

14 BY THE NOTES.

15         THAT IS IT, LADIES AND GENTLEMEN.  I WANT TO GIVE YOU,

16 NOW, ONE MORE INSTRUCTION ABOUT THE SUMMARY OF THE CHARGES THAT

17 THE GOVERNMENT IS GOING TO BE READING.  PLEASE REMEMBER, THAT

18 MR. RUEHLE IS PRESUMED INNOCENT UNLESS AND UNTIL PROVEN GUILTY.

19 THE CHARGES AGAINST HIM BROUGHT BY THE GOVERNMENT ARE ONLY

20 ACCUSATIONS, NOTHING MORE.  THE CHARGES ARE NOT PROOF OF GUILT OR

21 ANYTHING ELSE.

22         PLEASE ALSO REMEMBER THAT MR. RUEHLE HAS DENIED ALL THE

23 ALLEGATIONS IN THE INDICTMENT AND HAS PLED NOT GUILTY TO EACH AND

24 EVERY ONE OF THE CHARGES.  MR. RUEHLE DENIES THAT HE ENGAGED IN A

25 SCHEME TO DEFRAUD OR MADE FALSE STATEMENTS IN PUBLIC FILINGS OR TO

1    THE AUDITORS REGARDING BROADCOM'S STOCK-OPTION PRACTICES.  THE

2    DEFENSE MAINTAINS THAT, AT ALL TIMES, MR. RUEHLE ACTED IN GOOD

3    FAITH AND IN THE BEST INTEREST OF BROADCOM'S EMPLOYEES AND

4    SHAREHOLDERS.  THE DEFENSE FURTHER MAINTAINS THAT MR. RUEHLE AT NO

5    TIME INTENDED TO DEFRAUD INVESTORS.

6            DOES GOVERNMENT HAVE THE SUMMARY OF THE CHARGES?

7            **MR. STAPLES:**  YES, YOUR HONOR.

8            **THE COURT:**  WOULD YOU PLEASE PROCEED AND READ IT.

9            **MR. STAPLES:**  COUNT ONE, CONSPIRACY.

10           DEFENDANT WILLIAM J. RUEHLE WAS BROADCOM CORPORATION'S

11   CHIEF FINANCIAL OFFICER OR CFO.  BEGINNING IN 1999, AND CONTINUING

12   TO 2005, DEFENDANT RUEHLE, TOGETHER WITH OTHERS, ENGAGED IN A

13   FRAUDULENT SCHEME AND CONSPIRACY TO DISGUISE, CONCEAL, UNDERSTATE,

14   AND MISCHARACTERIZE COMPENSATION EXPENSES BROADCOM WAS REQUIRED TO

15   RECOGNIZE IN CONNECTION WITH ITS STOCK OPTIONS.

16           IN PARTICULAR, DEFENDANT RUEHLE AND COCONSPIRATORS

17   BACKDATED STOCK-OPTION GRANTS BY SELECTING OPTION GRANT DATES IN

18   THE PAST, WHEN THE STOCK PRICE HAD A LOWER PRICE THAN THE CURRENT

19   MARKET PRICE.  DEFENDANT RUEHLE AND COCONSPIRATORS FALSELY CLAIMED

20   TO BROADCOM'S AUDITORS AND SHAREHOLDERS THAT THE OPTION GRANTS

21   WERE MADE AS OF THE EARLIER DATE, SO THAT THE STRIKE PRICE

22   APPEARED TO BE SET AT FAIR MARKET VALUE ON THE DATE OF THE GRANT.

23           WHEN BROADCOM'S STOCK PRICE DECLINED OVER TIME,

24   DEFENDANT RUEHLE AND COCONSPIRATORS CAUSED PREVIOUSLY GRANTED

25   OPTIONS TO BE REPRICED.  DEFENDANT RUEHLE AND COCONSPIRATORS

1   PRETENDED THAT THE EARLIER GRANTS AND SUBSEQUENT REPRICING HAD NOT

2   OCCURRED, FALSELY CLAIMING TO BROADCOM'S AUDITORS AND SHAREHOLDERS

3   THAT THE OPTION GRANTS WERE MADE FOR THE FIRST TIME AS OF THE

4   REPRICING DATE.

5           DEFENDANT RUEHLE AND COCONSPIRATORS CAUSED BROADCOM TO

6   GRANT TENS OF MILLIONS OF BACKDATED AND REPRICED OPTIONS TO

7   BROADCOM EMPLOYEES WITHOUT PUBLICLY REPORTING THE REQUIRED

8   COMPENSATION EXPENSE.

9           DEFENDANT RUEHLE AND COCONSPIRATORS FALSELY CLAIMED TO

10  BROADCOM'S INVESTORS AND AUDITORS THAT THESE OPTIONS WERE NOT

11  BACKDATED OR REPRICED.

12          DEFENDANT RUEHLE AND COCONSPIRATORS CIRCUMVENTED

13  BROADCOM'S SHAREHOLDER-APPROVED OPTION PLAN AND FRAUDULENTLY

14  CONCEALED AND MISCHARACTERIZED EXPENSES RELATING TO OPTION GRANTS

15  MADE TO NEWLY HIRED BROADCOM EMPLOYEES BY FALSELY MAKING IT APPEAR

16  THAT THE EMPLOYEES WERE HIRED TO WORK AT A COMPANY THAT BROADCOM

17  WAS ACQUIRING.

18          BEGINNING AS EARLY AS JANUARY, 1999, AND CONTINUING TO

19  AT LEAST 2005, DEFENDANT RUEHLE, TOGETHER WITH OTHERS, KNOWINGLY

20  **CONSPIRED TO COMMIT THE FOLLOWING OFFENSES:**  SECURITIES FRAUD,

21  FILING FALSE REPORTS WITH THE SECURITIES AND EXCHANGE COMMISSION,

22  ACCOUNTING FRAUD, LYING TO BROADCOM'S ACCOUNTANTS, AND HONEST

23  SERVICES MAIL FRAUD.

24          COUNT TWO, SECURITIES FRAUD.

25          BEGINNING NO LATER THAN ON OR ABOUT JULY 3RD, 2002, AND

1   CONTINUING TO UNTIL AT LEAST ON OR ABOUT MARCH 1, 2005, DEFENDANT

2   RUEHLE, TOGETHER WITH OTHERS KNOWN AND UNKNOWN, AIDING AND

3   ABETTING EACH OTHER, KNOWINGLY AND WITH THE INTENT TO DEFRAUD,

4   DEVISED, EXECUTED, AND PARTICIPATED IN A SCHEME TO DEFRAUD AS TO

5   MATERIAL MATTERS AND TO OBTAIN MONEY AND PROPERTY BY MEANS OF

6   MATERIALLY FALSE AND FRAUDULENT PRETENSES, REPRESENTATIONS, AND

7   PROMISES, AND THE CONCEALMENT AND NONDISCLOSURE OF MATERIAL FACTS

8   IN CONNECTION WITH THE PURCHASE AND SALE OF BROADCOM STOCK.

9           COUNT THREE THROUGH SEVEN, FALSE CERTIFICATION OF

10  FINANCIAL REPORTS.

11          ON OR ABOUT THE DATES NOTED BELOW, DEFENDANT RUEHLE

12  FALSELY CERTIFIED THAT THE FORM SET FORTH WAS FILED WITH THE

13  SECURITIES AND EXCHANGE COMMISSION FAIRLY PRESENTED IN ALL

14  MATERIAL RESPECTS THE FINANCIAL CONDITION AND RESULTS OF

15  OPERATIONS OF BROADCOM WHEN, IN TRUTH AND IN FACT, DEFENDANT

16  RUEHLE KNEW THE FORM SET FORTH BELOW WAS FALSE IN THE FOLLOWING

17  **MATERIAL RESPECTS:**

18          COUNT THREE, DATED AUGUST 14, 2002, TO 2002,

19  2ND QUARTER, FORM 10Q, THE FALSE REPRESENTATION.

20          FIRST, THE 10Q UNDERSTATED BROADCOM'S STOCK-BASED

21  COMPENSATION EXPENSE.

22          SECOND, THE 10Q CLAIMED THAT THE STRIKE PRICES FOR

23  BROADCOM'S JULY 3, 2002, AND AUGUST 5, 2002, OPTION GRANTS WERE

24  SET AT FAIR MARKET VALUE ON THE DAY OF THE GRANT.

25          COUNT FOUR.  DATE, NOVEMBER 14, 2002.  THE FORM, A 2002,

1   3RD QUARTER 10Q.  THE FALSE REPRESENTATIONS.

2          FIRST, THE 10Q UNDERSTATED BROADCOM'S STOCK-BASED

3   COMPENSATION EXPENSE.

4          SECOND, THE 10Q CLAIMED THAT THE STRIKE PRICES FOR

5   BROADCOM'S JULY 3, 2002, AND AUGUST 5, 2002, OPTION GRANTS WERE

6   SET AT FAIR MARKET VALUE ON THE DAY OF THE GRANT.

7          THIRD, SARBANES-OXLEY CERTIFICATION CLAIMED BROADCOM

8   DISCLOSED ANY FRAUD, WHETHER OR NOT MATERIAL, THAT INVOLVES

9   MANAGEMENT OR OTHER EMPLOYEES WHO HAVE A SIGNIFICANT ROLE IN THE

10  REGISTRANT'S INTERNAL CONTROLS.

11         COUNT FIVE.  THE DATE, MARCH 31, 2003.  THE FORM, A 2002

12  10K.  THE FALSE REPRESENTATIONS.

13         FIRST, THE 10K UNDERSTATED BROADCOM'S STOCK-BASED

14  COMPENSATION EXPENSE.

15         AND, SECOND, THE SARBANES-OXLEY CERTIFICATION CLAIMED

16  BROADCOM DISCLOSED ANY FRAUD, WHETHER OR NOT MATERIAL, THAT

17  INVOLVES MANAGEMENT OR OTHER EMPLOYEES WHO HAVE A SIGNIFICANT ROLE

18  IN THE REGISTRANT'S INTERNAL CONTROLS.

19         COUNT SIX.  THE DATE, MARCH 15, 2004.  THE FORM, THE

20  2003, 10K.  THE FALSE REPRESENTATION.

21         THE 10K UNDERSTATED BROADCOM'S STOCK-BASED COMPENSATION

22  EXPENSE.

23         COUNT SEVEN.  THE DATE, MARCH 1, 2005.  THE FORM, THE

24  2004, 10K.  THE FALSE REPRESENTATION.

25         THE 10K UNDERSTATED BROADCOM'S STOCK-BASED COMPENSATION

Page 14

1    EXPENSE.

2                    COUNT NINE.  FALSE STATEMENTS IN REPORTS FILED WITH THE

3    SECURITIES AND EXCHANGE COMMISSION.

4                    ON OR ABOUT NOVEMBER 14, 2002, DEFENDANT RUEHLE

5    KNOWINGLY AND WILLFULLY MADE AND CAUSED TO BE MADE MATERIALLY

6    FALSE AND MISLEADING STATEMENTS, AND OMITTED AND CAUSED TO BE

7    OMITTED MATERIAL FACTS NECESSARY TO MAKE THE STATEMENTS MADE IN

8    LIGHT OF THE CIRCUMSTANCES UNDER WHICH THE STATEMENTS WERE MADE

9    NOT MISLEADING AND REPORT AND DOCUMENT THAT WAS REQUIRED TO BE

10   FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, NAMELY,

11   BROADCOM'S QUARTERLY REPORT ON FORM 10Q, FOR THE THIRD QUARTER

12   OF 2002.

13                   SPECIFICALLY, IN RELATION TO OPTIONS TO PURCHASE

14   BROADCOM STOCK PURPORTEDLY GRANTED ON JULY 3, 2002, AND AUGUST 5,

15   2002, DEFENDANT RUEHLE CAUSED BROADCOM'S FORM 10Q QUARTERLY REPORT

16   TO STATE THAT THE WEIGHTED AVERAGE EXERCISE PRICE PER SHARE FOR

17   THE OPTIONS IS $15.74, THE FAIR MARKET VALUE ON THE DATE OF THE

18   GRANT, WHEN, IN TRUTH AND IN FACT, AS DEFENDANT RUEHLE KNEW,

19   $15.74 WAS NOT THE AVERAGE STRIKE PRICE ON THE DATE OF THE ACTUAL

20   GRANT OF THESE OPTIONS.

21                   COUNTS 10 THROUGH 12, LYING TO ACCOUNTANTS.

22                   ON OR ABOUT THE DATES LISTED BELOW, DEFENDANT RUEHLE,

23   ACTING AS AN OFFICER OF BROADCOM, KNOWINGLY AND WILLFULLY,

24   DIRECTLY AND INDIRECTLY, MADE AND CAUSED OTHERS TO MAKE THE

25   FOLLOWING MATERIALLY FALSE AND MISLEADING STATEMENTS TO ERNST &

1    YOUNG, AND OMITTED TO STATE AND CAUSED OTHERS TO STATE TO ERNST &

2    YOUNG MATERIAL FACTS NECESSARY IN ORDER TO MAKE THE STATEMENTS

3    MADE IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH SUCH STATEMENTS

4    WERE MADE NOT MISLEADING, IN CONNECTION WITH ERNST & YOUNG'S

5    REVIEW EXAMINATION AND AUDITS OF THE FINANCIAL STATEMENTS OF

6    BROADCOM.

7            COUNT 10.  THE DATE, AUGUST 13, 2002.  THE FALSE AND

8    MISLEADING STATEMENTS.

9            FIRST, ALL MATERIAL TRANSACTIONS HAVE BEEN PROPERLY

10   REPORTED IN THE ACCOUNTING RECORDS UNDERLYING THE FINANCIAL

11   STATEMENTS.

12           SECOND, BROADCOM'S FINANCIAL STATEMENTS WERE IN

13   COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

14           COUNT 11.  THE DATE, NOVEMBER 14, 2002, THE FALSE AND

15   MISLEADING STATEMENTS.

16           FIRST, ALL MATERIAL TRANSACTIONS HAVE BEEN PROPERLY

17   RECORDED IN THE ACCOUNTING RECORDS UNDERLYING THE FINANCIAL

18   STATEMENTS.

19           SECOND, BROADCOM'S FINANCIAL STATEMENTS WERE IN

20   COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

21           COUNT 12.  JANUARY 23, 2003.  THE FALSE AND MISLEADING

22   STATEMENTS.

23           FIRST, BROADCOM HAD NO MATERIAL TRANSACTIONS THAT HAVE

24   NOT BEEN PROPERLY RECORDED IN THE ACCOUNTING RECORDS UNDERLYING

25   THE FINANCIAL STATEMENTS.

1          SECOND, BROADCOM'S FINANCIAL STATEMENTS WERE IN

2    COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

3          THIRD, BROADCOM HAD NO MATERIAL WEAKNESSES IN INTERNAL

4    CONTROL.

5          FOURTH, THERE WAS NO FRAUD INVOLVING MANAGEMENT OF

6    EMPLOYEES WHO HAVE SIGNIFICANT ROLES IN INTERNAL CONTROL.

7          COUNTS 14 AND 16.  FALSIFICATION OF CORPORATE BOOKS AND

8    RECORDS.

9          ON OR AFTER THE DATES LISTED BELOW, DEFENDANT RUEHLE AND

10   OTHERS KNOWN AND UNKNOWN, AIDING AND ABETTING EACH OTHER,

11   KNOWINGLY AND WILLFULLY, DIRECTLY AND INDIRECTLY, FALSIFIED AND

12   CAUSED OTHERS TO FALSIFY BOOKS, RECORDS, AND ACCOUNTS THAT

13   BROADCOM WAS REQUIRED TO MAKE AND KEEP AND THAT WERE REQUIRED IN

14   REASONABLE DETAIL TO ACCURATELY AND FAIRLY REFLECT THE

15   TRANSACTIONS OF BROADCOM.

16         SPECIFICALLY, ON OR AFTER THE DATES LISTED BELOW,

17   DEFENDANT RUEHLE KNOWINGLY AND WILLFULLY CAUSED TO BE CREATED

18   UNANIMOUS WRITTEN CONSENT, OR UWC, WHICH CLAIMED THAT BROADCOM'S

19   OPTION COMMITTEE OR COMPENSATION COMMITTEE GRANTED OPTIONS ON THE

20   DATE CONTAINED ON THE UWC WHEN, IN TRUTH AND IN FACT, AS DEFENDANT

21   RUEHLE KNEW, BROADCOM'S OPTION COMMITTEE OR COMPENSATION COMMITTEE

22   DID NOT TAKE ACTION ON THE DATES IDENTIFIED ON THE UWC.

23         COUNT 14.  THE DATE, AUGUST 12, 2002.  THE DATE OF

24   UNANIMOUS WRITTEN CONSENTS, AUGUST 5, 2002; UNANIMOUS WRITTEN

25   CONSENT TYPE, COMPENSATION COMMITTEE.

1        COUNT 16.  THE DATE, JANUARY 2003.  UNANIMOUS WRITTEN

2    CONSENT DATE, NOVEMBER 8, 2002; UNANIMOUS WRITTEN CONSENT TYPE,

3    OPTION COMMITTEE.

4        COUNT 17 -- EXCUSE ME, COUNT 18.  HONEST SERVICES MAIL

5    FRAUD.

6        BEGINNING IN AT LEAST IN OR AROUND 2001, AND CONTINUING

7    TO AT LEAST 2003, DEFENDANT RUEHLE AND OTHERS KNOWN AND UNKNOWN,

8    AIDING AND ABETTING EACH OTHER, KNOWINGLY AND WITH INTENT TO

9    DEFRAUD, DEVISED, PARTICIPATED IN, AND EXECUTED A SCHEME TO

10   DEFRAUD BROADCOM SHAREHOLDERS AND ITS BOARD OF DIRECTORS OF THEIR

11   RIGHT TO HONEST SERVICES BY MEANS OF MATERIALLY FALSE AND

12   FRAUDULENT PRETENSES, REPRESENTATIONS AND PROMISES, AND THE

13   CONCEALMENT OF MATERIAL FACTS.

14       ON OR ABOUT THE DATES SET FORTH BELOW, WITHIN THE

15   CENTRAL DISTRICT OF CALIFORNIA, DEFENDANT RUEHLE, FOR THE PURPOSE

16   OF EXECUTING AND ATTEMPTING TO EXECUTE THE ABOVE-DESCRIBED SCHEME

17   TO DEFRAUD, CAUSED THE FOLLOWING ITEM TO BE PLACED IN AN

18   AUTHORIZED DEPOSITORY FOR MAIL MATTER, TO BE SENT AND DELIVERED BY

19   THE UNITED STATES POSTAL SERVICE, OR TO BE DEPOSITED WITH AND

20   DELIVERED BY A COMMERCIAL INTERSTATE CARRIER ACCORDING TO THE

21   DIRECTIONS THEREON.

22       COUNT 18.  DATE, AUGUST 14, 2002.  THE MAILING AND SEC

23   FORM 4, SENT FROM IRVINE, CALIFORNIA, TO WASHINGTON D.C.

24       THANK YOU, YOUR HONOR.

25       **THE COURT:**  VERY WELL.

Page 18

1               IS THE GOVERNMENT READY TO MAKE THEIR OPENING STATEMENT?

2          **MR. STOLPER:**  YES, YOUR HONOR.

3          **THE COURT:**  PLEASE PROCEED.

4          **MR. UMHOFER:**  BEFORE WE BEGIN, COULD WE INVOKE THE RULE

5   AND EXCLUDE WITNESSES?

6          **THE COURT:**  ARE THERE ANY WITNESSES IN THE AUDIENCE, IF

7   COUNSEL COULD GIVE ME A REPRESENTATION ON THAT?

8          **MR. UMHOFER:**  I SEE ONE OF THE GOVERNMENT'S WITNESS IN

9   THE COURTROOM, YOUR HONOR.

10         **MR. ADKINS:**  THAT'S A CASE AGENT, YOUR HONOR.  BUT, AS

11  IS CUSTOMARY, WE ASK THE CASE AGENT BE ALLOWED TO REMAIN IN THE

12  COURTROOM.

13         **THE COURT:**  THAT IS ALLOWED UNDER THE RULE, EACH SIDE

14  HAS A PARTY REPRESENTATIVE.

15              SO JUST ONE CASE AGENT?

16         **MR. ADKINS:**  WE HAVE TWO, YOUR HONOR.

17         **THE COURT:**  OKAY.  I THINK YOU ARE JUST GOING TO HAVE

18  ONE.

19         **MR. ADKINS:**  OKAY.

20              YOUR HONOR, WE HAVE CASE AGENTS, ONLY ONE IS TESTIFYING.

21  BASICALLY, WE ASK THE QUESTION.

22         **THE COURT:**  WHY DON'T WE HAVE ONE CASE AGENT.

23         **MR. ADKINS:**  PRESENT FOR PURPOSE OF THE TRIAL, THAT'S

24  FINE, YOUR HONOR.

25

1                          OPENING STATEMENTS

2          **MR. STOLPER:**  GOOD MORNING, EVERYONE.  THIS IS A CASE

3    ABOUT STOCK-OPTION BACKDATING.  THE DEFENDANT, WILLIAM RUEHLE, WAS

4    THE CHIEF FINANCIAL OFFICER OF BROADCOM, A FORTUNE 500 COMPANY.

5    WE'RE HERE BECAUSE THE DEFENDANT LIED ON THE SECURITIES AND

6    EXCHANGE COMMISSION, HE LIED TO BROADCOM'S ACCOUNTANTS, AND, MOST

7    IMPORTANTLY, HE LIED TO BROADCOM'S INVESTORS, AND THERE WERE

8    THOUSANDS OF THEM.

9               LADIES AND GENTLEMEN, THE DEFENDANT LIED TO CONCEAL

10   EXPENSES THAT BROADCOM WAS REQUIRED TO TAKE ON THE REPORT CARDS

11   FILED WITH THE SEC.  HE LIED BY BACKDATING MILLIONS OF STOCK

12   OPTIONS.  HE LIED TO CONCEAL EXPENSES, $2.2 BILLION WORTH OF

13   EXPENSES.  AND FINALLY, LADIES AND GENTLEMEN, THE DEFENDANT LIED

14   SO HE COULD SELL HIS OWN BROADCOM STOCK INTO THE PUBLIC MARKETS,

15   OVER $77 MILLION WORTH.

16              AS THE CHIEF FINANCIAL OFFICER, THE DEFENDANT OWED

17   BROADCOM'S INVESTORS, ITS SHAREHOLDERS, SPECIAL DUTIES.  AND THE

18   MOST IMPORTANT OF THOSE DUTIES WAS THE DUTY TO BE HONEST WITH

19   THEM, TO PROVIDE THEM THE FACTS ABOUT THE COMPANY THEY INVESTED

20   THEIR MONEY IN, WHETHER THOSE FACTS WERE GOOD, BAD, OR UGLY.

21   WE'RE HERE TODAY BECAUSE, INSTEAD OF BEING TRUTHFUL WITH THOSE

22   INVESTORS, THE DEFENDANT CHOSE TO LIE.

23              LET ME GIVE YOU AN OVERVIEW OF WHAT I'M GOING TO TALK

24   ABOUT THIS MORNING.  FIRST, I'M GOING TO GIVE YOU A LITTLE

25   BACKGROUND ABOUT WHAT BROADCOM IS, WHAT THE DEFENDANT'S ROLE WAS

Page 20

1    AT BROADCOM.

2            NEXT, WE'RE GOING TO TALK ABOUT STOCK OPTIONS, WHAT THEY

3    ARE, AND WHY THEY WERE IMPORTANT TO BROADCOM.  AND THEN WE'RE

4    GOING TO LOOK AT SOME OF THE GRANTS THE DEFENDANT -- THE

5    STOCK-OPTION GRANTS THE DEFENDANT BACKDATED.

6            NEXT, WE'RE GOING TO TALK ABOUT AN INTERESTING FELLOW BY

7    THE NAME OF MEHRDAD NAYEBI.  WE'LL COVER SOME MORE BACKDATED

8    GRANTS, AND I'LL FINISH UP BY TELLING YOU HOW THIS FRAUD CAME TO

9    AN END, AND WHAT HAPPENED AND WHAT THE DEFENDANT DID WHEN HE WAS

10   DISCOVERED.

11           FIRST, LET'S TALK ABOUT BROADCOM.  BROADCOM WAS, AS I

12   SAID, WAS A FORTUNE 500 COMPANY.  IT'S A PUBLIC COMPANY.  THAT

13   MEANS IT'S OWNED BY THE PUBLIC, THE INVESTING PUBLIC.

14           WHO IS THE INVESTING PUBLIC?

15           WELL, IT TURNS OUT IT'S PRETTY MUCH EVERYONE:  ANYONE

16   WHO OWNS A MUTUAL FUND, A 401K, AN INDEX FUND; PEOPLE WHO DECIDE

17   TO SELL AND BUY STOCKS; THE INVESTING PUBLIC, THOSE ARE THE PEOPLE

18   WHO OWNED BROADCOM.

19           AS A PUBLIC COMPANY, THE INVESTORS HAVE TO FIND OUT

20   ABOUT THEIR INVESTMENT; HOW DO THEY DECIDE TO INVEST IN BROADCOM

21   VERSUS SOME OTHER COMPANY.

22           AS IT TURNS OUT, THERE ARE RULES, AND ONE OF THOSE RULES

23   IS, AS A PUBLIC COMPANY, BROADCOM HAS TO FILE REPORTS WITH THE

24   UNITED STATES SECURITIES AND EXCHANGE COMMISSION, THE SEC.

25           WHAT IS THE SEC?

Page 21

1                THE SEC IS THE GOVERNMENT WATCHDOG THAT'S SUPPOSED TO

2      MAKE SURE THAT THE STOCK MARKET IS FAIR.  SO INVESTORS CAN GO TO

3      THE SEC WEBSITE, PULL UP BROADCOM, AND LOOK AT BROADCOM'S PUBLIC

4      FILINGS.  AND, AS THEY LOOK AT BROADCOM'S PUBLIC FILINGS, THEY'LL

5      BE ABLE TO SEE HOW BROADCOM, AS A COMPANY, IS DOING.

6                THOSE PUBLIC FILINGS ARE JUST LIKE REPORT CARDS.  THIS

7      IS ONE OF THOSE FILINGS.  LIKE ANY REPORT CARD, IT CONTAINS

8      IMPORTANT INFORMATION.  IT TELLS YOU HOW MUCH MONEY BROADCOM MADE,

9      HOW MUCH IT COSTS TO MAKE THAT MONEY, AND MAYBE MOST IMPORTANTLY,

10     THE BOTTOM LINE.

11               YOU TAKE THAT, YOU SUBTRACT THAT, IT GIVES YOU

12     BROADCOM'S NET INCOME.  THE BOTTOM LINE:  HOW MUCH DID BROADCOM

13     DO, HOW WELL DID BROADCOM DO.

14               AND, NOT SURPRISINGLY, INVESTORS WOULD TURN TO THESE

15     PUBLIC FILINGS AND LOOK TO SEE IF BROADCOM WAS THE KIND OF COMPANY

16     THEY WANTED TO INVEST IN; IS BROADCOM THE KIND OF BUSINESS THAT

17     MAKES SENSE FOR THEIR HARD-EARNED DOLLARS.

18               NOW, WHERE DO THE REPORT CARDS COME FROM?

19               THEY'RE CREATED BY BROADCOM, AND, AS I SAID, THEY'RE

20     FILED WITH THE SEC.  THERE IS A TEAM OF PEOPLE AT BROADCOM WHO

21     WORK ON THOSE REPORT CARDS.  THERE WAS A WHOLE ACCOUNTING

22     DEPARTMENT THAT DOES THAT.  AS PART OF THAT, IN ADDITION TO THAT

23     ACCOUNTING DEPARTMENT, THERE IS ALSO OUTSIDE ACCOUNTANTS, ERNST &

24     YOUNG.  THOSE ARE AUDITORS WHO AUDIT BROADCOM'S FINANCIAL REPORTS

25     EVERY QUARTER, EVERY YEAR.

1          BUT AS THE EVIDENCE WILL SHOW, THE PERSON ULTIMATELY

2     RESPONSIBLE, THE PERSON WHO SIGNS BROADCOM'S FINANCIAL STATEMENTS,

3     SITTING RIGHT HERE.  THE DEFENDANT.  EVERY QUARTER, EVERY YEAR,

4     THE DEFENDANT HAS TO CERTIFY, PERSONALLY CERTIFY, THAT THESE

5     REPORT CARDS THAT GO OUT TO THE INVESTORS ARE TRUE AND ACCURATE.

6     AND HE GIVES HIS PERSONAL ASSURANCE BY SIGNING.

7          AND SO AN INVESTOR, THE SEC, CAN GO TO THE SEC WEBSITE,

8     CAN PULL UP THIS REPORT CARD AND SEE THAT BILL RUEHLE GAVE IT HIS

9     STAMP OF APPROVAL, WHAT IS ON THE REPORT CARD IS TRUE AND

10    ACCURATE.

11         NOW, AS I SAID, BROADCOM IS A TECHNOLOGY COMPANY.  WHAT

12    BROADCOM DID WAS THEY DESIGNED AND SOLD COMPUTER CHIPS.  TO DESIGN

13    COMPUTER CHIPS, YOU HAVE TO HIRE REALLY SMART PEOPLE.  PEOPLE WITH

14    ADVANCED DEGREES WHO KNOW HOW TO DESIGN COMPUTER CHIPS.  AND, AS

15    IT TURNS OUT, THESE FOLKS CAN COMMAND VERY, VERY HIGH SALARIES.

16         NOW, THAT PRESENTED A CHALLENGE FOR THE DEFENDANT AND

17    THE REST OF BROADCOM'S MANAGEMENT BECAUSE EVERY DOLLAR YOU PAY TO

18    THOSE FOLKS TO DESIGN YOUR CHIPS, IS ONE LESS DOLLAR ON THE BOTTOM

19    LINE.  EVERY DOLLAR THAT GOES OUT THE DOOR AS AN EXPENSE MAKE THE

20    BOTTOM LINE LOOK ONE DOLLAR LESS ON THE REPORT CARD.

21         THOSE EMPLOYEES WERE BROADCOM'S -- ONE OF BROADCOM'S

22    BIGGEST EXPENSES, AND THEY WERE ALSO THE LIFEBLOOD OF THE COMPANY.

23    IF YOU CAN'T RETAIN CHIP DESIGNERS, YOU CAN'T DESIGN CHIPS AND YOU

24    CAN'T SELL THEM.

25         AND SO THE DEFENDANT HAD, AS THE CHIEF FINANCIAL

1   OFFICER, SOME CHOICES TO MAKE.  ONE OF THOSE CHOICES COULD HAVE

2   BEEN TO PAY THESE EMPLOYEES MORE CASH, WRITE THEM A CHECK EVERY

3   TWO WEEKS.

4            OF COURSE, IF YOU DO THAT, IT SHOWS UP ON THE BOTTOM

5   LINE AND MAKES THE REPORT CARD LOOK WORSE.  THAT WASN'T A CHOICE

6   THAT WAS ACCEPTABLE TO THE DEFENDANT OR THE REST OF THE SENIOR

7   EXECUTIVES AT BROADCOM.  INSTEAD, THE WAY THAT BROADCOM, THE WAY

8   DEFENDANT DECIDED TO INCENTIVISE AND RETAIN THESE HIGHLY SKILLED

9   EMPLOYEES, THE BEST AND THE BRIGHTEST, WAS TO GRANT STOCK OPTIONS.

10           AND THEY DIDN'T JUST GRANT STOCK OPTIONS THEY GRANTED

11  MILLIONS UPON MILLIONS OF STOCK OPTIONS/AND THEY GRANTED STOCK

12  OPTIONS INSTEAD OF PAYING THE EMPLOYEES MARKET SALARIES.  SO

13  ENGINEERS, SECRETARIES, EVEN CHIEF FINANCIAL OFFICERS, MADE LESS

14  CASH THAN THEY COULD HAVE MADE ELSEWHERE, BUT THEY GOT STOCK

15  OPTIONS.

16           LET'S TALK ABOUT WHAT STOCK OPTIONS ARE, HOW THEY WORK,

17  HOW THEY'RE SUPPOSED TO WORK, AND HOW THE DEFENDANT MISUSED THEM.

18           FIRST QUESTION, OF COURSE, IS WHAT IS A STOCK OPTION?

19           A STOCK OPTION IS THE RIGHT TO PURCHASE A SHARE OF STOCK

20  AT A FIXED, OR STRIKE, PRICE.  HERE IS HOW IT'S SUPPOSED TO WORK.

21           LET'S SAY, ON APRIL 15, YOU, AS A BROADCOM EMPLOYEE, THE

22  BROADCOM STOCK-OPTION COMMITTEE DECIDES TO GRANT A SINGLE STOCK

23  OPTION TO YOU.  AND LET'S SAY THAT SAME DAY, BROADCOM STOCK ON THE

24  STOCK MARKET CLOSES AT $40 PER SHARE.  IF THEY GRANT YOU A STOCK

25  OPTION AT -- WITH A STRIKE PRICE OF $40 PER SHARE, THAT'S THE SAME

Page 24

 1   AS THE CLOSING PRICE, THE STRIKE PRICE EQUALS THE CLOSING PRICE,

 2   THAT'S WHAT IS CALLED AN AT-THE-MONEY OPTION.

 3            WHY IS IT AT THE MONEY?

 4            BECAUSE THEY'RE THE SAME.

 5            IF THE DAY YOU DECIDED TO REDEEM YOUR STOCK OPTION, YOU

 6   COULD TRADE IT IN TO BROADCOM, GIVE THEM $40, THEY GIVE YOU ONE

 7   SHARE OF BROADCOM STOCK WORTH $40.  THEY DIDN'T GIVE YOU VERY

 8   MUCH.

 9            WITH AN AT-THE-MONEY STOCK OPTION, THERE IS NO CHARGE.

10   NOTHING HAS TO GO ON BROADCOM'S BOTTOM LINE BECAUSE THOSE TWO

11   NUMBERS ARE THE SAME; THE STRIKE PRICE AND THE CLOSING PRICE ARE

12   THE SAME.

13            NOW, GOOD NEWS AND BAD NEWS, LIKE MOST THINGS IN LIFE.

14   THE GOOD NEWS ABOUT AN AT-THE-MONEY OPTION IS IT DOESN'T GO IN THE

15   BOTTOM LINE.  IT'S NOT A HIT TO EARNINGS.  IT DOESN'T SHOW UP AS

16   AN EXPENSE FOR BROADCOM.

17            BUT THERE IS SOME BAD NEWS.  THE EMPLOYEE'S NOT GETTING

18   THAT MUCH.  THE EMPLOYEE ONLY MAKES MONEY WITH AN AT-THE-MONEY

19   OPTION IF WHAT HAPPENS?

20            IF THE STOCK GOES UP.  SO, IF THE STOCK GOES UP TO 50,

21   THE EMPLOYEE CAN REDEEM HIS OPTION, HE PAID BROADCOM $40, GET THE

22   STOCK, SELL IT ON THE MARKET AND MAKE 10 BUCKS.  BUT, AS WE ALL

23   KNOW, STOCKS DON'T ALWAYS GO UP.  SOMETIMES THEY STAY THE SAME,

24   AND SOMETIMES THEY EVEN GO DOWN.  AND WHEN THAT HAPPENS, THE

25   EMPLOYEE DOESN'T GET ANYTHING.

1          AND SO, WITH AN AT-THE-MONEY OPTION, IT'S VERY RISKY FOR

2     THE EMPLOYEES, AND NOT ALL EMPLOYEES ARE KEEN TO GIVE UP HARD CASH

3     FOR OPTIONS THAT ARE RISKY.

4          NOW, THERE ARE ONLY TWO KINDS OF STOCK OPTIONS.  THIS IS

5     THE FIRST.  LET ME SHOW YOU THE SECOND.  THAT'S CALLED AN

6     IN-THE-MONEY STOCK OPTION.  SAME DAY, APRIL 15, SAME CLOSING

7     PRICE, $40 PER SHARE, BROADCOM'S STOCK-OPTION COMMITTEE GRANTS YOU

8     A SHARE OF STOCK.  THEY THINK YOU'RE A GREAT EMPLOYEE.  SO,

9     INSTEAD OF SETTING THE STRIKE PRICE AT $40, THEY'RE GOING TO GO

10    AHEAD AND SET IT AT $10.

11         AS YOU CAN SEE, THIS IS A MUCH BETTER DEAL FOR THE

12    EMPLOYEE.  THE DAY THE EMPLOYEE GETS THAT STOCK OPTION, IF HE

13    COULD EXERCISE IT, HE CAN PAY BROADCOM OR SHE CAN PAY BROADCOM

14    $10, AND THEY WOULD GET ONE SHARE OF STOCK WORTH $40, JUST MADE

15    30 BUCKS.

16         GOOD NEWS AND BAD NEWS, LIKE EVERYTHING ELSE.  THE GOOD

17    NEWS IS, THIS IS A LOT LESS RISKY FOR THE EMPLOYEE.  IF THE STOCK

18    STAYS THE SAME, STOCK GOES DOWN A LITTLE BIT.  IF THE EMPLOYEE CAN

19    EXERCISE THE STOCK OPTION, THE EMPLOYEE WILL STILL HAVE MADE

20    MONEY.

21         BUT THERE IS SOME BAD NEWS.  LIKE EVERYTHING, THERE IS

22    GOOD NEWS AND BAD NEWS.  AND THE BAD NEWS HERE IS THIS HAS TO GO

23    ON THE REPORT CARD.  UNDER THE RULES THAT THE DEFENDANT SAID

24    BROADCOM WAS FOLLOWING, YOU HAVE A CLOSING PRICE OF 40, AND YOU

25    GRANT A STOCK WITH A STRIKE PRICE OF 10, THERE IS A 30-DOLLAR

Page 26

1   DIFFERENCE.

2            GUESS HOW MUCH HAS TO GO ON THE REPORT CARD?

3            THIRTY BUCKS.  THIRTY BUCKS GOES ON AS A HIT TO

4   EARNINGS, THIRTY DOLLARS SHOWS UP AS SOMETHING ON BROADCOM'S

5   BOTTOM LINE.  AND THAT'S NOT AS GOOD FOR THE REPORT CARD AS AN

6   AT-THE-MONEY GRANT.

7            **SO WE HAVE THESE TWO TIMES OF GRANTS:**  IN-THE-MONEY AND

8   AT-THE-MONEY.  THE DEFENDANT DIDN'T LIKE THESE CHOICES.  THE

9   DEFENDANT WANTED TO HAVE EMPLOYEES, THE BEST AND THE BRIGHTEST,

10  THESE HIGHLY SKILLED ENGINEERS, HE WANTED TO HAVE THEM WITHOUT

11  SHOWING ANY EXPENSES ON BROADCOM'S REPORT CARD, WITHOUT HAVING THE

12  COST SHOW UP ON THE BOTTOM LINE FOR THE INVESTORS TO SEE.

13           WHAT TO DO, WHAT TO DO.

14           HOW DO YOU TAKE AN IN-THE-MONEY GRANT AND MAKE IT LOOK

15  LIKE AN AT-THE-MONEY GRANT?

16           YOU BACKDATE IT.  YOU SIMPLY LIE ABOUT WHEN THE GRANT

17  WAS MADE.

18           SO, ON APRIL 15, SAME DAY, THE DEFENDANT AND THE REST OF

19  THE SENIOR EXECUTIVES AT BROADCOM WANT TO GIVE THE EMPLOYEE AN

20  IN-THE-MONEY GRANT, BUT THEY DON'T WANT IT TO SHOW UP ON THE

21  REPORT CARD.  SO THEY LIE.  THEY LIE BY SAYING THE GRANT WAS NOT

22  MADE ON APRIL 15, BUT ON SOME DAY IN THE PAST WHEN THE SHARE PRICE

23  CLOSED AT A LOWER PRICE.

24           BY LYING, THEY'RE ABLE TO GIVE THE EMPLOYEE AN

25  IN-THE-MONEY GRANT WITHOUT TELLING THE INVESTORS WHAT THEY'RE UP

1   TO.  THE TRUE DATE OF THE OPTION GRANT IS HIDDEN, AND NO

2   COMPENSATION EXPENSE IS TAKEN.  AND, AS WE'LL SEE DURING THE

3   COURSE OF THIS TRIAL, THE DEFENDANT WOULD LIE, SOMETIMES BY DAYS,

4   SOMETIMES BY WEEKS, AND SOMETIMES BY MONTHS.  HE AND THE REST OF

5   THE SENIOR EXECUTIVES AT BROADCOM WOULD WAIT, AND THEY WOULD WAIT

6   FOR A DIP IN BROADCOM'S STOCK.  THAT DIP WOULD HAPPEN, TIME WOULD

7   MARCH ON, AND THEN THEY WILL REACH BACK IN TIME AND GRAB IT.  AND

8   THEY WOULD PRETEND LIKE THE BROADCOM STOCK-OPTION COMMITTEE

9   GRANTED IT, NOT ON THE REAL DATE, BUT ON THE FAKE, LYING,

10  BACKDATED DATE.

11          NOW, LADIES AND GENTLEMEN, THIS IS A FRAUD CASE.

12          ACTUALLY, LET'S PUT THAT BACK UP.

13          SOMETHING ELSE I SHOULD MENTION.  BROADCOM EMPLOYEES

14  WEREN'T GETTING ONE STOCK OPTION, THEY WEREN'T GETTING TWO.

15  BROADCOM EMPLOYEES WERE GETTING TENS OF THOUSANDS OF STOCK

16  OPTIONS; IN THE DEFENDANT'S CASE, MILLIONS OF STOCK OPTIONS.  AND

17  SO, BY BACKDATING THESE GRANTS TO THE EMPLOYEES, IT ENDS UP

18  HIDING, NOT $30 IN EXPENSE, BUT BILLIONS OF DOLLARS IN EXPENSE.

19          AS I SAID, THIS IS A FRAUD CASE, AND, IN A FRAUD CASE,

20  WE ALWAYS FOLLOW THE MONEY.  WHERE DOES THAT TRAIL LEAD US HERE.

21          WELL, WHEN THE EMPLOYEE GOES TO REDEEM THE STOCK OPTION,

22  THEY PAY THE STRIKE PRICE.  SO IF THE STRIKE PRICE WAS AT THE

23  MONEY, AT $40, THEY HAVE TO -- THE EMPLOYEE HAS TO GIVE BROADCOM

24  $40 IN CASH, THAT BROADCOM CAN USE AS PART OF ITS BUSINESS, IN

25  ORDER TO REDEEM THE STOCK OPTION.

1          NOW, WHEN THE DEFENDANT BACKDATED THESE STOCK OPTIONS

2    TO $10, TWO THINGS HAPPENED:  NUMBER ONE, NOTHING GOES ON THE

3    REPORT CARD, SO THE EMPLOYEES ARE CHEATED OUT OF THEIR RIGHT TO

4    TRUTHFUL INFORMATION ABOUT THEIR COMPANY.

5          NOTHING WRONG WITH PAYING YOUR EMPLOYEES A LOT, BUT IT

6    WASN'T HIS MONEY.  IT WAS THE INVESTORS' MONEY.  AND THE INVESTORS

7    ARE ENTITLED TO KNOW WHAT IT'S COSTING TO RUN THEIR BUSINESS.

8          SECOND PIECE OF BAD NEWS FOR THE INVESTORS:  BY

9    BACKDATING THE STOCK OPTION WHEN THE EMPLOYEE GOES TO EXERCISE THE

10   OPTION, AND THERE WERE MILLIONS OF STOCK OPTIONS THAT WERE

11   EXERCISED, LESS CASH COMES INTO BROADCOM.

12         THE COMPANY, INSTEAD OF GETTING $40, GETS $10.  AND

13   BECAUSE THE DEFENDANT LIED ABOUT WHEN THE OPTION WAS GRANTED, THE

14   INVESTORS NEVER EVEN KNEW THEY WERE BEING CHEATED.

15         NOW, TO BACKDATE MILLIONS AND MILLIONS OF STOCK OPTIONS

16   IS NOT SOMETHING THE DEFENDANT UNDERTOOK BY HIMSELF.  HE WORKED

17   WITH OTHERS.  THEY'RE CALLED COCONSPIRATORS.  AT BROADCOM, CERTAIN

18   PEOPLE WERE AUTHORIZED TO GRANT SUSPECTS.  THE INVESTORS KNEW

19   THESE THINGS WERE VALUABLE, AND THEY DIDN'T WANT JUST ANYONE

20   GRANTING THEM.  AND STOCK OPTIONS THAT WENT TO ORDINARY EMPLOYEES

21   **HAD TO BE GRANTED BY THESE TWO FELLOWS:**  HENRY SAMUELI AND

22   DR. HENRY NICHOLAS, COCHAIRMAN OF THE BOARD OF DIRECTORS.

23   DR. NICHOLAS WAS THE CHIEF EXECUTIVE OFFICER.

24         THE DEFENDANT ALSO WORKED WITH A MAN BY THE NAME OF

25   DAVID DULL, BROADCOM'S VICE PRESIDENT AND GENERAL COUNSEL.  AND

Page 29

1    FINALLY, THERE WAS A WOMAN BY THE NAME OF NANCY TULLOS, WHO WAS

2    BROADCOM'S VICE PRESIDENT OF HUMAN RELATIONS.

3            THESE FOLKS WORKED TOGETHER TO BACKDATE MILLIONS OF

4    STOCK OPTIONS.  THESE ARE VERY SMART PEOPLE.  OBVIOUSLY, YOU CAN'T

5    RUN INTO THE SEC AND SAY, "WE'RE BACKDATING OPTIONS."

6            YOU CAN'T GO TO YOUR INVESTORS AND SAY THAT, EITHER.

7    YOU HAVE TO BUILD IN A COVER STORY.  AND WE'RE GOING TO HEAR ABOUT

8    THAT COVER STORY DURING THE COURSE OF THIS TRIAL.  HERE IS WHAT IT

9    WAS, IN A NUTSHELL.

10            IN A NUTSHELL, THOSE TWO GENTLEMEN AT THE TOP, HENRY

11    SAMUELI AND HENRY NICHOLAS, WOULD HAVE OPTION COMMITTEE MEETINGS.

12    THEY'D MEET ON FRIDAY.  AND, ACCORDING TO THE COVER STORY, THEY

13    WOULD LOOK AT THE STOCK, AND THEY WOULD SAY TO THEMSELVES, IS THE

14    STOCK GOING TO GO UP, OR IS THE STOCK GOING TO GO DOWN.

15            THEY'D LOOK INTO THEIR CRYSTAL BALLS, AND IF THEY

16    BELIEVED THE STOCK WAS GOING TO GO UP, THEY WOULD GRANT STOCK

17    OPTIONS.  AND IF THEY BELIEVED THE STOCK WAS GOING TO GO DOWN,

18    THEY WOULD WAIT.

19            THAT WAS THE COVER STORY THAT THESE TWO FOLKS WERE

20    MEETING IN REAL TIME, HAVING MEETINGS IN REAL TIME, AND MAKING

21    DECISIONS ABOUT WHETHER THE STOCK IS GOING TO GO UP, WHETHER THE

22    STOCK IS GOING TO GO DOWN, AND THEN THEY WOULD DECIDE GRANT OR NOT

23    GRANT.

24            YOU'LL NOTE THAT, ON THIS CHART, THE DEFENDANT HAD NO

25    AUTHORITY, NONE, TO GRANT STOCK OPTIONS.  EVEN AS THE CHIEF

1   FINANCIAL OFFICER, THE SHAREHOLDERS DIDN'T TRUST HIM TO DO THE

2   GRANTS.  ONLY MEMBERS OF THE OPTION COMMITTEE, ONLY MEMBERS OF THE

3   BOARD COULD DO IT.

4           WE'RE GOING TO LOOK AT DOZENS OF STOCK-OPTION GRANTS IN

5   THIS CASE, AND WHAT THE EVIDENCE WILL SHOW YOU IS THAT THE

6   DEFENDANT AND THE OPTION COMMITTEE WERE NOT GOOD STOCK KICKERS.

7   THEY WERE BACKDATERS.  IT DOESN'T TAKE ANY SKILL TO LOOK BACK IN

8   TIME, SEE THAT IT'S A GOOD PRICE, AND LIE AND PRETEND THAT'S THE

9   GRANT DATE.  AND WE'RE GOING TO SEE GRANT AFTER GRANT AFTER GRANT,

10  WHERE THE DEFENDANT, WORKING WITH THE STOCK-OPTION COMMITTEE,

11  SOMETIMES DEBATED WHICH DATE IN THE PAST WOULD BE THE RIGHT DATE

12  TO BACKDATE TO.

13          ENOUGH TALKING ABOUT THESE THINGS IN GENERAL.  LET'S

14  TALK ABOUT A GRANT.  LET ME TAKE YOU BACK TO CHRISTMAS EVE, 2001;

15  DECEMBER 24, 2001.

16          ON DECEMBER 24, 2001, FROM THE OUTSIDE, IT LOOKED LIKE

17  BROADCOM HAD JUST DONE ITS LARGEST GRANTS TO DATE, OVER 18 MILLION

18  OPTIONS GRANTS ON DECEMBER 24, 2001.  THE OPTION COMMITTEE,

19  ACTUALLY WORKING FOR THE SHAREHOLDERS ON CHRISTMAS EVE,

20  GRANTED 18 MILLION OPTIONS TO THE EMPLOYEES.

21          HOW DO THE INVESTORS COME TO KNOW THAT?

22          THE DEFENDANT PUT IT IN AN SEC FILING IN ABSOLUTE PLAIN

23  ENGLISH.  ON DECEMBER 24, 2001, THE COMPANY GRANTED OPTIONS TO

24  PURCHASE 18 MILLION SHARES, THE EXERCISE PRICE WAS THE LAST

25  PURPORTED TRADING PRICE ON THE GRANT DATE.

1          **TWO PIECES OF INFORMATION:**  GRANTED CHRISTMAS EVE, ON

2    DECEMBER 24; GRANTED FAIR MARKET VALUE, THE LAST REPORTED TRADING

3    PRICE ON THE GRANT DAY, IN THIS CASE, $39.75.

4          THE THING ABOUT THE TRUTH, IT DOESN'T CHANGE.  IT'S THE

5    SAME INSIDE BROADCOM AS IT IS OUTSIDE BROADCOM, AND IT DOESN'T

6    CHANGE OVER TIME.  SO LET'S TAKE A LOOK INSIDE WHAT WAS GOING --

7    LET'S TAKE A LOOK AT WHAT WAS GOING ON INSIDE BROADCOM, TO SEE IF

8    THE OPTION COMMITTEE ACTUALLY MET AND GRANTED ON CHRISTMAS EVE,

9    2001.

10          E-MAIL FROM THE DEFENDANT TO THE OPTION COMMITTEE, TO

11    HENRY NICHOLAS AND TO HENRY SAMUELI.

12          WHAT DOES HE WRITE?

13          "I" -- ALL CAPS -- "VERY STRONGLY RECOMMEND THESE

14    OPTIONS BE PRICED AS OF DECEMBER 24.  GIVEN THE RECENT MARKET

15    PERFORMANCE" -- AS YOU CAN SEE, THE PRICE IS GOING UP -- "I THINK

16    WE SHOULD GRAB THE DECEMBER 24 PRICE.  IF WE WAIT BEYOND FRIDAY,

17    WE WILL HAVE MISSED THE DEADLINE AND WILL BE SUBJECT TO MARKET

18    RISK."

19          OUTSIDE, HE GRANTED OPTIONS ON DECEMBER 24; INSIDE,

20    10 DAYS LATER, "I THINK WE SHOULD GRAB THE DECEMBER 24 PRICE."

21          IF THE OPTION COMMITTEE WERE MEETING AND GRANTING IN

22    REAL TIME, IF THEY WEREN'T BACKDATING STOCK OPTIONS, THIS E-MAIL

23    CANNOT EXIST.

24          MAYBE, MAYBE THERE WAS A MISCOMMUNICATION.  MAYBE THE

25    OPTION COMMITTEE MET ON DECEMBER 24, AND JUST DIDN'T TELL THE

1    DEFENDANT.  MAYBE, IN THE HOLIDAY CRAZINESS, THAT MESSAGE JUST

2    DIDN'T GET COMMUNICATED TO THE DEFENDANT.

3           NOT POSSIBLE.  WE KNOW IT'S NOT POSSIBLE BECAUSE, FIVE

4    MINUTES LATER, A MEMBER OF THE OPTION COMMITTEE, HENRY SAMUELI,

5    RESPONDED TO THE DEFENDANT.

6           DID HE WRITE, "BILL, THE COMMITTEE MET ON DECEMBER 24,

7    WE GRANTED THE 18 MILLION OPTIONS, NOTHING TO WORRY ABOUT."

8           DID HE WRITE, "BILL, WE FORGOT TO TELL YOU, WE MET AND

9    GRANTED ON CHRISTMAS EVE."

10           NO, HE AGREED WITH THE DEFENDANT'S RECOMMENDATION THEY

11    **SHOULD BACKDATE TO CHRISTMAS EVE:**  "I AGREE, WE MAY NOT SEE

12    THE 39.75 PRICE AGAIN BEFORE JANUARY 31.  IT WOULD BE FAR TOO

13    RISKY TO WAIT AND SEE."

14           BUT BOTH THE DEFENDANT AND DR. SAMUELI, HIS

15    COCONSPIRATOR, NOTED IT WOULD BE TOO RISKY TO WAIT AND SEE.

16           WHAT ARE THEY TALKING ABOUT?

17           IT'S THE END OF THE YEAR.  AT THE END OF EVERY YEAR,

18    BROADCOM HAS TO PUT OUT ITS REPORT CARD, AND, AS PART OF THAT

19    REPORT CARD, BROADCOM HAS TO TELL ITS ACCOUNTANTS, ERNST & YOUNG,

20    WHEN THE OPTION COMMITTEE MET AND HOW MANY OPTIONS THEY GRANTED.

21    THAT MEANS THESE GUYS ARE ON THE CLOCK.  THEY CAN'T WAIT UNTIL

22    JANUARY OR FEBRUARY OR MARCH TO DECIDE IF THEY'RE GOING TO GRAB

23    THIS DECEMBER 24 PRICE.  THEY HAVE GOT TO DECIDE IT NOW.

24           AND WHAT THEY DECIDE, IN THIS CASE, 10 DAYS AFTER THE

25    GRANT DATE, IS THAT IT'S FAR TOO RISKY.  AS YOU CAN SEE, THE STOCK

1    HAS ALREADY GONE UP.  DECEMBER 24, $39.75.  ON THE DAY BEFORE THIS

2    E-MAIL IS SENT, IT'S 47 BUCKS.  IT'S UP ALMOST 25 PERCENT.

3            WHAT IS THE RISK?

4            IF THEY WAIT, THEY MAY NOT BE ABLE TO GRAB THIS

5    DECEMBER 24 PRICE.  THE AUDITORS, THE ACCOUNTANTS WILL HAVE COME

6    IN, AND THEY WON'T BE ABLE TO SAY THEY DID 18 MILLION SHARES ON

7    CHRISTMAS EACH.  SO THE RISK IS THE EMPLOYEES, THEY'RE SUBJECT TO

8    MARKET RISK, THE RISK IS THE EMPLOYERS WILL GET A HIGHER STRIKE

9    PRICE.

10           AS WE ALL KNOW, THE INVESTORS AREN'T SO LUCKY.  YOU

11   CAN'T WALK INTO MERRILL LYNCH OR CHARLES SCHWAB ON JANUARY 4 AND

12   SAY, "I WOULD LIKE TO BUY A SHARE OF BROADCOM STOCK, WOULD YOU

13   MIND SELLING IT TO ME AT THE DECEMBER 24 PRICE."

14           DOESN'T WORK THAT WAY.  I SAID EARLIER THAT SOMETIME

15   WE'LL SEE BACKDATING A FEW DAYS, SOMETIMES A FEW MONTHS.  THIS

16   ONE, IT IS JUST A FEW DAYS, FROM CHRISTMAS EVE TO JANUARY 4.

17           WHY BOTHER?

18           HERE'S WHY.  THE $10, THERE'S A $9-A-SHARE DIFFERENCE.

19   IT'S 18 MILLION SHARES.  THAT'S IN THE MONEY BY OVER $150 MILLION.

20   THAT'S $150 MILLION THAT DOESN'T SHOW UP ON BROADCOM'S REPORT

21   CARD.  THAT'S $150 MILLION THAT THE DEFENDANT DIDN'T REPORT TO THE

22   INVESTORS THAT HE WAS PAYING THE EMPLOYEES WHEN THESE OPTIONS

23   WOULD TO GET EXERCISED.  AND WHEN AND IF THESE OPTIONS WERE

24   EXERCISED, THAT'S 150 MILLION FEWER DOLLARS THAT CAME INTO

25   BROADCOM.

1          SO, THIS IS NOT A CASE ABOUT ACCOUNTING.  IT'S NOT A

2    CASE ABOUT BUSINESS.  IT'S A CASE ABOUT LYING.  AND IT'S A CASE

3    ABOUT LYING ABOUT SOMETHING VERY SIMPLE.

4          WHEN WERE OPTIONS GRANTED?

5          ON THE OUTSIDE, ON DECEMBER 24, 2001, THE COMPANY

6    GRANTED OPTIONS TO PURCHASE 18 MILLION SHARES TO THE EMPLOYEES.

7    ON THE INSIDE, WE SHOULD GRAB THE DECEMBER 24 PRICE.

8          "WE SHOULD GRAB THE DECEMBER 24 PRICE," IS THE

9    DEFENDANT'S WAY OF SAYING, "LET'S BACKDATE IT."

10          NO ACCOUNTING REQUIRED, NO COMPLEX SEC FILINGS, NOTHING

11   SOPHISTICATED ABOUT THIS LIE AT ALL, JUST A STRAIGHTFORWARD LIE

12   ABOUT WHEN THE OPTIONS WERE GRANTED.  AND, AS WE HEARD, A LIE THAT

13   WAS TOLD FOR, NOT JUST ONE REASON, BUT, IN THIS CASE, HUNDREDS OF

14   MILLIONS OF THEM.

15          NOW, THE DEFENDANT WAS SELDOM SO OBVIOUS IN HOW HE

16   BACKDATED STOCK OPTIONS.  MOST OF THE GRANTS ARE DONE A LITTLE BIT

17   MORE SUBTLE.  HERE IS A WOMAN WHO WORKED WITH THE DEFENDANT, NAMED

18   CAROL PRADO, WAS IN CHARGE OF ADMINISTERING BROADCOM'S

19   STOCK-OPTION PROGRAM, AT LEAST IN THE EARLY YEARS.  AND ONE OF HER

20   JOBS WAS TO GET INFORMATION ABOUT WHEN THE COMMITTEE MET, HOW MANY

21   OPTIONS IT GRANTED, WHO IT GRANTED THEM TO, THAT KIND OF STUFF.

22   ADMINISTRATIVE, ESSENTIALLY.

23          SHE HAD A TOUGH JOB.  SHE HAD A TOUGH JOB BECAUSE THE

24   DEFENDANT AND THE REST OF THE STOCK-OPTION COMMITTEE WOULD WAIT

25   AND WAIT AND WAIT AND WAIT.  THEY WOULD WANT TO WAIT AS LONG AS

1   THEY COULD SO THEY HAVE THE BIGGEST WINDOW OF OPPORTUNITY TO

2   BACKDATE STOCK OPTIONS.  AND SO WHAT WE'LL SEE IS HER, TIME AND

3   TIME AND TIME AGAIN, TRYING TO GET FROM THE DEFENDANT WHEN THE

4   OPTION COMMITTEE MET AND GRANTED.

5            AND, TIME AND TIME AGAIN, WE'LL SEE HER HAVING TO WAIT

6   MONTHS AND MONTHS UNTIL FINALLY THE DEFENDANT HAD TO MAKE A

7   DECISION ABOUT WHEN THE OPTION COMMITTEE MET BECAUSE THE AUDITORS

8   WERE COMING IN, BECAUSE OF THE SEC FILING THAT WAS DUE, AND WE'LL

9   SEE THE DEFENDANT AND THE REST OF THE BROADCOM SENIOR EXECUTIVES

10  PICK AN IMPOSSIBLY LOW PRICE EACH TIME.

11           LET'S TAKE A LOOK AT SOME GRANTS THAT WERE DONE IN

12  NOVEMBER OF 1999.  BROADCOM STOCK IS GOING UP UNBELIEVABLY FAST.

13  STARTS OFF AT AROUND $120 A SHARE AND, BY THE END OF THE YEAR,

14  IT'S MORE THAN DOUBLED, TO MORE THAN $220 PER SHARE.  THE STOCK IS

15  GOING UP VERY, VERY FAST.  AND SO MS. PRADO, I BELIEVE IN

16  DECEMBER, WRITES THE DEFENDANT AN E-MAIL:  "PLEASE LET US KNOW IF

17  AND WHEN THE OPTION COMMITTEE MET TO APPROVE GRANTS."

18           SIMPLE QUESTION.  MS. PRADO KNOWS GETTING AN ANSWER IS

19  DIFFICULT.  SO MS. PRADO WOULD SEND THE DEFENDANT THE CLOSING

20  PRICES ON THE PREVIOUS FRIDAY, THE DATE THE OPTION COMMITTEE

21  PURPORTEDLY MET, BECAUSE THEY WERE THE TYPICAL GRANT DATES.  THEY

22  WOULD SOMETIMES PUT IN ANOTHER VERY LOW PRICE BECAUSE SOMETIMES

23  THE OPTION COMMITTEE, EVEN IF IT WASN'T A FRIDAY, WOULD SOMEHOW

24  MIRACULOUSLY MEET ON THOSE LOWER PRICES.

25           FRIDAY FAIR MARKET VALUES.  THIS TIME THERE ARE EIGHT OF

1    THEM, STARTING AT 11/5 WHICH WAS OVER TWO MONTHS AGO, ALL THE WAY

2    THROUGH 12/17, AND END OF THE MONTH WAS 11/3,0 AT 179.63.  HIGH,

3    149; LOW, 225; SECOND TO LOW, 179.25.

4            GUESS WHICH DAYS THE DEFENDANT SAID THE OPTION COMMITTEE

5    MET?

6            PER VERBAL FROM BILL, THAT'S THE DEFENDANT, THE OPTION

7    COMMITTEE APPROVED GRANTS ON 11/5 AND 11/30, THE TWO LOWEST

8    PRICES.

9            LET'S LOOK AT ANOTHER ONE.  THIS IS NOW JULY 2000.

10   STOCK'S ALL OVER THE PLACE.  IT STARTS OFF AT ABOUT 220, GOES UP

11   TO 300, GOES BACK TO 220.  SEPTEMBER 11, CAROL PRADO SENDS AN

12   E-MAIL TO THE DEFENDANT, SAME KIND OF QUESTION:  "FOLLOWING ARE

13   THE FRIDAY CLOSING FAIR MARKET VALUES IN JULY THROUGH LAST FRIDAY.

14   LOW PRICE, 213; HIGH PRICE 268" -- THIS TIME, 10 POSSIBLE FRIDAYS.

15   TWO AND A HALF MONTHS WORTH OF FRIDAYS -- "PLEASE ADVISE IF THE

16   OPTION COMMITTEE MET AND APPROVED GRANTS ON ANY OF THESE DATES.

17           GUESS WHICH DAY THE DEFENDANT CLAIMED THE OPTION

18   COMMITTEE MET?

19           THE LOW PRICE, $213 PER SHARE:  "BILL RUEHLE HAS ADVISED

20   ME THE OPTION COMMITTEE APPROVED GRANTS ON 7/28 AT 213."

21           NO EXPLANATION WHY IT TOOK SO LONG TO FIND THAT

22   INFORMATION OUT.

23           SOMETIMES YOU DON'T EVEN NEED A STOCK CHART TO SEE WHAT

24   THE DEFENDANT IS DOING.  THIS IS AN E-MAIL THE DEFENDANT -- I'M

25   SORRY, I SKIPPED A STEP.

1          STOCK OPTIONS ARE IMPORTANT.  IT TRANSFERS VALUE FROM

2     THE INVESTORS TO THE EMPLOYEES.  AS SUCH, YOU HAVE GOT TO REPORT

3     IT IN BROADCOM'S OFFICIAL BOOKS AND RECORDS.  IT HAS TO GO IN WHAT

4     IS CALLED A UNANIMOUS WRITTEN CONSENT OR CORPORATE MINUTES, FANCY

5     NAME FOR A CORPORATE DOCUMENT AUTHORIZING THE TRANSFER OF STOCK

6     OPTIONS FROM THE SHAREHOLDERS TO THE EMPLOYEES.

7          IN ORDER TO MAKE THIS FRAUD WORK, THE DEFENDANT, WORKING

8     WITH HENRY NICHOLAS AND HENRY SAMUELI AND OTHERS, HAD TO CREATE

9     FALSE BOOKS AND RECORDS, HAD TO MAKE IT APPEAR AS THOUGH THE STOCK

10    OPTION COMMITTEE WAS GRANTING.  THE LAST ONE WE SAW, THE CLAIM WAS

11    THE COMMITTEE GRANTED JULY 28, AND HERE IS THE OFFICIAL CORPORATE

12    RECORD SHOWING STOCK-OPTION COMMITTEE GRANTING 700,000 SHARES,

13    $213 PER SHARE, EQUAL TO THE CLOSING SELLING PRICE AS OF THE GRANT

14    DATE, JULY 28, 2000, SIGNED BY HENRY NICHOLAS AND HENRY SAMUELI.

15         YOU HAVE HEARD ABOUT COOKING THE BOOKS.  THAT'S WHAT

16    THIS LOOKS LIKE, OF COURSE, LYING ON OFFICIAL CORPORATE DOCUMENTS.

17         LET'S GO AHEAD AND TURN TO THE NEXT GRANTS.  I SAID THIS

18    ONE, YOU WOULD NEED A STOCK CHART TO SEE WHAT THE DEFENDANT WAS

19    DOING.  AGAIN, FROM CARL PRADO, AN E-MAIL SENT TO ANOTHER MEMBER

20    OF THE DEFENDANT'S STAFF.  THIS E-MAIL WAS SENT ON MARCH 16, 2000:

21         "BILL" -- THAT'S THE DEFENDANT -- "WOULD LIKE TO WAIT

22    UNTIL FRIDAY CLOSE, 3/17, TO MAKE A DECISION ON THESE GRANTS.  IF

23    FRIDAY'S CLOSE IS HIGHER THAN THE 3/1 CLOSE OF $206, WE'LL GO WITH

24    THE 3/1 DATE."

25         THAT'S BACKDATING.  THAT'S CHEATING.  THAT'S WATCHING TO

Page 38

1    SEE WHAT THE STOCK DOES.  IF IT GOES HIGHER, THE OPTION COMMITTEE

2    MET IN THE PAST; IF IT GOES LOWER, IT NEVER HAPPENED.

3              WHAT HAPPENED HERE?

4              I'LL TELL YOU WHAT HAPPENED:  STOCK WENT UP.

5              SO GUESS WHICH DATE THE OPTION COMMITTEE MET AND

6    GRANTED?

7              MARCH 1, SIGNED OFFICIALLY, HENRY NICHOLAS, HENRY

8    SAMUELI, THE OPTION COMMITTEE MET AND GRANTED 3 MILLION SHARES

9    AT $206 PER SHARE.

10             NOW, AS I SAID, THE DEFENDANT WAS SELDOM DIRECT ABOUT

11   STOCK OPTION DOCUMENTS, WITH GOOD REASON.  THE DEFENDANT HOLDS AN

12   MBA FROM HARVARD.  HE WAS THE CFO OF PUBLIC COMPANIES FOR YEARS

13   BEFORE HE WENT TO BROADCOM.  HE'S A HIGHLY INTELLIGENT INDIVIDUAL.

14   THE OPTION COMMITTEE, HENRY SAMUELI AND HENRY NICHOLAS, BOTH

15   PHD'S, DAVID DULL IS AN ATTORNEY, WHO I THINK WENT TO YALE.  THESE

16   ARE VERY, VERY SMART INDIVIDUALS.

17             AND THEY COVERED THEIR TRACKS AS THEY WENT.  AND I SAY

18   THAT BECAUSE WE'LL SEE, DURING THE COURSE OF THIS TRIAL, E-MAILS

19   FROM THE DEFENDANT, AND SOMETIMES FROM OTHERS, THAT SAY THE

20   COMMITTEE MUST MEET AND GRANT IN REAL TIME, OR SAY OTHER THINGS

21   THAT SEEM INCONSISTENT WITH OPTION BACKDATING.

22             WHEN YOU READ THOSE E-MAILS, YOU HAVE TO TAKE THEM IN

23   CONTEXT, AND THAT'S -- THIS IS THE CONTEXT.  THE E-MAIL WILL SAY,

24   "WE SHOULDN'T OPTION BACKDATE," AND THEN, THREE MONTHS LATER,

25   GUESS WHAT IS GOING ON, OPTION BACKDATING.

1          THEY WERE CAREFUL TO COVER THEIR TRACKS AS THEY WENT

2     ALONG.  THEY WERE CAREFUL TO AT LEAST PUT ON A VENEER THAT WHAT

3     WAS GOING ON WASN'T FRAUD.  BUT, AS YOU CAN SEE FROM WHAT IS GOING

4     ON IN THE INSIDE VERSUS THE OUTSIDE, THERE IS NO OTHER WORD TO

5     DESCRIBE IT.

6          DESPITE BEING CAREFUL, DESPITE COVERING HIS TRACKS, IN

7     LATE 2000, THE DEFENDANT ALMOST GOT EXPOSED.  IN THE MIDDLE OF

8     2000, TOWARDS THE END OF 2000, BROADCOM AUDITORS, ERNST & YOUNG,

9     WERE CONCERNED ABOUT A CERTAIN GRANT THAT BROADCOM HAD DONE, A

10    LARGE GRANT.  AND, IN THE END OF -- THAT MADE THE TIMING OF THE

11    COMPLAINT THAT CAME IN FROM MEHRDAD NAYEBI, UNUSUAL NAME.

12          WHO WAS MEHRDAD NAYEBI, AND WHY IS HE IMPORTANT TO THIS

13    CASE?

14          HE WAS AN ENGINEER THAT WAS HIRED BY HENRY NICHOLAS, THE

15    CEO, IN JUNE OF '99.  WHAT IS SPECIAL ABOUT MEHRDAD NAYEBI GETTING

16    HIRED, IS HE WAS HIRED WITH BACKDATED GRANTS.  HE DIDN'T WANT

17    AT-THE-MONEY GRANTS.  HE TOLD HENRY NICHOLAS, I WANT IN-THE-MONEY

18    GRANTS.

19          SO DR. NICHOLAS AND DR. NAYEBI, WITH THE DEFENDANT'S

20    KNOWLEDGE, AGREED TO BACKDATE HIS STOCK OPTION FROM JUNE UNTIL MAY

21    OF '99.  NAYEBI DIDN'T WORK OUT FOR BROADCOM.  AFTER LESS THAN TWO

22    YEARS, BROADCOM FIRED HIM.  BUT DR. NAYEBI, DR. MEHRDAD NAYEBI,

23    KNEW SOMETHING VERY VALUABLE.  HE KNEW THAT HENRY NICHOLAS, AND

24    THE DEFENDANT AND OTHERS, WERE BACKDATING STOCK OPTIONS.  AND SO

25    MEHRDAD NAYEBI WAS NOT ABOUT TO GO CHEAPLY.

 1            SO, IN LATE 2000, AFTER BROADCOM FIRED HIM, MEHRDAD

 2    NAYEBI HIRED A LAWYER, AND THAT LAWYER DRAFTED A COMPLAINT.  A

 3    COMPLAINT IS A LAWSUIT THAT YOU CAN FILE PUBLICLY; A DRAFT

 4    COMPLAINT OF THE LAWSUIT THAT YOU ARE THREATENING TO FILE

 5    PUBLICLY.  WHILE IT'S A DRAFT, IT'S STILL A SECRET STILL BETWEEN

 6    MEHRDAD NAYEBI AND BROADCOM.

 7            MEHRDAD NAYEBI'S COMPLAINT WAS SENT IN TO BROADCOM.  IT

 8    WAS GIVEN TO THE DEFENDANT, AND YOU'LL HEAR IT WAS READ BY THE

 9    DEFENDANT.  HERE IS WHAT MEHRDAD NAYEBI SAID WAS GOING ON AT

10    BROADCOM AT THE TIME.

11            MEHRDAD NAYEBI SAID THAT THEY BACKDATED HIS DOCUMENTS,

12    ALLOWING HIM TO PURCHASE SHARES AT $88 INSTEAD OF 118.  THAT'S FOR

13    HIS NEW-HIRE GRANT.

14            THE COMPLAINT GOES ON.  BECAUSE HE GOT BACKDATED

15    OPTIONS, MEHRDAD NAYEBI ALLEGED THAT -- OR SAID BROADCOM FAILED TO

16    DISCLOSE THE BACKDATING OF EMPLOYMENT DOCUMENTS IN THE 10Q, 10K,

17    OTHER REPORTS FILED WITH UNITED STATES SECURITIES AND EXCHANGE

18    COMMISSION -- 10Q AND 10K IS THE SEC CODE FOR THE REPORT CARDS

19    THAT GET FILED EVERY QUARTER, EVERY YEAR -- AND, FURTHER, THAT

20    SUCH BACKDATING ACTIONS WERE CONCEALED FROM THE OUTSIDE AUDITORS

21    RESPONSIBLE FOR PREPARING AUDITED FINANCIAL STATEMENTS WHICH WERE

22    SUBMITTED TO THE SEC.

23            THE COMPLAINT GOES ON.  BROADCOM HAS ENGAGED IN A

24    PATTERN AND PRACTICE OF FALSIFYING DATES ON EMPLOYMENT CONTRACTS

25    WITH THE INTENT OF TAKING ADVANTAGE OF FLUCTUATIONS IN STOCK

Page 41

1   OPTION PRICES TO PROVIDE COMPENSATION TO EMPLOYEES IN THE FORM OF

2   ARTIFICIALLY PRICED OPTIONS, RATHER THAN PAY SALARIES IN THE FORM

3   OF CASH.

4          WHY?

5          TO ARTIFICIALLY INFLATE BROADCOM'S EARNINGS, AND THEN

6   FAILED TO REPORT SUCH TRANSACTIONS IN ITS 10Q, 10K, OR ANY OTHER

7   PUBLIC DISCLOSURE FILINGS WITH THE UNITED STATES SECURITIES AND

8   EXCHANGE COMMISSION AND CONCEALED SUCH TRANSACTIONS FROM THE

9   OUTSIDE AUDITORS.

10          DR. NAYEBI MADE THE SAME ALLEGATIONS THAT THE DEFENDANT

11  IS CHARGED HERE WITH TODAY.  THIS COMPLAINT CONTAINED SOME OTHER

12  ALLEGATIONS ABOUT A BUSINESS TRANSACTION THAT WENT BAD.  ABOUT

13  DR. NICHOLAS'S ILLEGAL ACTIVITIES CONCERNING DRUGS AND

14  PROSTITUTES.  BUT IT'S THIS STUFF ABOUT FALSE FINANCIAL

15  STATEMENTS, ABOUT FALSELY SIGNED REPORT CARDS BY THE DEFENDANT,

16  IT'S THESE ALLEGATIONS THAT CAUSED THE DEFENDANT THE MOST CONCERN.

17          AS YOU CAN IMAGINE, THE SENIOR EXECUTIVES AT BROADCOM

18  WENT INTO CRISIS MODE.  THIS COMPLAINT COULD NOT GO PUBLIC.  IF IT

19  WENT PUBLIC, IT WOULD BE GAME OVER; GAME OVER FOR THE DEFENDANT,

20  GAME OVER FOR THE CEO, GAME OVER FOR THEM ALL.

21          THEY HIRED AN OUTSIDE LAWYER.  IMPORTANTLY, THEY LIED TO

22  THEIR OWN OUTSIDE LAWYER AND DENIED THAT ANY OF THESE ALLEGATIONS

23  WERE TRUE.  THE OUTSIDE LAWYER TRIED TO SETTLE THIS COMPLAINT WITH

24  MEHRDAD NAYEBI, TRIED TO PUT IT BACK IN THE BOX.

25          DIDN'T WORK.  A LAST-DITCH MEETING WAS SET UP, A MEETING

Page 42

1    BETWEEN MEHRDAD NAYEBI AND DR. HENRY NICHOLAS, THE CEO OF THIS

2    FORTUNE 500 COMPANY.

3            THE DEFENDANT DIDN'T ATTEND THIS MEETING, BUT YOU ARE

4    GOING TO HEAR WHAT THE DEFENDANT HEARD ABOUT THE MEETING THE NEXT

5    DAY.  THE MEETING WAS HELD AT A SUITE AT THE FOUR SEASONS IN

6    NEWPORT BEACH.  IN ORDER TO ENSURE SECURITY AND PRIVACY, BROADCOM

7    HIRED ARMED GUARDS IN THE MEETING.  MEHRDAD NAYEBI SHOWED UP AND

8    SAT DOWN WITH HENRY NICHOLAS.  BROADCOM'S OBJECTIVE, THE DEFENDANT

9    HENRY NICHOLAS' OBJECTIVE, TO GET DR. MEHRDAD NAYEBI TO TAKE THIS

10   **COMPLAINT AND PUT IT BACK IN THE DRAWER.  THE LEVERAGE NAYEBI HAD:**

11   PUBLIC EXPOSURE, BLOW THE WHISTLE.

12           THE MEETING LASTED FOR ABOUT FIVE HOURS.  DURING THE

13   COURSE OF THIS MEETING, HENRY NICHOLAS, THE CEO, PLEADED WITH

14   MEHRDAD NAYEBI.  HE PLEADED WITH HIM, "DON'T GO PUBLIC WITH THESE

15   ALLEGATIONS.  IF YOU DO SO, IT WILL RUIN ME; IT WILL RUIN

16   BROADCOM."

17           AT THE END OF THE MEETING, HENRY NICHOLAS WAS

18   SUCCESSFUL.  HE MANAGED TO BUY DR. NAYEBI'S SILENCE.  IN ORDER TO

19   KEEP MEHRDAD NAYEBI FROM GOING PUBLIC WITH THE ALLEGATIONS OF

20   BACKDATING, OF LYING TO THE SEC, OF LYING TO THE AUDITORS, HENRY

21   NICHOLAS PAID OFF -- EXCUSE ME, HENRY NICHOLAS CAUSED BROADCOM TO

22   PAY OFF MEHRDAD NAYEBI.

23           IRONICALLY, HENRY NICHOLAS AND THE DEFENDANT PAID OFF

24   MEHRDAD NAYEBI WITH BACKDATED STOCK OPTIONS.  THEY TOOK MEHRDAD

25   NAYEBI'S OPTIONS, AND THEY DECELERATED HIS INVESTMENT, SUCH THAT

1    MEHRDAD NAYEBI WAS GIVEN OPTIONS THAT WERE WORTH OVER $7 MILLION,

2    FOR LESS THAN TWO YEARS' WORTH OF WORK AT BROADCOM.

3           WHAT DID MEHRDAD NAYEBI GIVE BROADCOM?

4           MEHRDAD NAYEBI GAVE BROADCOM HIS SILENCE.  YOU'LL SEE

5    THE CONFIDENTIALITY AGREEMENT THAT BROADCOM ENTERED BETWEEN

6    MEHRDAD NAYEBI AND -- EXCUSE ME, THAT BROADCOM ENTERED WITH

7    MEHRDAD NAYEBI.  NOT ONLY DOES IT REQUIRE HIS SILENCE, THERE IS A

8    PENALTY CLAUSE.  IF MEHRDAD NAYEBI UTTERS A SINGLE WORD ABOUT

9    STOCK OPTIONS BACKDATING, A SINGLE WORD ABOUT THE ALLEGATION IN

10   THE COMPLAINT, MEHRDAD NAYEBI HAS TO GIVE BACK THE BACKDATED STOCK

11   OPTIONS THAT HE GOT, BUT HE HAS TO WRITE BROADCOM A CHECK

12   FOR $1 MILLION.  PRETTY STRONG INCENTIVE TO KEEP YOUR MOUTH SHUT.

13          THE SETTLEMENT WITH MEHRDAD NAYEBI WRAPPED UP DURING THE

14   FIRST MONTH OR SO OF 2001.  COMPLAINT CAME IN NOVEMBER; EARLY

15   2001, THERE WAS A MEETING WITH DR. NICHOLAS, AND THEN THE

16   SETTLEMENT WITH MEHRDAD NAYEBI.

17          AS WE TALKED ABOUT EARLIER, AT THE END OF EACH YEAR,

18   BROADCOM HAS TO PUT OUT ITS REPORT CARD.  DEFENDANT HAS TO SIGN

19   THAT, IT'S TRUE.  AS PART OF THAT PROCESS, THE DEFENDANT HAS TO

20   MAKE REPRESENTATIONS TO THE OUTSIDE ACCOUNTANTS, TO THE AUDITORS.

21          AS YOU CAN SEE, COMING INTO THE -- I'M SORRY, I SKIPPED

22   A STEP.  I APOLOGIZE.

23          AFTER THE MEHRDAD NAYEBI SETTLEMENT, AS YOU CAN SEE,

24   BROADCOM STOCK WAS GOING DOWN.  IN 2000, ALMOST $300 A SHARE;

25   EARLY 2001, BELOW 100.  THAT MEANS THE INVESTORS HAVE LOST

1    TWO-THIRDS OF THEIR INVESTMENT IN BROADCOM.  THAT ALSO MEANS THAT

2    THE EMPLOYEES WHO GOT OPTIONS, EVEN BACKDATED OPTIONS, EVEN

3    GRABBING THOSE LOW PRICES, WERE NOW UNDER WATER, MEANING THEIR

4    STRIKE PRICE WAS ABOVE THE FAIR MARKET VALUE OF THE STOCK.  THE

5    OPTIONS WERE WORTHLESS.

6            IN EARLY 2001, THIS PRESENTED A REAL PROBLEM FOR THE

7    SENIOR EXECUTIVES AT BROADCOM.

8            WHAT DO YOU DO?

9            YOU HAVE GOT EMPLOYEES WHO ARE WORKING LESS THAN MARKET

10   SALARY, AND THEY HAVE GOT OPTIONS THAT WERE WORTHLESS.  YOU HAVE

11   GOT TO HAVE CHIP DESIGNERS HERE, WORKING, AND WITHOUT THEM, YOU

12   HAVE GOT NO BUSINESS.

13           SO IN EARLY 2001, THE DEFENDANT, WORKING WITH THE REST

14   OF THE SENIOR EXECUTIVES, CAME UP WITH A SOLUTION.  THE SOLUTION

15   WAS CALLED REPRICING.

16           WHAT IS A REPRICING?

17           JUST WHAT IT SOUNDS LIKE.  TAKE A STOCK OPTION THAT HAS

18   A STRIKE PRICE OF 40, AND YOU JUST CHANGE TO ITS RIGHT PRICE

19   OF 10.  GOOD NEWS, BAD NEWS.  GOOD NEWS IS THE EMPLOYEE HAS LOWER

20   A STRIKE PRICE.  BAD NEWS, IT GOES ON THE REPORT CARD, JUST LIKE

21   IN-THE-MONEY GRANT.

22           DEFENDANT DIDN'T WANT TO DO A REPRICING BECAUSE IT GOES

23   ON THE REPORT CARD.  SO INSTEAD, THE REST OF THE BROADCOM

24   EXECUTIVES, WORKING WITH THE DEFENDANT, CONCOCTED A SECRET

25   REPRICING.  WE'LL GO INTO DETAILS OF WHAT A SECRET REPRICING IS

1    LATER.

2            WHAT IS IMPORTANT TO KNOW ABOUT A SECRET REPRICING IS

3    YOU HAVE GOT TO TRUST THE PERSON WHO YOU WERE PRICING TO KEEP THE

4    SECRET.  IF YOU TAKE AN EMPLOYEE'S OPTIONS AND YOU CHANGE IT

5    FROM 40 TO 10, THE EMPLOYEE IS GOING TO KNOW ABOUT IT.

6            IF YOU DO IT IN A WAY THAT CALLS FOR SECRECY, WHAT ARE

7    YOU CREATING?

8            ANOTHER POTENTIAL MEHRDAD NAYEBI, SOMEBODY ELSE WHO

9    COULD STEP FORWARD AND BLOW THE WHISTLE.

10           I'LL TALK ABOUT THIS E-MAIL IN A SECOND BUT, FIRST, LET

11   ME TALK ABOUT E-MAILS IN GENERAL.  WHAT IS GREAT ABOUT E-MAILS IS

12   THEY DON'T CHANGE.  THIS IS AN E-MAIL WRITTEN BY THE DEFENDANT ON

13   JANUARY 30, 2001.  THIS IS THE DEFENDANT SITTING DOWN AT HIS

14   COMPUTER AND PECKING OUT HIS THOUGHTS IN AN E-MAIL TO ONE OF HIS

15   COLLEAGUES.  NO MATTER WHAT I SAY, NO MATTER WHAT HIS ATTORNEYS

16   SAY, NO MATTER WHAT CONTEXT YOU PUT IT IN, THESE ARE THE

17   DEFENDANT'S WORDS.  AND THIS IS THE DEFENDANT TALKING ABOUT THE

18   SECRET REPRICING.

19           THE TERM THEY USED FOR SECRET REPRICING AT BROADCOM WAS

20   "DOUBLE UP AND CANCEL."  THAT'S WHAT THEY CALLED IT.  HERE IS WHAT

21   THE DEFENDANT WROTE ABOUT THE SECRET REPRICING, WHETHER OR NOT IT

22   **WAS A GOOD IDEA OR NOT:**

23           "THE MORE I THINK ABOUT THE DOUBLE-UP AND CANCEL

24   ALTERNATIVE, THE LESS I LIKE IT.  IF WE GET TOO CUTE, E AND Y" --

25   THAT'S ERNST & YOUNG, THE OUTSIDE ACCOUNTANTS -- "WILL BLOW THE

Page 46

1    WHISTLE ON OUR WHOLE PROGRAM.  AND IN THE UNLIKELY EVENT WE LEARN

2    WE HAVE SOMEONE IN OUR MIDST WITH MEHRDAD" -- THAT'S MEHRDAD

3    NAYEBI, UNUSUAL NAME -- "IN OUR MIDST WITH MEHRDAD-LIKE

4    TENDENCIES" -- DEFENDANT'S WORDS -- "WE ARE SCREWED."

5          WE HEARD EARLIER THAT ONE OF THE DEFENDANT'S CONTENTIONS

6    IS HE OPERATED IN GOOD FAITH THE WHOLE TIME.  THAT'S WHAT HE IS

7    SAYING NOW, THIS IS WHAT HE SAID THEN.  IF YOU ARE OPERATING IN

8    GOOD FAITH, IF YOU HAVE INTEGRITY, IF YOU ARE DOING THINGS IN A

9    WAY THAT YOU THINK ARE RIGHT, YOU DON'T WORRY ABOUT PEOPLE BLOWING

10   THE WHISTLE ON YOUR WHOLE PROGRAM, AND YOU DON'T WORRY ABOUT

11   WHISTLE-BLOWERS COMING FORWARD AND, TO USE THE DEFENDANT'S WORDS,

12   SCREWING YOU.

13         THE DEFENDANT'S COLLEAGUE, NANCY TULLOS, AGREED WITH THE

14   DEFENDANT'S SENTIMENT, BUT HENRY NICHOLAS, THE CEO, HE IS STILL

15   PUSHING FOR THIS SECRET REPRICING, THIS DOUBLE UP AND CANCEL.  SO

16   THE DEFENDANT ASKED MS. TULLOS TO DELIVER A MESSAGE TO HENRY

17   **NICHOLAS.  HERE WAS THE MESSAGE:**

18         "WE HAVE TO GIVE NICK THE NAMES HE HAS ASKED FOR.  THOSE

19   ARE THE NAMES OF PEOPLE WE'RE GOING TO TRUST TO DO THE SECRET

20   REPRICE.  PLEASE ALSO LET HIM KNOW MY SERIOUS RESERVATIONS ABOUT

21   KILLING THE GOLDEN GOOSE."

22         SO THE GOLDEN GOOSE IS AN AESOP'S FABLE.  MAN OWNS A

23   GOOSE, GOOSE LAYS A GOLDEN EGG.  MAN DECIDES HE WANTS MORE GOLD,

24   SO HE KILLS THE GOOSE TO GET THE GOLD INNARDS FROM HIS GOLDEN

25   GOOSE.  TO HIS HORROR, HE DISCOVERS THE GOOSE WAS LIKE ANY OTHER

Page 47

1  GOOSE, AND HE HAS KILLED THE GOOSE THAT'S LAID THE GOLDEN EGG.

2  **MORAL OF THE STORY:**  IF YOU GET TOO GREEDY, YOU'LL LOSE

3  EVERYTHING.

4          THE GOLDEN GOOSE, THE GOLDEN GOOSE WAS BROADCOM'S

5  ABILITY TO BACKDATE OPTIONS, GETTING SOMETHING FOR NOTHING.

6  RETAINING THE BEST AND THE BRIGHTEST, BRINGING THEM ON BOARD,

7  GETTING THEM IN-THE-MONEY GRANTS, BUT WITHOUT HAVING TO TAKE ANY

8  OF THE CONSEQUENCES, WITHOUT HAVING TO HAVE THEIR -- THE EXPENSE

9  OF KEEPING THEM AT BROADCOM SHOW UP ON THE REPORT CARD.

10         THE DEFENDANT DIDN'T WANT TO RISK KILLING THE GOLDEN

11  GOOSE BY CREATING OTHER MEHRDAD NAYEBIS.

12         COULDN'T HAVE ANY OTHER WHISTLE-BLOWERS BECAUSE THAT

13  WOULD EXPOSE BROADCOM BACKDATING AND DENY THE ABILITY TO HAVE THE

14  BEST AND THE BRIGHTEST WITHOUT ADVERSE CONSEQUENCES.

15         AS I SAID, THIS IS NOW THE END OF THE YEAR.  AS THE END

16  OF THE YEAR, IT'S TIME FOR BROADCOM TO PUT OUT IT'S REPORT CARD.

17  IT'S JANUARY 2001, ERNST & YOUNG HAS COME IN, AND THEY'RE AUDITING

18  BROADCOM FOR ITS 2000 REPORT CARD.  IT TRAILS BY A COUPLE OF

19  MONTHS.

20         AS PART OF THIS PROCESS, THE DEFENDANT HAS TO MAKE

21  REPRESENTATIONS TO ERNST & YOUNG ABOUT WHAT IS GOING ON INSIDE

22  BROADCOM SO ERNST & YOUNG CAN RENDER AN AUDIT.  LET'S LOOK AT WHAT

23  IS GOING ON THE INSIDE OF BROADCOM.

24         THE NAYEBI COMPLAINT CAME IN THIS LATE 2000.  BROADCOM

25  FAILED TO DISCLOSE THE BACKDATING.  ALLEGATIONS OF SECURITIES

Page 48

1   FRAUD, ALLEGATIONS OF LYING TO THE AUDITORS, ALLEGATIONS OF FRAUD.

2         2001 E-MAIL, DON'T WANT THEM TO BLOW THE WHISTLE ON OUR

3   WHOLE PROGRAM.  SOMEONE WITH MEHRDAD-LIKE TENDENCIES, WE'RE

4   SCREWED, CAN'T RISK KILLING THE GOLDEN GOOSE.

5         BY THE WAY, ON THE SECRET REPRICING, THE REASON THE

6   DEFENDANT DIDN'T WANT TO DO, IT WASN'T BECAUSE IT WAS WRONG, IT

7   WASN'T BECAUSE IT WAS FRAUD, IT WASN'T BECAUSE IT REQUIRED LYING

8   TO THE ACCOUNTANTS.  HE DIDN'T WANT TO DO IT BECAUSE HE DIDN'T

9   WANT TO GET CAUGHT.

10        FINALLY, VERY BEGINNING OF THE MONTH -- SORRY, VERY

11  BEGINNING OF FEBRUARY, 2001, NAYEBI SETTLEMENT.  FRAUD, FRAUD,

12  PAYING TO COVER UP FRAUD.

13        WHAT DID THE DEFENDANT TELL BROADCOM'S ACCOUNTANTS, THE

14  AUDITORS?

15        THERE HAS BEEN NO FRAUD INVOLVING MANAGEMENT.  THERE HAS

16  BEEN NO FRAUD THAT COULD HAVE MATERIAL EFFECT ON FINANCIAL

17  STATEMENTS.  SIGNED, WILLIAM J. RUEHLE, CHIEF FINANCIAL OFFICER.

18        ON THE INSIDE, FRAUD; FRAUD ABOUT THE OPTION GRANTING,

19  FRAUD WITH MEHRDAD NAYEBI, PAYING TO COVER UP THE FRAUD.  TO THE

20  OUTSIDE, NOTHING TO SEE HERE, NOTHING TO WORRY ABOUT.

21        THE STOCK FELL IN 2001.  IN 2002, IT WAS REALLY DOWN.

22  ONCE AT AROUND $300 PER SHARE, IT WAS NOW BELOW $20 PER SHARE.

23  EVEN THE BACKDATED GRANTS MEHRDAD NAYEBI GOT ARE NOW OUT OF THE

24  MONEY, UNDER WATER.

25        THIS PRESENTED A REAL PROBLEM FOR THE DEFENDANT AND THE

Page 49

1    REST OF THE BROADCOM SENIOR EXECUTIVES.  THE SAME PROBLEM THEY

2    **ALWAYS HAVE:**  HOW DO YOU RETAIN THE BEST AND THE BRIGHTEST WITHOUT

3    HAVING TO PAY THEM CASH.  AND THE PROBLEM IS MADE MORE ACUTE

4    BECAUSE, WITH THE STOCK PRICE KEEPING ON DROPPING, EVEN THE

5    BACKDATED GRANTS WEREN'T THAT STRONG OF AN INCENTIVE FOR THE

6    EMPLOYEES TO STICK AROUND.

7         SO, DURING EARLY 2002, THE DEFENDANT, WORKING WITH NANCY

8    TULLOS AND THE REST OF THE BROADCOM EXECUTIVES, WERE DESPERATELY

9    TRYING TO GET A GRANT THAT WOULD STICK IN THE MONEY LONG ENOUGH

10   FOR THE EMPLOYEES TO FEEL INCENTIVE.

11        SO WHAT THEY WOULD DO IS, THEY WOULD WAIT AND THEY WOULD

12   BACKDATE.  THEY PICK A DATE IN THE PAST.  BUT BECAUSE THE STOCK

13   WAS DROPPING, THE STOCK WOULD DROP BELOW EVEN THE BACKDATED GRANT.

14   SO WHAT THE DEFENDANT AND MS. TULLOS WOULD DO, WOULD BE PRETEND

15   LIKE THE GRANT NEVER HAPPENED.  THEY'D BACKDATE A GRANT, STOCK

16   WOULD DROP BELOW THE GRANT, THEY'D BACKDATE A NEW GRANT, REPEAT,

17   REPEAT, REPEAT.

18        BUT THINGS HAD CHANGED IN THE WORLD BY EARLY 2002.

19   ENRON, WORLDCOM, THESE COMPANIES HAD IMPLODED IN A WAVE OF

20   CORPORATE FRAUD AND ACCOUNTING SCANDALS.  AND THOSE IMPLOSIONS DID

21   NOT GO UNNOTICED BY THE BROADCOM SENIOR EXECUTIVES, INCLUDING THE

22   DEFENDANT.  THIS WAS NOT A TIME TO BE BRAZEN IN HOW YOU BACKDATED

23   STOCK OPTIONS.  SO YOU'LL SEE THAT THE DEFENDANT GREW EVEN MORE

24   CAREFUL AS A RESULT OF THOSE FRAUDS.

25        WHICH BRINGS ME BACK TO MEHRDAD NAYEBI FOR ONE OTHER

1    OBSERVATION.  AFTER MEHRDAD NAYEBI, WHAT DID THE DEFENDANT DO?

2              HE STOPPED BACKDATING STOCK OPTIONS?  NO.

3              DID HE TRY AND GET BROADCOM TO STRAIGHTEN UP AND FLY

4    RIGHT?  NO.

5              HE KEPT ON BACKDATING, DESPITE THE LESSONS LEARNED,

6    DESPITE THE THREATENED LAWSUIT AND LITIGATION, DESPITE THE PAYOFF,

7    KEPT ON BACKDATING.  THE LESSON HE DID LEARN WAS BE MORE CAREFUL.

8    THE LESSON HE DID LEARN WAS DON'T PUT THINGS IN WRITING, TRY AND

9    DO THE BACKDATING IN A WAY THAT YOU ARE NOT GOING TO GET CAUGHT.

10              THAT BRINGS US TO EARLY 2002.  THE BROADCOM EXECUTIVES

11    ARE BACKDATING BUT THEY'RE NERVOUS.  THEY DON'T WANT TO GET

12    CAUGHT, THEY DON'T WANT TO GET CAUGHT UP IN A WAVE OF ACCOUNTING

13    SCANDALS LIKE WORLDCOM AND ENRON.

14              SO, DURING THE SECOND AND THIRD QUARTER OF 2002,

15    BROADCOM AND ITS BOYS, WHO HAVEN'T GOTTEN OPTIONS IN A WHILE

16    BECAUSE THE STOCK KEEPS DROPPING, ARE GETTING SURLY, AND THEY'RE

17    ASKING THE EXECUTIVES, "WHAT IS GOING ON, WHERE ARE OUR STOCK

18    OPTIONS?"

19              MOST OF THE BRUNT OF THAT ANGER, THAT DISAPPOINTMENT,

20    LANDED ON NANCY TULLOS' DESK.  AS I SAID, MS. TULLOS IS THE VICE

21    PRESIDENT OF HUMAN RELATIONS.  SHE WILL BE TESTIFYING AT THIS

22    TRIAL.  SHE PLED GUILTY TO OBSTRUCTION OF JUSTICE IN CONNECTION

23    WITH THE MEHRDAD NAYEBI DEBACLE.

24              MS. TULLOS WAS GETTING COMPLAINTS.  SHE WAS GETTING

25    COMPLAINTS FROM EMPLOYEES WANTING TO KNOW, "WHAT IS GOING ON, WHY

1    HAVEN'T WE GOTTEN OUR STOCK OPTIONS?"

2         THIS IS HER RESPONSE TO ONE OF THOSE EMPLOYEES:  "I

3    REALLY DON'T UNDERSTAND WHY I KEEP GETTING THESE QUESTIONS,

4    PARTICULARLY FROM PEOPLE THAT HAVE BEEN AT BROADCOM A LONG TIME,

5    PEOPLE WHO KNOW HOW WE DO IT.  I CANNOT RESPOND FULLY IN WRITING,

6    BUT IN CASE YOU HAVEN'T NOTICED, THE STOCK CONTINUES TO DROP."

7         BROADCOM IS A FORTUNE 500 COMPANY.  SHE IS THE VICE

8    PRESIDENT OF HUMAN RELATIONS.

9         SHE CAN'T RESPOND IN WRITING?

10        THIS EMPLOYEE PUSHED A LITTLE BIT HARDER, AND MS.

11   TULLOS, WITH ENRON, WITH WORLDCOM FRESH ON HER BRAIN, WASN'T GOING

12   TO TELL THIS EMPLOYEE THAT THEY WERE BACKDATING STOCK OPTIONS.

13   **HERE IS WHAT SHE WROTE AT THE TIME:**

14        "THE PROBLEM IS, I CANNOT TELL YOU WHAT WE" -- AND

15   YOU'LL HEAR THAT'S HER AND THE OTHER DEFENDANTS, THE SENIOR

16   EXECUTIVES -- "ARE DOING POST-ENRON, NOW WORLDCOM."

17        A LITTLE BIT LATER, THERE WAS ANOTHER COMPLAINT FROM

18   ANOTHER EMPLOYEE, AND MS. TULLOS WROTE ESSENTIALLY THE SAME THING:

19   "AS FAR AS THE FOCAL GRANTS GO" -- THAT'S AN ANNUAL GRANT -- "I

20   GET E-MAILS EVERY DAY FROM MANAGERS COMPLAINING ABOUT WHY WE HAVE

21   NOT ISSUED THESE SINCE I STARTED THE PROCESS MONTHS AGO.  I CANNOT

22   SAY TOO MUCH IN WRITING, POST ENRON, NOW WORLDCOM, BUT I HAVE TOLD

23   THEM TO CHECK THE STOCK PRICE TREND."

24        SHE'S NOT GOING TO SIT DOWN AND WRITE WE'RE BACKDATING

25   STOCK OPTIONS.  SENIOR EXECUTIVES AT BROADCOM LEARNED THEIR

Page 52

1    LESSONS, SOME OF THEM, MAYBE THE WRONG ONES, FROM ENRON AND

2    WORLDCOM, AND THEY WEREN'T ABOUT TO COMMIT IN WRITING WHAT THEY

3    WERE DOING.

4           AS I SAID, IN 2002, THE EMPLOYEES WERE SURLY.  THEY

5    WEREN'T GETTING PAID ENOUGH, AND IT WAS THOUGHT THAT THE USUAL

6    MASSIVE GRANT OF BETWEEN 15 AND 18 MILLION SHARES WASN'T GOING TO

7    HAPPEN.  SO, IN 2002, BROADCOM SENIOR EXECUTIVES DECIDED TO DOUBLE

8    DOWN.  INSTEAD OF GRANTING BETWEEN 15 AND 18 MILLION SHARES, THEY

9    GRANTED OVER 30 MILLION OPTIONS.

10          THEY DECIDED TO BACKDATE THIS GRANT, AGAIN, JUST A FEW

11   DAYS, FROM THE MIDDLE OF JULY TO EARLY JULY.  TAKE YOU INSIDE OF

12   BROADCOM AGAIN.  THERE WAS A MEETING HELD IN THE OFFICE OF HENRY

13   SAMUELI, ONE-HALF OF THE OPTION COMMITTEE, THE CHIEF TECHNICAL

14   OFFICER.  IT WAS HELD IN HIS OFFICE ON JULY 16, AT 12:15 P.M.  AT

15   THIS MEETING, DR. SAMUELI, THE DEFENDANT, AND NANCY TULLOS, ALL

16   DECIDED TO GO FORWARD WITH THE DOUBLE FOCAL GRANT.  THEY DECIDED

17   THEY WOULD BACKDATE THIS DOUBLE FOCAL GRANT TO EARLY JULY.

18          AND THE DEFENDANT MADE A VERY -- IN THE COURSE OF THIS

19   MEETING, THE DEFENDANT GAVE NANCY TULLOS A VERY CRISP, CLEAR

20   INSTRUCTION ABOUT HOW THIS GRANT WAS TO BE HANDED.  THE DEFENDANT

21   TOLD MS. TULLOS, AND YOU'LL HEAR MS. TULLOS TELL YOU ABOUT IT ON

22   THE STAND, THAT SHE COULD WORK ON THIS GRANT, SHE COULD DO THIS

23   GRANT FOR EARLY JULY, BUT WHAT SHE COULD NOT DO WAS TO PUT

24   ANYTHING IN WRITING.  COULDN'T USE HER E-MAIL, BECAUSE THE

25   DEFENDANT DIDN'T WANT A TRAIL OF UNFAVORABLE DATES FOR THE

Page 53

1   AUDITORS OR ANYONE ELSE TO UNCOVER IN CASE THE STOCK DROPPED AGAIN

2   AND THEY HAD TO PICK A NEW BACKDATING GRANT.

3            YOU'LL BE ABLE TO JUDGE MS. TULLOS'S CREDIBILITY AND HER

4   MEMORY.  IN ADDITION TO BEING ABLE TO JUDGE THAT, YOU'LL ALSO BE

5   ABLE TO SAY WHAT MS. TULLOS WROTE ABOUT THAT MEETING THREE DAYS

6   AFTER IT HAPPENED.  ON JULY 19, MS. TULLOS, IN HER E-MAIL, WHICH

7   WILL NOT CHANGE, PUT EXACTLY WHAT HAPPENED AT THAT MEETING.

8            "BILL" -- THAT'S THE DEFENDANT -- "SAID THE PROCESS HAD

9   TO BE DONE BY TODAY.  "BILL" -- THAT'S THE DEFENDANT -- "DIDN'T

10  WANT ME TO COMMUNICATE ANYTHING IN WRITING BECAUSE IT WOULD LEAVE

11  AN E-MAIL TRAIL OF UNFAVORABLE DATES."

12           TIME MARCHES ON, E-MAIL STAYS EXACTLY THE SAME.

13           BACKDATING JUST A FEW DAYS, THIS TIME FROM JULY 16 TO

14  JULY 3RD.  ABOUT A 5-DOLLAR -- ABOUT A 6-DOLLAR -- LET'S SAY ABOUT

15  A 5-DOLLAR-A-SHARE DIFFERENCE.

16           TWO THINGS TO OBSERVE.  FIVE BUCKS A SHARE WHEN YOUR

17  STOCK IS TRADING AT 200, IS NOT THAT BIG OF A DEAL.  WHEN YOUR

18  STOCK IS TRADING AT 15, IT'S ABOUT 25 PERCENT.  THAT'S FOR A FEW

19  DAYS.

20           SECOND THING IS, THEY BACKDATED 30 -- OVER 30 MILLION

21  SHARES.  DO THE MATH.  $5 A SHARE, MULTIPLY BY OVER 30 MILLION

22  SHARES, BRINGS YOU UP TO OVER $150 MILLION.  $150 MILLION IN THE

23  MONEY GRANTS THAT GO TO THE EMPLOYEES.  150 FEWER DOLLARS THAT

24  BROADCOM'S INVESTORS WILL GET WHEN THE STOCK LEASE OPTIONS ARE

25  EXERCISED.  AND, FINALLY, $150 MILLION THAT THE DEFENDANT DIDN'T

1    PUT ON THE REPORT CARD.  $150 MILLION EXPENSES THE DEFENDANT

2    SIMPLY MADE VANISH BY LYING ABOUT GRANT DATE.

3         WE TALK ABOUT THE GRANTS THAT WENT TO ORDINARY

4    EMPLOYEES.  SOME OF THOSE GRANTS ALSO WENT TO THE DEFENDANT.

5    WE'LL TALK ABOUT THOSE DURING THE COURSE OF TRIAL.  I WANT TO

6    FOCUS ON A GRANT THAT WAS AN OFFICER GRANT.  A GRANT THAT WENT TO

7    THE MOST SENIOR EXECUTIVES AT THE COMPANY, INCLUDING THE

8    DEFENDANT.

9         NOW, UNLIKE GRANTS TO EMPLOYEES, EVEN THE OPTION

10   COMMITTEE, EVEN HENRY NICHOLAS AND HENRY SAMUELI, COULDN'T GRANT

11   OPTIONS, AS SECTION 16 OFFICERS.  THEY DIDN'T WANT PEOPLE WORKING

12   AT THE COMPANY GRANTING OPTIONS TO THEIR FRIENDS.  INSTEAD, THE

13   OUTSIDE DIRECTORS, A MAN BY THE NAME OF WERNER WOLFEN, AND A MAN

14   BY THE NAME OF LANNY ROSS, THEY WERE THE ONES THAT HAD TO DO

15   GRANTS TO THE MOST SENIOR EXECUTIVES.  THEY'RE CALLED A

16   COMPENSATION COMMITTEE.  IT'S PART OF THE INVESTOR-APPROVED PLAN.

17   IT'S THE RULES THAT THEY HAD TO FOLLOW WHEN IT CAME TO GRANTING

18   OPTION.

19        THE COMPENSATION COMMITTEE HAD EXCLUSIVE AUTHORITY TO

20   GRANT THE OPTIONS, AND BOTH GUYS HAD TO SAY YES.  BOTH OF THE

21   SENIOR EXECUTIVES HAVE TO SAY, BOTH OF THE OPTION COMMITTEE

22   MEMBERS -- BOTH THE COMPENSATION COMMITTEE MEMBERS, IN ORDER FOR

23   THERE TO BE A GRANT, HAVE TO SAY, "YES, I APPROVE A GRANT."

24             (RECESS TAKEN, FROM  10:39 TO 11:01.)

25        **THE COURT:**  MR. STOLPER, PLEASE PROCEED, SIR.

1          **MR. STOLPER:**  THANK YOU, YOUR HONOR.

2          GOOD MORNING AGAIN.  BEFORE WE LEFT FOR THE BREAK, WE

3     WERE TALKING ABOUT THE DEFENDANT'S OWN PERSONAL STOCK OPTIONS.  AS

4     I SAID, SOME OF THE OPTIONS THAT WE TALKED ABOUT BEFORE INCLUDED

5     THE DEFENDANT, BUT I WANT TO FOCUS ON GRANTS THAT WERE JUST FOR

6     THE OFFICERS; JUST FOR THE VERY SENIOR EXECUTIVES AT BROADCOM LIKE

7     THE DEFENDANT AND HIS COCONSPIRATORS.

8          AS I SAID BEFORE THE BREAK, THOSE GRANTS HAD TO BE

9     AUTHORIZED BY A DIFFERENT COMMITTEE, A SPECIAL COMMITTEE.  THE

10    COMPENSATION COMMITTEE.  TWO INDEPENDENT MEMBERS OF THE BOARD HAD

11    TO SAY YES BEFORE THAT VALUE COULD BE TRANSFERRED FROM THE

12    SHAREHOLDERS TO THE DEFENDANT.

13         LET'S LOOK AT HOW THE DEFENDANT HANDLED HIS OWN PERSONAL

14    GRANTS.  WE'RE NOW IN THE END OF JULY, EARLY AUGUST, 2002.  WE

15    HAVE ALREADY FINISHED THAT JULY 3RD GRANT, THE ONE THEY BACKDATED

16    FROM JULY 16; THE ONE THAT'S THE E-MAIL OF NO E-MAIL TRAIL OF

17    UNFAVORABLE DATES.

18         MS. TULLOS SENT AN E-MAIL, NANCY TULLOS THE VICE

19    PRESIDENT OF HR, HUMAN RELATIONS, SENT AN E-MAIL TO BOTH MEMBERS

20    OF THE COMPENSATION COMMITTEE TO WARREN WOLFEN AND LANNY ROSS.

21    THE DATE OF THE E-MAIL IS IMPORTANT.  SHE SENT THE E-MAIL ON JULY

22    29, 2002.  IT WAS A MONDAY.  "PLEASE CONFIRM THAT THE COMPENSATION

23    COMMITTEE HAS MET AND APPROVED THE ATTACHED SECTION 16 OFFICER

24    GRANTS."

25         INCLUDED IN THOSE GRANTS WERE 300,000 OPTIONS; 300,000

1   TO THE DEFENDANT.  THE VERY NEXT DAY, ONE MEMBER OF THE

2   COMPENSATION COMMITTEE, NOT BOTH, JUST ONE, LANNY ROSS RESPONDED.

3   "I APPROVE."  WORDS ARE IMPORTANT.  NOT, "I ALREADY APPROVED."

4   NOT, "I APPROVED."  NOT, "WE APPROVED THIS LAST WEEK."  JUST, "I

5   APPROVE."  WHICH WOULD PUT THE FIRST POSSIBLE DATE, ASSUMING THE

6   OTHER MEMBER OF THE COMMITTEE GAVE HIS APPROVAL, THE FIRST

7   POSSIBLE DATE WOULD BE JULY 30, 2002, A STRIKE PRICE OF $19.65.

8   COMPARED TO SOME OF THE OTHER PRICES WE HAVE SEEN, PRETTY GOOD.

9           NO RESPONSE CAME IN FROM THE OTHER MEMBER OF THE

10  COMMITTEE.  HIS NAME IS WERNER WOLFEN.  AN UNUSUAL NAME.

11  MR. WOLFEN DIDN'T SEND AN E-MAIL BACK, DIDN'T TELEPHONE IN, RADIO.

12  SILENCE.  A DAY GOES BY, AND MS. TULLOS MINDFUL THAT THE DEFENDANT

13  AND THE REST OF THE OFFICERS WOULD LIKE TO GET A GOOD PRICE, SAYS

14  MAYBE WE SHOULD GO WITH A PRICE FROM THE PREVIOUS WEEK.

15          WHAT IS THE DEFENDANT'S RESPONSE AS CHIEF FINANCIAL

16  OFFICER OF THIS FORTUNE 500 COMPANY?  "MY UNDERSTANDING IS THE

17  COME COMMITTEE APPROVED THEM AS OF LAST FRIDAY."

18          HOW IS THAT POSSIBLE?  THE FIRST TIME THE COMP COMMITTEE

19  GOT THE E-MAIL ASKING FOR APPROVAL WAS JULY 30.  AND THE ONE

20  MEMBER OF THE COMP COMMITTEE WHO DID RESPOND DIDN'T SAY "I

21  APPROVED THEM LAST FRIDAY."  HE SAID, "I APPROVE."  AND WE STILL

22  HAVEN'T HEARD FROM WERNER WOLFEN, THE OTHER MEMBER OF THE COMP

23  COMMITTEE.  WHY?  WHY BACKDATE JUST A FEW DAYS?

24          WELL, DO THE MATH.  $19.65 STRIKE PRICE COMPARED TO A

25  17-DOLLAR CHANGE STRIKE PRICE.  AT THE TIME THE DEFENDANT WOULD GO

Page 57

1   TO EXERCISE THOSE OPTIONS, THAT'S AN EXTRA $600,000 IN HIS POCKET

2   BY JUST LYING AND SAYING WHEN THE COMPENSATION COMMITTEE MET.

3          DEFENDANT HAD NO AUTHORITY.  SHAREHOLDERS DIDN'T ENTRUST

4   HIM TO GRANT OPTIONS TO HIMSELF; TO SET HIS OWN STRIKE PRICE.

5   ONLY THE COMP COMMITTEE COULD DO THAT.

6          AS YOU CAN SEE, THE STOCK PRICE CONTINUED TO GO DOWN.

7   GUESS WHAT HAPPENED?  ON AUGUST 5, THE DEFENDANT RESET HIS OWN

8   STRIKE PRICE.  HE DIDN'T LIKE THE JULY 30 PRICE.  HE NO LONGER

9   LIKES THE JULY 26 PRICE.  LET'S TAKE IT DOWN TO $15.74, THE

10  AUGUST 5 PRICE.  WHY?  IN JUST A FEW DAYS, AN EXTRA $400,000 IN

11  THE DEFENDANT'S POCKET WHEN IT CAME TIME TO EXERCISE THE OPTION.

12  YOU WANTED $15.74 TODAY, YOU GOT IT.

13         NOW, AS WITH THE OPTION COMMITTEE, THE COMPENSATION

14  COMMITTEE HAS TO SIGN THOSE PERSONAL BOARD CONSENTS.  THE

15  UNANIMOUS WRITTEN CONSENTS.  WELL, THE OTHER SENIOR EXECUTIVES AT

16  BROADCOM, THE SAME PEOPLE WHO GOT THE STOCK OPTION -- I SKIPPED A

17  STEP.  I'M SORRY.

18         WHERE IS WERNER WOLFEN?  WE HAVE ONLY GOT ONE MEMBER OF

19  THE COMPENSATION COMMITTEE.  IS IT POSSIBLE THAT MR. WOLFEN AND

20  MR. ROSS APPROVED THE GRANT DATE ON AUGUST 5 OR JULY 30?  IS THAT

21  POSSIBLE?  NOT POSSIBLE.  MR. WOLFEN, UNBEKNOWNST TO THE

22  DEFENDANT, WAS ON AN ALASKA CRUISE DURING THIS TIME PERIOD, AND HE

23  WASN'T MAKING SHIP TO SHORE CALLS TO HAVE OPTION -- SORRY

24  COMPENSATION COMMITTEE MEETINGS SO THE DEFENDANT COULD PUT AN

25  EXTRA MILLION DOLLARS HIS POCKET AT THE TIME OF EXERCISE.

1        YOU NEED BOTH MEMBERS OF THE COMMITTEE.  ONE SAID YES ON

2    JULY 30, AND THE OTHER WAS ON A CRUISE NOT HAVING MEETINGS.

3        HOW DID THEY GET THE COMPENSATION COMMITTEE TO SIGN THE

4    CORPORATE RECORDS THAT MAKE THIS GRANT OFFICIAL?  EASY.  THE

5    DEFENDANT AND THE OTHER SENIOR EXECUTIVES, THE SAME PEOPLE WHO

6    WERE GETTING THIS BACKDATED GRANT, STUCK THE CORPORATE DOCUMENTS

7    IN A STACK OF STUFF THAT NEEDED TO BE SIGNED AT THE END OF THE

8    BOARD MEETING.  AND YOU'LL HEAR FROM ONE OF THE BORDER MEMBERS WHO

9    WILL TELL YOU THEY HAD NO IDEA THEY WERE HELPING THE DEFENDANT

10   BACKDATE HIS OWN GRANTS AND, IF THEY HAD KNOWN, THEY NEVER WOULD

11   HAVE APPROVED.

12       LET'S TAKE A LOOK AT THE NEXT SLIDE.  THE TRUTH SHOULD

13   BE THE SAME, BOTH INSIDE AND OUTSIDE.  INSIDE BROADCOM WE'RE

14   WATCHING SHARE PRICES MOVE AROUND LIKE A BOUNCING BALL.  THE

15   DEFENDANT TAKES HIS OWN SHARE PRICE AND HE SHIFTS IT NOT ONCE, BUT

16   TWICE, EACH TIME TRYING TO GET HIMSELF A MORE FAVORABLE DAY.  AS

17   TO THE DOUBLE FOCAL, 30 MILLION SHARES BACKDATED FROM AT LEAST

18   JULY 19 TO EARLY JULY.

19       WHAT DOES THE DEFENDANT SAY TO THE OUTSIDE?  WHAT DOES

20   HE PUT DOWN ABOVE HIS SIGNATURE ON THE REPORT CARD?  THE EXERCISE

21   PRICE PER SHARE FOR THE OPTIONS IS $15.74, THE FAIR MARKET VALUE

22   ON DATE OF GRANT, WILLIAM J. RUEHLE, VICE PRESIDENT AND CHIEF

23   FINANCIAL OFFICER."

24       IT'S NOT A CASE ABOUT ACCOUNTING.  IT'S NOT A CASE ABOUT

25   BUSINESS.  IT'S A CASE ABOUT LYING.  IT'S A CASE ABOUT LYING WHEN

Page 59

1   THEY GRANTED OPTIONS.

2           SO, WE COME TO THE END.  IN 2003, SHORTLY AFTER THESE

3   GRANTS WERE DONE, A NEW CEO TOOK OVER AT BROADCOM.  AND AFTER HE

4   GOT SETTLED IN, BROADCOM ESSENTIALLY STOPPED BACKDATING STOCK

5   OPTIONS.  IT'S IMPORTANT TO KNOW THAT THE DEFENDANT NEVER

6   MENTIONED ANYTHING TO THE NEW CEO ABOUT HOW THE OLD PRACTICES

7   WORKED, BECAUSE OF THE WAY OPTIONS ARE ACCOUNTED FOR, THESE

8   EXPENSES THAT GO UNDER THE REPORT CARD SHOW UP FOR A NUMBER OF

9   YEARS ON THE REPORT CARDS AFTER THE GRANTS ARE DONE, WHICH MEANS

10  OPTION THAT ARE BACKDATED IN 2002 WILL SHOW UP IN 2003, AND 2004,

11  AND 2005.  DEFENDANT KEPT ON SIGNING THOSE REPORT CARDS EVEN

12  THOUGH THEY WERE FALSE, EVEN THOUGH HE KNEW THEY WERE FALSE, WHICH

13  BRINGS US TO 2006.

14          2006 IS THE YEAR THAT THIS ALL CAME CRASHING IN ON THE

15  DEFENDANT.  IN THE MIDDLE OF MAY, 2006, AN INVESTOR GROUP PUT OUT

16  A REPORT.  THE REPORT WAS ENTITLED "OPTIONS BACKDATING."  OPTIONS

17  BACKDATING.  WHICH COMPANIES ARE AT RISK.  THE REPORT IDENTIFIED

18  THREE POTENTIALLY BACKDATED GRANTS, INCLUDING TWO WE JUST TALKED

19  ABOUT.  THE 30 MILLION SHARE DOUBLE FOCAL JULY 3RD AND A SHARE THE

20  DEFENDANT MOVED AROUND FOR HIMSELF, BACKDATED AND REPRICED,

21  AUGUST 5, 2002.

22          THE REPORT NOTICED THERE WAS A STATISTICAL PROBLEM.

23  THESE GRANTS ARE WAY TOO FAVORABLE TO HAVE OCCURRED RANDOMLY.

24  WITH THIS REPORT CAME THE INEVITABLE QUESTIONS FROM THE PRESS AND

25  FROM INVESTORS.  ONE OF THOSE QUESTIONS WAS PIPED INTO THE

1    DEFENDANT FROM A REPORTER AT THE LOS ANGELES TIMES.  HERE IS WHAT

2    HE ASKED.  IT IS AN E-MAIL SO THERE IS NO DISPUTE ABOUT WHAT IT

3    SAYS.  "DOES THE COMPANY KNOW OR DOES IT HAVE ANY EVIDENCE OF

4    BACKDATING STOCK OPTIONS?"

5         REPORT COMES OUT, ACCUSES BROADCOM THE DEFENDANT OF

6    BACKDATING STOCK OPTIONS, PRESS ASKS A REASONABLE QUESTION.  "DOES

7    THE COMPANY KNOW OR DOES IT HAVE ANY EVIDENCE OF BACKDATING STOCK

8    OPTIONS?"

9         TIME FOR A CHOICE; RIGHT?  DEFENDANT COULD HAVE SAID ANY

10   NUMBER OF THINGS NOW.  "NO COMMENT."  "WE'RE LOOKING INTO IT."

11   "WE'LL GET BACK TO YOU."

12        LET'S LOOK WHAT THE DEFENDANT ACTUALLY SAID.  HIS

13   E-MAIL.  "WE ARE QUITE COMFORTABLE WITH THE INTEGRITY OF OUR

14   OPTIONS GRANTING PROCESS."

15        IN RESPONSE TO THE QUESTION, HAVE YOU BEEN BACKDATING?

16   DO YOU HAVE ANY EVIDENCE OF BACKDATING?  DEFENDANT CHOSE HIS WORDS

17   AND THE WORD HE CHOSE, "INTEGRITY."

18        WE HAVE SEEN A LOT OF WORDS THAT THE DEFENDANT HAS USED

19   AND OTHERS HAVE USED TO DESCRIBE BROADCOM'S OPTIONS PRACTICES.

20   DR. NAYEBI CALLED THEM SECURITIES FRAUD.  THE DEFENDANT USED THE

21   WORDS THAT HE KNEW WOULD BLOW THE WHISTLE ON THE WHOLE PROGRAM.

22   IF THERE WAS SOMEONE ELSE WITH DR. NAYEBI-LIKE TENDENCIES.  "WE'RE

23   SCREWED."  "DON'T WANT TO KILL THE GOLDEN GOOSE."  "WE SHOULD GRAB

24   AN EARLIER PRICE."  "DON'T WANT TO LEAVE AN E-MAIL TRAIL OF

25   UNFAVORABLE DATES."

Page 61

1          THOSE ARE WORDS.  NONE OF THOSE WORDS CONTAINS

2   "INTEGRITY."

3          THE NEXT DAY, BROADCOM'S INVESTORS WENT OUT, PICKED UP

4   THE LOS ANGELES TIMES.  WENT TO THE DRIVEWAY, GRABBED THE PAPER,

5   OPENED IT UP.  AND YOU CAN READ BROADCOM'S DENIAL, "WE ARE

6   CONFIDENT IN THE INTEGRITY OF OUR OPTION GRANTING PROCESS,"

7   TELLING THE SHAREHOLDERS, THE INVESTORS, THERE IS NOTHING TO SEE

8   HERE.

9          WHAT DID THE DEFENDANT DO ON THAT SAME DAY, THE SAME DAY

10  THE INVESTORS OPENED UP THEIR CRISP LOS ANGELES TIMES?  HE SOLD

11  STOCK.  HE EXERCISED 20,000 OPTIONS AND PUT $500,000 INTO HIS

12  POCKET THAT DAY.

13         THE DEFENDANT KNEW WHAT THE INVESTORS COULDN'T.  HE KNEW

14  THAT THERE WAS NO INTEGRITY IN THE OPTIONS GRANTING PROCESS.  HE

15  KNEW THAT IT WAS A LIE.  AND THE WAY HE KNEW WAS, HE WAS THE LIAR.

16         AN INVESTIGATION BECAME INEVITABLE.  ACCUSATIONS OF

17  OPTION BACKDATING, PRESS REPORTS ABOUT OPTIONS BACKDATING,

18  BROADCOM HAD TO LOOK INTO IT.  AND THE DEFENDANT AND THE REST OF

19  THE SENIOR EXECUTIVES KNEW THAT, AND THEY HIRED OUTSIDE

20  ACCOUNTANTS.  THEY HIRED OUTSIDE LAWYERS.  THEY CAME INTO

21  BROADCOM.  THEY STARTED REVIEWING THE OPTIONS GRANTING PROCESS.

22         BY JULY, THE TAB STARTED.  BY JULY, ON JULY 14, THE

23  DEFENDANT PUT OUT A PRESS RELEASE.  AND THAT PRESS RELEASE IS

24  FILED WITH THE SEC AND SIGNED BY THE DEFENDANT WILLIAM J. RUEHLE,

25  CHIEF FINANCIAL OFFICER.  IN THAT PRESS RELEASE, DEFENDANT ADMITS

1   THAT THE PREVIOUS REPORT CARDS, THE 10K THAT HE FILED, MOST OF

2   THEM ARE FALSE AND CANNOT BE RELIED UPON BY THE INVESTORS.

3           ADMITS IT.  THE INVESTIGATION ROLLED ON.  THEY KEPT ON

4   FINDING MORE AND MORE AND MORE BACKDATED STOCK OPTIONS.  DOZENS OF

5   THEM.  BY SEPTEMBER, THE TAB HAD DOUBLED.  ONE OF THE MEMBERS OF

6   THE DEFENDANT'S FINANCE STAFF PUT OUT A PRESS RELEASE, SIGNED BY

7   HIM, FILED WITH THE SEC.  "SORRY, OUR REPORT CARDS AREN'T

8   $750 MILLION WRONG; THEY'RE AT LEAST $1.5 BILLION WRONG."

9           AS YOU CAN IMAGINE, IT'S QUESTION TIME.  BROADCOM'S

10  BOARD HIRED ATTORNEYS, AND THOSE ATTORNEYS DID AN INVESTIGATION.

11  AND ONE OF THE PEOPLE THOSE ATTORNEYS WANTED TO SPEAK WITH WAS

12  DEFENDANT.  HE WAS THE CHIEF FINANCIAL OFFICER.  THEY WANTED TO

13  ASK HIM, HOW COULD THIS HAVE HAPPENED ON YOUR WATCH?  HOW COULD

14  VIRTUALLY EVERY REPORT CARD YOU SIGNED AND YOU FILED WITH THE

15  SECURITIES AND EXCHANGE COMMISSION THAT OUR INVESTORS ARE ENTITLED

16  TO RELY UPON, HOW COULD THOSE ALL HAVE BEEN WRONG?  FALSE?  AND

17  NOT JUST A LITTLE BIT.  BILLIONS OF DOLLARS WRONG.

18          AND, SO, THE BOARD OF DIRECTORS, THROUGH THEIR

19  ATTORNEYS, SET UP AN INTERVIEW, A TIME WHERE THEY COULD SIT DOWN

20  AND ASK THE DEFENDANT THE HARD QUESTIONS ABOUT HOW THIS COULD HAVE

21  HAPPENED ON HIS WATCH.  THAT INTERVIEW WAS SCHEDULED ON

22  SEPTEMBER 11, 2006.  AND IT WAS SCHEDULED TO TAKE PLACE ON

23  SEPTEMBER 21, 10 DAYS LATER.

24          THIS WAS GOING TO BE IT.  THE DEFENDANT WOULD BE ABLE TO

25  SIT DOWN WITH HIS BOARD OF DIRECTORS, THE REPRESENTATIVES, THE

Page 63

1    SHAREHOLDERS, AND EXPLAIN WHAT HAPPENED.  LET'S TALK ABOUT THAT

2    INTERVIEW.

3            DID THE DEFENDANT EXPLAIN TO THE LAWYERS OF THE BOARD OF

4    DIRECTORS FOR THE SHAREHOLDERS THAT HE OPERATED IN GOOD FAITH?

5    DID HE SAY TO THEM, "I'M CONFIDENT IN THE INTEGRITY OF THE OPTIONS

6    GRANTING PROCESS."  DID HE SAY, "I RELIED UPON THE LAWYERS.  I

7    RELIED UPON THE ACCOUNTANTS.  I WAS CONFUSED.  I DIDN'T UNDERSTAND

8    MY JOB."

9            HERE IS WHAT HE SAID TO BROADCOM'S BOARD OF DIRECTORS,

10   THE REPRESENTATIVES OF THE SHAREHOLDERS.  NOTHING.  AFTER BEING

11   BROADCOM'S CHIEF FINANCIAL OFFICER FOR NINE YEARS, THE DEFENDANT

12   RESIGNED TWO DAYS BEFORE HE WAS SUPPOSED TO HAVE THAT

13   HEART-TO-HEART TALK WITH BROADCOM'S INVESTORS.  THE INTERVIEW

14   NEVER HAPPENED.  THE DEFENDANT NEVER SAID A WORD TO THE BOARD.

15           AFTER THE DEFENDANT RESIGNED, JUST BEFORE HE WAS

16   SUPPOSED TO BE INTERVIEWED, THE INVESTIGATION WRAPPED UP.  AS PART

17   OF THE INVESTIGATION, BROADCOM'S BOARD CANCELED ALL THE STOCK

18   OPTIONS THE DEFENDANT RECEIVED AFTER BROADCOM WENT PUBLIC.  THEY

19   DIDN'T WANT THE DEFENDANT TO PROFIT FROM THOSE STOCK OPTIONS

20   ANYMORE.

21           THAT DOESN'T MEAN, LADIES AND GENTLEMEN, THAT THE

22   DEFENDANT DIDN'T PROFIT.  EVERY YEAR THE DEFENDANT WAS THE CHIEF

23   FINANCIAL OFFICER, EVERY YEAR THE DEFENDANT SIGNED AND FILED FALSE

24   REPRESENTATIONS TO THE INVESTORS, FALSE REPORT CARDS, DEFENDANT

25   FILED HIS OWN STOCK.  $78.9 MILLION OF HIS OWN STOCK.  DOESN'T

1    INCLUDE SALARY; DOESN'T INCLUDE BONUSES.  JUST HIS OWN PERSONAL

2    STOCK SALES FROM 1998 THROUGH 2006.

3           THAT'S WHAT THE DEFENDANT GOT.  WHAT DID THE

4    SHAREHOLDERS GET?  THEY LEARNED THAT THEIR CFO HAD HID

5    $2.2 BILLION FROM THEM OVER THE COURSE OF HIS TENURE AS CHIEF

6    FINANCIAL OFFICER.  IN ADDITION TO BEING ROBBED OF THEIR RIGHT TO

7    THE TRUTH, ROBBED OF THEIR RIGHT TO GETTING REPORT CARDS THAT ARE

8    TRUE AND ACCURATE, THE SHAREHOLDERS ALSO LEARNED THAT WITH EACH OF

9    THOSE BACKDATED IN-THE-MONEY GRANTS THAT WAS EXERCISED, THEY LOST

10   CASH.

11          IN ADDITION, BECAUSE BROADCOM HAD TO RESET THE STRIKE

12   PRICES OF OUTSTANDING OPTIONS, THEY GOT ANOTHER $30 MILLION BILL,

13   $29 MILLION BILL OF CASH THEY HAD TO PAY OUT TO EXISTING BROADCOM

14   OPTION HOLDERS TO RESET THEIR STRIKE PRICES TO THE CORRECT PRICE,

15   NOT THE BACKDATED PRICE THAT THE DEFENDANT SAID.

16          FINALLY, DURING THE COURSE OF THIS TRIAL, WE'RE GOING TO

17   HEAR FROM SOME INVESTORS WHO WILL TELL YOU, IN THEIR OWN WORDS,

18   HOW THE DEFENDANTS LIES COST THEM.  AT THE END OF THIS TRIAL, AT

19   THE CLOSE OF EVIDENCE, I EXPECT THAT A MEMBER OF THE GOVERNMENT

20   TEAM, ONE OF THE PROSECUTORS, AS WELL AS THE FBI AGENTS WHO WERE

21   WORKING ON THIS CASE, A MEMBER OF THE GOVERNMENT TEAM IS GOING TO

22   STAND UP HERE AND THEY'RE GOING TO ASK YOU TO RETURN VERDICTS OF

23   GUILTY.  GUILTY OF CONSPIRACY, GUILTY OF SECURITIES FRAUD, GUILTY

24   OF LYING TO THE SEC, GUILTY OF LYING TO THE ACCOUNTANTS, AND

25   GUILTY OF FALSE BOOKS AND RECORDS.  WE EXPECT THAT WILL BE THE

Page 65

1   ONLY VERDICT THAT WILL BE CONSISTENT WITH THE EVIDENCE YOU HEAR.

2   THANK YOU AGAIN FOR YOUR ATTENTION.

3            **THE COURT:**  VERY WELL.

4            MR. MARMARO, YOU NEED A FEW MINUTES TO SET UP, SIR?

5            **MR. MARMARO:**  I DON'T THINK SO, YOUR HONOR.  I THINK

6   WE'RE READY.

7            **THE COURT:**  ALL RIGHT.  VERY WELL, SIR.

8               (THE FOLLOWING PROCEEDINGS WERE HELD AT SIDEBAR.)

9            **MR. UMHOFER:**  YOUR HONOR, WE MOVE FOR A MISTRIAL.  MR.

10  STOLPER REALLY STEPPED IN IT.  HE SAID, AT THE END OF HIS CLOSING,

11  THAT MR. RUEHLE NEVER SAID A WORD TO THE BOARD.  BASED ON THE 9TH

12  CIRCUIT'S RULING AND BASED ON THE POSITION THE GOVERNMENT HAS

13  TAKEN ABOUT THE IRELL INTERVIEW, THAT WAS AN INTERVIEW GIVEN TO

14  THE LAWYERS REPRESENTING THE AUDIT COMMITTEE AND THE BOARD.

15            WHAT THEY HAVE DONE IS THEY HAVE TAKEN AN INTERVIEW THAT

16  MR. RUEHLE CLAIMS WAS PRIVILEGED, BUT NOW IT'S COMING IN THAT THEY

17  HAVE ALWAYS CLAIMED IT WAS AN INTERVIEW GIVEN TO THE BOARD AND

18  THEY HAVE JUST SAID HE DIDN'T SAY A WORD TO THE BOARD.

19            WE DON'T WANT THAT IN THIS TRIAL AT ALL, BUT NOW THEY

20  FORCED US IN THE POSITION WHERE WE HAVE GOT TO BRING UP A

21  CONVERSATION THAT WE BELIEVE IS PRIVILEGED IN ORDER TO DISPROVE

22  WHAT THEY JUST TOLD TO THE JURY.  THEY HAVE MUCKED UP THIS

23  COMPLETELY, YOUR HONOR, WITH THAT, AND THAT'S JUST FOR STARTERS.

24            LET'S GO TO ENRON --

25            **THE COURT:**  NO, WE'RE GOING TO HAVE TO -- I DIDN'T KNOW

Page 66

1    WHAT THIS WAS GOING TO BE.  WE'LL HAVE TO DEAL WITH THIS AT THE

2    LUNCH BREAK.

3              MR. UMHOFER:  I DIDN'T WANT TO WAIVE IT.

4              MR. MARMARO:  I JUST WANTED TO PRESERVE THE RECORD, YOUR

5    HONOR.  THANK YOU.

6                   (END SIDE-BAR.)

7              MR. MARMARO:  MAY IT PLEASE THE COURT, JUDGE CARNEY,

8    COUNSEL FOR THE GOVERNMENT, LADIES AND GENTLEMEN OF THE JURY.

9              WHAT I'M GOING TO DO IN THE NEXT HOUR HALF OR SO IS

10   SOMETHING A LITTLE DIFFERENT THAN THE PROSECUTOR DID.  I'M GOING

11   TO TRY TO STICK TO THE FACTS.  I'M NOT GOING TO COLOR IT, I'M NOT

12   GOING TO SUPERCHARGE IT FOR YOU WITH WORDS LIKE "LYING" AND

13   "CHEATING" AND "STEALING."  WORDS LIKE "COOKING BOOKS" AND

14   "BACKDATING," WORDS THAT NATURALLY GET SOMEONE'S JUICES FLOWING.

15   I'M GOING TO TRY TO STICK TO THE FACTS.  I'M GOING TO TRY TO STICK

16   TO THE EVIDENCE.  I'M GOING TO TRY TO STICK TO THE STORY THAT

17   YOU'LL HEAR FROM THE WITNESS STAND.

18              AND THAT'S WHAT MY PREVIEW IS GOING TO BE.  BECAUSE IN

19   THE END, WE ALL KNOW AS LAWYERS, IT IS YOU, THE LADIES AND

20   GENTLEMEN OF THE JURY, THAT DETERMINE THE FACTS.  NO ONE TELLS YOU

21   THAT SOMETHING IS A LIE RATHER THAN A MISTAKE.  NO ONE TELLS YOU

22   THAT SOMETHING IS FALSE RATHER THAN SIMPLY INCORRECT.  YOU NEED TO

23   DETERMINE THAT AND YOU NEED TO DETERMINE THAT FROM THE WITNESS

24   STAND, NOT FROM THE WORDS OF THE GOVERNMENT.

25              NO ONE TELLS YOU THAT THE GOOD AND DECENT AND HONEST

1   PEOPLE AT BROADCOM ARE COCONSPIRATORS UNLESS YOU DETERMINE THAT

2   THEY'RE COCONSPIRATORS.  WHEN THEY WORKED AT BROADCOM, THEY

3   THOUGHT OF THEMSELVES AS BROADCOM EMPLOYEES.  AS GOOD AND DECENT

4   PEOPLE.  BUT NOW, THE GOVERNMENT LABELS THEM CONSPIRATORS.  IT

5   WILL BE YOU WHO WILL DETERMINE THAT.

6          NOW, YOU JUST HEARD A LENGTHY ARGUMENT ABOUT LYING AND

7   CHEATING AND STEALING.  AND IT MAY SEEM ODD TO YOU THAT I PUT ON

8   THE SCREEN AS MY FIRST GRAPHIC, FOR YOUR CONSIDERATION, A LIST OF

9   COMPANIES, ABOUT 200 STRONG ON THE LEFT AND AN ACCOUNTING

10  PRINCIPLE ON THE RIGHT.

11         NOW, THE GOVERNMENT MAY SAY THIS IS NOT A CASE ABOUT

12  ACCOUNTING, BUT THAT'S GOING TO BE FOR YOU TO DETERMINE BECAUSE I

13  WOULD SUBMIT TO YOU THAT'S WHAT YOU ARE GOING TO HEAR FOR THE NEXT

14  TWO MONTHS.  THIS IS INDEED A CASE ABOUT ACCOUNTING FOR STOCK

15  OPTIONS.  AND THAT ACCOUNTING OPINION ON THE RIGHT IS THE KEY

16  OPINION, BUT I'LL GET TO THAT IN A MOMENT.

17         SO, WHY DO I START WITH A LIST OF 200 COMPANIES, WHICH

18  INCLUDES BROADCOM?  YOU MAY THINK IT ODD, BUT IT'S NOT REALLY.

19  THE REASON I START THERE IS BECAUSE ALL OF THESE COMPANIES HAVE

20  SOMETHING IN COMMON.  YES, THERE ARE PLACES LIKE BED, BATH AND

21  BEYOND WHERE WE SHOP, PLACES LIKE CHEESE CAKE FACTORY, WHERE WE

22  EAT, AND COMPANIES LIKE APPLE AND MATTEL WHOSE PRODUCTS WE BUY.

23  YOU CAN'T NECESSARILY TELL FROM THAT THE SMALL PRINT BUT YOU'LL

24  SEE IT IN THE EVIDENCE WHEN IT COMES IN.

25         ALL THESE COMPANIES HAD SOMETHING IN COMMON WITH

Page 68

1   BROADCOM.  AND THAT IS, IN 2006, AND 2007, ALL OF THESE COMPANIES

2   FOUND THEMSELVES IN THE SAME ACCOUNTING BOAT AS BROADCOM, THE SAME

3   ACCOUNTING BOAT.  ALL OF THESE COMPANIES HAD MISINTERPRETED AND

4   MISAPPLIED THE SAME ACCOUNTING OPINION, OPINION NUMBER 25, DURING

5   THE SAME TIME PERIOD, 1998 TO 2002, AS BROADCOM.  ALL OF THESE

6   COMPANIES, COMPANIES THAT ALL HAD CFO'S, THAT ALL HAD ACCOUNTING

7   DEPARTMENTS, THAT ALL HAD OUTSIDE AUDITORS, THE FINEST AUDITORS IN

8   THE WORLD.

9           HOW DID THIS ALL HAPPEN?  HOW DID THAT HAPPEN?  WHY ARE

10  WE HERE?  WHY IS BILL RUEHLE, AGE 67, AFTER 40 YEARS IN THE

11  BUSINESS WORLD, WHERE HE EARNED AN IMPECCABLE REPUTATION, WHY IS

12  HE SITTING AT COUNSEL TABLE?

13          A PERSON WHO, WITNESS AFTER WITNESS IN THIS TRIAL IS

14  GOING TO SAY WAS A GOOD AND DECENT HUMAN BEING.  WITNESS AFTER

15  WITNESS WILL SAY HE ALWAYS TRIED TO DO THE RIGHT THING; THAT HE

16  ALWAYS TRIED TO GET THE ACCOUNTING RIGHT; AND THAT HE ALWAYS TRIED

17  TO HELP THE EMPLOYEES.

18          WHY IS HE SITTING HERE?  IT'S NOT BECAUSE A CRIME WAS

19  COMMITTED, BECAUSE THERE WAS NONE.  AND IT'S NOT BECAUSE HE IS A

20  CRIMINAL, BECAUSE HE IS NOT.  WHY ARE WE HERE?

21          WE'RE HERE BECAUSE THIS IS A CASE INVOLVING TWO SIMPLE

22  WORDS.  "THEN" VERSUS "NOW."  THE TIME PERIOD ON THE LEFT IS WHEN

23  THE OPTION GRANTS AT ISSUE WERE ISSUED IN THIS CASE.  1998 THROUGH

24  ALMOST 2003.  THE TIME PERIOD ON THE RIGHT, IS NOW.  THAT REFLECTS

25  2006 AND FORWARD.

1          SOMETHING HAPPENED IN 2006, LADIES AND GENTLEMEN, THAT

2     CHANGED THE WORLD.  NOT EXACTLY THE WHOLE WORLD, JUST THE WORLD OF

3     ACCOUNTING FOR STOCK OPTIONS.  AND IN ORDER TO UNDERSTAND WHY

4     WE'RE HERE TODAY, WE NEED TO UNDERSTAND WHAT HAPPENED THEN.

5          IT ACTUALLY HAPPENED IN LATE 2005.  A PROFESSOR AT THE

6     UNIVERSITY OF IOWA DID AN ACADEMIC STUDY AND WHAT HE FOUND WAS

7     MANY, MANY COMPANIES IN AMERICA, SOME OF THE FINEST COMPANIES, THE

8     COMPANIES THAT WERE ON THAT LIST I SHOWED YOU, HAD OPTION GRANT

9     PRICING PRACTICES WHICH SEEMED LOW.  IT SEEMED LIKE THEY PICKED

10    LOW DATES FOR THEIR OPTION PRACTICES.  AND, AS A RESULT, THEIR

11    ACCOUNTING MIGHT BE WRONG.

12         NOW, WHAT HAPPENED WAS THAT THESE COMPANIES DID WHAT

13    HONEST COMPANIES DO AND WHAT BROADCOM DID.  THEY HIRED A TEAM OF

14    LAWYERS -- BROADCOM HIRED TWO -- THEY HIRED A TEAM OF

15    ACCOUNTANTS -- BROADCOM, ACTUALLY TWO -- AND THEY DID AN ANALYSIS

16    OF WHAT IT HAPPENED BACK THEN.  BUT THE THING ABOUT THAT ANALYSIS

17    IS, IT WAS DONE WITH THE PERSPECTIVE OF 2006, NOT FROM THE

18    PERSPECTIVE OF THE EVENTS THAT HAPPENED IN 1998 AND 2002.

19         AND WHAT THEY DID WAS THEY TOOK A VERY STRICT READING OF

20    THAT OLD ACCOUNTING OPINION, AND THEY LOOKED AT THE GRANTS AND

21    THEY SAID, IF THEY DIDN'T TECHNICALLY COMPLY WITH THAT STRICT

22    READING, THEN THERE SHOULD HAVE BEEN AN ACCOUNTING CHARGE.

23         AND YOU KNOW WHAT THAT LED TO, LADIES AND GENTLEMEN?

24    OVER 200 COMPANIES IN OUR COUNTRY HAD TO DO RESTATEMENTS, JUST

25    LIKE BROADCOM.  WHAT IS A RESTATEMENT?  A RESTATEMENT IS SIMPLY A

1    CORRECTION.  IT'S NOT AN ADMISSION OF FALSITY.  IT'S NOT AN

2    ADMISSION OF A CRIMINAL ACT.  IT IS A BOOKKEEPING CORRECTION.

3           AND WHAT HAPPENED IN 2006, LADIES AND GENTLEMEN, WAS

4    THAT BROADCOM LEARNED THAT IT, AS WELL AS THOSE 200 OTHER

5    COMPANIES, HAD MISINTERPRETED THIS OPINION 25.  BUT ACTUALLY THESE

6    COMPANIES WEREN'T THE FIRST COMPANIES TO MISINTERPRET THIS OPINION

7    25.  ACTUALLY, MICROSOFT, DID IN THE ENTIRE DECADE OF 1990S -- AND

8    YOU'LL HEAR EVIDENCE ABOUT THIS -- MICROSOFT, THE LEADING

9    TECHNOLOGY COMPANY IN THE WORLD, WITH THEIR ACCOUNTING STAFF AND

10   THEIR OUTSIDE AUDITORS, MISAPPLIED THIS ACCOUNTING OPINION.  THEY

11   PRICED THEIR OPTIONS WITH THE BEST PRICE FROM THE PREVIOUS 30

12   DAYS.  NOT IN REAL TIME.

13          BUT THEY BELIEVED, AS ALL THESE OTHER COMPANIES AND, WE

14   WILL SUBMIT, AS BROADCOM DID, THAT THOSE OPTIONS WERE FAIR MARKET

15   VALUE UNDER THE ACCOUNTING OPINION.

16          NOW, WHEN THEY DID IT, AND THEY DISCOVERED WHAT THEY

17   DID, THE WORLD HADN'T CHANGED YET.  SO, THEY QUIETLY CORRECTED

18   THEIR ACCOUNTING, TOOK A $217 MILLION CHARGE AND MOVED ON.  BUT IN

19   2006, THE WORLD HAD CHANGED.

20          SO, NOW WE HAVE TO TALK ABOUT THE ACCOUNTING OPINION

21   WHICH IS AT THE HEART OF THIS CASE.  AND I WOULD LIKE TO INTRODUCE

22   YOU TO ACCOUNTING OPINION NUMBER 25.  THIS IS AN ACCOUNTING

23   OPINION THAT TRIPPED UP THE BEST ACCOUNTING DEPARTMENTS IN THE

24   COUNTRY, INCLUDING BILL RUEHLE, AND IT TRIPPED UP THE BEST

25   AUDITING FIRMS IN THE WORLD.

1          AND WHAT I HAVE DONE, THIS IS A BRIEF INTRODUCTION

2    BECAUSE THIS IS JUST AN OVERVIEW OF WHAT THE EVIDENCE WILL SHOW.

3    I GAVE YOU A LITTLE TIMELINE ABOUT OPINION 25.  IT WAS ISSUED IN

4    1972.  FROM ALMOST THE TIME IT WAS ISSUED, IT WAS HEAVILY

5    CRITICIZED FOR PRODUCING ANOMALOUS RESULTS.  THOSE ARE NOT MY

6    WORDS.  THOSE ARE THE ACCOUNTING BOARD'S WORDS.

7          BY 1995, EVERYONE REALIZED IT HAD TO BE REPLACED, AND IT

8    ALMOST WAS REPLACED WITH THESE NEW ACCOUNTING GUIDELINES.  BUT

9    THEN IT WAS REINTERPRETED IN 2000 IN A VERY LENGTHY THING CALLED

10   THIN INTERPRETATION NUMBER 44.  HUNDREDS OF PAGES TO INTERPRET A

11   20-PAGE OPINION.  BY 2005, IT WAS DISCARDED.  BY 2006, IT IS NOW

12   DEFUNCT.

13         THAT'S A BRIEF HISTORY OF THE ACCOUNTING OPINION THAT

14   UNDERLIES THE ACCOUNTING MISTAKES THAT WERE DONE IN THIS CASE.

15   AND IF ANYTHING IS NOT UNDERSTOOD ABOUT THAT, LET ME REPEAT.  THE

16   ACCOUNTING OPINION THAT IS AT THE HEART OF THIS CASE IS NOW

17   DEFUNCT.  DISCARDED.  BUT BEFORE IT WAS DISCARDED, IT TRIPPED UP

18   SOME OF THE WORLD'S GREATEST COMPANIES.

19         NOW, THIS IS NOT A CASE ABOUT LYING OR CHEATING OR

20   STEALING.  IT'S ABOUT A CASE ABOUT ACCOUNTING FOR STOCK OPTIONS.

21   NO ONE STOLE ANYONE'S MONEY.  BILL RUEHLE DIDN'T STEAL ANYONE'S

22   MONEY IN THIS CASE NOR DID HE EVER STEAL MONEY.  NO ONE DEFRAUDED

23   ANYONE.  BILL RUEHLE NEVER DEFRAUDED ANYONE.

24         ONE THING BILL RUEHLE DID WAS HE WORKED HARD.  HE WORKED

25   HARD TO BUILD SHAREHOLDER VALUE IN A GREAT COMPANY CALLED

1    BROADCOM.  NOT TO CHEAT THE SHAREHOLDERS.  THE SINGLE TRUTH THAT

2    YOU ARE GOING TO SEE IN THIS CASE THAT'S GOING TO COME THROUGH

3    EVERY WITNESS AT THEIR CORE ON THE PROSECUTION CASE, AND IF THERE

4    IS A DEFENSE CASE, ON THE DEFENSE CASE, IS THAT BILL RUEHLE NEVER

5    INTENDED TO DEFRAUD BROADCOM SHAREHOLDERS, AND HE NEVER DID.

6          NOW, WHAT YOU ARE GOING TO SEE IS EVIDENCE OF PEOPLE

7    TRYING TO BUILD A COMPANY.  HE AND BROADCOM'S FINANCE DEPARTMENT

8    ALWAYS ACTED IN GOOD FAITH.  AND THEY ALWAYS TRIED TO GET THE

9    ACCOUNTING RIGHT.  AND YOU ARE GOING TO SEE THAT IN E-MAIL AFTER

10   E-MAIL.  AND YOU ARE ALSO GOING TO SEE THAT HE HAD A TERRIFIC

11   STAFF OF IN-HOUSE ACCOUNTANTS AND WORLD-CLASS OUTSIDE EXPERTS WHO

12   BELIEVED, AT THE TIME, UNTIL THE WORLD CHANGED IN 2006, THAT THEY

13   WERE INTERPRETING THE OPINION 25 CORRECTLY.  AND YOU'LL SEE THAT

14   NOT FROM MY WORDS, LADIES AND GENTLEMEN, YOU'LL SEE THAT FROM THE

15   CONTEMPORANEOUS E-MAILS AT THE TIME.

16         AND WHAT YOU'LL ALSO SEE FROM THE E-MAILS IS EVERYTHING

17   IN THIS CASE HAPPENED IN THE LIGHT OF DAY.  NOT IN SOME DARK

18   CORNER SOMEWHERE.  NOT IN SOME CORNER OFFICE WITH THE LIGHTS OUT

19   AND PEOPLE EXCLUDED.  NOT IN SOME ALLEY.  EVERYTHING HAPPENED IN

20   THE LIGHT OF DAY.

21         WHAT HAS HAPPENED NOW IS THAT THIS INNOCENT CONDUCT HAS

22   BEEN RECAST.  AND WORDS LIKE "BACKDATING" AND "FRAUD" AND

23   "COCONSPIRATORS" ARE USED TO SUPERCHARGE WHAT WAS BELIEVED, AT THE

24   TIME, TO BE INNOCENT CONDUCT.

25         THERE ARE FIVE TRUTHS THAT ARE GOING TO COME THROUGH

Page 73

1    THIS EVIDENCE LOUD AND CLEAR.  AND I'D LIKE TO INTRODUCE THEM TO

2    YOU.  EACH OF THESE TRUTHS IS GOING TO COME FROM THE EVIDENCE.

3              NUMBER ONE, BROADCOM IS A SUCCESS STORY.  IT'S ALIVE AND

4    WELL.  IN FACT, VERY WELL; FLOURISHING RIGHT HERE IN ORANGE

5    COUNTY.  WHAT HAPPENED IN THIS CASE DID NOT RESULT IN BANKRUPTCY,

6    LAYOUTS OR GOVERNMENT BAILOUT.

7              THIS ISN'T A CASE ABOUT GREED OR FRAUD ON WALL STREET.

8    THIS IS A CASE ABOUT SUCCESS IN ORANGE COUNTY.  THAT'S TRUTH

9    NUMBER ONE.

10             TRUTH NUMBER TWO.  BILL RUEHLE WAS AN IMPORTANT PART OF

11   THAT SUCCESS.  YOU'LL HEAR FROM WITNESS AFTER WITNESS THAT BILL

12   RUEHLE WORKED HARD.  AND HE HAD ONLY ONE GOAL, LADIES AND

13   GENTLEMEN, AND IT WASN'T TO LINE HIS POCKETS, AS THE GOVERNMENT

14   SUGGESTS.  HIS GOAL WAS TO BUILD BROADCOM INTO THE SUCCESSFUL

15   COMPANY IT IS TODAY AND TO TREAT EMPLOYEES AND SHAREHOLDERS FAIRLY

16   IN THE PROCESS.  AND YOU WILL SEE THAT THROUGHOUT THE EVIDENCE.

17             TRUTH NUMBER THREE.  THE STOCK OPTION PROGRAM AT

18   BROADCOM WAS PART OF A COMPENSATION PHILOSOPHY OF THE FOUNDERS OF

19   THE COMPANY -- AND I'LL SPEAK ABOUT THAT IN A MOMENT -- TO BENEFIT

20   THE EMPLOYEES AND TO BUILD SHAREHOLDER VALUE.  IT BENEFITS THE

21   SHAREHOLDERS BECAUSE IT HELPED ATTRACT AND RETAIN THE BEST

22   ENGINEERS IN THE WORLD, AND IT BENEFITED THE EMPLOYEES BY GIVING

23   THEM AN OWNERSHIP STAKE IN THE ACTION, AND IT HELPED PRESERVE THE

24   COMPANY'S CASH FOR RESEARCH AND DEVELOPMENT.

25             AND THAT WAS MOTIVATION OF THE STOCK OPTION PROGRAM.

1    WHEN THE PROSECUTOR SPOKE, HE TALKED ABOUT A MOTIVATION OF NOT

2    HAVING COMPENSATION CHARGES.  BUT THAT WASN'T THE MOTIVATION.

3    THAT WAS AN EFFECT THAT THERE WEREN'T COMPENSATION CHARGES, BUT

4    THAT WASN'T THE MOTIVATION.

5            TRUTH NUMBER FOUR, BROADCOM STOCK OPTION PROGRAM WAS

6    FRAUGHT WITH DELAYS AND FRUSTRATIONS.  IT WAS A PROCESS THAT WAS

7    CONSTANTLY STRESSED OUT.  AND IT WAS STRESSED OUT PRIMARILY FOR

8    THREE REASONS.  IT'S ALL GOING TO COME IN THROUGH THE EVIDENCE.

9    THE MANAGEMENT STYLE OF THE CEO, DR. HENRY NICHOLAS, THE RAPIDLY

10   EXPLODING EMPLOYEE BASE, AND THE VOLATILE STOCK MARKET THAT WE ALL

11   WITNESSED THOSE YEARS.

12           SO, THAT'S TRUTH NUMBER FOUR.

13           AND TRUTH NUMBER FIVE, NO ONE FOCUSED ON THE NOW DEFUNCT

14   OPINION 25, AND THAT'S NOT BECAUSE THEY WERE INTENTIONALLY SEEKING

15   TO IGNORE IT OR VIOLATE IT.  IT WAS BECAUSE EVERYONE BELIEVED AT

16   THE TIME, BACK THEN, THAT THEY WERE PROPERLY ACCOUNTING FOR THE

17   OPTIONS; THAT THESE GRANTING PRACTICES DID NOT REQUIRE

18   COMPENSATION CHARGES.

19           AND THE ONE TIME WHERE THEY GOT EXPERT ADVICE IT TURNS

20   OUT IN HINDSIGHT THAT THE EXPERTS WERE WRONG, AND I'M GOING TO

21   TALK TO YOU ABOUT THAT AT A LITTLE LENGTH THIS MORNING.

22           SO, THESE ARE THE FIVE TRUTHS, LADIES AND GENTLEMEN, AND

23   THEY'RE GOING TO COME THROUGH THE EVIDENCE LOUD AND CLEAR.

24           NOW, I NEGLECTED IN MY EXCITEMENT TO GET STARTED TO

25   REINTRODUCE MYSELF AND TO SAY GOOD MORNING.  MY NAME IS RICHARD

1    MARMARO AND, ALONG WITH JACK DICANIO WHO IS AT COUNSEL TABLE AND

2    KRISTIN TAHLER AND MATT UMHOFER, IT IS OUR PRIVILEGE TO REPRESENT

3    BILL RUEHLE.

4            I WANT TO START BY THANKING YOU FOR YOUR JURY SERVICE.

5    WE HAD A LONG DAY YESTERDAY AND I FEEL I GOT TO KNOW YOU ALL A

6    LITTLE BIT.  BUT I THINK EVERYONE SAW HOW EASY IT IS SOMETIMES TO

7    GET OUT OF JURY SERVICE.  YOU GIVE AN ANSWER THAT THE LAWYERS

8    DON'T LIKE, YOU SAY YOU CAN'T BE FAIR AND IMPARTIAL, AND YOU'RE

9    OUT.

10           YOU DIDN'T DO THAT.  AND YOU'RE THE REASON OUR SYSTEM

11   WORKS.  AND HIS HONOR TALKED TO YOU ABOUT THAT WHEN YOU WERE FIRST

12   IMPANELED.  YOU ARE THE REASON OR SYSTEM WORKS.

13           SO, FROM MY PERSPECTIVE AND BILL RUEHLE AND OUR ENTIRE

14   TEAM, I WILL THANK YOU NOW.  I WILL NOT HAVE ANOTHER CHANCE UNTIL

15   THE END OF THE CASE TO THANK YOU, AND I WANT YOU TO KNOW WE

16   APPRECIATE YOUR JURY SERVICE.

17           BEFORE I GO ANY FURTHER, I WANT TO TALK TO YOU A LITTLE

18   BIT ABOUT THE PERSON I REPRESENT; THE PERSON WHO IS ON TRIAL IN

19   THIS CASE.  AND WHEN I TALK TO YOU ABOUT BILL RUEHLE, I THINK

20   YOU'LL SEE WHY I SAY IT'S A PRIVILEGE TO REPRESENT HIM.

21           HE WAS BORN AND RAISED IN CLEVELAND, OHIO.  HE WENT TO A

22   SMALL COLLEGE CALLED ALLEGHENY COLLEGE IN WESTERN PENNSYLVANIA,

23   AND HE DID WELL ENOUGH AT COLLEGE THAT WHEN HE GRADUATED IN 1964,

24   HE WAS ADMITTED TO HARVARD BUSINESS SCHOOL WHERE HE FOCUSED ON

25   MANAGEMENT.  AND THEN HE ENTERED THE BUSINESS WORLD.  AND JUST AS

Page 76

1   HE HAD IN COLLEGE AND IN GRAD SCHOOL, HE SUCCEEDED IN THE BUSINESS

2   WORLD THROUGH ONE THING AND ONE THING ONLY.  HARD WORK.

3         HE STARTED AT THE GROUND FLOOR OF A COMPANY, AS EVERYONE

4   STARTS WHEN THEY GET OUT OF GRAD SCHOOL.  WORKED AT CBS BACK IN

5   NEW YORK, BUT BY 1987 HE HAD RISEN TO THE LEVEL OF BECOMING A

6   CHIEF FINANCIAL OFFICER.  AND THAT YEAR HE STARTED WITH A YOUNG

7   COMPANY CALLED SYNOPTICS.

8         NOW, I'M GOING TO TAKE A COUPLE MINUTES TO TALK ABOUT

9   THAT BECAUSE YOU'LL SEE SOME PARALLELS WITH BROADCOM.  IN 1987,

10  SYNOPTICS WAS A SMALL COMPANY.  IT HAD 30 EMPLOYEES, $2 MILLION IN

11  REVENUE.  BUT WITH BILL'S STEADY HAND, THE COMPANY WENT PUBLIC,

12  AND 10 YEARS LATER, IT HAD GROWN TO 6000 EMPLOYEES WORLDWIDE AND

13  $2 BILLION IN REVENUE DURING HIS STEWARDSHIP.

14        I MENTIONED EARLIER THAT OVER HIS 40-YEAR CAREER HE HAS

15  EARNED A STERLING REPUTATION IN THE FINANCIAL COMMUNITY.  THE

16  FINANCIAL COMMUNITY LISTENED TO BILL RUEHLE WHEN HE SPOKE BECAUSE

17  THEY KNEW HE SAID IT STRAIGHT.  AS A REPRESENTATIVE OF HIS

18  COMPANY, HE WAS ALWAYS CREDIBLE AND HE WAS ALWAYS CONSERVATIVE.

19        SO, LET ME GIVE YOU A PICTURE OF BILL IN 1997.  HE IS 55

20  YEARS OLD AT THAT POINT.  THROUGH HIS HARD WORK HE HAD OBTAINED

21  FINANCIAL SECURITY FOR HIMSELF, FOR HIS CHILDREN, AND FOR HIS

22  GRANDCHILDREN.  AS THEY SAY, HE COULD HAVE RIDDEN OFFER IN THE

23  SUNSET, BUT HE WAS TOO YOUNG TO RETIRE AND HE WAS LOOKING FOR

24  ANOTHER CHALLENGE; A CHALLENGE OF BUILDING ANOTHER COMPANY ALMOST

25  FROM SCRATCH LIKE HE HAD DONE WITH SYNOPTICS, AND HE FOUND THAT

1   CHALLENGE RIGHT HERE IN ORANGE COUNTY, LADIES AND GENTLEMEN, WITH

2   BROADCOM.

3           I WANT TO TALK TO YOU A LITTLE BIT ABOUT BROADCOM.  SO,

4   IN 1991, BROADCOM WAS FOUNDED BY TWO GENTLEMEN, AND YOU'LL HEAR A

5   LOT ABOUT THESE GENTLEMEN.  THE GOVERNMENT CALLED THEM

6   COCONSPIRATORS.  I'M GOING TO CALL THEM THE COFOUNDERS OF BROADCOM

7   AND LET YOU DETERMINE WHAT THE FACTS ARE IN THIS CASE.

8           THE COFOUNDERS OF BROADCOM WERE DR. HENRY NICHOLAS AND

9   DR. HENRY SAMUELI.  THE COMPANY WAS ACTUALLY FOUNDED IN THE SPARE

10  BEDROOM OF DR. NICHOLAS'S CONDO IN REDONDO BEACH IN 1991.  YOU'LL

11  HEAR A LOT ABOUT DR. SAMUELI; QUIET, BRILLIANT ENGINEER AND

12  PROFESSOR FROM UCLA.  HE IS THE GENTLEMAN ON THE RIGHT.  AND

13  YOU'LL HEAR MORE ABOUT DR. HENRY NICHOLAS, HIS NOT SO QUIET

14  STUDENT.

15          TOGETHER, THEY CHIPPED IN $5000 EACH AND THEY HATCHED A

16  BOLD PLAN.  THEY WANTED TO BUILD A WORLD-CLASS SEMICONDUCTOR

17  COMPANY THAT WOULD POWER PRODUCTS THAT CHANGED PEOPLE'S LIVES.

18  BUT WHEN THEY STARTED IN 1991, THEY HAD NOTHING.  THEY HAD NO

19  DESIGN, NO PRODUCTS, NO EMPLOYEES, NO CUSTOMERS, NO REVENUE.  BUT

20  THEY HAD EXTRAORDINARY INTELLIGENCE, BOUNDLESS ENERGY AND THIS

21  DREAM.

22          NOW, BY 1997, WHEN BILL RUEHLE WAS HIRED, THE COMPANY

23  WAS ON THE VERGE OF GOING PUBLIC, AND THE TWO HENRYS WERE READY TO

24  TAKE THIS COMPANY TO THE NEXT LEVEL.  BUT BEFORE THEY COULD DO

25  THAT, THEY NEEDED A STEADY HAND.  THEY NEEDED A CONSERVATIVE,

Page 78

1   CREDIBLE PRESENCE TO THE FINANCIAL COMMUNITY.  THEY NEEDED SOMEONE

2   WHO HAD ATTAINED A REPUTATION OF STRAIGHT TALK AND THEY FOUND THAT

3   STEADY HAND IN BILL RUEHLE.

4          BILL JOINED BROADCOM IN 1997.  AT THAT TIME, IT WAS A

5   SMALL COMPANY, MUCH LIKE SYNOPTICS WAS.  IT HAD 150 EMPLOYEES.  IT

6   HAD REVENUES OF ABOUT $20 MILLION.  BUT ON BILL RUEHLE'S WATCH,

7   THE DREAM OF THE TWO HENRYS BECAME A REALITY, LADIES AND

8   GENTLEMEN, IN A WAY THAT NEITHER DR. NICHOLAS NOR DR. SAMUELI

9   COULD HAVE EVER DREAMED.  FROM ITS HUMBLE BEGINNINGS IN HIS CONDO,

10  IN DR. NICHOLAS'S CONDO, THE COMPANY GREW TO A COMPANY THAT IS

11  TODAY A COMPANY THAT HAS $4.6 BILLION IN REVENUE.

12         IT REALLY IS THE TRUE AMERICAN SUCCESS STORY.  WHEN IT

13  STARTED, IT WAS LIKE DAVID AGAINST GOLIATH, BECAUSE WHEN THEY

14  STARTED THIS COMPANY, INTEL, TEXAS INSTRUMENTS, COMPANIES WE HAVE

15  ALL HEARD OF, WERE ALREADY WELL ESTABLISHED.

16         NOW, LET'S LOOK AT WHAT HAPPENED ON BILL RUEHLE'S WATCH

17  AT BROADCOM.  HE STARTED IN 1997 AT THE COMPANY AT $20 MILLION IN

18  REVENUE.  BY THE TIME HE RETIRED IN 2006, THE COMPANY HAD

19  $3.6 BILLION IN REVENUE.  AND MOST OF BILL RUEHLE'S TIME,

20  VIRTUALLY ALL OF HIS TIME WAS SPENT ON BUILDING THAT FUTURE.

21         NOW, AT TRIAL YOU KIND OF DON'T GET THE CONTEXT OF WHAT

22  IS HAPPENING IN THE REAL WORLD OR EVEN AT BROADCOM.  STOCK OPTION

23  ACCOUNTING WAS A VERY SMALL PIECE OF BROADCOM.  THIS WAS THE

24  BROADCOM STORY OF BUILDING A GREAT COMPANY, AND THAT'S WHAT BILL

25  RUEHLE SPENT MOST OF HIS TIME ON.

1         SO, WHAT ARE YOU GOING TO HEAR ABOUT BILL RUEHLE FROM

2    THE WITNESSES ON THE STAND?  YOU ARE GOING TO HEAR THAT HE WAS A

3    GOOD BOSS.  I DOUBT ANYONE WILL SAY ANYTHING TO THE CONTRARY.  YOU

4    ARE GOING TO HEAR THAT HE WAS APPROACHABLE.  THAT HE WAS OPEN TO

5    THE VIEWS OF OTHERS, ESPECIALLY HIS COLLEAGUES.  THAT THE OUTSIDE

6    EXPERTS WHO WORKED WITH HIM ALL LIKED AND RESPECTED HIM.  AND THEY

7    KNEW HIM FROM THE SYNOPTICS DAYS.  THAT HE CARED ABOUT EMPLOYEES.

8    THAT HE WANTED TO MAKE SURE THE COMPANY'S ACCOUNTING WAS PURE,

9    BEYOND QUESTION.

10         NOW, THOSE WORDS MAY SEEM ODD TO YOU AFTER HEARING THE

11   PROSECUTOR RAIL ABOUT FRAUD AND INSIDE, OUTSIDE, AND ALL THESE

12   SUPERCHARGED WORDS.  BUT I WANT YOU TO KNOW THESE ARE NOT MY

13   WORDS.  THAT BILL RUEHLE WANTED THE ACCOUNTING OF THE COMPANY

14   PURE, BEYOND REPROACH.

15         THESE ARE THE NOTES OF THE CHIEF OF FINANCIAL REPORTING

16   IN A MEETING WITH BILL AND OTHERS IN FEBRUARY OF 2002, AND A

17   SENIOR LAWYER OF THE COMPANY, SOME OF THESE PEOPLE THE GOVERNMENT

18   CALLS CONSPIRATORS NOW, BUT AT THAT TIME THEY WERE JUST BROADCOM

19   EMPLOYEES DOING THEIR JOB.  AND HERE IS WHAT CAME OUT OF THAT

20   MEETING.  "THE ACCOUNTING MUST BE PURE AND HAVE THE APPEARANCES OF

21   PURITY.  IT MUST BE ON THE UP-AND-UP."

22         NOW, BILL RUEHLE, TODAY, IS 67 YEARS OLD.  AND FOR THE

23   FIRST TIME IN HIS LIFE HE IS BEING REFERRED TO AS A CRIMINAL.

24   BUT, OF COURSE, THAT'S FOR YOU TO DECIDE FROM THE EVIDENCE.

25         YOU'LL HEAR A LOT OF EVIDENCE ABOUT ACCOUNTING FOR STOCK

1    OPTIONS.  BILL RUEHLE WAS NOT AN ACCOUNTANT.  NOW, HE SURROUNDED

2    HIMSELF WITH VERY GOOD ACCOUNTANTS, VERY ABLE PROFESSIONALS.  AND

3    HE SURROUNDED HIMSELF WITH ERNST & YOUNG, ONE OF THE FINEST

4    AUDITING FIRMS IN THE WORLD.  AND ONE OF BILL RUEHLE'S MANTRAS

5    THAT YOU WILL HEAR ABOUT IN THIS CASE IS, "DID YOU RUN IT BY E &

6    Y?  DID YOU RUN IT BY THE AUDITORS?

7            WHEN AN ACCOUNTING QUESTION SURFACED IN THE BROADCOM

8    ACCOUNTING DEPARTMENT THAT THEY DIDN'T KNOW THE ANSWER OF, OR THAT

9    THEY BELIEVED THEY DIDN'T KNOW THE ANSWER OF, BILL RUEHLE INSISTED

10   THAT THEY RUN IT BY THE AUDITORS.  AGAIN, THESE ARE NOT MY WORDS.

11   THESE ARE WORDS THAT ARE GOING TO COME FROM THE EVIDENCE IN THIS

12   CASE.

13           THIS IS AN E-MAIL DURING THE HEART OF WHAT THE

14   GOVERNMENT CALLS A CRIMINAL CONSPIRACY TO FRAUDULENTLY MISREPORT

15   EXPENSES.  AND GREG BUSBY IS ONE OF THE ACCOUNTANTS IN BILL'S

16   DEPARTMENT AND GAIL PATTON IS ANOTHER ONE.  AND IT INVOLVES A

17   SPECIFIC ISSUE, BUT MY POINT HERE IS WHAT IT SAYS ABOUT BILL.  IN

18   THE MIDDLE THERE IT SAYS, "HAD A DISCUSSION WITH BILL AND WANTED

19   TO RUN THINGS BY ME (AT BILL'S REQUEST) AND WE BOTH KNOW HOW BILL

20   ALWAYS ASKS IF WE RAN IT BY E & Y."

21           BECAUSE IF THERE WAS ONE THING THAT BILL TOLD HIS STAFF

22   IT WAS, IF YOU HAVE A QUESTION, RUN IT BY E & Y.  THAT'S WHY WE

23   PAY THEM.

24           NOW, IF WE COULD GO TO THE NEXT DOCUMENT.  THERE WAS A

25   WOMAN NAMED GAIL PATTON WHO WAS THE SENIOR FINANCIAL REPORTING

Page 81

1   PERSON WHO WORKED WITH BILL.  AND WHEN NUMBERS WOULD BE RELEASED

2   TO THE PUBLIC, THE NUMBERS THAT THE GOVERNMENT SAYS WERE

3   CRIMINALLY FALSIFIED, BILL RUEHLE HAD A MANTRA, AND THESE ARE HIS

4   WORDS AT THE TIME.  "I WON'T RELEASE ANY NUMBERS TO THE PUBLIC

5   UNTIL THEY HAVE BEEN GAILED."  THAT'S GAIL PATTON'S FIRST NAME.

6        SOME PEOPLE SAID HE WOULDN'T RELEASE NUMBERS UNTIL THEY

7   HAD BEEN "PATTON'D."  HE WANTED TO MAKE SURE SHE WAS COMFORTABLE

8   WITH EVERY NUMBER BEFORE IT GOT RELEASED TO THE PUBLIC.

9        NOW, I WANT TO TALK ABOUT ONE OF THE BIG GRANTS IN THIS

10  CASE.  I HAVE INTRODUCED YOU TO BILL RUEHLE.  I HAVE INTRODUCED

11  YOU TO REALLY WHAT IS AT THE HEART OF THIS CASE.  AND I WANT TO

12  TALK ABOUT ONE GRANT AT SOME LENGTH.  IT'S THE MAY 26, 2000 GRANT.

13  AND THIS GRANT, LADIES AND GENTLEMEN, AT THE TIME WAS THE LARGEST

14  GRANT IN BROADCOM'S HISTORY.  AND THE REASON I WANT TO FOCUS ON

15  THIS ONE IS THAT IT TELLS THE WHOLE STORY OF THE CASE, AND IT

16  INCORPORATES THE FIVE TRUTHS THAT I IDENTIFIED FOR YOU.

17       SO, IN THE EARLY DAYS IN '97 AND '98, BROADCOM WAS A

18  RELATIVELY SMALL COMPANY.  DR. SAMUELI AND DR. NICHOLAS PROBABLY

19  KNEW MOST, IF NOT ALL, OF THE ENGINEERS.  SO, TO DO A GRANT, IT

20  WAS EASY.  YOU DID A GRANT.  IF YOU HAD AN ANNIVERSARY GRANT THE

21  FIRST YEAR AFTER THEY WERE THERE, YOU DID IT.  BUT BY THE YEAR

22  2000, THE COMPANY HAD GROWN SO MUCH THAT IT WAS NOT PRACTICAL TO

23  DO GRANTS AT EACH PERSON'S ANNIVERSARY BECAUSE WHAT WOULD THAT

24  MEAN, YOU ARE GRANTING PRACTICALLY EVERY DAY.  SO THE COMPANY

25  DECIDED TO DO WHAT WAS CALLED A FOCAL GRANT, AN ANNIVERSARY GRANT.

1    AND THIS WAS GOING TO GO TO ALL OR VIRTUALLY ALL OF THE EMPLOYEES

2    AT THE COMPANY.

3            NOW, I WANT TO SHOW YOU ANOTHER CHART BECAUSE IT SHOWS

4    SOMETHING THAT THE PROSECUTOR NEGLECTED TO IDENTIFY ABOUT THE

5    GRANTS IN THIS CASE.  THIS ISN'T JUST MAY 26 GRANT.  THIS IS ALL

6    THE GRANTS.  95 PERCENT OF THE GRANTS WENT TO THE EMPLOYEES OF

7    BROADCOM, 5 PERCENT WERE GRANTED TO THE EXECUTIVES.

8            THIS IS NOT A CASE ABOUT CORPORATE EXECUTIVES LYING,

9    LINING THEIR OWN POCKETS, LADIES AND GENTLEMEN.  DR. SAMUELI AND

10   DR. NICHOLAS HAD A COMPENSATION PHILOSOPHY.  AND IT WAS, TO HELP

11   BUILD THIS GREAT COMPANY THEY NEEDED THE BEST ENGINEERS IN THE

12   WORLD.  THEY ALSO NEEDED TO BE ABLE TO MOTIVATE THEM TO WORK HARD,

13   TO BUILD THE NEWEST, FASTEST MICROCHIPS, TO RUN THE BEST NEW

14   PRODUCTS WHICH WOULD CHANGE PEOPLE'S LIVES.

15           AND YOU MAY NOT HAVE HEARD OF BROADCOM'S PRODUCTS, BUT

16   THEY ARE IN THINGS THAT WE ALL USE.  FOR EXAMPLE, THE BLUE TOOTH

17   HEADSET IS POWERED BY A BROADCOM MICROCHIP.  THAT CHANGED THE WAY

18   WE LEAD OUR LIVES.  CABLE BOXES ARE POWERED BY BROADCOM

19   MICROCHIPS.

20           NOW, IN ORDER TO BUILD THESE THINGS, THEY NEEDED THE

21   BEST ENGINEERS AND THEY NEEDED TO OUTWORK AND OUTPERFORM THE

22   COMPETITION.  SO DR. NICHOLAS AND DR. SAMUELI MADE A DECISION VERY

23   EARLY ON THAT THEY WERE GOING TO GIVE UP A PIECE OF THEIR OWN

24   OWNERSHIP OF THE COMPANY -- REMEMBER, I MENTIONED THEY OWNED THE

25   COMPANY 50/50 -- AND THEY WERE GOING TO SHARE THAT WITH THE

Page 83

1    EMPLOYEES OF THE COMPANY TO GIVE THEM AN OWNERSHIP INTEREST.

2         THEY DECIDED THAT THE COMPANY WOULD HEAVILY RELY ON

3    STOCK OPTIONS.  THAT IT WOULD GIVE LOW CASH SALARIES TO CONSERVE

4    CASH FOR R & D.  AND IT WANTED TO ATTRACT ENTREPRENEURIAL

5    EMPLOYEES WHO WOULD WORK HARD TO BUILD THE NEXT GREAT PRODUCT.

6    BUT THERE WHERE IS OPPORTUNITY, THERE IS RISK.  AND LET ME SHOWS

7    WHAT THE RISK WAS THAT WAS FACED BY BROADCOM AND MANY OTHER

8    COMPANIES.

9         THAT'S A STOCK CHART OF BROADCOM STOCK, BUT YOU PROBABLY

10   WILL RECOGNIZE IT AS A STOCK CHART OF WHAT HAPPENED IN THE STOCK

11   MARKET THOSE YEARS.  BROADCOM WASN'T ANY DIFFERENT THAN THE OTHER

12   TECHNOLOGY COMPANIES.  IT WENT UP VERY QUICKLY IN THE PERIOD 1998

13   TO 2000 AND THERE WAS WHAT THEY CALLED THE TECHNICAL BUBBLE

14   BURSTING.  WE ALL WERE AFFECTED BY IT.  BROADCOM WAS AFFECTED BY

15   IT, TOO.

16        NOW, IN THE EARLY YEARS, WHEN THE STOCK PRICE IS GOING

17   UP, PARTICULARLY THIS YEAR, IT'S VERY EASY TO MOTIVATE THE

18   EMPLOYEES.  THEY HAVE A GRANT AT $100 A SHARE, WITHIN WEEKS THE

19   OPTIONS ARE AT $200 A SHARE, AND THEN $300, AND THEY'RE WORKING

20   HARDER AND HARDER, AND THAT'S EASY.  BUT WHEN THE STOCK STARTED

21   GOING DOWN, THERE IS A REAL PROBLEM TO MOTIVATE THE EMPLOYEES.

22   AND WHAT HAPPENED WAS, MANY EMPLOYEES WHO GOT OPTIONS UP HERE,

23   FOUND THEIR OPTIONS UNDER WATER BY DOWN THERE.

24        SO, THESE BROADCOM EMPLOYEES WERE SUFFERING.  AND I'M

25   GOING TO SHOW YOU JUST ONE E-MAIL AS AN EXAMPLE.

Page 84

1          AND THEN I THINK, YOUR HONOR, IT'S A CONVENIENT TIME TO

2    BREAK, IF THE COURT PLEASE.

3          THIS IS JUST AN EXAMPLE OF THE NUMEROUS E-MAILS THAT

4    NANCY TULLOS RECEIVED.  NANCY WAS THE DIRECTOR OF HUMAN RESOURCES.

5    THIS IS AN ENGINEER, AND IT'S MAY OF -- MARCH OF 2001.  HE IS

6    WRITING WITH A VERY SIMPLE QUESTION.  "PLEASE FIRE ME.  PLEASE LET

7    ME GO."

8          WHY?  "BECAUSE MY SECOND ISSUE IS UNDER WATER AND I

9    CAN'T MAKE MY CHILD SUPPORT OR MY MORTGAGE PAYMENT."

10         NOW, BROADCOM COULD HAVE PAID PEOPLE WITH CASH AND VERY

11   LITTLE STOCK OPTIONS, BUT THAT WAS AGAINST DR. NICHOLAS AND DR.

12   SAMUELI'S PHILOSOPHY.  THEY WANTED TO MOTIVATE THESE EMPLOYEES.

13   THEY WANTED TO MAKE THESE EMPLOYEES PART OF THE OWNERSHIP OF THE

14   COMPANY.

15         SO, HUMAN RESOURCES GOT REQUEST AFTER REQUEST, "DO

16   SOMETHING FOR ME OR ELSE I'M GOING TO LEAVE THE COMPANY AND GO TO

17   THE COMPETITORS."

18         NOW, A RELATED E-MAIL -- AND, YOUR HONOR, THIS WILL BE

19   TWO MINUTES -- A RELATED E-MAIL SHOWS A SLIGHTLY DIFFERENT

20   PROBLEM.  AND I'M GOING TO SHOW YOU AN E-MAIL FROM APRIL OF 2000.

21   THIS IS A FELLOW THAT -- AND I WANT TO READ THE WHOLE THING

22   BECAUSE IT REALLY TELLS A STORY -- "I JOINED BROADCOM ON

23   FEBRUARY 28.  BUT ON MY SIGNED OFFER LETTER I INDICATED JOIN DATE

24   MARCH 6.  CONSIDERING THE TIGHT PROJECT SCHEDULE, MY MANAGER, JOHN

25   LANELL, WANTED ME TO JOIN AS SOON AS POSSIBLE.  AFTER DISCUSSED

Page 85

1    WITH MY PREVIOUS EMPLOYER, THEY AGREED TO ALLOW ME TO USE MY

2    VACATION TO OFFSET ONE WEEK ADVANCE NOTICE SO I CAN JOIN ONE WEEK

3    EARLY TO HELP THE PROJECT" -- TO HELP BUILD THE CHIP -- "BUT THE

4    DISAPPOINTING THING IS JUST BECAUSE I JOINED ONE WEEK EARLY, MY

5    STOCK OPTION PRICE WAS FIXED AT $197.  IT SHOULD BE $122 IF I HAD

6    JOINED MARCH 6," WHICH WAS THE WEEK THAT HE WAS SUPPOSED TO JOIN.

7    "ACCORDING TO MY SIGNED OFFER LETTER, THE PEOPLE WHO JOINED

8    BROADCOM AFTER MARCH 1, WHICH IS TWO DAYS LATER THAN ME, GOT $122

9    OPTION.  THE DIFFERENCE IS $75.  WHAT A DISAPPOINTING REWARD OF

10   JOINING ONE WEEK EARLY.  THE DIFFERENCE IS $3.375 MILLION."

11          SO, THERE WAS A REAL PROBLEM, LADIES AND GENTLEMEN, AT

12   BROADCOM.  AND THE PROBLEM WAS YOU HAD AN ENGINEER SITTING HERE

13   WHO HAD $122 OPTION, AND AN ENGINEER SITTING RIGHT NEXT TO HIM WHO

14   HAD STARTED THE WEEK BEFORE AT $197 OPTION.

15          THIS IS NOT A CASE ABOUT GREEDY EXECUTIVES.  NOT AT ALL.

16   THIS IS A CASE ABOUT WHAT THE EXECUTIVES DID TO TRY TO HELP THE

17   EMPLOYEES AND TO TRY TO BE FAIR TO THE EMPLOYEES.

18          GOING TO ONE MORE E-MAIL AND THEN WE'RE GOING TO BREAK.

19          THIS IS JUST BEFORE THE MAY 26 GRANT, AND THIS IS WHAT

20   IS HAPPENING AT THE COMPANY.  THIS IS THE CONTEXT.  IT'S AGAIN

21   FROM AN ENGINEER TO NANCY TULLOS, COPIES DR. NICHOLAS ON THIS ONE,

22   TALKING ABOUT HIS STOCK OPTIONS.

23          "I AM WAY UNDER WATER.  MY PAY PACKAGE DEFINITELY GIVES

24   NEGATIVE IMPACT ON THE MOTIVATION OF MY CREATIVE WORK."

25          SO, IN MAY OF 2000, THIS WAS THE MILIEU; THIS WAS WHAT

1    WAS HAPPENING AT BROADCOM.  EMPLOYEES WERE DESPERATE.  THE

2    EXECUTIVES WERE VERY WORRIED THAT THESE EMPLOYEES WOULD LEAVE AND

3    GO TO THE COMPETITION.  AND EMPLOYEES KNEW THAT A BIG GRANT WAS ON

4    THE WAY.  THAT'S THE MAY 26 GRANT, AND I'LL PICK UP WITH THAT

5    AFTER LUNCH.

6             **THE COURT:**  VERY WELL.  LADIES AND GENTLEMEN, THIS IS

7    OUR FIRST BREAK DURING THE TRIAL AND I WANT TO REMIND YOU OF THE

8    INSTRUCTION I GAVE YOU EARLIER.  UNTIL THE TRIAL IS OVER, YOU ARE

9    NOT TO DISCUSS THE CASE WITH ANYONE, INCLUDING YOUR FELLOW JURORS,

10   MEMBERS OF YOUR FAMILY, PEOPLE INVOLVED IN THE TRIAL OR ANYONE

11   ELSE, NOR ARE YOU ALLOWED TO PERMIT OTHERS TO DISCUSS THE CASE

12   WITH YOU.

13             IF ANYONE APPROACHES YOU AND TRIES TO TALK TO YOU ABOUT

14   THE CASE, PLEASE LET ME KNOW ABOUT IT IMMEDIATELY.  DO NOT READ OR

15   LISTEN TO ANY NEWS REPORTS OF THE TRIAL.

16             FINALLY, YOU ARE REMINDED TO KEEP AN OPEN MIND UNTIL ALL

17   THE EVIDENCE HAS BEEN RECEIVED AND YOU HAVE HEARD THE ARGUMENTS OF

18   COUNSEL, THE INSTRUCTION OF THE COURT, AND THE VIEWS OF YOUR

19   FELLOW JURORS.

20             AGAIN, IF YOU NEED TO SPEAK WITH ME ABOUT ANYTHING,

21   LADIES AND GENTLEMEN, PLEASE GIVE ME A NOTE, AND I HOPE YOU HAVE A

22   VERY GOOD LUNCH.  IT IS A LITTLE BIT AFTER 12.  WHY DON'T WE GET

23   BACK HERE A LITTLE BIT AFTER ONE AND WE'LL PROCEED.  HAVE A NICE

24   LUNCH.

25                            (JURY OUT.)

Page 87

1              **THE COURT:**  MR. MARMARO, I SUGGEST WHY DON'T WE TABLE

2    THAT ISSUE UNTIL THE END OF THE DAY.

3              **MR. MARMARO:**  GREAT IDEA, YOUR HONOR.

4              **THE COURT:**  SO WE CAN ENJOY OUR LUNCH.

5                   (AT 12:00 A LUNCH RECESS WAS TAKEN)

6    (WHEREUPON THERE WAS A CHANGE IN REPORTERS AND DEBORAH PARKER

7    REPORTED THE 1:00 SESSION.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 88

1

2                                    -oOo-

3

4                                 CERTIFICATE

5

6            I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28,

7    UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT

8    OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

9    ABOVE-ENTITLED MATTER.

10

11   DATE:  OCTOBER 23, 2009

12

13

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

15

16

17

18

19

20

21

22

23

24

25